```
                                            Volume: 1 of 2
                                            Pages: 231
                                            Exhibits: 4

                      COMMONWEALTH OF MASSACHUSETTS
MIDDLESEX, SS                        LOWELL DISTRICT COURT
                                     CRIMINAL DIVISION

* * * * * * * * * * * * * * * *
                              *
COMMONWEALTH OF MASSACHUSETTS *
                              *
     Plaintiff,               *
                              *
v.                            * Docket No. 1911CR000365
                              *
LEON J. CAMPBELL,             *
                              *
     Defendant.               *
                              *
* * * * * * * * * * * * * * * *

                      TRANSCRIPT OF JURY TRIAL
               BEFORE HONORABLE JUDGE JOHN F. COFFEY

 APPEARANCES:

 For the Commonwealth:
 Tucker DeVoe, Esq.
 Middlesex County District Attorney's Office
 151 Warren Street
 Lowell, MA 01852

 For the Defendant:
 Pro Se

                              Lowell, Massachusetts
                              September 3, 2019

 TRANSCRIBED BY: Eileen Dhondt, CET-807

             Proceedings recorded by electronic sound
 recording, transcript produced by transcription service.



             AEQUUM LEGAL TRANSCRIPTION SERVICES
                      480-241-2841
```

INDEX
September 3, 2019

FOR THE COURT:                                          PAGE:

Commonwealth's Opening Statement                        63
Defendant's Opening Statement                           67
Defendant's Closing Argument                            213
Commonwealth's Closing Argument                         223

WITNESSES:
FOR THE COMMONWEALTH:

DAVID PENDER
        Direct Examination by Mr. DeVoe                 69
        Cross-examination by Mr. Bey                    86

KYLE GRIFFIN
        Direct Examination by Mr. DeVoe                 120
        Cross-examination by Mr. Bey                    128
        Redirect Examination by Mr. DeVoe              145

FOR THE DEFENDANT:

INDIA NASCIEMENTO
        Direct Examination by Mr. Bey                   148
        Cross-examination by Mr. DeVoe                  157
        Redirect Examination by Mr. Bey                158
        Re-cross-examination by Mr. DeVoe              159

AKIF BEY
        Direct Examination by Mr. Bey                   166
        Cross-examination by Mr. DeVoe                  178
        Redirect Examination by Mr. Bey                180

LEON CAMPBELL
        Direct Examination by Mr. Bey                   190
        Cross-examination by Mr. DeVoe                  209

```
EXHIBITS:                              MARKED:       ADMITTED:
FOR THE COMMONWEALTH:
Exhibit 1                              73            73
Exhibit 2                              83            83
Exhibit 3                              84            84
Exhibit 4                              84            84

FOR THE DEFENDANT:
(None)
```

4

|    |                                                           |
|----|-----------------------------------------------------------|
| 1  | PROCEEDINGS                                               |
| 2  | (Proceedings commence at 9:12 a.m.)                      |
| 3  | COURT CLERK:  Commonwealth v. Leon Campbell.             |
| 4  | MR. DEVOE:  Commonwealth.                                |
| 5  | MR. BEY:  Counsel.                                       |
| 6  | COURT CLERK:  Your Honor, there are five matters before the |
| 7  | Court today.  One matter is scheduled for a jury trial, one's on |
| 8  | for probable cause, one's for a disposition attention Judge |
| 9  | Crane, one matter on for payment, and the last matter is |
| 10 | scheduled for arraignment this morning.                  |
| 11 | THE COURT:  Okay.                                        |
| 12 | COURT CLERK:  If I may arraign the defendant?            |
| 13 | THE COURT:  Certainly.                                   |
| 14 | COURT CLERK:  Sir, you're before the Court on Docket 4458 |
| 15 | of 2019 --                                               |
| 16 | MR. BEY:  What -- what matter --                         |
| 17 | COURT CLERK:  -- charged with operating after your license |
| 18 | has been suspended, a subsequent offense, and a light violation |
| 19 | on June 20, 2019 in Lowell.                              |
| 20 | THE COURT:  All right.  Sir, I'm going to enter a plea of |
| 21 | not guilty on this new criminal --                       |
| 22 | MR. BEY:  Objection.  I don't need a plea of not guilty. |
| 23 | THE COURT:  Okay.                                        |
| 24 | MR. BEY:  I need a speedy trial.                         |
| 25 | THE COURT:  All right.  You're probably going to get one. |

1  Okay.

2      MR. BEY:  Yeah.

3      THE COURT:  All right.  Good morning, Attorney DeVoe.

4      MR. DEVOE:  Good morning, Your Honor.

5      THE COURT:  And what's the current status on the trial

6  matter and the probable cause?

7      MR. DEVOE:  Sure.  Certainly, Your Honor.

8      So on the trial matter, the 19-365 matter, the Commonwealth

9  is ready for trial with one to two witnesses.  One witness here

10  present in the courtroom.

11      And on the 19-1969 matter, on probable cause, the

12  Commonwealth is moving to dismiss that case.

13      THE COURT:  Okay.  So 1911CR1969 will be dismissed at the

14  request of the Commonwealth.

15      MR. DEVOE:  Thank you, Your Honor.

16      MR. BEY:  Which one is that?

17      THE COURT:  It's forgery.

18      COURT CLERK:  1969 of 2019.

19      THE COURT:  All right.  And, sir, are you ready for trial

20  on the trial matter?

21      MR. DEVOE:  I'm ready.

22      THE COURT:  Okay.  All right.  We're going to hold this.

23  We'll call this matter again.  All right?

24      MR. BEY:  But he -- he just misinformed you.  Where did

25  that come from?  They -- they -- they sent two documents to the

6

1   trust instrument.  They continued to send documents to the trust

2   instrument.  I continued to have a jury vindicate me for driving

3   without a license, but we're going to repeat the same thing

4   here.

5        One of the documents I managed to glimpse, right?  They

6   sent two of the same documents: one with the forgery, the other

7   one without the forgery.  Now he's here trying to dismiss

8   something that he already removed from --

9        THE COURT:  No, there were --

10       MR. BEY:  -- the contract?

11       THE COURT:  No, there was a case that was on the scheduled

12  for probable cause --

13       MR. BEY:  I don't have -- I don't see it.  I need to see

14  it.  I would like to see it.

15       THE COURT:  We'll give you a copy of it, sir.  Okay.

16       COURT CLERK:  We'll give you a copy.

17       THE COURT:  All right.  We'll call this matter again.

18       MR. BEY:  Okay.

19       THE COURT:  The trial matter.

20       COURT CLERK:  Matters are held.

21       (Court takes up other matters)

22       (Proceedings recommence at 9:21 a.m.)

23       COURT CLERK:  Commonwealth v. Leon Campbell.

24       MR. DEVOE:  Commonwealth.

25       MR. BEY:  Counsel.

1      COURT CLERK:  So, sir, as to Docket 291 of 2019, you need

2  to go to the third session courtroom for a sentence to be

3  imposed on that matter in front of Judge Crane.  And then you'll

4  have to come back here, sir, for your jury trial today.

5      MR. BEY:  Okay.

6      COURT CLERK:  Okay.

7      MR. BEY:  Will that --

8      COURT CLERK:  You can head to the third session courtroom

9  for disposition in front of Judge Crane.

10      MR. BEY:  Oh, do that and then --

11      THE COURT:  Then you're coming back.

12      MR. BEY:  -- come back here?

13      THE COURT:  Yeah.

14      COURT CLERK:  And then come back here.

15      THE COURT:  And, sir, if I can ask, how many witnesses do

16  you anticipate calling on that docket?

17      MR. BEY:  I have two more witnesses.

18      THE COURT:  Okay.

19      And, Commonwealth, are you going forward on all nine

20  counts?

21      MR. DEVOE:  We are not, Your Honor.  I'm going to file a

22  nolle pross on one count.

23      THE COURT:  Okay.

24      MR. DEVOE:  I can grab it now.  Count 4, we are nolle

25  prossing.

8

1        THE COURT:  Okay.

2        MR. DEVOE:  That's the false information ID count.

3        THE COURT:  Okay.  All right.  So you're going forward on

4   the Counts 1, 2, 3, 5, and 6.  Is that correct?

5        MR. DEVOE:  That's correct, Your Honor.

6        THE COURT:  Okay.  All right.

7        COURT CLERK:  So, sir, you can head to the --

8        MR. BEY:  1, 2, 3, 5, and 6?

9        THE COURT:  That's what the Commonwealth is going to go

10   forward.

11        MR. BEY:  So operating to endanger, a weapon law violation,

12   resisting arrest, motor vehicle charges, and use of force.

13   Those are the charges, because that's the order I have in here.

14        THE COURT:  Carrying a dangerous weapon is Count 1,

15   negligent operation of a motor vehicle is Count 2, unlicensed

16   operation of a motor vehicle is Count 3 --

17        MR. BEY:  Even though I --

18        THE COURT:  Oh, hold on.

19        Count 4 was the one that the Commonwealth just nolle

20   prossed.  Count 5 is resisting arrest.  Count 6 is failing to

21   stop for a police officer.  And then there's the three civil

22   motor vehicle infractions, sir.

23        MR. BEY:  And those are the counts he's moving forward?

24        THE COURT:  Yes.

25        MR. BEY:  So I head over to session three?

1          THE COURT:  Yup.

2          MR. BEY:  Get the verdict from Crane, and then be back

3     here?

4          THE COURT:  Yeah.  Judge Crane.

5          MR. BEY:  Judge Crane.

6          (Court takes up other matters)

7          (Proceedings recommence at 9:52 a.m.)

8          COURT CLERK:  Commonwealth v. Leon Campbell.

9          MR. BEY:  Counsel.

10         MR. DEVOE:  Commonwealth.

11         THE COURT:  Attorney DeVoe.

12         MR. BEY:  There are matters that are being made for

13    representation of the contractual name Campbell.

14         THE COURT:  Sir, how do you want to be addressed?

15         MR. BEY:  Jabir Bey is fine.  Or Mr. Bey.

16         THE COURT:  Mr. Bey?

17         MR. BEY:  Yeah.  That's fine.

18         THE COURT:  All right.

19         All right.  And, Attorney DeVoe, is there any preliminary

20    matters?

21         MR. DEVOE:  I'm sorry, Your Honor, I didn't --

22         THE COURT:  Are there any preliminary motions?

23         MR. DEVOE:  There are, yes.  There are a few.

24         THE COURT:  Have you given them to Mr. Bey?

25         MR. DEVOE:  I haven't.  I haven't had a chance to copy --

1    THE COURT:  All right.  Why don't we do this?  Why don't
2  you give him a copy.

3    MR. DEVOE:  Yes.

4    THE COURT:  And, Mr. Bey, we're just going to hold this.
5  There is a custody matter that we have to see where it's at, and
6  we'll call this matter again.  But you should -- Commonwealth
7  has a couple of motions before we address them you have to look
8  at.  Okay, sir?

9    MR. BEY:  Okay.

10    MR. DEVOE:  Thank you.

11    COURT CLERK:  Matter is held for further call.

12    (Court takes up other matters)

13    (Proceedings recommence at 10:36 a.m.)

14    COURT CLERK:  Commonwealth v. Leon Campbell.

15    MR. DEVOE:  Commonwealth.  Good morning again, Your Honor.

16    THE COURT:  Good morning.

17    DEPUTY CLERK:  Sit at the table, sir.

18    (Pause)

19    THE COURT:  All right.  And, sir, did you have an
20  opportunity to look over the motions the Commonwealth provided
21  you?

22    MR. BEY:  I did.

23    THE COURT:  Okay.  So what I'll do, sir, I'm going to hear
24  from the Commonwealth, and then I'll look to you to hear your
25  response.  All right?

1      MR. DEVOE:  Thank you, Your Honor.  I'm submitting it now.

2      One of those, Your Honor, was just Commonwealth's witness

3  list.

4      THE COURT:  Okay.

5      MR. DEVOE:  But there are four motions in --

6      THE COURT:  Okay.

7      MR. DEVOE:  Or three motions in lim and a proposed jury

8  instruction.  I'm happy to start in whatever order the Court

9  wants.

10      THE COURT:  All right.  So we'll save the proposed jury

11  instruction for the end of the evidence, and then -- so why

12  don't we start with your title, Commonwealth's motion in limine

13  to admit certified records of the Registry of Motor Vehicles?

14      MR. DEVOE:  Certainly.

15      So this motion, Your Honor, concerns the defendant's

16  certified license image and registration -- license image and

17  demographic information.

18      THE COURT:  Yeah.

19      MR. DEVOE:  They are a business record and non-testimonial

20  in nature.  The relevance here is to just help identify the

21  defendant.

22      MR. BEY:  Objection.  Because the RMV has the same record,

23  the same -- my free national name --

24      THE COURT:  Yeah.

25      MR. BEY:  -- on their records file.  So if you're going to

12

1   pull that, you should pull that, too, and enter that, too.  It

2   can't -- you can't pick one and not the other.  See what that --

3   it don't make sense.

4        THE COURT:  So this was obtained and printed May 30th,

5   2019.  So you have another license on file?

6        MR. BEY:  Yeah.  I went there myself.  They wanted me to

7   pay Federal Reserve notes to obtain a copy of it, which I will

8   go do after this case, but they have it on their file.  And so

9   I'm sure if you got these from the RMV, he definitely jumped

10  over the Leonitus Jabir Bey, my free national name, and just --

11       THE COURT:  Okay.

12       MR. BEY:  -- buys with it --

13       THE COURT:  And the reason I talked about the date, sir, is

14  that the date of this offense is January of 2019.  It predates

15  the print of this one.  But if you want to offer something else

16  to rebut that, you're free to do that, but I'm going to allow

17  this motion at this time.

18       MR. BEY:  It predates the -- what did you say?

19       THE COURT:  Yeah.  The date of the offense for which we're

20  going to try you is January of 2019, and these records were

21  printed on May 30th of 2019, so it's after -- the offense

22  predates these records.

23       MR. BEY:  What does that mean?

24       THE COURT:  That I'm going to allow the Commonwealth's

25  motion to admit these.

1     MR. BEY:  Because the -- the documents predate the --

2     THE COURT:  Offense date.

3     All right.  So we're moving on to --

4     COURT CLERK:  Counsel.

5     DEPUTY CLERK:  Counsel.

6     MR. BEY:  Can I -- can I --

7     THE COURT:  Now just -- hold on, sir.  This is a courtroom,

8 okay?  It's not an open forum.  It's a public forum, but if

9 anybody chooses to shout out or disrupt the proceedings, first,

10 you're going to be asked to leave.  All right?

11     MR. BEY:  May I speak to my counsel for a sec?  Because I

12 don't understand what you mean by predate and you're not --

13     THE COURT:  No.

14     MR. BEY:  -- give them any information.

15     THE COURT:  Sir, you're representing yourself, so --

16     MR. BEY:  I am.

17     THE COURT:  Okay.

18     MR. BEY:  But the Constitution --

19     THE COURT:  Well you're going to have time afterwards, sir,

20 because we're going to just address these motions, and then

21 we're going to wait for the jury.

22     So, Commonwealth, your motion in limine --

23     MR. BEY:  But I don't understand why you're admitting it.

24 I have no clarity as to why you're doing what you're doing.

25     THE COURT:  All right.  Because it's a business record

14

1  under the Massachusetts rules of evidence.

2       MR. BEY:  It's a business record?

3       THE COURT:  It's a business record.  It's self-

4  authenticated.  It has come in, and it's a true copy, and it's

5  been attested by the Registrar.  So it does come in under the

6  business record exception, the hearsay rule.

7       MR. BEY:  Right.

8       THE COURT:  Okay.

9       MR. BEY:  So why not -- why doesn't he have Leonitus Jabir

10 Bey in this record?

11      THE COURT:  That's

12      MR. BEY:  He can pick and choose.

13      THE COURT:  He has decided to put this one in.

14      MR. BEY:  To put Leon and not --

15      THE COURT:  Yeah.

16      MR. BEY:  -- and he's just -- okay.  That's all I wanted is

17 to be advised.

18      THE COURT:  Okay.

19      MR. BEY:  That's just -- let's be honest.

20      THE COURT:  Okay.

21      MR. BEY:  All right.

22      THE COURT:  And then the next one is the motion in limine

23 to admit documents as a business record.

24      MR. DEVOE:  Right.

25      MR. BEY:  Is it -- is it on the record, though, as well?

1        THE COURT:  Pardon me?

2        MR. BEY:  Is it on the record?

3        THE COURT:  Is what on the record?

4        MR. BEY:  What -- everything that's proceeding here.

5        THE COURT:  Yeah.  As long as -- see that red, the clock in

6   front of you?

7        MR. BEY:  Yup.

8        THE COURT:  As long as that's ticking down the time --

9        MR. BEY:  The record.

10        THE COURT:  -- this is being recorded.

11        MR. BEY:  Okay.

12        THE COURT:  Okay.

13        MR. DEVOE:  Logistically, Your Honor, would you like to

14   mark them now as exhibits?  Or should we wait?

15        THE COURT:  We'll wait.

16        MR. DEVOE:  Okay.

17        THE COURT:  Okay.

18        MR. DEVOE:  So the second motion, Your Honor, concerns his

19   certified driving history.  It's an excerpt of that driving

20   history, and I've redacted, and shown redactions to Mr. Bey, any

21   information about the substance of the offenses.  The key pieces

22   here are his identity, his address, and the -- and the fact of

23   suspension, which is contained within these records.  There are

24   also business records and non-testimonial.  The records of

25   mailing and the records of the offenses were made prior to

1  trial.  They're kept in the ordinary course by the Registrar.

2       THE COURT:  Okay.

3       (Pause)

4       THE COURT:  Sir?

5       MR. DEVOE:  Yeah, I'm going to object to that, as well.

6       THE COURT:  Okay.

7       MR. DEVOE:  It's relevancy.  He's just he's -- Leon

8  Campbell is not -- you guys -- you guys want to try Leon

9  Campbell.  He's an entity of astronomy.  It's an astronomer

10  name.

11       THE COURT:  Okay.

12       MR. DEVOE:  The real flesh and blood human is not Leon

13  Campbell, so I don't understand.  How does that play a part in

14  this?

15       THE COURT:  All right.  So -- well this will go in.  I'll

16  allow it because it is -- again, it's a business record.  And

17  it's relevant because one of the charges that's against Leon

18  Campbell is unlicensed operation of a motor vehicle, so this

19  seems to be relevant on that particular charge.

20       So I'll note your objection for the record, but I am going

21  to allow the motion.

22       MR. DEVOE:  And the final motion, Your Honor, is a Crayton

23  motion to allow and in-court identification by the arresting

24  officers.

25       THE COURT:  Okay.

17

1       And, sir, do you want to be heard on that motion?

2       MR. BEY:  Objection.

3       THE COURT:  Okay.  Okay.  I'll note your objection, sir,

4  and I'll allow that.

5       MR. BEY:  But you're going to enter them anyway on behalf

6  of them.

7       THE COURT:  Pardon me?

8       MR. BEY:  You're going to enter them all anyway, right?

9       THE COURT:  Well I'm going to allow this last motion

10  because it's what's called a Crayton motion for identification

11  and all the --

12       MR. BEY:  And, My Honor, let me, just for some clarity

13  purposes, the judge is not to be acting favorable to any parties

14  in this trial, right?

15       THE COURT:  Sir --

16       MR. BEY:  The judge has to be neutral.

17       THE COURT:  I am neutral, but --

18       MR. BEY:  I'm just making sure.  I want clarity for the

19  record stating --

20       THE COURT:  All right.

21       MR. BEY:  I'm just making sure.

22       THE COURT:  All right.

23       MR. DEVOE:  That's it for our motions in limine, Your

24  Honor.

25       THE COURT:  Okay.

1      All right.  Do you have anything?

2      MR. BEY:  I do.

3      THE COURT:  Okay.

4      MR. BEY:  First, I would like to -- for the record, I want

5  to know, like, will my constitutional rights be protected?  Is

6  this a constitutional court?

7      THE COURT:  Yeah.  So -- so you --

8      MR. BEY:  Article 3 constitutional?

9      THE COURT:  Pardon me?

10      MR. BEY:  Article 3 constitutional?

11      THE COURT:  No, it's not an Article 3 court, sir.  An

12  Article 3 court is a federal court under the United States

13  Constitutional Article 3.  That relates to federal courts.  This

14  is a state court.  So it is constituted under the laws of the

15  Commonwealth of Massachusetts, not the --

16      MR. BEY:  According to Judge Crane --

17      THE COURT:  -- federal --

18      MR. BEY:  -- this is an Article 3 court.

19      THE COURT:  Okay.

20      MR. BEY:  That's neither here nor there.

21      THE COURT:  Okay.

22      MR. BEY:  I'm going to enter this.  Should I approach and

23  bring it up, or what?

24      THE COURT:  Why don't you give it to the court officer.

25      And what are the exhibit --

1      MR. BEY:  This is a notarized letter from one of my

2  witnesses who can't be here.

3      THE COURT:  Okay.  Why don't you just go --

4      MR. DEVOE:  I have not seen that, Your Honor.

5      MR. BEY:  I thought you had seen it, sir.

6      MR. DEVOE:  Thank you.

7      THE COURT:  So this is a letter from one of your witnesses?

8      MR. BEY:  Yep.

9      THE COURT:  Okay.  Let me just read it.

10     (Pause)

11     THE COURT:  All right.  So it doesn't appear that it was

12  signed by a notary.

13     MR. BEY:  No.  The -- it had a thumbprint on the side.

14     THE COURT:  Okay.

15     MR. BEY:  That's --

16     THE COURT:  All right.  So, sir, this would constitute

17  hearsay.  Is this someone that you were intending --

18     MR. BEY:  She was there.

19     THE COURT:  Oh, no, I'm not saying -- but I can't let her

20  out-of-court statement come in without being subject to

21  cross-examination.  So is this -- is this someone that you're

22  able to get in to court?

23     MR. BEY:  I can try.

24     THE COURT:  All right.  Well does she live in the area?

25     MR. BEY:  Yeah.

1      THE COURT:  Okay.

2      MR. BEY:  My mother-in-law.

3      THE COURT:  Pardon me?

4      MR. BEY:  She's my mother-in-law.

5      THE COURT:  Okay.  Then she -- and is there some particular

6  reason she can't be here today?

7      MR. BEY:  She's at -- she has work.

8      THE COURT:  Okay.

9      MR. BEY:  She works for the electrical company.

10     THE COURT:  Okay.

11     MR. BEY:  EDI.

12     THE COURT:  Could she be here later on in the day?

13     MR. BEY:  I'm not sure.  I would have to contact her.

14     THE COURT:  All right.

15     MR. BEY:  I can try.

16     THE COURT:  All right.  So I can't let this in as evidence,

17  but we'll address whether her presence --

18     MR. BEY:  I'm confused, though.

19     THE COURT:  Okay.

20     MR. BEY:  That's -- that's part of -- it's business

21  acceptance, like you said, just like --

22     THE COURT:  No.

23     MR. BEY:  -- the RMV stuff.

24     THE COURT:  No, it's --

25     MR. BEY:  How is it not?

1        THE COURT:  Because this was -- this was -- this was --

2        MR. BEY:  It's a witness's testimony to what she was --

3   what she witnessed.  She was there.

4        THE COURT:  Well, okay.

5        MR. BEY:  But it's hearsay?

6        THE COURT:  This is hearsay.  That doesn't come within the

7   exception, sir.

8        So what else do you have?

9        MR. BEY:  I have a ticket from one of your -- from one of

10  the policy enforcers that I want to put in as evidence.

11       THE COURT:  I take it, related to this offense?

12       MR. BEY:  Related -- it's related to him -- his competency

13  and him being a policy enforcer.  It's related to competence.

14       MR. DEVOE:  Your Honor, if I may?  I have seen this.  It's

15  not related to this offense.  It's related to a citation that

16  Mr. Bey received on February 26th.  That's the case that was

17  dismissed earlier today.

18       THE COURT:  Okay.

19       MR. DEVOE:  It relates to that offense.  Today's case

20  involves events on January 23rd, 2019.

21       THE COURT:  Right.

22       All right.  Sir, I'm not going to put it in unless you

23  establish relevance through that -- is that officer going to

24  testify?

25       MR. BEY:  So --

1    MR. DEVOE:  That officer is going to testify.

2    THE COURT:  All right.  And you can question that officer

3 about that.

4    MR. BEY:  So his predated documents are all accepted even

5 though they are not relevant to the case?

6    THE COURT:  Well, sir, I didn't -- I didn't say that you

7 couldn't.  I said depending upon your cross-examination of that

8 officer, that might be admissible.  Okay.  I'm not going to just

9 make a ruling on it at this point.

10    MR. BEY:  But I'm going to object on the grounds that his

11 -- his documents share the same gravity as my documents.

12    THE COURT:  And I've noted your objection.

13    MR. BEY:  And his are accepted, and mine's not.

14    THE COURT:  But I noted your objection, sir.  Okay.  So

15 your objection's on the record.  I didn't say you couldn't; I

16 just said at this point that might be relevant, but it's subject

17 to what you're going to bring out on cross-examination.  Okay.

18    MR. BEY:  Okay.

19    THE COURT:  All right.

20    MR. BEY:  And my last piece of evidence is the summons I

21 have for the officer in question from District Court.

22    THE COURT:  The summons?

23    MR. BEY:  Yeah, it's a summons.

24    MR. DEVOE:  Your Honor, I saw this document as well.  It

25 appears to be a summons for the federal court in Boston to

1   Officer Pender, who's one of the officers testifying today.  I

2   don't know --

3        THE COURT:  All right.

4        MR. DEVOE:  -- about the authenticity, but that's what the

5   document appears to be.

6        (Pause)

7        THE COURT:  Oh, so this is a summons in a civil action

8   that's pending in the United States District Court in Boston?

9        MR. BEY:  Right.

10       THE COURT:  Okay.

11       MR. BEY:  Well it's not pending anymore.  It's moving

12  forward.

13       THE COURT:  No, well, that's -- that's the same.

14       MR. BEY:  Correct.

15       THE COURT:  Okay.  And you want to offer this here?

16       MR. BEY:  It's relevant.  It's dealing with the physical

17  violence.  They -- they -- they've -- they shared information

18  with me about his record of physical violence, and it's very

19  relative to this case, and I want it to be -- I want to put it

20  in as evidence.

21       THE COURT:  Just this?  Just this piece of paper?

22       MR. BEY:  No.  I have a whole entire case.

23       MR. DEVOE:  That, I have not seen, Your Honor.

24       THE COURT:  Okay.  You got to show -- you got to show it.

25       (Pause)

1       THE COURT:  And while the Commonwealth is looking at those,

2  what's the relevance of the documents you're showing him to the

3  case that we are about to try?

4       MR. BEY:  Well the relevance is the violent nature of the

5  officer in question.

6       THE COURT:  And you want to put that in to show what?

7       MR. BEY:  To show that all of what these -- all these

8  charges are fabricated, and he was emotionally compromised.

9  That's why he did what he did.  And that shows that this guy has

10  an emotional problem.

11       MR. DEVOE:  So, Your Honor, from my very brief review of

12  the documents, it appears to be a complaint filed by Mr. Bey

13  against Officer Pender concerning some of the events on the date

14  of this offense that Mr. Bey is charged with.

15       THE COURT:  And it's the first of -- well --

16       MR. DEVOE:  The first one is --

17       THE COURT:  The first one is July 1st.  Judge Saris

18  dismissed the complaint for the claims against Officer Pender.

19  Is that correct?

20       MR. BEY:  Nope.  He dismissed every -- he dismissed all

21  claims against everyone except Mr. Pender.

22       THE COURT:  Oh, okay.  All right.  Then it's up to -- okay.

23  All right.  And --

24       MR. DEVOE:  So it appears to be a complaint with certain

25  evidence attached to it, including the police report from this

25

1  case.  If Mr. Bey wishes to testify under oath about any of

2  these events, he's certainly at liberty to do so here.  I don't

3  think it's proper to introduce his complaint as evidence.

4      THE COURT:  All right.

5      And, Mr. Bey, you wanted to put in -- I can't let you put

6  in the actual complaint because those are allegations.

7      MR. BEY:  Right.

8      THE COURT:  But you can testify.  I'm not going to prevent,

9  you know --

10     MR. BEY:  Okay.

11     THE COURT:  Okay.  But -- sir, you can certainly testify,

12  all right?

13     (Pause)

14     THE COURT:  But I just can't have this whole thing go in as

15  an exhibit.  Okay.

16     All right.  Is there anything else?

17     MR. BEY:  No.

18     THE COURT:  Okay.  So we're going to -- I just have to take

19  a plea, and then we'll proceed with empanelment.

20     Okay.  So before we break, though, Mr. Bey, if you need

21  this individual, the recipient witness, and she's unavailable

22  today, let me know now, because if we stop and she doesn't show

23  up and we're finished, then you might not be able to call her.

24  So tell me, is this something you -- you can rectify as far as

25  her availability?

1     MR. BEY:  I'd have to talk to her.

2     THE COURT:  All right.

3     MR. BEY:  I couldn't make a decision on that.

4     THE COURT:  All right.  How much time do you think you need

5  to get ahold of her and speak to her?

6     MR. BEY:  At least 15 minutes.

7     THE COURT:  All right.  No, that's good.  We're going to

8  take a break, sir.  If you can get ahold of her and then come

9  back to me and let me know about your witness situation.  Okay.

10    MR. BEY:  Okay.

11    COURT CLERK:  Matter's held for further call.

12    MR. BEY:  Is the actual summons document in here?  The

13  actual --

14    THE COURT:  Oh, no, no.  Here.

15    MR. BEY:  Thank you.  Further call?

16    THE COURT:  Yeah, we'll call it again.  I have to address

17  another issue --

18    MR. BEY:  Can I go out --

19    THE COURT:  -- so while you -- you can make a phone call,

20  okay, sir?

21    MR. BEY:  Okay.

22    (Court takes up other matters)

23    (Proceedings recommence at 11:14 a.m.)

24    COURT CLERK:  We're on the record.  Commonwealth v. Leon

25  Campbell.

1        MR. BEY:   Counsel.

2        MR. DEVOE:   Commonwealth.

3        THE COURT:   Okay.  And, sir, were you able to get ahold of

4   Ms. --

5        MR. BEY:  I was.

6        THE COURT:   Okay.

7        MR. BEY:  And she -- so she's willing to come in, but it's

8   -- the scheduling in this phase, so if we could get -- but

9   before that --

10        THE COURT:  Well okay.  Hold on.

11        MR. BEY:  -- I kind of want to argue --

12        THE COURT:  Let's deal with that.  What did she say?

13        And here's why I'm asking you, okay?  If she's a percipient

14   witness for you, what I mean by -- if she's going to testify as

15   to what she saw, heard, relating to this offense for which

16   you're being tried, I would like her to be here for your

17   defense, because you talked about -- I'm going to be -- I have

18   to be fair.  I have to be fair to the Commonwealth, and I also

19   have to be fair to you.  So if she can come in on a date where

20   you're sure she can come in on, I'll put this over for that day

21   just so that you're not deprived of a defense.

22        MR. BEY:  Well I didn't ask you for a specific date.

23        THE COURT:  Well you can ask her again.

24        MR. BEY:  I just asked for --

25        THE COURT:  But let me just -- so let's -- so what you --

1  so that's why I'm -- that's why I asked you.

2       MR. BEY:  All right.  But it says here in the Black's Law

3  Dictionary, hearsay, a statement other than one made by the --

4  the --

5       THE COURT:  Declarant.

6       MR. BEY:  -- while testifying at the trial or hearing of --

7  hearing offered in evidence to prove the truth of the matter

8  asserted.

9       THE COURT:  Yes.

10      MR. BEY:  So hearsay evidence is evidence of a statement

11 that is made other than by a witness while testifying at the

12 hearing that is offered to prove the truth of the matter stated,

13 Kalieve (phonetic), that's Kalieve evidence, quote, right

14 hearsay evidence is testimony in court of a statement made out

15 of the court.  A statement being offered an assertion -- as an

16 assertion to show the truth of the matter asserted therein and

17 thus resting for its value upon the credibility of the out

18 course asserted.

19      THE COURT:  Yeah.

20      MR. BEY:  And that's Busy v. State (phonetic).

21      THE COURT:  Yeah.

22      MR. BEY:  So you're saying it's hearsay.  This thing is

23 saying as long as it's signed and it's not something that she

24 overheard, it's her actual visual testimony --

25      THE COURT:  Right.

1      MR. BEY:  -- it's not hearsay.

2      THE COURT:  But this doesn't -- no, this is hearsay because

3  what you're trying to do is put in Ms. McCue's (phonetic) that

4  she observed an officer trying to pull Mr. Bey from his truck,

5  with a passenger filming.  And so she's trying to prove certain

6  facts with her statement, and I can't let this in because it's

7  not subject to cross-examination, and it doesn't come in under

8  any of the hearsay exceptions.

9      So with that being said, what did Ms. McCue say as far as

10  when she could come in?

11      MR. BEY:  It would -- she -- she can't take a whole day off

12  of work because she's the only one there.  Their scheduling is

13  crazy right now, so it would have to be somewhere where we could

14  get her in to testify early in the case and then have it so she

15  can make it to work.

16      THE COURT:  Well I know that -- I don't anticipate -- how

17  many for the Commonwealth?

18      MR. DEVOE:  We have two witnesses, Your Honor.

19      THE COURT:  Two witnesses.  And just off the top of your

20  head, how long would it take?  Just because --

21      MR. DEVOE:  An hour and a half.

22      THE COURT:  Okay.

23      MR. DEVOE:  With both direct and cross.

24      THE COURT:  So the morning, right?

25      MR. DEVOE:  Yeah.  Yeah.

1       THE COURT:  Okay.  So could she get --

2       MR. DEVOE:  But, Your Honor -- I mean, Your Honor, I would

3  object to a continuance in this case.

4       THE COURT:  No, I understand.

5       So can she be here this afternoon?

6       MR. BEY:  No, she cannot.  We'll continue as is.

7       THE COURT:  Pardon me?

8       MR. BEY:  She cannot be here this afternoon.

9       THE COURT:  Okay.  And you're requesting a continuance to

10  get her appearance in?

11      (Pause)

12      THE COURT:  Sir?

13      MR. BEY:  Yeah, we'll just go ahead.

14      THE COURT:  Okay.  All right.

15      All right.  Mr. Campbell, you understand we're going to put

16  on a panel of seven.  You have the right to challenge two

17  without assigning any cause thereto.

18      MR. BEY:  Except, you keep calling me Mr. Campbell.

19      THE COURT:  I'm sorry, sir.  Mr. Bey.

20      MR. BEY:  I mean, I know everyone -- I don't know how

21  serious this is, but I -- the Mr. Campbell is a third-party

22  straw man that you're going to refer to me whenever you don't

23  remember to call me my free national name.  How does that work

24  when it comes to proper procedures in the courtroom?  How does

25  that --

1        THE COURT:  Well, sir, right now I have somebody in front

2   of me that, you know, is by Mr. Jabber -- excuse me, Jabey --

3   Jabir Bey, correct?

4        MR. BEY:  Jabir Bey.  Yeah.

5        THE COURT:  All right.  And I understand you're talking

6   about a straw man, but right now I think the straw man and Mr.

7   Bey are standing right in front of me, correct?

8        MR. BEY:  That's -- that would be your opinion of it.

9        THE COURT:  All right.  So that's all I have to go by,

10  then.

11       MR. BEY:  Yeah.  When it comes to flesh and blood --

12       THE COURT:  Yeah.  Okay.

13       MR. BEY:  -- Mr. Jabir Bey is standing in front of you.

14       THE COURT:  Okay.

15       MR. BEY:  But when it comes to paperwork and contractual

16  agreement --

17       THE COURT:  Yeah.

18       MR. BEY:  -- it's a different story.

19       THE COURT:  Okay.

20       MR. BEY:  And it has to be done properly, don't you think?

21       THE COURT:  All right.  So I'm going to --

22       MR. BEY:  Just like the courtroom procedures.

23       THE COURT:  I'm going to refer to as -- so we'll introduce

24  you as Leon Campbell, also known as Leonitus Jabir.

25       MR. BEY:  I'm going to object to that because the a.k.a.

1  affiliates me with the straw man as the same and as one.  I'm

2  the representative.  I own that straw man name --

3      THE COURT:  Okay.  And so --

4      MR. BEY:  -- according to the house attorney resolutions.

5      THE COURT:  And you to make that argument -- okay.  You can

6  make that argument to them.

7      MR. BEY:  But, My Honor, you're the only one I can argue

8  this with.  Everyone else here is not -- you're -- you're -- you

9  -- according to the books, you're the one I have to bring this

10 up with.

11     THE COURT:  Okay.  And what --

12     MR. BEY:  I'm seeking through --

13     THE COURT:  I've just ruled.  So we're going to -- this is

14 the -- this is the trial of the Commonwealth v. Leon Campbell,

15 also known as Leonitus Jabir Bey.

16     MR. BEY:  But then that affects what you said about being,

17 like, neutral in it, because you seem is if you're on the

18 Commonwealth's side.

19     THE COURT:  No, but -- no, but this is how the complaint is

20 issued, sir.  So that's not an element of the offense, that's

21 just how the complaint issued.

22     MR. BEY:  Oh, okay.

23     THE COURT:  Okay.

24     COURT CLERK:  So, Your Honor, just for clarification, when

25 I'm introducing this individual, I'm going to introduce him as

1  Leon Campbell, also known as Leonitus -- is it Jabir, sir?

2       MR. BEY:  Jabir.

3       COURT CLERK:  Jabir Bey.

4       THE COURT:  Okay.

5       And, sir, you understand you have two peremptory

6  challenges, correct?

7       MR. BEY:  Say it again?

8       THE COURT:  You have two peremptory challenges.  We're

9  going to empanel seven, and you have a right to challenge any

10  two without having to assign any reason.  Okay?

11       MR. BEY:  Okay.

12       THE COURT:  And then are we ready for --

13       MR. BEY:  So I won't be able to use this at all?

14       THE COURT:  No.

15       MR. BEY:  So then I would like a continuance to see if I

16  can get her in here.

17       THE COURT:  All right.  Okay.

18       MR. BEY:  I thought I would be -- still be able to use

19  it --

20       THE COURT:  No.  No.

21       MR. BEY:  -- when I was doing my statements for the jury

22  and not --

23       THE COURT:  All right.  How long will it take you to get

24  her on the phone?  I know you have to go outside, but --

25       MR. BEY:  Two minutes.

34

1        THE COURT:  All right.

2        MR. BEY:  She can't make it today, though.

3        THE COURT:  All right.  What -- find --

4        MR. BEY:  Find out a good day from her?

5        THE COURT:  Yeah.  Yeah.

6        MR. DEVOE:  Your Honor, may I be heard --

7        THE COURT:  Yeah.

8        MR. DEVOE:  -- before we break?

9        THE COURT:  Yeah.  Yeah.

10       MR. DEVOE:  So this is the fourth scheduled jury trial in

11  this case.  The Commonwealth has been ready on each of the prior

12  dates --

13       MR. BEY:  Objection.

14       THE COURT:  Shh.

15       MR. DEVOE:  -- including the 18th of June, the 11th of

16  July, the 8th of July, the 20th of August, and now today.  I'm

17  not exactly sure when Lauren McCue first became known to the

18  Commonwealth, but it was as at least as early as those July

19  dates.  I also understand that Mr. Campbell intends to call two

20  other percipient witnesses, who I believe would share similar

21  testimony --

22       THE COURT:  Okay.

23       MR. DEVOE:  -- with Ms. McCue.  Given that this case has

24  had many dates, and this witness has been at least on the

25  defendant's mind at that time --

1      THE COURT:  Okay.  Let me ask -- so do you have other

2 witnesses who would testify to the same facts as Ms. McCue?

3      MR. DEVOE:  Yeah.

4      THE COURT:  Okay.  All right.  So based on that, I'm going

5 to deny your motion to continue.

6      MR. BEY:  That's fine.  But --

7      COURT CLERK:  Your Honor, he's not provided the witnesses,

8 either.  So I need to be able to introduce --

9      THE COURT:  Oh, yeah.  Can you write the witnesses on --

10      MR. BEY:  I gave them a list of names.  And for the record,

11 so the record can reflect all times when the case has been

12 rescheduled --

13      THE COURT:  Yeah.

14      MR. BEY:  -- the Commonwealth was not ready.  I've been

15 ready on all other accounts, and the Commonwealth has not been

16 ready on any of the other counts.

17      THE COURT:  Okay.

18      (Pause)

19      COURT CLERK:  Just, I'm being handed a piece of -- I just

20 want to make sure I'm noting correctly.  The two witness names

21 are India Nasciemento and Akif Bey.  Is that correct?

22      MR. BEY:  Correct.

23      COURT CLERK:  And those are your two witnesses you intend

24 on calling, sir?

25      MR. BEY:  Correct.

1        COURT CLERK:  Thank you.  What city or town are each of

2    them from?

3        MR. BEY:  Well their domicile is here in Massachusetts, in

4    Lowell.

5        COURT CLERK:  Lowell.  Thank you.

6        MR. BEY:  So even though the Black's Law Dictionary, which

7    speaks legalese, does all of your -- your own policies says that

8    the signature and the thumbprint is not hearsay, and you're

9    still going to classify it as hearsay?

10       THE COURT:  Yes.

11       MR. BEY:  Against --

12       THE COURT:  And I'll -- and I'll --

13       MR. BEY:  Against your own policies?

14       THE COURT:  Yeah.  And I'll note your objection to that,

15   okay?

16       MR. BEY:  No, but I want -- I want to note that you're

17   going against your own policies.

18       THE COURT:  I just said -- I just said I'm ruling against

19   you.  I'll note your objection for the --

20       MR. BEY:  Well it's not me.  It's your own policy ruling

21   against it.

22       THE COURT:  I don't think so, sir.

23       MR. BEY:  I just want to know for the record --

24       THE COURT:  But your objection is on the record.

25       MR. BEY:  Okay.  That you're going against your own policy.

1       THE COURT:  Whatever objection you made.

2       MR. BEY:  All right.

3       THE COURT:  Okay.  That's all ready.

4       Are we ready to bring the jurors in?

5       MR. DEVOE:  I'm ready, Your Honor.

6       THE COURT:  All right.

7       And is anybody requesting a sequestration order?

8       MR. DEVOE:  I would request a sequestration order.

9       THE COURT:  All right.  All right.

10      MR. DEVOE:  And I would ask that Your Honor makes it fairly

11  explicit what can and can't be talked about.

12      THE COURT:  Okay.  All right.

13      So would all those who are going to testify -- I'm not

14  asking you to leave just yet.  Anybody who is going to give

15  testimony in this trial, could you just stand?

16      (Pause)

17      THE COURT:  All right.  All right.  During the empanelment

18  process you can stay in the courtroom.  However once we begin

19  with the trial, you're going to be asked to leave and not come

20  in until your name is called.  You cannot discuss your testimony

21  with each other.  After you've testified, you cannot then

22  discuss with the other witness what you testified to, otherwise

23  you'd be in violation of the sequestration order which could

24  result in you not being allowed to testify.

25      So with that being said, you all take a seat, and we will

1  continue with the process.

2      MR. BEY:  Is it only up to the Commonwealth?

3      THE COURT:  For what?

4      MR. BEY:  To be ready to proceed with the jury, or do I

5  have to be ready, as well?

6      THE COURT:  Are you -- are you ready to proceed?

7      MR. BEY:  No, because none of these are of my own peers.

8      THE COURT:  All right.  So, sir, as far as that objection

9  goes, the jury commissioner sends us a pool every morning, and

10  they do their best to get a cross-reference of the community.

11  This is the pool we have today.  This is the pool we have to

12  draw from.  So I'll note your objection that you're objecting to

13  this particular pool --

14      MR. BEY:  Well I object -- I'm objecting to every pool

15  because they've never once brought out a jury of my own peers.

16      THE COURT:  All right.  And so I'll note that objection as

17  well, sir.

18      MR. BEY:  That --

19      THE COURT:  Okay.

20      MR. BEY:  I'm sorry.  I -- what was your name again for the

21  record, Judge?

22      THE COURT:  My name is Judge John Coffey, C-O-F-F-E-Y.

23  Someone wrote it down for you.

24      MR. BEY:  Thank you.

25      (pause)

39

1      DEPUTY CLERK:  Folks, just during the trial you have to

2   remain quiet or you're going to be asked to leave.  Okay?

3      MR. BEY:  How come -- how come --

4      DEPUTY CLERK:  Court, all rise.  Jury in.

5      (Jury in at 11:31 a.m.)

6      DEPUTY CLERK:  Please remain standing.  Jurors remain

7   standing.  Everybody else may be seated.

8      Madame Clerk.

9      COURT CLERK:  Thank you.

10      Good morning, ladies and gentlemen.  This is the courtroom

11   of Judge Coffey.  Will all members of the jury panel please

12   raise your right hand?

13                          JURY, SWORN

14      COURT CLERK:  Please be seated.

15      Ladies and gentlemen, this is a trial of the Commonwealth

16   v. Leon Campbell, also known as a Leonitus Jabir Bey.  Mr. Bey,

17   of Lowell Massachusetts, is accused of carrying a dangerous

18   weapon, negligent operation of a motor vehicle, unlicensed

19   operation of a motor vehicle, resisting arrest, and failure to

20   stop for police.

21      The defendant has entered a plea of not guilty to the

22   charges.

23      MR. BEY:  Now, Judge, I --

24      COURT CLERK:  Mr. Campbell, a.k.a. Mr. Bey, please stand

25   and face the jury pool --

1      MR. BEY:  But --

2      COURT CLERK:  -- and introduce yourself to the jury.

3      MR. BEY:  I did not enter a plea of not guilty.

4      THE COURT:  Sir, that's just procedural.  Otherwise, we

5  can't have a trial, so just listen to what she's saying.

6      MR. BEY:  How you guys doing?  I'm Leonitus Jabir Bey.

7      Salam.  Hello.  Hi.  All the languages I know how to greet

8  in.  Try to make this as quick as possible, because I know we

9  all got things to do.

10     THE COURT:  All right.  Thank you, sir.

11     COURT CLERK:  Please be seated.

12     The Commonwealth is represented by Assistant District

13  Attorney DeVoe.

14     Please stand and introduce you to the jury pool.

15     MR. DEVOE:  Good morning, ladies and gentlemen of the jury.

16  My name is Tucker DeVoe, and I'm the assistant district attorney

17  in this case.

18     COURT CLERK:  Ladies and gentlemen, there will be a number

19  of witnesses called in this case.

20     Witnesses, as your name is called, please stand and face

21  the jury pool.

22     Officer David Pender, Lowell Police Department.

23     DEPUTY CLERK:  Officer Pender, come this way.  Stand right

24  here next to me so they can see.  Officer Pender.  Thank you,

25  sir.

41

1      COURT CLERK:  Officer Kyle Griffin, Lowell Police

2 Department.

3      DEPUTY CLERK:  Officer Griffin, stand here, briefly.

4      Can everybody see him okay?  Thank you.

5      COURT CLERK:  India Nasciemento, Lowell, Massachusetts.

6      DEPUTY CLERK:  Ma'am, you can step up here and just face

7 the jury pool?  Thank you.

8      COURT CLERK:  Akif Bey, Lowell, Massachusetts.

9      DEPUTY CLERK:  Mr. Bey.  Sir.

10      THE COURT:  Good morning again, ladies and gentlemen.  I'm

11 now going to pose some questions to all of you as prospective

12 jurors, and I asked you to listen carefully to each of the

13 questions, and if your answer to a specific question is a "yes",

14 please raise your hand with your juror number in the hand so

15 that the court officer, the clerk, and myself may see it and

16 record your juror number responding to each specific question.

17      Question one, are any of you related to the defendant?  Do

18 any of you know the defendant, either of the lawyers, or any of

19 the witnesses in this case?

20      No affirmative response.

21      Do any of you have an interest or stake of any kind in this

22 case?

23      No affirmative response.

24      To the extent that you have heard anything about this case,

25 have any of you expressed or formed any opinions about it?

1        No affirmative response.

2        Are any of you aware of any bias or prejudice that you have

3   towards either the defendant or the prosecution?

4        No affirmative response.

5        Do any of you not understand that in a criminal case, the

6   defendant is presumed innocent until proven guilty?

7        No affirmative response.

8        Do any of you not understand that the prosecution has the

9   burden of proving that the defendant is guilty beyond a

10  reasonable doubt and that the defendant does not have to present

11  any evidence on his behalf?

12       No affirmative response.

13       And finally, do any of you know of any reason why you would

14  not be impartial in this case and be able to render a true and

15  just verdict based solely on the evidence and the law?

16       No affirmative response.

17       Okay.

18       COURT CLERK:  Mr. Bey, can you please stand?

19       Sir, you are placed at the bar on these good jurors whom I

20  shall call are to pass between the Commonwealth and you upon

21  your trial.  If you should object to any of the jurors, you will

22  do so after their numbers are called and before they are sworn.

23  You have the right to challenge two of the jurors without giving

24  any reason therefore and as many more as you have good cause to

25  challenge.

43

1        You may be seated.  Thank you.

2        THE COURT:  Could I see Mr. Bey and Attorney DeVoe at

3   sidebar?

4        (Sidebar commenced at 11:36 a.m.)

5        THE COURT:  Mr. Bey, before I put them in the box, I just

6   want to call them up individually.  I want to make sure they

7   heard all my questions and understood all of my questions,

8   because sometimes they don't.  Okay.

9        (Sidebar concluded at 11:36:46 a.m.)

10       COURT CLERK:  Ladies and gentlemen of the jury, as I call

11  your numbers, please answer "here" and please approach sidebar.

12       Juror Number 17.

13       That juror is present, for the record.

14       (Sidebar commenced at 11:37 a.m.)

15       THE COURT:  All right.  Good morning, ma'am.

16       JUROR NUMBER 17:  Good morning.

17       THE COURT:  I just want to make sure you heard all of my

18  questions, you understood all of my questions.

19       JUROR NUMBER 17:  Yes.

20       THE COURT:  Is there anything about these particular

21  charges in this case where you don't think you could be fair and

22  impartial to all sides?

23       JUROR NUMBER 17:  No.

24       THE COURT:  All right.  Ma'am, you can take seat number

25  one.

44

1        (Sidebar concluded at 11:37 a.m.)

2        COURT CLERK:  Juror Number 17, please take seat number 1 in

3    the jury box.

4        DEPUTY CLERK:  Right this way.

5        COURT CLERK:  Juror Number 18, please approach sidebar.

6        DEPUTY CLERK:  Watch your step.

7        COURT CLERK:  Number 18 is present.

8        (Sidebar commenced at 11:37 a.m.)

9        THE COURT:  Good morning, ma'am.  I just want to make sure

10   you heard my questions and you understood all of my questions.

11   And you've heard with the allegations in this case are.  Is

12   there anything about those allegations where you do not think

13   you could be fair and impartial to both sides?

14       JUROR NUMBER 18:  No.

15       THE COURT:  All right.  All right.  Ma'am, you can take

16   seat number 2.

17       (Sidebar concluded at 11:37:56 a.m.)

18       COURT CLERK:  Juror Number 18, please take seat number 2 in

19   the jury box.

20       DEPUTY CLERK:  Watch your step, ma'am.

21       COURT CLERK:  Juror Number 20.  Present.  Please approach

22   sidebar.

23       DEPUTY CLERK:  Right this way, ma'am, okay.

24       (Sidebar commenced at 11:38 a.m.)

25       THE COURT:  Good morning, ma'am.

1       JUROR NUMBER 20:  Good morning.

2       THE COURT:  I just want to make sure you heard my questions

3  and you understood all of my questions.

4       JUROR NUMBER 20:  I do heard, but I cannot hear this ear --

5       THE COURT:  Okay.

6       JUROR NUMBER 20:  -- so I have to get it all.

7       THE COURT:  Okay.  And what -- which questions didn't you

8  understand?

9       JUROR NUMBER 20:  The last one.  What is it that you said?

10       THE COURT:  The last one is: is there any other reason why

11  you don't think you would be able to sit as a jury on this case

12  and render a fair and impartial verdict based solely on the

13  evidence and the law?

14       JUROR NUMBER 20:  Still, I didn't understand it, Your

15  Honor.

16       THE COURT:  Okay.  Okay.  Let me rephrase it.

17       Do you think there's any reason why you don't think you

18  could sit as a juror on this case and be able to render a fair

19  and just verdict based solely on the evidence and the law?

20       JUROR NUMBER 20:  I don't have problem with that, but I

21  have other financial problem.

22       THE COURT:  Okay.

23       JUROR NUMBER 20:  I do -- I do work, okay.

24       THE COURT:  Yeah.

25       JUROR NUMBER 20:  I don't, but I cannot have everything.

1   My husband is disabled.

2        THE COURT:  Okay.

3        JUROR NUMBER 20:  And so my income to help if I stay away

4   two, three days then I --

5        THE COURT:  Okay.

6        JUROR NUMBER 20:  -- cannot do that.

7        THE COURT:  All right.  This is a case that should be

8   finished today.

9        JUROR NUMBER 20:  Today.  Okay.

10       THE COURT:  Okay.  And is there anything else you want to

11  tell me?

12       JUROR NUMBER 20:  I have the problem of my left ear.

13       THE COURT:  Okay.

14       JUROR NUMBER 20:  Sometimes I cannot --

15       THE COURT:  Would it be helpful to you --

16       JUROR NUMBER 20:  -- hear what you say.

17       THE COURT:  -- if you do get seated as a jury, if we put --

18  if we have the -- we have some devices that you can use to

19  amplify.  Would that make it easier for you?

20       JUROR NUMBER 20:  Probably.

21       THE COURT:  Okay.  All right.  We might be able to do that

22  for you.

23       JUROR NUMBER 20:  Okay.

24       THE COURT:  All right.  So you can take -- now you can take

25  seat number 3.  Oh, no.  You keep that.

1        JUROR NUMBER 20:  Okay.

2        (Sidebar concluded at 11:39 a.m.)

3        COURT CLERK:  Juror Number 20, please take seat number 3 in

4   the jury box.

5        Juror Number 22.

6        DEPUTY CLERK:  Watch your step.

7        COURT CLERK:  Present.  Please report to sidebar.

8        (Sidebar commenced at 11:40 a.m.)

9        THE COURT:  Good morning.  I just want to make sure you

10  heard my questions and you understood all of my questions.  Is

11  there anything that you've heard about the allegations in this

12  complaint, is there anything about those allegations that would

13  make it difficult for you to be fair and impartial to both

14  sides?

15        JUROR NUMBER 22:  No.

16        THE COURT:  Okay.  You can take seat number 4.

17        (Sidebar concluded at 11:40 a.m.)

18        COURT CLERK:  Please take seat number 4 in the jury box.

19        Juror Number 1, please approach sidebar.

20        (Sidebar commenced at 11:40 a.m.)

21        THE COURT:  Good morning again, ma'am.  I just want to make

22  sure you heard my questions and you understood all of the

23  questions.  Now you've heard what the allegations in this

24  complaint are.  Is there anything about those allegations, or

25  anything else, that you don't think you could be fair and

48

1 impartial to both sides in this case?

2        JUROR NUMBER 1:  No.  The first cop, he's, like, I went to

3 school in Ojai, and I believe that he was the police officer

4 that's always been there, so I do recognize him for many years.

5        THE COURT:  Okay.  And was he the resource officer there?

6 Or whatever you call it.

7        JUROR NUMBER 1:  I'm not sure --

8        THE COURT:  All right.  Do you know --

9        JUROR NUMBER 1:  -- what his title was.

10       THE COURT:  Do you know him?

11       JUROR NUMBER 1:  I don't know him personally, no.

12       THE COURT:  Okay.  Now the fact that he was in the school

13 where you -- he was the officer in the school, would that affect

14 your ability to be fair and impartial?

15       JUROR NUMBER 1:  No.

16       THE COURT:  Okay.  All right.

17       And it says you were a victim of a crime.  Does that have

18 any bearing on whether or not you could be fair and impartial

19 and render a verdict based solely on what you see and hear in

20 the courtroom today?

21       JUROR NUMBER 1:  I don't know.

22       THE COURT:  Okay.  All right.  Okay.  Why don't you just

23 have a seat, and I'll deal with that.

24       Given her response that she's unsure, I don't think should

25 be a fair and impartial juror, so I'm going to strike her for

1  cause.  Okay.  Unless you have an objection to that.

2      MR. BEY:  I mean, she's probably one of the closest to my

3  own peers.  That would be my only objection.

4      THE COURT:  All right.  Would you -- but do you think she'd

5  be fair and impartial to you in this case?

6      MR. BEY:  Well I don't know why she couldn't be.

7      THE COURT:  Pardon me?

8      MR. BEY:  I'd place her.

9      THE COURT:  Okay.

10      All right.  Come here, ma'am.

11      All right.  So, ma'am, do you think you could be fair and

12  impartial in this case, given your prior history, and just

13  decide the facts in the case?  And you said you don't think so,

14  and some people say they don't think so and they really mean yes

15  or no.

16      JUROR NUMBER 1:  I just don't know.  Like, I work in a

17  restaurant, and I serve a lot of cops.  I'm a bartender, and I

18  just know that, like, they are friends, and I just don't know --

19  like, the relationship they have, I don't think they would go

20  against each other.

21      THE COURT:  So would you tend to believe the testimony of a

22  police officer over that of a civilian witness solely because

23  that person was a police officer?

24      JUROR NUMBER 1:  I don't know.  I guess it depends on the

25  case.

50

1        THE COURT:  Okay.  So you'd be willing to sit and here the

2   facts of the case before you make that decision?

3        JUROR NUMBER 1:  Yeah.

4        THE COURT:  Okay.  All right.  So, ma'am, you can take seat

5   number 5.

6        (Sidebar concluded at 11:43 a.m.)

7        COURT CLERK:  Please take seat number 5 in the jury box,

8   ma'am.

9        Juror Number 6, please approach sidebar.

10       (Sidebar commenced at 11:43 a.m.)

11       THE COURT:  Good morning, again.

12       JUROR NUMBER 6:  Good morning.

13       THE COURT:  I just want to make sure you heard my questions

14   and you understood all of my questions.

15       JUROR NUMBER 6:  Yup.

16       THE COURT:  Is there anything you know about this case so

17   far where you don't think you can be fair and impartial to both

18   sides?

19       JUROR NUMBER 6:  No.

20       THE COURT:  All right.  Ma'am, you can take seat number 6.

21       (Sidebar concluded at 11:44 a.m.)

22       COURT CLERK:  Juror Number 6, please take a seat in number

23   6 in the jury box.

24       Juror Number 7, please approach sidebar.

25       (Sidebar commenced at 11:44 a.m.)

51

1        THE COURT:  Good morning.  I just want to make sure you

2   heard my questions and you understood all of my questions.

3        JUROR NUMBER 7:  Yes.

4        THE COURT:  Is there anything you know about this case so

5   far where you don't think you could be fair and impartial to

6   both sides?

7        JUROR NUMBER 7:  No, sir.

8        THE COURT:  Okay.  I understand you -- is it you or your

9   brother had a prior, and you had an old juvenile.

10       JUROR NUMBER 7:  Juvenile, yeah.  It was dismissed.

11       THE COURT:  All right.  And your experience and your

12   relationship with your brother, would that affect your ability

13   to be fair and impartial?

14       JUROR NUMBER 7:  I don't believe so.

15       THE COURT:  All right.  Sir, you can take seat number 7.

16       (Sidebar concluded at 11:44 a.m.)

17       COURT CLERK:  Juror Number 7, please take seat number 7 in

18   the jury box.

19       (Sidebar commences at 11:44 a.m.)

20       THE COURT:  So this is just for cause.  Juror Number 7 will

21   be seated (indiscernible) for cause.

22       MR. DEVOE:  I'm a bit concerned as to Juror Number 20,

23   but --

24       THE COURT:  Yeah.

25       MR. DEVOE:  Okay.

1       THE COURT:  Let me put on the record why.  So after Mr. Bey

2   raised the issue that he thought that that was a juror of his

3   peers, and I asked her additionally, and I put the question to

4   her: do you think you could believe the testimony of a police

5   officer more so based solely on the fact that they had a

6   position as a police officer.  And she responded to the effect

7   that she could, it would depend on the case.  So based on her

8   open-mindedness just to think before she reacted, I do find her

9   fair and impartial.

10      MR. DEVOE:  Okay.  Sorry, and the other one is Juror 20.

11  She's seated in seat number 3.  She has a hearing problem.

12      THE COURT:  Oh, the hearing problem.  Oh, that one.  Okay.

13  Nothing about what she said would make her not be fair and

14  impartial.  We can alleviate the hearing situation.

15      The ones sitting in the box right now, do you have any

16  challenges just for cause?

17      MR. BEY:  No.

18      THE COURT:  No.  Okay.

19      All right.  So what I'll do is we'll go to the

20  peremptories.  So, Attorney DeVoe, you get two, you get two.

21  The Commonwealth goes first.  You don't have to use both two,

22  and you don't have to do it all as the same time.  You can

23  challenge one.  And I will bring the replacement in before I ask

24  you if you have another one.  Okay?

25      MR. DEVOE:  I have no challenges at this time.

53

1          THE COURT:  Okay.  So we have a jury panel.  I'll just ask

2     you on the record if you're content.

3          COURT CLERK:  Judge, I just (indiscernible) respect to the

4     hearing devices.  The (indiscernible).  I did get those

5     downstairs, but I just might need time.

6          THE COURT:  Okay.  We can take some time to get them.

7          COURT CLERK:  Yeah, I can get it set up.

8          THE COURT:  Okay.  All right.  Okay.

9          (Sidebar concluded at 11:46 a.m.)

10         THE COURT:  So, Attorney DeVoe, is the Commonwealth

11    content?

12         MR. DEVOE:  The Commonwealth is content, Your Honor.

13         THE COURT:  And, Mr. Bey, is the defendant content?

14         MR. BEY:  The defendant is content, My Honor.

15         THE COURT:  All right.  We have a jury.

16         So for the remaining members of the venire, I just want to

17    take you for your participation in the selection of this

18    particular case.  I'm going to ask that you go with the court

19    officer who will bring you to your next assignment for the day.

20         DEPUTY CLERK:  All rise.  Remaining jurors, grab your

21    belongings and follow me, please.

22         All rise.

23         (Remaining perspective jurors dismissed)

24         COURT CLERK:  You may be seated.

25         (Pause)

54

1      COURT CLERK:  Can you hear, ma'am?

2      JUROR NUMBER 20:  Yes.

3      COURT CLERK:  Thank you.

4      Do you want me to swear them in?

5      Members of the jury, please stand and raise your right

6  hand.

7                          JURY, SWORN

8      COURT CLERK:  Members of the jury, hearken to the

9  complaint.  As to Docket Number 1911CR365, Trial Court of

10  Massachusetts, District Court Department, Lowell Division.  Leon

11  J. Campbell, also known as Leonitus Jabir Bey, of 109 4th Ave,

12  Apartment 1 in Lowell, as to a complaint issued on January 23rd

13  of 2019, for date of offense of January 22nd, 2019, in the town

14  and city of Lowell, by the Lowell Police Department.

15      The defendant is charged with carrying a dangerous weapon.

16  That on January 22, 2019, he did carry on his person, or carry

17  on a person or under his control, in a vehicle, or when arrested

18  on a warrant for an alleged crime, or while committing a breach

19  or disturbance of the public peace, was armed or did have on his

20  person or and his control, in a vehicle, a dangerous weapon to

21  wit an 18-inch machete, not being authorized to do so.

22      He's charged also with negligent operation of a motor

23  vehicle.  That on January 22nd, 2019, he did operate a motor

24  vehicle upon a public way, or in a place to which the public has

25  the right of access, or in a place to which members of the

1   public have access as invitees or licensees, negligently, so

2   that the lives or safety of the public might be in danger.

3       He's charged with unlicensed operation of a motor vehicle.

4   That on January 22nd, 2019, not being duly licensed or otherwise

5   accepted by law, did operate a motor vehicle on a way as defined

6   in General Laws, Chapter 90, Section 1.

7       Charge with resisting arrest.  That on January 22nd, 2019,

8   did knowingly prevent, or attempt to prevent, a police officer,

9   who was acting under the color of his or her official authority,

10  from affecting an arrest by using or threatening to use physical

11  force or violence against a police officer or another, or using

12  some other means which created a substantial risk of causing

13  bodily injury to such police officer or another.

14      Last, he's charged with failing to stop for police.  That

15  on January 22nd, 2019, while operating or in charge of a motor

16  vehicle, did refuse or neglect to stop when signaled to stop by

17  a police officer who wasn't --

18      DEPUTY CLERK:  I don't want to interrupt, but this -- Juror

19  Number 3.  Is it not on?

20      (Pause)

21      DEPUTY CLERK:  So this device, Judge, is not working, but I

22  think we have supplemental --

23      THE COURT:  Okay.

24      THE DEPUTY CLERK:  So we'll just have to --

25      THE COURT:  All right.  We'll just have to, just take a

1    brief -- everybody stay in their respective spots --

2         DEPUTY CLERK:  Yeah.

3         THE COURT:  -- and we'll get a replacement.  Okay.

4         (pause)

5         DEPUTY CLERK:  All right.  Your Honor, batteries are

6    helpful.

7         (pause)

8         COURT CLERK:  Ma'am, can you hear me?

9         JUROR NUMBER 20:  Yes, ma'am.

10        COURT CLERK:  You can.

11        Your Honor, would you like to start from the top with

12   respect to the charges?

13        THE COURT:  No, just at what point?  You should read the

14   charges again.  Okay.

15        COURT CLERK:  I'll reread the charges.

16        So the defendant, as I've indicated, has been charged with

17   the following:

18        Carrying a dangerous weapon.  That on January 22nd, 2019,

19   he did carry on his person, or carry on his -- on his or her

20   person or under his or her control, in a vehicle, or when

21   arrested upon a warrant for an alleged crime, or while

22   committing a breach or disturbance of the public peace, was

23   armed with or did have on his person or under his control in a

24   vehicle, a dangerous weapon, to wit an 18-inch machete, not

25   being authorized by law to do so.

57

1      He is charged with negligent operation of a motor vehicle.

2   That on January 22nd, 2019, he did operate a motor vehicle upon

3   a way, or in a place to which the public has the right of

4   access, or in a place to which members of the public have access

5   as invitees or licensees negligently so that the lives or safety

6   of the public might be in danger.

7      Charged with unlicensed operation of a motor vehicle.  That

8   on January 22nd, 2019, not being duly licensed or otherwise

9   accepted by law, did operate a motor vehicle on a way defined by

10  Chapter 90, Section 1.

11     He's charged with resisting arrest.  That on January 22nd,

12  2019, he did knowingly prevent, or attempt to prevent, a police

13  officer, as defined under Chapter 68, Section 32-B, who was

14  acting under the color of his or her official duty or authority

15  from affecting an arrest by using or threatening to use physical

16  force or violence against a police officer or another, or using

17  some other means which created a substantial risk of causing

18  bodily injury to such police officer or another.

19     Lastly, he is accused of failure to stop for police.  That

20  on January 22nd, 2019, while operating or in charge of a motor

21  vehicle, did refuse or neglect to stop when signaled to stop by

22  the police officer, who was in uniform, who displayed his or her

23  badge conspicuously on the outside of his or her outer garment.

24     The complaint is signed by Officer Ragene (phonetic) from

25  the Lowell Police Department and sworn to by First Assistant

58

1   Clerk Janice Carroll on January 23rd, 2019.

2        On these complaints, the defendant has pled that he is not

3   guilty and for trial, therefore, places himself on the country,

4   which country you are.  You are now sworn to try the issue.  If

5   he is guilty, you will say so.  If he's not guilty, you will say

6   so and no more.

7        Members of the jury, hearken to the evidence.

8        THE COURT:  Now, members of the jury, I'm about to make

9   some general remarks to introduce you to the trial in this case

10  and to acquaint you with some of the general legal principles

11  that will control throughout this trial in your deliberations.

12       Now these remarks are not a substitute for the more

13  detailed instructions on the law that I will give you at the

14  conclusion of the trial before you retire to consider your

15  verdict.

16       Now you heard the clerk introduce or recite to you the

17  complaint in this case.  Now you should understand that the

18  complaint is just a piece of paper.  It is not, itself, evidence

19  of any guilt.  It is merely a formal manner of accusing a person

20  of a crime in order to bring him to trial.  You must not draw

21  any inference of guilt from this complaint or the fact that the

22  defendant has been formally charged.

23       Now in any criminal case, the defendant is presumed to be

24  innocent unless he is proven guilty beyond a reasonable doubt.

25  Now the law requires the prosecutor, who we sometimes referred

1  to as the Commonwealth, to prove the defendant is guilty beyond

2  a reasonable doubt.  The law does not require the defendant to

3  prove his innocence or to produce any evidence at all.

4      Now at the end of the trial, you must find the defendant

5  not guilty unless the Commonwealth has proved to you beyond a

6  reasonable doubt that the defendant has committed these offenses

7  for which he is charged.

8      Now the trial will proceed in the following order:

9      First, the attorney for the Commonwealth and the defendant

10  will have an opportunity to present opening statements.  After

11  the assistant district attorney makes his opening statement for

12  the prosecution, the defendant may choose to make an opening

13  statement immediately, may postpone doing so until later, or may

14  decide not to do one at all, since the entire burden of proof is

15  always on the Commonwealth.

16      Now the opening statements are not evidence.  They are

17  somewhat like roadmaps which the parties are going to explain to

18  you what they expect to lie ahead.

19      Next, the prosecution will introduce evidence in support of

20  the charges in the complaint.

21      After that, the defendant may present evidence on his

22  behalf if he wishes to do so, but he is obliged to do no such

23  thing.  Remember, the burden of proof is always on the

24  Commonwealth to prove the defendant guilty.  The law does not

25  require the defendant to prove his innocence or to produce any

1   evidence.

2        Now after all of the evidence, each side will have an

3   opportunity to offer you arguments about what conclusions you

4   might draw from the evidence.  Again, the closing arguments,

5   just like the opening statements, are not evidence.

6        And finally, after all the evidence and the attorney's

7   arguments, I will instruct you in detail on the principles of

8   law which you are to apply in your deliberations when you retire

9   to consider your verdict.

10        Your verdict must be unanimous.  All six deliberating

11   jurors must agree on the verdict.

12        Now my responsibility in this case is just to see that the

13   case is tried in the way that is orderly, fair, and efficient.

14   It is also my function to decide any questions of law that may

15   come up during the course of the trial and to instruct you on

16   the law that applies in this case.  It is your duty to accept

17   the law as I state it to you.

18        Your function is to determine the facts, and you are the

19   sole and exclusive judges of those facts.  You alone determine

20   what evidence to believe, how important any evidence is that you

21   do believe, and what conclusions all the believable evidence

22   leads you to.

23        You'll have to consider and weigh the testimony of all the

24   witnesses who will appear before you, and you alone will

25   determine whether to believe any witness and to the extent to

61

1   which you believe any witness.  It is part of your

2   responsibility to resolve any conflicts in testimony that may

3   arise during the course of the trial and to determine where the

4   truth lies.  Ultimately, you must determine whether or not the

5   Commonwealth has proved the charges in the complaint beyond a

6   reasonable doubt.

7       Now you must decide this case based solely on the evidence

8   that is presented in this courtroom.  This would include the

9   sworn testimony of any witnesses and any exhibits that are

10  admitted into evidence.  Questions from the parties to the

11  witnesses, no matter how artfully phrased, are not evidence.

12  Only the answers you received from the witnesses who are

13  testifying under oath are evidence.

14      During the course of the trial, the parties may object to

15  questions or statements that may not be admissible under our

16  rules of evidence.  That is their responsibility, and you should

17  not look negatively in any way on any party who makes any such

18  objection.

19      If I agree with an objection to a question, the term I will

20  use is "sustained".  You are to disregard that question, and you

21  are not to speculate as to what the answer might have been.  In

22  the same way, you are to disregard any evidence that I tell you

23  is stricken from the record.

24      If I reject or overrule an objection, I will permit the

25  witness to answer, and you may consider that answer.  However,

1  you are not to give that answer any more weight than you would

2  have had no objection been made.

3      Now if it becomes necessary during the course of the trial

4  to communicate with me, you may send me a signed note through

5  the court officer, but during the case, you may not communicate

6  with any of the parties, the witnesses, or the defendant.  And

7  until this case is submitted to you after my final instructions,

8  you must not discuss this case with anyone, not even with your

9  fellow jurors.  Discussions can lead to conclusions being drawn

10  or positions been taken prematurely, and fairness requires you

11  to keep an open mind about everything until your deliberations.

12      As I told you, you may only consider evidence presented in

13  this courtroom.  You may not conduct any investigation on your

14  own or engage in any research on the law that you think applies

15  this case.  You may not use any outside electronic devices to

16  learn things outside of what is presented in this courtroom.

17      Now you have been chosen precisely because you are

18  impartial.  As soon as you take on the role of an investigator,

19  you become an advocate, and you lose your ability to be

20  impartial.  I know that you will try this case according to the

21  oath you have taken as jurors which you promised you would well

22  and truly try the issue between the Commonwealth and the

23  defendant according to the evidence.  If you follow that oath

24  and try the issues without fear or prejudice, bias or sympathy,

25  you will arrive at a true and just verdict.

1        And before we begin, I just want to -- if anybody during

2   the course of the trial cannot hear anybody, including the

3   witnesses, just raise your hand and let us know.  If anybody

4   becomes uncomfortable during the course of the trial, raise your

5   hand, we can take a break or stretch.

6        And also, as far as the schedule goes, we will go until 1

7   o'clock.  We will then break from 1:00 to 2:00, and start again

8   at 2 o'clock, and probably go until about 4 o'clock this

9   afternoon.

10       So with that, we will begin the trial with the opening

11  statements of Commonwealth.

12       Attorney DeVoe.

13       MR. DEVOE:  Thank you, Your Honor.

14                     COMMONWEALTH'S OPENING STATEMENT

15       MR. DEVOE:  Ladies and gentlemen of the jury, in this case

16  the defendant, who is right there, repeatedly acted without

17  necessary care or respect for the law and authority.

18       This case began on January 22nd of this year, here in

19  Lowell, Massachusetts, at about 6:00-6:15 in the evening.  It

20  was cold, the sun had gone down, as it does in the winter at

21  that early hour, and this case begins with the defendant driving

22  his car down Mammoth Road in Lowell, Massachusetts.  He was in a

23  gray pickup truck.

24       You'll hear testimony of Officer David Pender of the Lowell

25  Police Department who saw the defendant driving his pickup

64

1    truck.  The defendant was in his pickup truck in the left lane

2    on Mammoth Road going outbound from Global, where it's a left

3    turn only lane.  When the light went green, instead of going

4    left, the defendant went straight, cutting off several cars

5    almost causing an accident.  This brought the defendant and his

6    vehicle to the attention of Officer Pender.

7         You'll hear Officer Pender testify having then turned on

8    his lights and sirens and follow the defendant's vehicle.  The

9    defendant did not stop for Officer Pender.  Instead, he

10   continued outbound on Mammoth Road, swerving into the opposite

11   lane of traffic to go around other cars and avoid Officer

12   Pender.  He did this for several hundred feet, swerving into the

13   other lane, and then back into his appropriate lane.

14        Officer Pender then observed the defendant take a right

15   onto 4th Avenue, continue not to stop for the police officer,

16   and go on for several hundred more feet.  All this time, the

17   officer had his lights and sirens on his marked cruiser on.

18        Officer Pender will tell you how eventually the defendant

19   parked his vehicle at 109 4th Avenue.  Officer Pender then

20   parked his cruiser and approached the vehicle.  He approached

21   the vehicle and tried to get the defendant's attention through

22   the window.  The defendant did not respond, did not roll down

23   the window, did not open his door.

24        The defendant wasn't the only person in the vehicle.  While

25   the defendant was driving it, Manny Chico Smith (phonetic) was a

1  passenger, two people in the vehicle.

2      You'll hear from Officer Pender that at some point he

3  opened the door so that he could speak with the defendant and

4  told him that he was going to be placed under arrest.  Instead

5  of exiting the vehicle, the defendant stayed in the vehicle, and

6  the passenger, Chico Smith, stepped out of the vehicle, came

7  around to Officer Pender's side.  Officer Pender will describe

8  the scene to you, how the defendant is right in front of him,

9  still in the pickup truck refusing to get out, and Mr. Smith as

10  to the side, right next to him.

11      During this interaction, Officer Pender will also describe

12  to you how he saw the defendant reaching for something in the

13  center console.  The officer couldn't see what at the time.

14      Officer Pender will describe to you that he thought the

15  situation was getting out of hand.  He took out his Taser and

16  pointed it at Mr. Smith in order to get him to back off.  While

17  his attention was focused on Mr. Smith, instead of backing off,

18  Mr. Campbell slapped the Taser out of his hand, landing on the

19  ground underneath pickup truck.

20      At this moment, Officer Pender will describe to you what he

21  was thinking, what he was feeling.  He had to use force to

22  control the situation.  He punched the defendant in order to get

23  control of him.  He pushed off Mr. Smith.  And at this point,

24  you'll also hear the testimony of Officer Kyle Griffin, who

25  arrived on the scene and was able to pull back on Mr. Smith and

1  restrain him.  Officer Pender was then able to get the defendant

2  out of the car.

3      All during this time, Mr. Smith and the defendant were

4  yelling at the officers, shouting at them, causing an uproar

5  situation.  Eventually, people come from outside of the houses

6  and the surrounding area to look on the scene, but the officers

7  were able to successfully restrain both individuals and place

8  the defendant under arrest.

9      Officer Pender then searched the vehicle, and near where

10  the defendant was reaching, towards the center console, he found

11  an 18-inch long machete.  Again, it's January 22nd, it's cold,

12  it's winter.

13      This case has five different charges.  I ask that you

14  listen closely to the evidence.  Each offense will be found in

15  that evidence, like charge of failure to stop for a police

16  officer, negligently operating a motor vehicle so as to endanger

17  the public, unlicensed operation of a motor vehicle.

18      After the defendant was booked, they searched his license

19  and you'll find, indeed, it was suspended by the Commonwealth of

20  Massachusetts, and the evidence will show that it was suspended

21  and that suspension had been mailed to the defendant.  That he

22  did so on a public way, Mammoth Road in Massachusetts, that the

23  defendant resisted arrest, which is the fourth charge, and that

24  he was carrying a dangerous weapon, that 18-inch machete, during

25  the winter, while he was under arrest for these offenses.

1    At the close of the trial, I will come back to you and ask

2  that you find the defendant guilty on all five counts.

3    Thank you.

4    THE COURT:  Thank you, Attorney DeVoe.

5    Mr. Bey, do you wish to give an opening now?

6    MR. BEY:  Yup.

7    THE COURT:  All right.

8                    DEFENDANT'S OPENING STATEMENT

9    MR. BEY:  Hello, Jury.  How you guys doing today?  I'm

10  Leonitus Jabir Bey, no a.k.a.  That straw man name is a birth

11  certificate, contractual agreement that they usually don't tell

12  any of us about.  We all know that schools aren't really

13  teaching us that, right?  So my thing is --

14    I mean, can I say what I want to say now?  Or should I save

15  it for --

16    THE COURT:  Why don't we come up?

17    (Sidebar commenced at 12:07 p.m.)

18    MR. BEY:  This is just my opening statement?

19    THE COURT:  Hold on.  Yeah.  Yeah.  It's just your opening

20  statement, so it's not closing argument.  It's really, like,

21  what you expect you'll draw out from the evidence, okay?

22    MR. BEY:  Okay.

23    (Sidebar concluded at 12:08 p.m.)

24    MR. BEY:  Okay.  Granted, his job is to make me look like

25  what Hillary Clinton likes to call the super bad, I'm supposed

1   to be like someone dangerous, a killer, whatever, according to

2   them.

3       Driving down Mammoth Road, a street this wide, swerving

4   throughout the thing, but we'll find out from these so-called

5   officers if there was any call in about any car that would be

6   kind of dangerous.  We'll ask the necessary questions.

7       I won't let them trick us, the people, into believing

8   anything that flies out of their mouth just so they can go home

9   and cash their checks and kiss their babies and look for the

10  next potential caller.  That's what they call us, caller.  They

11  can have their fun day with us.  All right.

12      So we'll let the case and the evidence decide, because they

13  have, without a reasonable doubt, to make sure I'm guilty,

14  right?  And what is it, dangerous weapon -- right, dangerous

15  weapon, driving without a license, and everything above.  Which,

16  just so you guys know, I was in this courtroom --

17      THE COURT:  Sir --

18      MR. BEY:  -- two weeks ago --

19      THE COURT:  Sir --

20      MR. BEY:  -- at a trial with --

21      THE COURT:  Mr. Bey --

22      MR. BEY:  -- the same stuff --

23      THE COURT:  Mr. Bey --

24      MR. BEY:  -- that I've already be --

25      THE COURT:  Mr. Bey --

1       MR. BEY:  -- driving without a license --

2       THE COURT:  Mr. Bey --

3       MR. BEY:  -- and everything --

4       THE COURT:  Mr. Bey --

5       MR. BEY:  -- and the people found me not guilty.

6       THE COURT:  Mr. Bey, just keep it --

7       MR. BEY:  That's all I wanted to say.

8       THE COURT:  Okay.  All right.  Thank you.

9       All right.  Attorney DeVoe --

10      MR. BEY:  I already know what you're going to do.

11      THE COURT:  -- you can call your first witness.

12      MR. DEVOE:  Certainly, Your Honor.  I'd like to call

13   Officer David Pender.

14      DEPUTY CLERK:  Officer Pender.

15      (Pause)

16      DEPUTY CLERK:  Just watch your step, Officer.  Be careful

17   stepping up.  Thank you.

18                      DAVID PENDER, WITNESS, SWORN

19      THE COURT:  All right.  Attorney DeVoe.

20      MR. DEVOE:  Thank you, Your Honor.

21                      DIRECT EXAMINATION

22   BY MR. DEVOE:

23   Q    Officer Pender, can you please state your name, and spell

24   your last name for the record?

25   A    Yes.  David Pender, P-E-N-D-E-R.

70

1   Q     And, Officer Pender, are you employed?

2   A     Yes, I am.

3   Q     Where do you work?

4   A     I'm a police officer for the City of Lowell.

5   Q     How long have you been a police officer for the City of

6   Lowell?

7   A     Thirty-three years.

8   Q     Prior to becoming a police officer, did you attend the

9   training academy?

10  A     Yes, I did.

11  Q     Where and when was that?

12  A     That was in Needham, Massachusetts.  It was a six-month

13  course.

14  Q     Turning your attention to January 22, 2019 at approximately

15  6 p.m.  Were you working that day?

16  A     Yes, I was.

17  Q     What was your shift and assignment?

18  A     I was assigned to traffic enforcement, and I was in the

19  area of Mammoth Road and Varnum Ave.

20  Q     Were you in a marked police vehicle?

21  A     Yes, I was.

22  Q     Were you in uniform?

23  A     Yes, I was.  Dressed as I am today.

24  Q     At approximately 6 p.m., where were you stationed?

25  A     I was at the corner of Mammoth Road and Varnum Ave.  It's a

1  public way in the City of Lowell, right in the Pawtucketville

2  area.

3  Q    Do you recall the weather and the light on that day and at

4  that time?

5  A    Yes.  A little chilly, but it was a normal, clear day.

6  There was still snow and stuff on the sides of the road, but it

7  was a clear day.

8  Q    Had the sun gone down by 6 p.m.?

9  A    Yes.  It had started to go down, yes.

10  Q    While you were on your patrol, was your attention drawn to

11  any vehicle?

12  A    Yes, it was.

13  Q    What vehicle was it drawn to?

14  A    It was a pickup truck coming over the O'Donnell Bridge

15  headed outbound onto Mammoth Road.

16  Q    And what drew your attention to that vehicle?

17  A    The vehicle was in the left lane.  It took two -- going

18  outbound on the O'Donnell Bridge it's two lanes, right and left.

19  He was in the left lane, which is -- there's several signs, and

20  the road is painted for left turn only.

21  Q    What did you observe that pickup truck do on Mammoth Road,

22  if anything?

23  A    As he was coming across the bridge, like I said, he was in

24  the left lane.  He cut the motor vehicles off that were in the

25  right lane, and then he came straight ahead, so much so that the

72

1  vehicles in the right lane had to slam the brakes on so not to

2  collide.

3  Q    Approximately how close to other vehicles was this pickup

4  truck?

5  A    Well like I said, there's two lanes, so they are probably

6  two feet apart as they're going across, but as he cut them off,

7  I would say they came within probably five feet of hitting each

8  other.

9        MR. DEVOE:  Your Honor, may I approach?

10       THE COURT:  You may.

11 BY MR. DEVOE:

12 Q    Officer Pender, I'm handing you a document.  If you would

13 please take a look at each of these three photos?

14       (Pause)

15 Q    Officer Pender, did you have a chance to look at those?

16 A    Yes, I did.

17 Q    What do those -- what does that appear to be to you?

18 A    The first --

19 Q    Briefly.

20 A    The first picture right here is coming across the O'Donnell

21 Bridge heading towards Mammoth Road and Varnum Ave.  As you can

22 see, it's painted here with the left turn telling you, you have

23 to turn left there.

24 Q    Are there other images also appearing in the photo?

25 A    The second picture here is on Mammoth Road by 7-Eleven as

1  you're heading outbound on Mammoth Road heading towards the

2  Dracut, Mass.

3      And then do you want me to continue?

4      The third picture is also Mammoth Road, and it's right by

5  the McAvinnue School just before you turn right onto 4th Ave.

6  Q    Are those images fair and accurate representations of

7  Mammoth Road?

8  A    Yes, they are.

9  Q    Did you see the pickup truck that you're describing

10 operating on those sections of Mammoth Road?

11 A    Yes, I did.

12      MR. DEVOE:  Your Honor, I'd like to offer this as Exhibit

13 1.

14      THE COURT:  All right.  Any objection, Mr. Bey?  Any

15 objection, sir?

16      MR. BEY:  No.  No objection.

17      THE COURT:  Okay.  That'll be Exhibit 1, the three

18 photographs.

19      (Commonwealth's Exhibit 1 marked and admitted)

20      MR. DEVOE:  Your Honor, may it be published to the jury?

21      THE COURT:  Yeah, we're going to --

22      (Pause)

23 BY MR. DEVOE:

24 Q    So, Officer, after you saw the pickup truck cut off several

25 vehicles, what did you do next?

74

1      THE COURT:  Officer, if you could just put that aside for
2 now?
3      THE WITNESS:  Yeah, I will.
4      THE COURT:  If you need it --
5      THE WITNESS:  Okay.
6      THE COURT:  Thank you.
7 BY MR. DEVOE:
8 Q    So let me repeat my question.
9      After you saw the defendant cutoff -- or the vehicle cutoff
10 several other vehicles, what did you do next?
11 A    I activated my blue lights and siren and attempted to pull
12 the motor vehicle over.
13 Q    Did the pickup truck pull over?
14 A    No, it did not.
15 Q    What, if anything, did you observe the vehicle do?
16 A    I stayed behind it with my blue lights and siren trying to
17 get them to pull over.  At that time, he crossed over the solid
18 double yellow lines into the oncoming traffic, went past several
19 motor vehicles, cut back over, continued outbound on Mammoth
20 Road and took a right onto 4th Ave.
21 Q    Is Mammoth Road a public way in Massachusetts?
22 A    Yes, it is.
23 Q    How many times did you observe the pickup truck cross the
24 double yellow lines?
25 A    Just once.

1   Q    Can you describe the outbound side of Mammoth Road that the

2   defendant was traveling along?

3   A    Yeah.  He was traveling -- Mammoth Road and Varnum Ave and

4   the O'Donnell Bridge is very, very busy intersection, numerous

5   cars at all times.  As he was going out, like I said, he passed

6   several motor vehicles that were going on the outbound side, out

7   by -- oh, excuse me, outbound side, and he crossed over to the

8   lane coming inbound, and several vehicles had to slam their

9   brakes on to stop as he went on the wrong side of the road.

10  Then he cut back over onto Mammoth Road.

11  Q    Did the pickup truck ever turn off of Mammoth Road?

12  A    Yes, it did.  It took a right onto 4th Ave.

13  Q    Did you continue to follow that truck?

14  A    Yes, I did.  I had called it in that I was in pursuit of

15  the motor vehicle trying to get it to stop.  I chased him down

16  4th Ave, and he pulled into, I believe it was 109 4th Ave.

17  Q    Can you describe 4th Avenue?

18  A    Numerous dwellings on both sides, houses.  Like I said, you

19  have the McAvinnue School.  As soon as you turn onto it, you

20  have the McAvinnue School there on your left, and then it's all

21  houses on both sides of the road, and it's a two-way street.

22  Q    On Mammoth Road, is it possible for a vehicle to pull over

23  to the side?

24  A    Oh, yes.  Yes, I've stopped numerous cars on the road.

25  Q    On 4th Ave, is it possible for vehicles to pull over to the

76

1    side?

2    A    Yes.  It's a very wide.  Like I said, it's a two-way

3    street, and there's parking on the side, so it's a very wide

4    street that at any time he could have pulled over.

5    Q    And you just testified that the pickup truck eventually

6    turned into 109 4th Ave.  Is that right?

7    A    That is correct.

8    Q    From when you first turned on your blue lights and sirens

9    until when the pickup truck pulled into 109 4th Ave, can you

10   estimate approximately how great of a distance that was?

11   A    From Varnum Ave to there, I would say probably close to

12   three quarters of a mile to a mile.

13   Q    Were you following the pickup truck the whole time?

14   A    Yes, I was.

15   Q    Were your lights on the whole time?

16   A    Yes, they were.

17   Q    Was your siren on the whole time?

18   A    Yes, it was.

19   Q    Once you observed the vehicle pull into 109 4th Ave, what,

20   if anything, did you do next?

21   A    I pulled behind the motor vehicle, and I exited my motor

22   vehicle and approached the driver of the pickup truck.

23   Q    How many occupants did you observe in the pickup truck?

24   A    There were two individuals inside the pickup truck.

25   Q    Do you see the person who was sitting behind the driver's

1   seat of the pickup truck sitting in the courtroom today?

2   A    Yes, I do.

3   Q    Could you please identify him by an article of clothing?

4   A    Yes.  The gentleman sitting here at the table with a white

5   shirt and the red cap on.

6        MR. DEVOE:  Your Honor, may the record reflect that Officer

7   Pender identify the defendant?

8        THE COURT:  The record will so reflect.

9   BY MR. DEVOE:

10  Q    After you approached the vehicle, what did you do?

11  A    Like I said, I got out of my motor vehicle, and I started

12  to go towards his pickup truck.  And as I was approaching him, I

13  can see him making further gestures inside the vehicle on the --

14  to his right.

15  Q    Can you describe in more detail the gestures you saw?

16  A    Yeah.  It looked as though he was trying to either get

17  something or hide something on the side of him.

18  Q    How, if at all, did you try to get the defendant's

19  attention?

20  A    He would not open up his door or roll down his window, so I

21  tapped on the window.  He refused to acknowledge that I was

22  there.

23  Q    When you say "refuse to acknowledge you were there", what

24  do you -- what do you mean by that?

25  A    He had told me I had no authority whatsoever to talk to

1   him.

2   Q    You could hear this through the window?

3   A    Yes.

4   Q    At some occasion, was the driver's side door opened?

5   A    Yes.  I had opened it.

6   Q    Why did you open the door?

7   A    I was going to place Mr. Campbell under arrest.

8   Q    When you say "Mr. Campbell", are you referring to the

9   defendant?

10  A    Yes.  The gentleman right here.

11  Q    What, if anything, did the defendant say to you?

12  A    Shoved me away, asked me why he was under arrest.  I told

13  him he was being placed under arrest for failure to stop.  He

14  said I had no authority to arrest him and refused to exit the

15  motor vehicle.

16  Q    During this interaction, while you were speaking with him,

17  did you observe him make any other motions or actions?

18  A    Yes.  He kept fidgeting with something on the righthand

19  side of him, between the seats, I believe.

20  Q    Why at that time were you placing Mr. -- or were you

21  placing the defendant under arrest?

22  A    For the failure to stop.

23  Q    So what, if anything, happened next?

24  A    Him and, I believe the other one was Mr. Smith that was in

25  the car with him, just were verbally attacking me and telling me

1  I had no authority and no right to pull him over or arrest him

2  and that he didn't have to get out of the truck.

3  Q    What did you do in response to his statements that you had

4  no authority to get -- to get him out of the truck?

5  A    I told him I was a Lowell police officer and he was being

6  under arrest for motor vehicle charges.  And he said -- again,

7  he just continued, him and Mr. Smith, verbally attacking me

8  saying I had no right and refused -- continued to refuse to get

9  out of the motor vehicle.  Then, at some point, Mr. Smith came

10  out around the truck towards me.

11  Q    Mr. Smith, the other occupant, exited the vehicle?

12  A    Correct.

13  Q    And how did -- did he identify himself to you as Mr. Smith?

14  A    No.  I came to learn of his name afterwards.

15  Q    So can you describe the scene where after Mr. Smith exited

16  the vehicle where were you, Mr. Smith, and where --

17  A    So they pulled in --

18  Q    -- the defendant was?

19  A    So it was -- 109 is a, it looked like a multitenant

20  apartment building -- house.  He pulled into the driveway.  As I

21  opened the door, I had the car door in front of me.  It was

22  tight quarters and so I had the building immediately against my

23  side there, and then Mr. Smith came around -- came -- got out of

24  the passenger's side, came around the back of the truck and

25  towards me.  So I was now -- had Mr. Campbell in the driver's

80

1    seat, Mr. Smith in front of me, because I diverted my attention

2    towards him, and then the door and the building all -- so I was

3    pretty much boxed in by them.

4    Q    Did you attempt to pull the defendant out of the vehicle?

5    A    At that point, when Mr. Smith came around the side, I had

6    pulled my Taser out.

7    Q    And why did you pull your Taser out?

8    A    I was in fear that I was going to be assaulted at that

9    point.

10   Q    Okay.  Who, if anyone, did you point the Taser at?

11   A    Mr. Smith.

12   Q    And what happened next?

13   A    I ordered him to stay away, to move back and stay away from

14   me.  At the same time, Mr. Campbell was shoving me from the

15   driver's side seat, and Mr. Campbell had then whacked my hand,

16   knocking the Taser out, and it fell underneath of the truck.

17   Q    At that moment, what do you feel?

18   A    Ready to fight.

19   Q    What, if anything, did you do next?

20   A    I was waiting for backup to come.  I was trying to get Mr.

21   Campbell out of the truck.  I was trying to get Mr. Smith to

22   back away from me.  Mr. Campbell went to go reach -- he shoved

23   me again, and went to go reach for something on the side, and I

24   hit him with a straight punch towards him.

25   Q    Did you feel any fear at that time?

1   A     Yes.

2   Q     Why did you throw the punch towards him?

3   A     Again, at that time, I thought he was going for a weapon.

4   Q     Did another officer eventually arrive?

5   A     Yes.  Officer Griffin was the first to show up.

6   Q     How long after the event you just described did Officer

7   Griffin show up?

8   A     It seemed like forever, but in actuality it was probably

9   three or four minutes.

10  Q     When Officer Griffin arrived, what, if anything, did he do?

11  A     He grabbed Mr. Smith.  Them two started wrestling.  I was

12  able to wrestle Mr. Campbell out of his -- out of the driver's

13  seat.

14  Q     After you wrestled the defendant out of the driver's seat,

15  what did you do next?

16  A     I was able to place handcuffs on him and arrest him.  Other

17  officers had arrived at the scene, and they helped Officer

18  Griffin handcuff Mr. Smith.

19  Q     Was Mr. Campbell saying anything to you at this time?

20  A     He was just telling me I had no -- again, most of the thing

21  was him telling me I had no authority to stop him or pull him

22  over and I had no authority to arrest him.

23  Q     Did anyone else, civilians or officers or otherwise,

24  approach the scene at any point during this interaction?

25  A     People came -- so there was residents on Pawtucket Street

82

1   that were looking.  I think they had called the police as well.

2   And then people that were at 109 4th Ave exited the house.

3   Q    Following the defendant's arrest, were you able to search

4   the vehicle?

5   A    Yes, I was.

6   Q    And what, if anything, did you find upon searching the

7   vehicle?

8   A    I found this machete right where he kept reaching for.

9   Q    After you see -- where was the machete found?

10  A    It was right on the side of his seat.  It was a bench seat

11  with, like, a little slice on the side, so it was right there on

12  the side where I saw him the whole time fidgeting towards.

13  Q    After you seized the machete, what was done with it?

14  A    It was tagged and placed into evidence.

15  Q    And is that the machete right in front of you?

16  A    Yes, it is.

17  Q    Is it in substantially the same condition as when you found

18  it on the scene?

19  A    Yes.

20  Q    When you found it, was it in that carrying case, or was it

21  outside the carrying case?

22  A    It was in the case.

23       MR. DEVOE:  Your Honor, I move to admit that object as

24  Exhibit 2.

25       THE COURT:  All right.  That will be Exhibit Number 2.

83

1        (Commonwealth's Exhibit 2 marked and admitted)

2    BY MR. DEVOE:

3    Q    At any point during your interaction with the defendant or

4    Mr. Smith prior to their arrest, did they tell you about this

5    machete?

6    A    No, they did not.

7    Q    At any time during this interaction, or as you placed the

8    defendant under arrest, did he tell you his name?

9    A    I don't know if he told me it or if I ascertained it

10   afterwards, but I came to learn that it was Leon Campbell.

11   Q    Did he tell you -- did the defendant tell you any other

12   names at the scene?

13   A    No, he did not.

14       MR. DEVOE:  Your Honor, may I approach?

15       THE COURT:  You may.

16       MR. DEVOE:  If I may have the Lexis document?

17   BY MR. DEVOE:

18   Q    Officer, I'm handing you another document.  Please take a

19   look at it.  Do you recognize what this document is?

20   A    Yes.  It's a Commonwealth of Massachusetts Registry of

21   Motor Vehicle image of Leon Campbell.

22   Q    Does the picture there match the defendant?

23   A    Yes, it does.

24   Q    Do you see a stamp of Registry of Motor Vehicles on it?

25   A    Yes, I do.

84

1   Q    And what's the listed address at the top of the second page

2   of that document?

3   A    It's listed as PO Box 55889, Boston, Massachusetts 02205.

4   Q    I'm sorry.  On the second page of this document, Page 2 of

5   3, do you see it says there historical address information?

6   A    I'm sorry.  Does it say what?

7   Q    Historical address information, on the second page.

8   A    Yes, it does.

9   Q    And what's the first address he lived at?

10  A    Historical license ID, demographic historical name

11  information, Leon J. Campbell, 109 4th Ave, Lowell, Mass 01852.

12  Q    And that's where these events took place.  Is that right?

13  A    That's where they ended up at, yes.

14       MR. DEVOE:  Your Honor, I'd ask that this document be

15  admitted.

16       THE COURT:  That'll be Exhibit 3.

17       (Commonwealth's Exhibit 3 marked and admitted)

18  BY MR. DEVOE:

19  Q    One last question before he grabs it.  Do you see on the

20  top of the first page, underneath the passenger status, it says

21  suspended?

22  A    Yes, I do.

23  Q    Thank you.

24       MR. DEVOE:  Your Honor, may I approach?

25       THE COURT:  You may.

BY MR. DEVOE:

Q    Officer, I'm handing you another document.  Do you see at the top of this document it says "driver history report"?

A    Yes, I do.

Q    And do you see in the middle of the page there's a stamp of the Registrar of Motor Vehicles?

A    Yes, I do.

Q    Do you see at the top left it says the date of his court is February 8, 2019?

A    Yes, I do.

Q    Can you please read the first sentence of the second paragraph?  It begins, "I further certify".

A    "I further certify that in accordance with General Law, Chapter 90, Section 23, there has been no reinstatement of his or her license or right to operate a motor vehicle in the Commonwealth of Massachusetts."

     MR. DEVOE:  Your Honor, I'd ask that this be admitted, this document.

     THE COURT:  That'll be Exhibit 4.

     (Commonwealth's Exhibit 4 marked and admitted)

BY MR. DEVOE:

Q    Following your handcuffing and the arrest of the defendant, what happened next?

A    There was numerous officers on scene.  They called for the wagon.  They were placed in the wagon to be transported to the

86

1   police station.  The motor vehicle was towed.

2   Q    Did you write a police report regarding the events?

3   A    Yes, I did.

4        MR. DEVOE:  Thank you, Your Honor.  No further questions.

5        THE COURT:  All right.  Thank you.

6        Mr. Bey.

7                        CROSS-EXAMINATION

8   BY MR. BEY:

9   Q    Mr. Allen, how you doing today?

10  A    I'm sorry?

11       THE COURT:  And, sir, just so that we all -- so if you

12  could stand there.  Unless you need to show him something --

13       MR. BEY:  Oh.

14       THE COURT:  -- then you have to ask the Court permission.

15  Okay?

16       MR. BEY:  All right.  I'll stand over there with the jury,

17  with the people.

18  BY MR. BEY:

19  Q    How you doing today, Mr. Allen?

20  A    That's not my name, sir.

21  Q    Pender.  Allen.  Your name is not --

22  A    My name is David.

23  Q    David Allen Pender?

24  A    Yup.

25  Q    Mr. Allen is not a good name to refer to you as?

1  A    No, it is not.

2  Q    Would do you like to be referred as?

3  A    Officer Pender.

4  Q    Officer Pender.

5       And for the jury, so the jury can know, you are a policy

6  enforcer, or are you a law enforcer?

7  A    I'm a law enforcement officer.

8  Q    Your law enforcer.

9  A    Correct.

10 Q    Law enforcer.  So law enforcers must enforce law, right?

11 Right?  How long you been a law enforcer?

12 A    How long have I been a police officer?

13 Q    You just said you were a law enforcer.

14 A    Well you asked if I --

15 Q    And that's not a police officer.  Is it a law enforcer or a

16 police officer?

17      THE COURT:  Mr. Bey, just ask the question and let him

18 answer.

19      MR. BEY:  Am I going to be able to --

20      THE COURT:  Yes, you will.  But --

21      MR. BEY:  -- do what the D.A. can do?

22      THE COURT:  Ask a question.

23      MR. BEY:  All right.

24 BY MR. BEY:

25 Q    So how long have you been a law enforcer?

1  A    I've been a police officer for 33 years now.

2  Q    Okay.  So you must know some law, then.  I'm going to ask

3  you some Mass general laws just to see -- just to test his

4  competence, right, because he's law enforcement police.

5       THE COURT:  Okay.  Mr. Bey --

6       MR. BEY:  They should know these things.

7       THE COURT:  Mr. Bey --

8       MR. BEY:  This is what they do all the time.

9       THE COURT:  And I just want to remind everybody of the

10  warning I gave everybody prior to the start of this trial.

11       (Sidebar commenced at 12:33:12 p.m.)

12       THE COURT:  You can't -- you can't test him.  You can ask

13  questions --

14       MR. BEY:  That's all I am doing is asking him questions.

15       THE COURT:  It's not a competency test.

16       MR. BEY:  But you -- he -- he said it is for competency.

17  He mentioned that when he admitted the documents --

18       THE COURT:  Shh, shh, shh.

19       MR. BEY:  -- to the -- you said it is competency.  Now it's

20  not competency?

21       THE COURT:  No, it's --

22       MR. BEY:  I'm confused.  I'm confused.

23       THE COURT:  You're not going to do a competency test.

24  Okay?

25       MR. BEY:  We might have to because I'm confused.  I don't

1   know if it's about competency or is it not about competency?

2       THE COURT:  Okay.  So --

3       MR. BEY:  So then -- so then it's not about --

4       THE COURT:  Here, look, keep your voice down.

5       MR. BEY:  I am.  So it's not about competency?

6       THE COURT:  No.

7       MR. BEY:  That's what you're saying?

8       THE COURT:  It's not --

9       MR. BEY:  Not about competency.

10      THE COURT:  It's about the facts of the case.  Okay.  So

11  you can ask him questions, but you can't give him a competency

12  test as to what he knows or doesn't know.  If you want the Court

13  to take judicial notice of any particular law I can do that at

14  the end of the trial, but not now.

15      MR. BEY:  Do you -- you guys always say that, and you never

16  do.

17      THE COURT:  Well --

18      MR. BEY:  That's the problem I'm having.

19      THE COURT:  Sir, before you rest, if you want me to take

20  judicial notice of any laws in the Commonwealth of Massachusetts

21  or any other jurisdiction, I can.

22      MR. BEY:  You can -- you can stay on the jurisdiction.

23  That is on Supreme Court (indiscernible) cases.

24      THE COURT:  Supreme Court cases?

25      MR. BEY:  Yeah.

90

1      THE COURT:  I'll have to look at them.

2      MR. BEY:  I mean, this is Court has to adhere to the

3  Supreme Court decisions.

4      THE COURT:  If it relates to --

5      MR. BEY:  If it relates to ---

6      THE COURT:  -- the Massachusetts State Court, yeah.

7      MR. BEY:  Well Supreme Court relates to every state court.

8      THE COURT:  It does, but Massachusetts has its own laws.

9  While it's true that some of the federal laws apply to

10  Massachusetts as well.

11      MR. BEY:  I'm well aware of that.

12      THE COURT:  Okay.

13      MR. BEY:  So you're saying I can continue to question?

14      THE COURT:  Yeah.  It's not going to be an exam.  Okay.

15      MR. BEY:  Well it's not taking an exam.  It's just to bring

16  the jury and everyone to an understanding of the mental capacity

17  of what we're doing.

18      THE COURT:  No, his mental capacity is not an issue.

19      MR. BEY:  But it has to be an issue if they're writing

20  tickets, pulling people over, and jumping into the street with

21  their -- with their vehicles recklessly.  It has to be an issue.

22      THE COURT:  No, it's not an issue, Mr. Campbell.  Mr. Bey,

23  I'm sorry.

24      MR. BEY:  So let me ask you.  So you're telling me a police

25  officer does not need to know anything or anything of what he's

1   doing, just like me trying to resist.  And I don't need to know

2   how to resist, and I can just go outside --

3        THE COURT:  If you want to --

4        MR. BEY:  -- but it is --

5        THE COURT:  -- (indiscernible).

6        MR. BEY:  But that is what I'm asking.

7        THE COURT:  Okay.  But it can't be a competency issue.

8   Okay.  All right.  All right, sir.

9        MR. BEY:  I'm still confused.

10        THE COURT:  Well let's see if you can get through this.

11        (Sidebar concluded at 12:36 p.m.)

12   BY MR. BEY:

13   Q    So you're a police officer, right?  You enforce law, right?

14   A    Yes.

15   Q    Did you know that Mass general law, right, the operation of

16   a motor vehicle owned by nonresidents, do you know what it says

17   about that?

18   A    No.

19   Q    No, you don't.  Okay.

20        When you -- when you saw the defendant at the -- the lights

21   at -- what's the name of the street?  The --

22   A    You were on the O'Donnell Bridge originally.

23   Q    O'Donnell Bridge.  Right.  And in this -- these photos you

24   guys can see.  There's pumpkins in the church right behind

25   there, so this photo was taken old when that line is very

1  visible to show you that left lane turn --

2      THE COURT:  Mr. Bey, you'll have closing arguments later,

3  but now it's questioning this particular witness, okay.

4      MR. BEY:  Okay.

5  BY MR. BEY:

6  Q    You said you pulled out, you saw the vehicle do whatever it

7  did, and you pulled out using your sirens and your lights.

8  A    Correct.

9  Q    How long did it take you to get out of the parking lot of

10  the house where I saw you?

11  A    I immediately pulled in right behind you --

12  Q    You did?

13  A    -- so seconds.

14  Q    Seconds.  You pulled right behind me.

15  A    Yes, I did.

16  Q    Okay.  And you saw the defendant, so-called person, swerve

17  on the other side of the street and -- and endanger other cars

18  and everything, you said?

19  A    I said I saw the -- you pull over onto the opposite side of

20  the road, yes.

21  Q    Right.  And endanger other cars and everything?

22  A    That is correct.

23  Q    Were there any police report call-ins about that that

24  night?  Anyone call the station about some reckless driving on

25  Mammoth --

93

1  A     I have no idea.

2  Q     -- that evening when I did that?

3  A     I have no idea.

4  Q     You have no idea if there's any record of any call-in of

5  someone recklessly and dangerously driving on Mammoth Road that

6  night, the night in question?

7  A     I already said I have no idea.

8  Q     Nobody.  All right.  Cool, cool, cool, cool.  You said,

9  here, right, you said you -- you found the -- the machete?

10  A     Well yes.

11  Q     You found the machete?

12  A     Yes.

13  Q     Oh, okay.  Well -- and -- and -- and your fellow --

14  according to your fellow officer, he found the machete.  So now

15  we have a discrepancy.

16  A     He --

17  Q     They both seem to have found one object --

18        THE COURT:  Sir --

19        MR. BEY:  -- at the same time.

20        THE COURT:  Again, you can't --

21        MR. BEY:  I can't talk to the people.

22        THE COURT:  You can do that at closing --

23        MR. BEY:  They don't want to be talked to.

24        THE COURT:  At closing --

25        MR. BEY:  Okay.

1    THE COURT:  -- argument, you can.

2  BY MR. BEY:

3  Q    So you're sure you found it?  Or did Kyle find it?

4  A    It could have been Kyle.  I don't remember.

5  Q    It could have been Kyle.

6  A    But I -- it could have been.

7  Q    But you said you found it.

8  A    Did I?  Well then if I wrote down I found it, then --

9  Q    Hold on.  Is this your handwriting here?

10 A    No, that's print.  That's a type.  That's not handwritten.

11 Q    Did you type this?

12 A    I don't know what you have there.

13 Q    You don't?  Is this your name down here at the bottom?

14    THE COURT:  MR. BEY --

15    MR. BEY:  I'm asking him --

16    THE COURT:  I can't see it from here, either.

17    MR. BEY:  Oh.

18    THE COURT:  And I got glasses on.

19    MR. BEY:  Well you guys do this to us all the time.

20    THE COURT:  So if you want to show him something, you can

21  approach and show him what you want to show him.

22    MR. BEY:  I understand that, but I'm just being fair.

23    THE COURT:  I'm trying to be fair and --

24    MR. BEY:  What's done to others, right -- do unto others as

25  you would do unto yourself.

95

1        THE COURT:  Right.  If he can't see it, sir, you can

2   approach with it.

3        MR. BEY:  I understand it, Your Honor.

4        THE COURT:  Okay.

5        MR. BEY:  When you're sitting up there on the bench, you

6   show -- you -- you show me a green sheet like this way up there,

7   and I'm way back here, and you ask me is this is my signature

8   and -- and --

9        THE COURT:  Sir --

10       MR. BEY:  -- what --

11       THE COURT:  Mr. Bey --

12       MR. BEY:  It's the same thing.

13       (Sidebar commenced at 12:39 p.m.)

14       THE COURT:  Mr. Bey, you absolutely have me on that.  I

15   always show people --

16       MR. BEY:  And I'm just trying to be fair.

17       THE COURT:  -- (indiscernible).

18       MR. BEY:  I'm not trying to be --

19       THE COURT:  -- they're the ones who just signed it, so I'm

20   just reaffirming that that's their signature.  If you need to

21   call -- if you need to approach to show him something if he

22   can't see it -- just like anybody I'm taking a plea from.  If

23   they told me that they weren't able to look at that, I'd let

24   them look at it.

25       MR. BEY:  Okay.

1        THE COURT:  Okay.  You understand?

2        MR. BEY:  I understand.

3        THE COURT:  All right.  Okay.

4        (Sidebar concluded at 12:39 p.m.)

5    BY MR. BEY:

6    Q    Okay.  So you followed this -- this -- this car, swerving

7    and dangerly [sic] driving, right?  No.  You're not sure if any

8    calls went into the station about that or anything.  Then you

9    said he turned on what street?  What street did -- did the --

10       THE COURT:  At what time frame?  Turning onto what street,

11   did he --

12   BY MR. BEY:

13   Q    After him following the vehicle and seeing it do all that

14   you claim that it did, you said it took a turn onto a street,

15   right?  Didn't you say that here?

16       "We followed up on Mammoth where Mr. Campbell went around

17   several cars when driving the road, up going onto the opposite

18   side of the road, causing inbound motor vehicles to move out of

19   his way.  He then took a right onto --"  You wrote it right

20   here.  You want -- should I -- you want to take a look at it --

21   A    You haven't asked me question.

22   Q    -- to refresh your --

23   A    I don't know what you want me to say.

24   Q    I asked you what street was that that the --

25   A    Mammoth Road onto 4th Ave.

1   Q    Onto 4th Avenue.  And what was the address?

2   A    I believe it was 109.

3   Q    109 what?

4   A    4th Avenue.

5   Q    4th Avenue.

6        All right.  So when you get there, to this -- this -- this

7   -- the truck, pickup truck pulls into the address, 4th Avenue,

8   right?

9   A    That is correct.

10  Q    And you exit your car, your -- your -- your trooper vehicle

11  to then approach the truck.  How did you approach?

12  A    On foot.

13  Q    I know, but aggressively?  Well did you approach cool,

14  calm, and collect?  Did you approach with the Taser already in

15  your hand?  Did you approach yelling?  Did you approach -- like,

16  how did you approach?

17  A    I just walked up to your side of the motor vehicle.

18  Q    Cool, calm, and collect?

19  A    I believe I was, yes.

20  Q    Under control?

21  A    I believe I was, yes.

22  Q    No Taser in your hand?

23  A    No.

24  Q    You came with your hands empty?

25  A    That is correct.

1  Q    Okay.  And what did you say to the driver?

2  A    I asked you to roll down your window, and I asked for your

3  license and registration.

4  Q    You asked for license and registration.  Oh.  Because what

5  you -- that -- that -- that -- I might have missed that part,

6  but we'll -- we'll -- we'll get to that, right?  Let's look and

7  let's see if we can find out where you said you asked for the

8  license and registration.  Da, da, da.  109, and I approached

9  pickup truck.  Da, da, da.  Something between the seats.  Da,

10  da, da.

11      At this time, very -- so and then you go, "I then got his

12  door open."

13      But at no point did you even put you asked for license and

14  registration.  I'm just giving you a refresher.  You didn't

15  write that there.  You might have did, but you didn't write it.

16  Just let you know.  All right.

17      And then you go --

18      THE COURT:  Sir -- Mr. Bey, was that a question?  Again,

19  you have to put it in the form of a question, not statements.

20  Okay.

21      MR. BEY:  Okay.  That wasn't a question.  I'm just trying

22  to help him out.

23      THE COURT:  No, just help yourself.

24  BY MR. BEY:

25  Q    Then he goes -- right.  Then he goes, "He then gets the

1  door open and asked to step out of the car where he refused, and

2  then asked me -- because I had no right to ask him." So how --

3  how -- how did you ask him to step out of the car?  In what way?

4  A    How did I ask you to step out of the car?

5  Q    However you -- however your mind wants to play it.  I'm

6  just asking a question.  How did you ask the individual to step

7  out of the car?

8  A    I asked you to step out of the car by just saying, "Step

9  out of the car, please."

10  Q    Through the window rolled all the way up, or after you

11  opened the door, or how did you do it?

12  A    I believe it was both.

13  Q    Both.  With the window up.

14  A    Once with the window up, and once when I opened up the

15  door.

16  Q    All right.  Who opened it?  You opened the door, or --

17  A    I did.

18  Q    -- the individual opened the door?

19  A    Well you keep saying "the individual".  The individual is

20  you.

21  Q    That's fine.  But I'm asking you a question.  Who opened

22  the door?  The individual --

23  A    I believe I said --

24  Q    -- or you?

25  A    -- in the report I opened the door.

1   Q    You opened it.

2   A    That is correct.

3   Q    Okay.  And then you say Mr. -- Mr. -- you said -- when you

4   said the person was fidgeting around in the middle of the thing,

5   like, how much fidgeting?  Full-body turned fidgeting?  Arm only

6   fidgeting?

7   A    You had -- you had moved over -- you had fidgeted over

8   toward -- you had moved over toward the right like you were

9   trying to grab something or hide something.

10  Q    Is this before or after you approached the driver's side

11  window to ask for what you were asking for?

12  A    You were actually doing it as I was walking to it and as I

13  got to your door.

14  Q    So as you were walking to the vehicle, and as you

15  approached the thing, I still -- the -- the --

16  A    You were --

17  Q    -- person was still fidgeting?

18  A    You were reaching or --

19  Q    Reaching.

20  A    -- hiding something on the side there.

21  Q    Right in the front area on the front seat?  Front, middle?

22  A    I believe I said that, yes.

23  Q    Okay.  All right.  So reaching in the front, middle, right?

24       THE COURT:  Mr. Bey, again, you'll have time to argue

25  later, but don't talk to the jurors --

1       MR. BEY:  Okay.

2       THE COURT:  -- during the course --

3       MR. BEY:  My apologies.  My apologies, My Honor.

4   BY MR. BEY:

5   Q    Let's continue on.

6       You said Mr. Smith came out the car.  All right, so hold

7   on.  You saw the fidgeting inside.  Did you see any kind of

8   recording going on with a cell phone on the inside as well?

9   A    No, I didn't.

10  Q    No recording.

11  A    No.

12  Q    But you saw me fidgeting, if you didn't see the passenger,

13  the guest in the car, doing any phone up, nothing?

14  A    Not that I'm aware of any recordings, no.

15  Q    Any when -- when -- when -- when he alleged came out and

16  came around to approach you, was he recording?

17  A    Mr. Smith?

18  Q    Yes.

19  A    I have no idea if he had a recorder in his hand or not.

20  Q    Oh.

21  A    I didn't see one.

22  Q    You didn't see one.

23  A    No.

24  Q    Well let me help you out there, right?

25       (Pause)

1      How did I miss that?  So when -- when -- when Mr. Smith

2  approached, was it aggressively, or was he just walking up to

3  you?

4  A    It was aggressively.

5  Q    Aggressively.

6      And you said you were -- you said -- you said -- you said

7  at one point, "At this time, Mr. Smith both became very loud and

8  started to argue with the officer," but you -- you leave a gap.

9  "Then I got to the door and he asked to step out, but he was

10  refusing, and I said him why.  Because I had no right to stop

11  him."

12      So right there, what happened that made Mr. Smith and the

13  defendant start to just rail up and start yelling at you and

14  stuff?

15  A    You would have to ask Mr. Smith that question, not I.

16  Q    But it was both of them.

17  A    You would have to ask yourself and Mr. Smith why you acted

18  that way.

19  Q    So you wouldn't know why after you asked the question we

20  just --

21  A    How would I know why you behaved the way you do, sir?

22  That's your, not me.

23  Q    Oh.

24  A    You would have to ask yourself why you behaved like that.

25  Q    Is it true -- is it true that you have prior cases of

1   abuse?

2        MR. DEVOE:  Objection.

3        THE COURT:  Sustained.

4   BY MR. BEY:

5   Q    Is it true you have prior questions of -- things of abuse?

6        MR. DEVOE:  Objection.

7        THE COURT:  Sustained.  Next question.

8   BY MR. BEY:

9   Q    Is it true you just came off of paid administrative leave?

10       MR. DEVOE:  Objection.

11       THE COURT:  Sustained.

12  BY MR. BEY:

13  Q    Is it true it's public knowledge to Lowell that you abused

14  the children in the high school?

15       MR. DEVOE:  Objection.

16       THE COURT:  Sustained.

17       MR. DEVOE:  Your Honor, can I be heard at sidebar?

18       THE COURT:  Yes.

19       MR. BEY:  All the objections --

20       (Sidebar commenced at 12:46 p.m.)

21       THE COURT:  Okay.  Sir, where are you going with this?

22       MR. BEY:  I'm asking questions.

23       THE COURT:  He's objecting because unless you --

24       MR. BEY:  But he's not answering any of the questions I

25  have regarding the things, so I have to get --

1       THE COURT:  Yeah, he is.

2       MR. BEY:  -- some sort of --

3       THE COURT:  But you can't --

4       MR. BEY:  What am I to do --

5       THE COURT:  -- ask a question you have no basis to ask for.

6   Okay?

7       MR. BEY:  But I do have basis.  I have a --

8       MR. DEVOE:  He does have some (indiscernible) basis.

9       MR. BEY:  Some --

10      MR. DEVOE:  The Commonwealth has provided discovery on

11  (indiscernible) private administrative issues.  Officer Pender

12  (indiscernible).

13      MR. BEY:  (Indiscernible.)

14      THE COURT:  (Indiscernible) came before, because there's no

15  -- there's no -- it was not your cases, and the motor vehicle

16  cases that (indiscernible) before the Court.  So I'm going to --

17      MR. BEY:  Yeah, but he --

18      THE COURT:  -- (indiscernible).

19      MR. BEY:  He even puts that strong-arms me.  He punched me

20  in the face three times.

21      THE COURT:  You can -- you can -- all right -- that's --

22  that's fair.

23      MR. BEY:  I need to bring that to the people's attention --

24      THE COURT:  Okay.  No, right -- sure.

25      MR. BEY:  -- if it's a cop running around punching people

1   in the face.

2       THE COURT:  If you want to bring that up, but nothing on

3   the prior, because it doesn't --

4       MR. BEY:  It does, it -- it -- because I can't -- I can't

5   make him seem like that if you guys keep presenting him as an

6   outstanding person.

7       THE COURT:  I'm not presenting him as anything.

8       MR. BEY:  All right.  So --

9       THE COURT:  If you have evidence of that, what he said in

10  this police report, ask him.  Okay?  Okay?

11      MR. BEY:  Okay.

12      THE COURT:  All right.

13      (Sidebar concluded at 12:48 p.m.)

14  BY MR. BEY:

15  Q   You discovered that machete before or after the suspects

16  were in custody?

17  A   Afterwards.

18  Q   Afterwards.

19  A   Yes.

20  Q   How long do you say it took you to take the suspects in

21  custody?  Like, how long time frame?

22  A   Again, I said the whole thing lasted about four or five

23  minutes throughout the thing, the interaction.

24  Q   Oh, you mean -- you mean from beginning to the arrest and

25  all the troopers clearing out, or the whole thing meaning just

1  you and the individuals?

2  A    If you're asking me when I found the knife, and it was

3  after you were in custody.  If you're asking me to pinpoint ten

4  seconds, two minutes, I couldn't tell you.

5  Q    I'm asking you how long --

6  A    It was after --

7  Q    -- it took for you to get the suspects in custody.  That's

8  it.  Simple.  It's not rocket science.  How long did it take for

9  you --

10  A    Well --

11  Q    -- your alleged quarreling with them, until you got the

12  cuffs on, until you got them in the van and out of there so you

13  could search and do everything else?  How long did that take

14  until you got the suspects to the van and out of there?

15  A    Well I would say it was around 15 minutes before the van

16  got there.

17  Q    Okay.

18  A    The wagon.

19  Q    So how long?

20  A    I just told you.  It was around 15 minutes --

21  Q    That's just when --

22  A    -- before the wagon got there.

23  Q    -- the wagon got there.  How long did it take to get us

24  from --

25  A    I don't understand the question.

1    THE COURT:  I don't understand the question, either.  I

2 understand --

3    MR. BEY:  One of the charges is disorderly, correct?

4    THE COURT:  No.

5    MR. BEY:  No?  Not one of the charges is not resisting or

6 disorderly?

7    THE COURT:  Resisting.  Not disorderly.

8    MR. BEY:  Resisting.  Okay.  So that's why I'm asking, how

9 long did it take him to get us into custody and into the van.

10 I'm not asking how long the van took to pull up.

11    THE COURT:  If you could pinpoint, Officer, how long it

12 took you to get -- between the time you had already took the

13 defendant into custody, and then got him into the van.

14    THE WITNESS:  It was around 15 minutes.

15 BY MR. BEY:

16 Q    So the exact -- the exact same time that it took for the

17 wagon to get there?

18 A    Yeah.  That's what you asked.  Between the time --

19 Q    No, I asked --

20 A    -- you went into the wagon --

21 Q    I understand that's all you understand, but it's not what I

22 asked.  So -- and you stated you found the machete, and you

23 saying you couldn't see the plates until the -- you got the snow

24 off the back of the truck?

25 A    Correct.

108

1  Q    All right.  You said you pulled out with sirens and lights

2  on, correct?

3  A    That is correct.

4  Q    All the way from the start of the chase until the -- to the

5  house, to the house where the suspect eventually pulled into?

6  A    That is correct.

7  Q    Sirens and lights on all the way?

8  A    That is correct.

9  Q    Okay.  Okay.  And you also said -- so what did the suspect

10 do, the driver, to make you have to punch him in the face the

11 way you did, repeatedly?  What -- what did he do to --

12 A    Besides knocking the Taser out of my hand and being fairly

13 combative with me, and then trying to reach for something.

14 Q    So you punched him in the --

15 A    What else did he do?

16 Q    -- face after he knocks the Taser out of your hand?

17 A    Yeah.  I believe that's what I wrote as well.

18 Q    So here we have a suspect, physically knocks the Taser, you

19 say, like, knocks it out of the hand.  Had to hit your hand to

20 knock the object out of your hand?

21 A    Correct.

22 Q    Is any of these charges assault and battery on an -- on an

23 officer?

24      THE COURT:  Sir, sir, you're asking a question --

25      MR. BEY:  No, I'm asking --

1       THE COURT:  -- that's out of his control.

2       MR. BEY:  Because I forgot all the charges.  Is any of them

3   assault and battery on an officer?

4       THE COURT:  The charges that are being tried are carrying a

5   dangerous weapon, operating to endanger, unlicensed operation of

6   a motor vehicle, resisting arrest, and failing to stop for

7   police officer.

8       MR. BEY:  No, no assault and battery on a police officer.

9   But he slapped the Taser.  He slapped you and slapped the Taser

10  out of your hand.  All right.  Cool.  Next question.  Oh,

11  actually, you might not even have the answer, right?

12  BY MR. BEY:

13  Q   What -- you said when the -- the guest in the car came

14  around to you, did -- did he make it in time to you before

15  backup arrived?  Did you -- you were handling both suspects by

16  yourself?

17  A   I was trying to.

18  Q   You was trying to.  Like, how were you trying to karate,

19  like, what are you doing?  Like, did you have one here and one

20  here?

21      THE COURT:  Sir, that's an argumentative question.  Just

22  ask him the question.

23  BY MR. BEY:

24  Q   How did he -- how did he handle both subjects before your

25  backup arrived?  How did you handle it?

1   A    How did I handle it?

2   Q    Right.  I mean, because you're --

3   A    Obviously not very well because you knocked the Taser out

4   of my hand.

5   Q    You're saying that they were belligerent, yelling, and

6   whatever.

7   A    That is correct.

8   Q    You feared for your life.

9   A    That is correct.

10  Q    You being the only one with a gun on you and a Taser, you

11  feared for your life.  And I'm saying, like, you had no backup,

12  so two -- two -- two individuals could easily -- the way you're

13  describing them, could easily well subdue you.  And I'm asking

14  you how did Mr. Smith, however you want to call him, whatever

15  you're calling him, did he get to you?  How did you handle both

16  suspects like that?

17  A    I pointed my Taser at Mr. Smith.

18  Q    Uh-huh.  This is before or after I knocked it out your

19  hand?

20  A    That's kind of a dumb question, but --

21  Q    Was it before or after --

22  A    How could -- I pointed it at him --

23  Q    -- the Taser was knocked out of --

24  A    How could I point it at somebody if you --

25       THE COURT:  Officer -- okay.  Just --

1        THE WITNESS:  -- knocked it out of my hand?

2        THE COURT:  Just, I mean --

3   BY MR. BEY:

4   Q    Was this before or after the Taser was knocked out of your

5   hand?

6   A    Obviously it was before --

7   Q    Before.

8   A    -- it was knocked out of my hand.

9   Q    And how did you get the straw named suspect out of the car

10  -- out of the truck?

11  A    The -- again, I don't know what you just said.

12  Q    Well ask -- ask the judge.

13       THE COURT:  No, no.  Can you rephrase the question?

14  BY MR. BEY:

15  Q    The straw man subject who you called --

16  A    What's --

17  Q    -- who you referred to as Leon Campbell, how did you get

18  him --

19  A    How did I get you out of the car?

20  Q    How did you get Leon Campbell out of the truck?

21  A    I grabbed you and pulled you out of the truck.

22  Q    You grabbed me?  You physically had to take --

23  A    I physically had to take you out of the truck.

24  Q    Okay.  And at that point, what was in your hand when you

25  were physically taking the suspect out of the truck?

1   A   Nothing.

2   Q   Nothing.  Your hands was free.

3       Where was your Taser at that point?

4   A   Underneath of the truck.

5   Q   When you were physically pulling him out, it was already

6   under?

7   A   Yes.

8   Q   So you went to physically pull him out of the truck, but

9   the Taser was already underneath the truck.  When did the

10  suspect knock the Taser out your hand again?

11  A   When did you knock the Taser out?

12  Q   I mean, you can say you, he, she --

13  A   When I pointed it at --

14  Q   We're just --

15      MR. DEVOE:  Objection, Your Honor.

16      MR. BEY:  We're trying to get to the bottom of this.

17      THE COURT:  Yes.  As best you can, answer the question,

18  Officer.  As best you can --

19      MR. BEY:  I'm asking the question clearly

20      THE COURT:  -- answer the question.  All right.

21      MR. BEY:  He keeps rephrasing it with you and he and hate.

22  So he --

23      THE COURT:  All right.  But you can't control how he

24  answers the question.

25      MR. BEY:  I cannot, I know.  So --

1        THE COURT:  All right.  Just ask the question, sir.

2        MR. BEY:  Is he allowed to re-ask me the question?

3        THE COURT:  No.

4        MR. BEY:  Okay.

5        THE COURT:  I just informed him --

6        MR. BEY:  All right.

7        THE COURT:  -- just to answer the question.

8    BY MR. BEY:

9    Q    So you're saying this person knocked the Taser out your

10   hand and then hopped back in the truck for you to pull him out

11   of it?

12   A    I never said you got out of the truck.  You're saying that,

13   sir.

14   Q    Okay.  So the suspect knocked the Taser out your hand from

15   inside the truck?

16   A    You did, yes.

17   Q    So the suspect's sitting in the vehicle ready to reach out

18   the window, reach out the side of the truck.  How did he --

19   A    No.

20   Q    How did he knock the Taser out your hand?

21   A    Well like I said earlier, I had opened the door.

22   Q    Right.  And how did he knock the Taser out your hand?

23   A    You slapped it out of my hand, I believe.  You either

24   slapped it or punched it, however you swung and knocked it out

25   of my hand.

1  Q    So you can't --

2  A    You knocked it out of my hand, so however.  You would have

3  to answer whether it was open hand, closed fist.  You knocked it

4  out of my hand.

5  Q    All right.  After the suspect knocked it out of your hand,

6  did that get you upset in any way emotionally?  Did you do

7  anything?

8  A    Was I upset?  No, I was scared.

9  Q    So after the suspect knocked it out of your hand, then what

10 did you do?

11 A    Again, I was ready to fight.  I was ready to fight you and

12 Mr. Smith.

13 Q    Did you punch him in the face?  Did you punch the person in

14 the face before or after that he knocked the Taser out of your

15 hand?

16 A    That was after.

17 Q    So after he knocked the Taser, you punched him in his face?

18 A    Correct.

19 Q    Was this before or after you pulled him out of the car?

20 A    You were still in the car reaching for something at that

21 point.

22 Q    That's -- at that point, that's when you punched the person

23 in the face?

24 A    Correct.

25 Q    So in the car reaching, slapped the Taser out of his hand

1    in the car, and you punched him in the face in the car, and then

2    dragged the suspect out?

3    A    No, you weren't taken out of the car until my help arrived.

4    Q    So then you had one suspect coming around the vehicle,

5    another suspect still in the car.  How did you handle it?

6    A    What do you mean by how did I handle it?

7    Q    How did you handle the suspect approaching you and the

8    suspect in the car reaching for something?

9    A    Again, at that point, I had my Taser telling Mr. Smith to

10   stay back.  At the same time trying to --

11   Q    So you was just -- you was just there shriveling, stay

12   back, and the other guy's pulling something out of the car.

13   That's pretty much what you were doing?

14   A    Yeah.  I had to keep my eyes on both of you.  Yeah -- so,

15   yeah.  It's not easy, but I had to do it.

16   Q    You had to do it.

17   A    Yes.

18   Q    Okay.  Let's see.  Backup arrived, and they were struggling

19   with -- how did you get the cuffs on the suspect?

20   A    After struggling with you, I got your hands behind your

21   back, and I arrested you.

22   Q    How?  How did you get the -- how -- how was that done?

23   What was the struggle like?

24   A    Once my -- once my help arrived, once I --

25   Q    No.  What was the struggle like with the suspect?  What was

1   the struggle like?

2   A    Just a short wrestling match, and then I was able to cuff

3   you.

4   Q    A short wrestling match?

5   A    Correct.

6   Q    How did you guys wrestle?  Like, what kind of wrestling?  I

7   mean, I was watching wrestling before --

8        THE COURT:  As best as you can describe the process.

9        MR. BEY:  Yeah.

10       THE WITNESS:  Yeah.  We had a brief struggle.  I was

11   able --

12   BY MR. BEY:

13   Q    What -- like, can you describe the struggle?

14   A    Yeah.  We both had our hands on one another, and we were --

15   I was trying to get you -- my handcuffs on you --

16   Q    The suspect --

17   A    -- but you would not allow it.

18   Q    -- had his hands all over you?

19   A    I'm sorry?

20   Q    The suspect had his hands on you?

21   A    Yes, he did.

22   Q    You both had your hands on each other?

23   A    That is correct.

24   Q    Do you -- are -- is there body cameras, Lowell Police

25   required for body cameras?

1   A    No.

2   Q    Okay.  And you said you don't recall seeing the suspect

3   doing any sort of filming?

4   A    No, I did not.

5   Q    Okay.

6        MR. BEY:  I rest my case.  No further questions.

7        THE COURT:  No further questions.

8        Anything further, Attorney DeVoe?

9        MR. DEVOE:  No further questions, Your Honor.

10       THE COURT:  All right.

11       Thank you, Officer.  You may step down.

12       THE WITNESS:  Thank you.

13       THE COURT:  All right.  Ladies and gentlemen, as I told

14  you, we always break from 1:00 to 2:00 for lunch, so we're going

15  to break right now.

16       I have to admonish you, do not discuss this case with

17  anyone during the break, including each other.  If you happen to

18  run into any of the parties in this case, anybody, during the

19  course of your lunch, do not engage them in conversation because

20  they're going to be admonished not to engage in conversation as

21  well.

22       So we'll see everybody back here right at 2 o'clock.

23       DEPUTY CLERK:  All rise.  Jury out.  Be careful stepping

24  down.  Come this way, please.

25       (Jury out at 12:59 p.m.)

1       THE COURT:  All right.  2 o'clock.

2       MR. DEVOE:  One point of logistics, Your Honor.  I think it

3  was very cold in here for some of the jurors.  If there's some

4  way we could --

5       MR. BEY:  I'm shivering.

6       THE COURT:  Yeah.

7       MR. BEY:  The jurors are trembling.

8       DEPUTY CLERK:  I'm going to address that.

9       MR. BEY:  I'm trembling.

10      DEPUTY CLERK:  I'm going to open some windows, too.

11      THE COURT:  It's an old building.

12      DEPUTY CLERK:  It's either freezing or hot.

13      THE COURT:  It's either freezing or hot.

14      DEPUTY CLERK:  Yup.

15      MR. BEY:  I'll take it --

16      MR. DEVOE:  I'm not requesting a miracle.

17      THE COURT:  Okay.  No, we'll do as best we can.

18      DEPUTY CLERK:  I'll open the windows.

19      MR. BEY:  Thank you.

20      (Recess taken from 12:59 p.m. to 2:02 p.m.)

21      COURT CLERK:  Back on the record, Commonwealth v. Leon

22  Campbell.

23      THE COURT:  Okay.  And ready to bring the jury in?

24      DEPUTY CLERK:  Yeah, they're ready, Judge.

25      THE COURT:  Okay.  And we did turn down the air

1  conditioner --

2      MR. BEY:  Thank you.

3      THE COURT:  -- so it should be a little bit more

4  comfortable in here.

5      DEPUTY CLERK:  Is the witness done, or are we going to

6  bring in the new one?

7      MR. DEVOE:  We're going to bring in the next witness.

8      DEPUTY CLERK:  Okay.

9      MR. DEVOE:  Kyle Griffin.

10     DEPUTY CLERK:  Yeah, I'm ready when you are.

11     MR. DEVOE:  Thank you.

12     (Pause)

13     DEPUTY CLERK:  Court, all rise.  Jury in.

14     (Jury in at 2:04 p.m.)

15     DEPUTY CLERK:  Step up to the box.  Be careful.

16     Please be seated.  Court's back in session.  Resume case on

17  trial.

18     THE COURT:  All right.  Ladies and gentlemen, was everybody

19  able to comply with my instructions not to discuss this case

20  during the lunch recess?

21     THE JURY:  Yes.

22     THE COURT:  Everybody's nodding the affirmative.

23     Begin with the case on trial.

24     We'll just wait for you to get that on, ma'am, okay?  Let

25  us know when you're ready.

1        (Pause)

2        DEPUTY CLERK:  I already turned it on.

3        THE COURT:  All set?

4        JUROR NUMBER 20:  Yes.

5        THE COURT:  Okay.

6        Attorney DeVoe.

7        MR. DEVOE:  Thank you, Your Honor.  The Commonwealth calls

8   Officer Kyle Griffin.

9        DEPUTY CLERK:  Kyle.

10       (Pause)

11       DEPUTY CLERK:  Be careful stepping up, Officer.  Thank you.

12                    KYLE GRIFFIN, WITNESS, SWORN

13       THE COURT:  Attorney DeVoe.

14       MR. DEVOE:  Thank you, Your Honor.

15                    DIRECT EXAMINATION

16   BY MR. DEVOE:

17   Q    Officer Griffin, can you please state your name, and spell

18   your last name for the record?

19   A    Yeah.  It's Officer Kyle, K-Y-L-E, Griffin, G-R-I-F-F-I-N.

20   Q    And, Officer Griffin, are you employed?

21   A    Yes.

22   Q    Where do you work?

23   A    The Lowell Police Department.

24   Q    How long have you been an officer with the Lowell Police

25   Department?

1    A    In total, about four years.

2    Q    Were you an officer anywhere else prior to that?

3    A    Yes.  I worked for the Sudbury Police Department.

4    Q    How long were you a police officer there?

5    A    Approximately three and a half years.

6    Q    Prior to becoming a police officer, did you attend the

7    training academy?

8    A    Yes.

9    Q    Where and when was that?

10   A    I attended in 2010, Lowell Police Municipal Training

11   Academy.

12   Q    Turning your attention to January 22nd, 2019, at

13   approximately 6:15 in the evening, were you working on that day?

14   A    Yes, I was.

15   Q    What was your shift and assignment?

16   A    I was a early rollcall evening shift car, and I believe I

17   was assigned to a traffic unit.

18   Q    What sort of car were you in at that time?

19   A    A marked police cruiser.

20   Q    And were you in uniform?

21   A    Yes, I was.

22   Q    On that occasion, were you dispatched to a call?

23   A    Yes.

24   Q    Where were you dispatched to?

25   A    I believe in the area of 4th Street, as there was a short

1  motor vehicle pursuit that was ending there.

2  Q    Did you understand whether you were responding to any

3  particular officer?

4  A    Officer Pender was the one involved in the attempted stop,

5  and then what was going on afterwards.

6  Q    Did you -- on your -- as you were responding to the call,

7  did you attempt to make contact with Officer Pender?

8  A    Dispatch attempted to contact him multiple times, and was

9  in and out whether or not he was able to respond to them.

10  Q    As you approached the scene on 4th Street, what, if

11  anything, did you see?

12  A    I could see Officer Pender's cruiser, and I could see a car

13  in the driveway of -- I can't recall the address, but one of the

14  driveways on 4th Street.

15  Q    Do you recall what kind of car it was?

16  A    It was a pickup truck.

17  Q    Who, if anyone, did you see at that scene?

18  A    I had a hard time making out who was in front of the truck.

19  I could see a gentleman blocking what appeared to be Officer

20  Pender and a person inside the driver's side of the vehicle.

21  Q    Could you describe briefly how everyone was physically

22  arranged in the truck and -- and the home and the three

23  individuals you saw?

24  A    Right.  If I was looking at the house this way, the house

25  would be on my left, the driveway would be on the right side.

1  The truck had pulled into the driveway with the passenger -- or

2  I'm sorry -- the driver's side door facing the house, and a bush

3  and some snowbank over here.  The driver's side door was open,

4  and there was a gentleman in between myself and the two -- the

5  officer and the driver's side.

6  Q    As you observed the scene, was there any path of escape for

7  Officer Pender?

8  A    Not that he was trying to escape, but had he wanted to

9  regress back out of the driveway, he would have had to pass

10 another individual that was standing between me and him.

11 Q    Did you observe any other individuals on the scene when you

12 first arrived?

13 A    No.

14 Q    After arriving on the scene and seeing those individuals,

15 what did you do next?

16 A    I attempted to aid Officer Pender in making the arrest.

17 Q    How did you attempt to aid Officer Pender?

18 A    I tried to approach him.

19 Q    And what happened when you tried to approach Officer

20 Pender?

21 A    There was an individual between the two of us in the --

22 standing in what would be, I guess, described as an alleyway,

23 between the vehicle and the house and where Officer Pender was.

24 That individual was blocking me from accessing Officer Pender.

25 Q    Did you eventually learn of that individual's name?

1   A     Yes.

2   Q     What was it?

3   A     I believe it was a Chico Smith.

4   Q     So after you approached Mr. Smith, what, if anything, did

5   you do?

6   A     He impeded my progress to aid Officer Pender.

7   Q     And how did he do so?

8   A     When I tried to get around him, he noticed me over his

9   shoulder, stiffened up, and tried to impede me from getting

10  towards Officer Pender.

11  Q     Were either of the individuals, besides Officer Pender,

12  speaking during this incidence?

13  A     There was some -- there was a lot going on back and forth

14  between the individual holding the camera, Officer Pender

15  issuing commands in the car, the person in the car replying back

16  to Officer Pender.

17  Q     Who did you see holding a camera?

18  A     The person in front of me that was facing down, so Mr.

19  Smith.

20  Q     What kind of camera was it?

21  A     It was a cell phone camera.

22  Q     Did you -- were you able to observe the individual who was

23  still in the driver's side of the vehicle?

24  A     Not really.  I couldn't see him.  All I could see was

25  Officer Pender leaning into the vehicle.

1    Q    After Mr. Smith blocked you, what did you do next?

2    A    I removed him from the alleyway and placed him on the

3    ground into handcuffs.

4    Q    How did you do that?

5    A    I physically took him to the ground out of the way.

6    Q    What happened next?

7    A    I was able to place Mr. Smith in handcuffs.  Other officers

8    arrived on scene simultaneously as I was taking him down and

9    putting him in handcuffs, and Officer Pender pulled -- pulled

10   the driver out of the -- the driver's side of the truck.

11   Q    Incident to this arrest, were you able to observe the

12   defendant?

13   A    Yes.

14   Q    Or excuse me, the driver.  You were able to observe the

15   driver?

16   A    Yes.

17   Q    Do you see him sitting in the courtroom today?

18   A    Yes.

19   Q    Could you please identify him with an article of clothing?

20   A    Yes.  That gentleman sitting right here.

21        MR. DEVOE:  Your Honor, may the record reflect that the

22   officer has identified the defendant?

23        THE COURT:  The record will so reflect.

24   BY MR. DEVOE:

25   Q    While Officer Pender was removing the defendant from the

1  vehicle, what, if anything, did you observe about that
2  interaction?
3  A    It was -- it wasn't exactly a smooth operation.  It was
4  definitely a physical altercation that was taking place between
5  Officer Pender and the -- and the driver.  There was resistance
6  on pulling him out.  Officer Pender would be seemingly pulled
7  into the vehicle and then pull himself out, until he eventually
8  was able to remove the person from the vehicle.
9  Q    Do you recall anything the defendant said during this
10 encounter?
11 A    To myself, no.  And I was -- I really can't recall anything
12 that was said between Officer Pender and the defendant.
13 Q    So you described bringing Mr. Smith to the ground and
14 handcuffing him.  What did you do next after that?
15 A    I stood up, patted him down for anything that might poke
16 me, stick me, harm me in any way.  I checked him for any
17 weapons, and then secured the scene.
18 Q    Can you describe what you mean by "secured the scene"?
19 A    After both individuals were placed in handcuffs, the driver
20 and Mr. Smith, there was some yelling back and forth between
21 them, speech between them.  People came out of a house,
22 apparently came out of the house that -- that the car ended up
23 being parked in, and I feel like some people may have come from
24 behind as well, but after there only being two individuals
25 there, once everyone was in handcuffs it seemed like there were

1  six or seven individuals out in the driveway at that point.  So

2  keeping them away from the people on the ground in handcuffs and

3  waiting for transportation.

4  Q    If you can recall, when did these other individuals arrive

5  on the scene?

6  A    Like I said, a very short time after they were placed in

7  handcuffs and put on the ground.

8  Q    Was the pickup truck searched?

9  A    What's that?

10  Q    Was the pickup truck searched?

11  A    Yes.

12  Q    Did you participate in the search?

13  A    Yes.

14  Q    What, if anything, was found inside?

15  A    There was scattered trash.  I don't know if there was any

16  personal belongings that were -- that were moved, but there was

17  also a large machete behind the driver's side seat, I believe,

18  of the vehicle.

19  Q    Did you observe that machete?

20  A    Yes, I did.

21       MR. DEVOE:  Your Honor, may I approach?

22       THE COURT:  You may.

23       MR. DEVOE:  If I could see Exhibit 2?

24       (Pause)

25  BY MR. DEVOE:

1  Q    Officer, I'm handing you what has previously been marked as

2  Exhibit 2.  Do you recognize it to be the machete found on the

3  scene?

4  A    Yes.

5       MR. DEVOE:  No further questions, Your Honor.

6       THE COURT:  All right.

7       All right.  Mr. Bey.

8                          CROSS-EXAMINATION

9  BY MR. BEY:

10  Q    How you doing today, Mr. Griffin?

11  A    Not bad.  How are you?

12  Q    Good.  You want to -- can we put the machete back?  Because

13  he's got it, it's right there.  I know it's a dangerous weapon.

14       On the night in question, right -- now, first, you work

15  for?

16  A    The Lowell Police Department?

17  Q    Lowell Police.  How long have you been with the Lowell

18  Police?

19  A    Approximately four years.

20  Q    So you're a police, not -- are you police or law

21  enforcement, because they're two different things?

22  A    Okay.  I enforce the law as a police officer.

23  Q    Good answer.  All right.  So you should know some law if I

24  was to ask you some law, some minor stuff, right?

25  A    Sure.

129

1   Q    All right.  And how long have you been a police?

2   A    Approximately four and a half years.

3   Q    Four and half years?

4   A    No, actually, total as a police officer, or just in Lowell?

5   Q    Police officer total.

6   A    So total, about nine.

7   Q    Nine years.

8        MR. BEY:  May I approach?

9        THE COURT:  You may.

10  BY MR. BEY:

11  Q    Why don't you take a look at something here?  Is that your

12  handwriting?

13  A    Yes.

14  Q    You wrote that ticket?

15  A    Yes, I did.

16  Q    All right.

17       MR. BEY:  Can I show this to the jury?

18       THE COURT:  Oh, well if you could tell us -- have him

19  explain what it is first.

20       MR. BEY:  Oh.

21  BY MR. BEY:

22  Q    What is this ticket here?

23  A    It's a motor vehicle citation.

24  Q    A citation.

25  A    Yes.

130

1   Q     For?

2   A     An unregistered motor vehicle.

3   Q     Could you do me a favor?

4   A     Uh-huh.

5   Q     Read the date of birth on that ticket you wrote.

6   A     Yeah.

7         MR. DEVOE:  Objection, Your Honor.

8         THE COURT:  Can I see it?

9         MR. BEY:  I want to see if he --

10        THE COURT:  Hold on.  Let me --

11        MR. BEY:  Nine years police, he should --

12        (Sidebar commenced at 2:16 p.m.)

13        THE COURT:  Okay.

14        MR. DEVOE:  So again, this is a ticket from their

15  (indiscernible).

16        THE COURT:  And so, Mr. DeVoe, and I --

17        MR. BEY:  He should read the date of birth.  It's simple.

18        THE COURT:  Yeah, I'll -- yeah.  Okay.

19        MR. BEY:  Thank you.

20        (Sidebar concluded at 2:16 p.m.)

21  BY MR. BEY:

22  Q     Sorry about that.

23  A     Uh-huh.

24        MR. BEY:  He's allowed to read it?

25        THE COURT:  Yes.

1          MR. BEY:  Okay.

2    BY MR. BEY:

3    Q    Could you read that date off of that citation that you --

4    that you, nine years in the police force, issued to the suspect,

5    please?

6    A    Right.  It says --

7    Q    Read his date of birth.

8    A    Do you want me to read it?

9    Q    Yeah.

10   A    Okay.  2/26/19.

11   Q    2/20?

12   A    2/26/19.

13   Q    2/26/19, right?

14   A    Yes.  Yup.

15   Q    Well six or a zero, either way.  So 2/26/19, not 11/20/19?

16   A    No.

17   Q    No.  You see it.  We looking on two different things?  That

18   date right here.

19   A    Oh, I'm sorry.  11/20/19.

20   Q    Oh, okay.  11/20/19?

21   A    Yes.

22   Q    So is it fair to say that this person isn't even born yet?

23   A    Yes.

24   Q    The date -- okay.  The date, he's not even here yet.  So

25   we're -- we're waiting for someone to pop up in 11/20/19 so we

1  can charge him with this because this guy's not even born yet,

2  right?

3  A    Correct.

4  Q    And you -- and you wrote this ticket, correct?

5  A    I do.  I believe I wrote it on -- I don't know.  If I could

6  check the date?  I don't know if it's -- what we're talking

7  about here, but I'll look at the date, sure.

8  Q    Was everything okay when you were writing the ticket?

9  A    Sure.  I don't recall.  I don't recall the date.

10 Q    No, but was everything okay when you were writing the

11 ticket, like, mentally?  Or you --

12 A    I don't recall the incident.

13 Q    The incident was the 26th, the second of this year, the

14 '19, right?  That's the date that you wrote that it was written,

15 right?  You wrote a Lowell agency code.  You wrote a bunch of

16 stuff on there.

17 A    Uh-huh.

18 Q    You can't recall?  On the -- on the 26th of the second,

19 which is February, how were you feeling?  Were you --

20 A    I was feeling pretty good, I'm assuming.  I don't remember

21 feeling badly.

22 Q    All right.  So, cool.  So, and -- and you still managed to

23 write a ticket to someone who's not born yet.  All right.  Cool.

24       Then, in questions -- in questioning of the night at hand,

25 the -- what date is this?  The 22nd.  You said -- you said

1   here --

2        MR. BEY:  I'm sorry.  Can I approach first?

3        THE COURT:  You may.

4   BY MR. BEY:

5   Q    And make sure this is -- make sure this is your report.

6   A    Uh-huh.

7   Q    Your -- is that your name there, and is that your report?

8   A    Right.  Yeah.

9   Q    All right.  And he said here -- you said here on your

10  report that your path to him was impeded by an individual

11  filming the incident.

12  A    Right.

13  Q    But I thought there was no film, no footage.  No -- I moved

14  to get the footage --

15       THE COURT:  Sir, is that a question?

16       MR. BEY:  Yeah.

17       THE COURT:  Okay.

18       MR. BEY:  Because they told us there was no footage.

19  Before when the trial was -- this was supposed to go on --

20       THE COURT:  Sir --

21       MR. BEY:  -- a while back --

22       THE COURT:  Sir -- sir, is there a question?  Not -- not --

23  it's to him --

24       MR. BEY:  The question is to him.

25       THE COURT:  Okay.

1   BY MR. BEY:

2   Q    I thought there was no footage.  So is there footage, or is

3   there not footage?

4   A    I never viewed any footage, and I was never provided any

5   footage.  I assumed what the gentleman was doing in front of me

6   was videotaping.

7   Q    Okay.  And you -- you said you had to walk by him to get to

8   Pender?

9   A    Yes.

10  Q    And he impeded you and stuff.  And you were able to step

11  through him, go down and get him -- how long did that take you

12  to get him, like --

13  A    Handcuffed?

14  Q    -- squared away?  Handcuffed and squared away.

15  A    I would guess a matter of moments, probably.

16  Q    A few moments?

17  A    Yeah.

18  Q    Did he resist?  Did he -- was he --

19  A    Yeah.

20  Q    He gave you a hard time?

21  A    Yes.

22  Q    But it took you moments to get him?

23  A    Yes.

24  Q    In your advanced training, they train you guys well, right?

25  Must be the training?

1 A    Must be.

2 Q    All right.

3      Then, the individual -- oh, oh, let me just throw out --

4 the individual in question, did she go straight -- I'm sorry,

5 this is for the -- for you, My Honor.

6      THE COURT:  No, if you have a question for me, it's at

7 sidebar.

8      MR. BEY:  Can I -- can I?  I have a question.

9      (Sidebar commenced at 2:20 p.m.)

10     MR. BEY:  The fact that all of these charges were

11 dismissed --

12     THE COURT:  Uh-huh.

13     MR. BEY:  -- (indiscernible) attention, or --

14     THE COURT:  No, because he didn't dismiss him.

15     MR. BEY:  I know he didn't dismiss him.

16     THE COURT:  Yeah.  So --

17     MR. BEY:  But he charged him.

18     THE COURT:  Yeah.  That's his job.  It's somebody else's

19 job what happens, so you can't ask him about the outcome,

20 because it's on another person's, because he has no -- he has

21 his --

22     MR. BEY:  But in my -- in my closing remarks and things of

23 that nature I can bring it up?

24     THE COURT:  Not unless you've put in evidence about it.

25     MR. BEY:  Not unless what?

1        THE COURT:  You'd have to put in evidence of that.  You

2   can't put it in through him.

3        MR. BEY:  No, I'm saying in my closing remarks to the jury

4   and stuff, I can disclose it.

5        THE COURT:  Only if it comes in as evidence during the

6   course of the trial.

7        MR. BEY:  Oh.

8        THE COURT:  Okay.  All right.

9        (Sidebar concluded at 2:21 p.m.)

10  BY MR. BEY:

11  Q    Okay.  You said -- I'm just --

12       MR. BEY:  I got a few more questions, and then I'm done.

13       THE COURT:  Okay.

14  BY MR. BEY:

15  Q    You said the -- the -- the -- the knife was located where?

16  A    I believe it was located behind the driver's side seat.

17  Q    Behind the driver's side seat?

18  A    Yes.

19  Q    Not in the middle?  You guys didn't find it in the middle,

20  in some sort of crevice in the middle of the front seat?

21  A    I don't --

22  Q    It was behind the driver's side seat?

23  A    I didn't --

24  Q    Not in the middle, in the crevices of it, right?

25  A    If I was to be seated in the driver's side seat myself --

1  Q    Right.

2  A    -- and I was to turn, it would be somewhere in the area

3  behind or next to.  I'm not -- I'm not positive.

4  Q    Well, we got -- in law you got to be specific.  Where

5  you --

6      THE COURT:  Sir, you got to --

7      MR. BEY:  I need specifics.

8      THE COURT:  -- ask questions.

9  BY MR. BEY:

10  Q    Where was the machete found?

11  A    I said I believe it was behind the driver's side seat.

12  Q    You believe, or do you know?

13  A    Did I --

14      THE COURT:  He's answered the question.  The question is

15  he --

16      MR. BEY:  Okay.  Is "believe" substantial enough for him to

17  answer the question?

18      THE COURT:  At this point, yes.  He believed.  That's what

19  he believes.

20      MR. BEY:  Okay.

21  BY MR. BEY:

22  Q    But you believe in the back, behind the driver's side seat?

23  A    Yes.

24  Q    Because it says here, in your words, "Placed him into

25  handcuffs.  (Indiscernible)" --

1     MR. BEY:  Oh, quick question for you, My Honor.  What --

2  post -- post, what does that word mean in the legalese?

3     THE COURT:  I'm not testifying, so --

4     MR. BEY:  Can I look it up?  I do have a Black's Law

5  Dictionary --

6     THE COURT:  You can --

7     MR. BEY:  -- here with me.

8     THE COURT:  Whoever wrote it, you can ask them.

9  BY MR. BEY:

10  Q    What do you mean by "post arrest"?

11  A    After the arrest.

12  Q    After the arrest.  I just wanted to make sure that I got

13  the same thing --

14  A    Yeah.  That's fine.

15  Q    -- that you got.

16  A    Absolutely.

17  Q    All right.  So after the arrest, a large machete was

18  located behind the driver's side seat near the center console,

19  right?

20  A    Right.

21  Q    Where Officer Pender had been.  So Pender was in the front,

22  in the -- in the vehicle?

23  A    Yes.  He was leaning into the vehicle with you.

24  Q    Oh.  Okay.  And you said you managed to try to get past the

25  individual filming, so threw him, throw him down, and then get

1  to Pender to aid him?

2  A    Yes.

3  Q    How did you aid him?

4  A    I did not aid him.  I tried to aid him, but I was impeded,

5  and I ended up making and unrest.  He was able to subdue you

6  himself.

7  Q    Oh, he was able to subdue me himself.

8       When you approached, what was Mr. Pender's position?  When

9  you approached the guy filming impeding your thing, what was his

10 position?

11 A    Well I --

12 Q    His stance.

13 A    His stance?

14 Q    Yeah.  What kind of stance was he at?

15 A    He was attempting to pull you out of the vehicle, I think.

16 Q    Oh.  He didn't have a Taser pointed at one individual and

17 had me on standby?

18 A    No.  I believe you had already slapped the Taser out of his

19 hand at that point.

20 Q    Oh.  And the individual that you -- had impeded your --

21 your walkway to Pender --

22 A    Yeah.

23 Q    -- he was just standing there at the time, filming?

24 A    When I arrived, yes.

25 Q    When you arrived.

1   A    Yes.

2   Q    So you didn't see him on Mr. Pender or anything trying to

3   do anything or a Taser pointed at him or anything?

4   A    I did.

5   Q    He was already on the ground and you was able to walk up,

6   and he was filming and you subdued him?

7   A    Yes.

8   Q    Okay.  Right, so -- how many officers did you say was on

9   the scene that night?

10  A    Prior to the arrest, or post arrest?

11  Q    Prior, post, during, before, after.  Throughout the whole

12  thing.

13  A    Officer Pender arrived first, I arrived second.  A short

14  time after, probably two or three more, so maybe six or seven.

15  I don't know.  A supervisor arrived as well, I believe, and then

16  the wagon.

17  Q    Your supervisor there, too?

18  A    I believe so, yeah.

19  Q    That was a new one.  All right.

20       So two -- what did you say, two or three?  How many patrol

21  cars pulled up?

22  A    How many cars?

23  Q    Yeah.  How many other individuals there?  You said two or

24  three more?

25  A    Right.  So after -- I'd say there was Officer Pender,

1  myself, one or two more officers as the arrests were being made,

2  and then maybe two or three more.  There was a call for a motor

3  vehicle pursuit and then an altercation afterwards, so we tend

4  to come in bunches at that point.

5  Q    Who made the call in?

6  A    I'm sorry, what?

7  Q    Where did the call come from, there?  You said there was a

8  call for a motor vehicle pursuit, from?

9  A    Officer Pender.

10  Q    Officer Pender called it in.

11  A    Right.

12  Q    Oh.  He called it a motor vehicle pursuit?

13  A    I believe it was a vehicle failing to stop, yeah.

14  Q    That's not what you wrote here.  You wrote here that

15  Officer Pender did not, or was not able to answer multiple

16  hailing calls.

17  A    That's -- if you'd like for me to read the report, I'll

18  read to you where I said it.

19  Q    I can read it.

20  A    Okay.

21  Q    I can read it well.

22  A    Okay.

23  Q    You said that he -- he called in a -- a what you call it?

24  What was the word you used?

25  A    He was dealing with a erratically operating vehicle that

1   was failing to stop for him, I believe was the call.

2   Q    No, no.  What was the call you said the -- the call that

3   came in?  You said something else.  You said the call came in --

4   A    I'm sorry.  It came in as a vehicle failing to stop, or a

5   "pursuit" is what you're looking for?

6   Q    Yeah.  You said something about pursuit.

7   A    Right.  Yeah.  Yeah.

8   Q    What was the word that you used?

9   A    A motor vehicle pursuit.

10  Q    Okay.

11  A    That's what happens when a vehicle fails to stop.  That's

12  the nomenclature.

13  Q    That's funny, because Pender doesn't mention that at all,

14  but I guess you guys do whatever you want anyway.

15  A    I believe he charged you with failure to stop, no?

16  Q    Let's see.

17       (Pause)

18       Failed to stop for police.

19  A    Right.

20       MR. BEY:  Is that one of the charges --

21       THE COURT:  Yes, it is.

22       MR. BEY:  -- that's being charged?  Okay.

23  BY MR. BEY:

24  Q    But I'm just looking here as if -- I just -- I would think

25  he would write that in the report.

143

1   A    It's on the front page, I believe, correct?

2   Q    That's why I was looking --

3   A    Okay.

4   Q    -- on the exact front page, looking for where he said --

5   what is it?  Pursuant?  What's the word you used?

6   A    I used --

7   Q    Vehicle pursuit?

8   A    Right.  Yup.

9   Q    A motor vehicle pursuit.  No, that's the first page, unless

10  I got something wrong here.

11       Couldn't call it -- couldn't call it in the plates because

12  it was covered with snow.  Nothing about a motor vehicle thing

13  or anything.

14       But did you happen to hear any call-ins that night about an

15  erratic driver swerving into the wrong side of the road into

16  that -- any calls came into the station that night about that?

17  A    Over the entire course of the night?

18  Q    Yeah.

19  A    I don't remember.  It was last January.

20  Q    Last January, or was it this January?

21  A    The last time it was January.  It was, I guess, this year.

22  Q    This year, or last January?  Because last January's 2018.

23  This January --

24  A    Okay.

25       THE COURT:  Mr. Bey, you're arguing with the --

144

1      MR. BEY:  I'm not arguing.  I'm just trying to get facts

2   correct.  He said last January --

3      THE COURT:  He said the last January.

4      MR. BEY:  -- the paper says this January.

5      THE WITNESS:  Give me the date that you want that answer

6   for, and I will tell you.

7   BY MR. BEY:

8   Q    The 22nd.  The night in question.

9   A    Well what year?

10  Q    1/22/2019.

11  A    What year?  2019.  Yeah, I don't recall what calls came

12  over the radio for that entire night, no.

13  Q    For that night.

14  A    I don't.

15  Q    And you say you didn't have to aid Mr. Pender out in any

16  way when it came to -- you -- you were able to make an arrest

17  and then Mr. Allen made his arrest.

18  A    Right.  Yeah.

19  Q    And --

20  A    Almost simultaneously.  I make my arrest, other officers

21  arrive.  I'm not sure if anyone aided him in pulling you out of

22  the vehicle, but you were arrested subsequently, yes.

23  Q    And then post arrest --

24  A    Post arrest, yes.

25  Q    -- the machete was found, correct?

1   A    Yes.

2   Q    And -- and -- and located behind the driver's side seat?

3   A    Right.

4   Q    Correct?

5   A    Correct.

6        MR. BEY:  No further questions, Your Honor.

7        THE COURT:  Okay.  Thank you.

8        Attorney DeVoe.

9        MR. DEVOE:  Thank you.  Very briefly, Your Honor.  If I may

10  approach and have Exhibit 3?

11       THE COURT:  Yes.

12       (Pause)

13                          REDIRECT EXAMINATION

14  BY MR. DEVOE:

15  Q    Officer Griffin, I'm showing you a document previously

16  marked as Exhibit 3.  Do you recognize the driver's license

17  information in that photo?

18  A    Yes.

19  Q    Do you recognize the person in the photograph?

20  A    Yes.

21  Q    Who do you recognize him to be?

22  A    Leon Campbell.

23  Q    Is he the defendant in this case?

24  A    Yes.

25  Q    Do you see his date of birth listed there?

1   A    Yes.

2   Q    And what's that date of birth?

3   A    November 20th, 1983.

4   Q    And the defendant previously asked you on cross about a

5   citation that had a date of birth of 11/20/19.  Do you remember

6   that testimony?

7   A    Yes.

8   Q    Do you believe it was likely a mistake?

9   A    Yes.

10  Q    It's the same month and day?

11  A    Right.

12       MR. DEVOE:  No further questions.

13       THE COURT:  Thank you, Officer.  You may step down.

14       THE WITNESS:  Thank you.

15       UNIDENTIFIED FEMALE:  Pretty serious, a police officer

16  (indiscernible).

17       DEPUTY CLERK:  Quite, please.

18       THE COURT:  Hey.

19       (Sidebar commenced at 2:31 p.m.)

20       THE COURT:  That's the second time.

21       DEPUTY CLERK:  Is that the second time?

22       THE COURT:  Yeah.  So she's out of here.

23       DEPUTY CLERK:  Okay.

24       (Sidebar concluded at 2:31 p.m.)

25       THE COURT:  Attorney DeVoe.

1        MR. DEVOE:  Your Honor, the Commonwealth rests.

2        THE COURT:  All right.  The Commonwealth rests.

3        Mr. Bey?

4        MR. BEY:  I have to call my witness.

5        THE COURT:  Okay.

6        MR. DEVOE:  Your Honor, if we may be briefly heard at

7    sidebar?

8        THE COURT:  Sure.

9        (Sidebar commenced at 2:31 p.m.)

10       MR. DEVOE:  So during Officer Griffin's testimony, there

11   was reference of video being taken by Mr. Smith.  I have what I

12   believe to be the video.  My records are unclear as to what

13   might be provided in this video to Mr. Bey.  It's maybe about

14   five minutes long.  I'm bringing the lectern over so that you

15   can view it at some point during --

16       THE COURT:  Okay.

17       MR. DEVOE:  -- his evidence, and we'll see if he wants to

18   enter it in his case in chief.

19       THE COURT:  Okay.

20       MR. BEY:  That video was already done in Chico's case.

21   That was dismissed and that's not -- the stop is in the video.

22   We're looking for -- we're looking for over 10, 15 minutes of

23   footage that started in the vehicle --

24       THE COURT:  Okay.

25       MR. BEY:  -- all the way out until he was --

1       THE COURT:  Okay.  I don't --

2       MR. DEVOE:  That, I don't have.

3       MR. BEY:  I know you don't.

4       THE COURT:  Okay.  All right.

5       MR. BEY:  I know.  Trust me, I know.

6       THE COURT:  Okay.  All right.

7       MR. BEY:  I'm well aware that you have it.

8       THE COURT:  Okay.  Thank you.

9       (Sidebar concluded at 2:32 p.m.)

10      THE COURT:  All right.  Mr. Bey, you can call your first

11  witness.

12      MR. BEY:  I'd like to call India Nasciemento to the stand,

13  please.

14      DEPUTY CLERK:  First name is India?

15      MR. BEY:  India, yes.

16      DEPUTY CLERK:  India.  Follow me, please.  Follow me,

17  ma'am.  Thank you.  Good afternoon.  Just follow me to the

18  stand.  Right over here, this way.  Be careful stepping over

19  these, too.  And be careful stepping up.  Thank you.

20                  INDIA NASCIEMENTO, WITNESS, SWORN

21      THE COURT:  Mr. Bey, you may proceed.

22                          DIRECT EXAMINATION

23  BY MR. BEY:

24  Q    How you doing today?

25  A    I'm Fine.  How are you?

1    Q    Ms. Nasciemento.

2    A    I'm good.

3         THE COURT:  And can I stop you?  How do you spell your last

4    name, ma'am?

5         THE WITNESS:  N-A-S-C-I-M-E-N-T-O.

6         THE COURT:  Okay.  Thank you.

7         THE WITNESS:  Uh-huh.

8    BY MR. BEY:

9    Q    All right.  And on the night in question --

10        MR. BEY:  Can I approach to see the exhibits?

11        THE COURT:  Which one do you want, sir?

12        (Pause)

13   BY MR. BEY:

14   Q    Do you recognize that?

15        THE COURT:  And I think the record should reflect that Mr.

16   Bey has shown Exhibit Number 3.  Just so we can have it on the

17   record.

18        MR. BEY:  Okay.

19   BY MR. BEY:

20   Q    Exhibit -- do you recognize that guy there?

21   A    Well yeah.  Kind of.

22   Q    What is that guy's name is?  If you were to have to call

23   that, what would you call that guy?  What's his name?

24   A    His name in this picture?

25   Q    Yeah.

1   A    Leon.

2   Q    Was his full name?

3   A    Leon Campbell.

4   Q    The guy in the picture that resembles me.  What's my name?

5   A    Your name is Leonitus.

6   Q    Leonitus what?

7   A    Jabir Bey.

8   Q    How did I come across that name?

9   A    After doing your history, finding out who you are, doing

10  your studies.

11  Q    All right.  Did I ever have a problem using that name when

12  it came to U.S. stuff, getting paperwork filed and stuff --

13  A    Oh, no.

14  Q    -- getting things done using my nationality?

15  A    No problem.

16       MR. DEVOE:  Objection, Your Honor.

17       MR. BEY:  All right.

18       THE COURT:  All right.  Just move on.  I'll overrule the

19  objection.  Move on.

20  BY MR. BEY:

21  Q    On the night in question, right, how -- where were you?

22  A    I was in the house.

23  Q    And what house was that?

24  A    The house on 109 4th Ave.

25  Q    109 4th Avenue.  What -- what made you come outside?

1    A    I seen light outside, and I didn't hear no siren.

2    Q    You saw lights.  You didn't -- but you didn't hear no

3    sirens?

4    A    No, I didn't hear no sirens.

5    Q    You only saw lights?

6    A    I just seen lights.

7    Q    No sirens?

8    A    No.

9    Q    All right.  And the lights made you come outside?

10    A    Between the lights, and then I heard Leonitus say, "Why are

11    you punching me?"

12    Q    Okay.  Oh, so you heard me.  All right.

13        When you came outside, what was going on the instant you

14    came outside?  What did you see?

15    A    I seen a lot of police cars outside.

16    Q    About how many police cars did you see?

17    A    Whew, um --

18    Q    About how many?

19    A    I want to say maybe around 10 cars were outside.

20    Q    Uh-huh.  From what you can see just from being in the

21    driveway?

22    A    Yeah.  Just from being in the driveway.

23    Q    Did you walk out and take a look left or right down for

24    that?

25    A    No.

1  Q    This is from you in the driveway from what you could see

2  looking out?

3  A    Yes.

4  Q    Okay.  How many cars did you see just looking straight out?

5  A    Just looking straight out, they had the whole front full,

6  so I want to say was about 10 police cars in the front.

7  Q    Because our driveway is pretty large, right?

8  A    Yes.

9  Q    How much cars do we fit in there regularly without the

10 police?  How much cars --

11 A    Regularly in our driveway there is about six.

12 Q    Six.  What, about six, seven cars?

13 A    Maybe six, seven cars, yeah.

14 Q    And you said there was about 10 cars out there on that

15 night.

16      Now when you came out was the person in question already

17 being arrested, in some sort of struggle trying to get arrested

18 with the officer?  Was the officer fighting him?  What was it?

19 What did you see when you came out?

20 A    When I came outside, Leonitus was on the floor already in

21 handcuffs asking, "Why -- why did you punch me?"

22 Q    Okay.

23      MR. DEVOE:  Objection.  Move to strike the last response.

24      THE COURT:  It's just being offered for what he heard, not

25 to -- so, ladies and gentlemen, the last answer from this

1  particular witness, "Why did you punch me," just being offered

2  to show what this individual heard.  It's not being -- you

3  cannot consider it for the truth of that statement.

4      All right.  Go ahead, sir.

5  BY MR. BEY:

6  Q    After you saw the suspect on the ground and in cuffs asking

7  the officer, "Why did you punch me," then what happened?

8  A    Then I seen them escort you into the vehicle and off you

9  went.

10 Q    All right.

11 A    But still, there were vehicles in front of the house.

12 Q    After they drove off with me in the wagon and everything,

13 were you guys still out there --

14 A    Yes.

15 Q    -- in the driveway?  With the policy enforcers?

16 A    Yes.

17 Q    What -- what -- what did -- were you able to speak to any

18 of those officers?

19 A    Not speak to them, like, I can ask you a question, and

20 you're going to answer me back, no.  They was out there just

21 explaining themselves.

22 Q    Just explaining themselves.

23      At what point did Mom come outside?

24 A    You were already in the vehicle.

25 Q    I was already in the vehicle when Mom came outside.

1    And what did Mr. Pender Allen say to Mom?

2    MR. DEVOE:  Objection.

3    THE COURT:  Sustained.

4    THE WITNESS:  Answer it?

5    THE COURT:  No, you can't answer that.

6    THE WITNESS:  Okay.

7    MR. BEY:  Can't answer it?

8  BY MR. BEY:

9  Q    What did you overhear?  Say -- tell me some of the things

10  you overheard while you were out there.

11  A    Um --

12    MR. DEVOE:  Objection.

13    THE COURT:  That's sustained.  And can I see Mr. Bey,

14  just --

15    (Sidebar commenced at 2:38 p.m.)

16    THE COURT:  I let the last one in as to why did you keep

17  punching him, but if you're going to call another witness as to

18  what the conversation was, you can get it in that way.  But you

19  can't get in somebody else's conversation through this witness.

20  Okay?

21    MR. BEY:  Okay.  All right.

22    DEPUTY CLERK:  It was brought to my attention by Officer

23  Pender, he believes that his wife (indiscernible) talk about the

24  testimony you gave (indiscernible).

25    THE COURT:  The one that I just had before that?  Okay.  To

1    the other witness who hasn't appeared yet or this witness as

2    well?

3         DEPUTY CLERK:  No, not this witness.

4         THE COURT:  Okay.  All right.  So before that witness comes

5    in here, I want to speak to her, okay?

6         DEPUTY CLERK:  All right.  Thanks.

7         (Sidebar concluded at 2:39 p.m.)

8    BY MR. BEY:

9    Q    So when you were in the driveway and you seen all the

10   patrol cars and you seen them take me away, then what did they

11   do to my truck?  To the truck.

12   A    They towed it.

13   Q    They towed it.  Before or after they searched it?

14   A    That was after they searched it.

15   Q    And then when they searched it, what -- what -- who -- who

16   searched the truck?

17   A    Personally the guy who searched the truck is not here.

18   Q    Was it -- did you -- did you see the other two officers

19   that were in question?  Did you get a good look at them?

20   A    Yeah.

21   Q    What -- what --

22   A    But I did see --

23   Q    Were any one of those the guys that searched the truck that

24   day?

25   A    No.  I did see the officer in the uniform.

1    Q    Yeah.

2    A    I did see him around the truck, because they supposedly

3    were looking for a VIN number inside of the vehicle.

4    Q    Right.

5    A    And I pointed out that it's on the window.

6    Q    So you --

7    A    Everyone knows that.

8    Q    You pointed out to one of them that the VIN is on the

9    window?

10   A    On the window.  You can see it from outside of the car.

11   Q    From the outside.  No need to go into it.

12   A    No need to go in the vehicle.

13   Q    But they still went in the vehicle and all sorts of things?

14   A    Yes.

15   Q    Did you see -- the officer in the uniform that you

16   recognize, did you see him find a machete?

17   A    No.  He was -- he was on the outside of the vehicle.

18   Q    Oh, okay.  Now the officer you saw who pulled the machete

19   out, who found the machete, is he -- did you see him here at all

20   in the courtroom on this day?

21   A    No.

22        MR. BEY:  I got no further questions, Your Honor.

23        THE COURT:  All right.  Thank you, sir.

24        Attorney DeVoe.

25        MR. DEVOE:  Thank you.

157

1                     CROSS-EXAMINATION

2    BY MR. DEVOE:

3    Q    Ms. Nasciemento, how long have you known the defendant for?

4    A    I want to say, now, maybe four years, five years.  It's

5    been a handful.

6    Q    Do you live at 109 4th Ave?

7    A    Yes.

8    Q    Does the defendant live there?

9    A    Yes.

10   Q    On January 22nd of this year, you stated on the record that

11   there were approximately 10 cars out front by the time you came

12   out and saw anything.  Is that right?

13   A    Yes.

14   Q    And when you came outside, the defendant was already on the

15   ground.  Is that right?

16   A    Yes.

17   Q    And you also testified you saw a machete be removed from

18   the truck.  Is that right?

19   A    Yes.

20        MR. DEVOE:  No further questions.

21        THE COURT:  All right.  Thank you, ma'am.  You may step

22   down.

23        THE WITNESS:  Okay.  Should I leave this here?

24        THE COURT:  Yes, leave it there.

25        MR. BEY:  Well could I question her further?

1     THE COURT:  Well you said you were done, sir.

2     MR. BEY:  Oh.

3     THE COURT:  Do you have something else you want to ask her?

4     MR. BEY:  Yeah.

5     THE COURT:  All right.  Can you come back, ma'am?

6     (Pause)

7     THE COURT:  And, Mr. Bey, only ask the matters that were

8  raised on cross-examination.

9                          REDIRECT EXAMINATION

10  BY MR. BEY:

11  Q    Ms. Nasciemento, how often have you worked with Leonitus

12  Jabir Bey?

13  A    I do side jobs with him.

14  Q    How many tools would you say is in that truck at any given

15  time?

16  A    Oh, we do different kinds of jobs.

17  Q    How many dangerous weapons have I ever handed you?

18  A    Dangerous weapons?

19  Q    Yeah.

20     THE COURT:  Sustained.

21     THE WITNESS:  None

22     THE COURT:  You can't answer that question.

23     MR. BEY:  Okay.

24  BY MR. BEY:

25  Q    From your -- from your knowledge, is the machete you saw

1    someone find in the truck, are machetes a dangerous weapon?

2        MR. DEVOE:  Objection.

3        THE COURT:  Sustained.

4    BY MR. BEY:

5    Q    Where did I buy the machete from?

6    A    Walmart.

7    Q    Walmart.

8        MR. BEY:  No further questions, Your Honor.

9        MR. DEVOE:  One on redirect (sic).

10       THE COURT:  Sure.

11                        RECROSS-EXAMINATION

12   BY MR. DEVOE:

13   Q    Did you personally see the defendant buy the machete from

14   Walmart?

15   A    No.

16   Q    Thank you.

17       THE COURT:  All right.  Ma'am, you can step down.

18       All right.  Ladies and gentlemen, I have to address one

19   thing that's going to take me about five minutes, so I'm going

20   to ask if you can go with the court officer back into the room,

21   and we'll reconvene here in five minutes.

22       DEPUTY CLERK:  All rise.  Jury out.  You can bring that

23   with you.  Okay.  Just be careful stepping down.  Thank you.

24       (Jury out at 2:43 p.m.)

25       THE COURT:  And, Mr. Bey, who is the next witness going to

1  be?

2       MR. BEY:  Akif.

3       THE COURT:  Pardon me?

4       MR. BEY:  Akif Bey.

5       THE COURT:  Akif Bey.

6       MR. BEY:  Uh-huh.

7       DEPUTY CLERK:  Akif Bey.

8       (Pause)

9       THE COURT:  And, Mr. Bey, there was an individual that I

10  had removed from the courtroom.  What's that individual's name?

11      MR. BEY:  That's my wife.

12      THE COURT:  What's her name?

13      MR. BEY:  McCue, Lauren.

14      THE COURT:  Oh, Lauren McCue?

15      MR. BEY:  Yes.

16      THE COURT:  Okay.

17                    AKIF BEY, WITNESS, SWORN

18      THE COURT:  Good afternoon, sir.

19      THE WITNESS:  Good afternoon.

20      THE COURT:  And could you just tell me your name?

21      THE WITNESS:  Akif Bey.

22      THE COURT:  All right.  And, Mr. Bey, you were present when

23  I instructed all the people who are going to testify in this

24  trial about a sequestration order, correct?

25      THE WITNESS:  Correct.

161

1      THE COURT:  And that you were admonished not to discuss

2  your testimony, you know, with each other, even after you were

3  finished testifying.  Is that correct?

4      THE WITNESS:  Correct.

5      THE COURT:  All right.  Now at some point, a young lady,

6  Ms. McCue, left this courtroom.  Were you waiting outside when

7  that happened?

8      THE WITNESS:  Yeah, I was on the outside.

9      THE COURT:  Okay.  And did you have a conversation with Ms.

10  McCue?

11      THE WITNESS:  No, I didn't.

12      THE COURT:  You did not?

13      THE WITNESS:  She -- no, I didn't.

14      THE COURT:  Did you --

15      THE WITNESS:  She just came out.  She was frustrated.

16      THE COURT:  And did she say something to you?

17      THE WITNESS:  No, not to me.  She was venting.  Didn't know

18  what happened --

19      THE COURT:  And what --

20      THE WITNESS:  -- but something happened in here.

21      THE COURT:  Okay.  And what did she vent to you?

22      THE WITNESS:  No, didn't vent to me.  Was just more like

23  venting to herself coming out.

24      THE COURT:  Okay.  Did you hear what she was saying when

25  she was venting?

1       THE WITNESS:  Not really, it wasn't her fullest.

2       THE COURT:  Okay.  All right.

3       Attorney DeVoe, any questions?

4       MR. DEVOE:  No, Your Honor.

5       THE COURT:  No.

6       All right, sir.  You can step down.

7       THE COURT:  Ms. McCue.  Ms. McCue.

8       DEPUTY CLERK:  She's coming.

9       THE COURT:  Oh, all right.  All right.

10      DEPUTY CLERK:  But then I'll get the officer.

11      THE COURT:  I will have the officer come in.

12      MR. BEY:  Well if that is the case --

13      THE COURT:  Hold on.  Hold on.

14      (Pause)

15      COURT CLERK:  He's previously been sworn, Your Honor.

16      MR. PENDER:  Yes.

17      THE COURT:  All right.  Officer, thank you for coming back.

18      Now there was a -- a little while ago, a young lady, who

19  was identified to me by Ms. McCue, left this courtroom.

20      MR. PENDER:  Correct.

21      THE COURT:  And she had short hair.

22      MR. PENDER:  Yes.

23      THE COURT:  All right.  And there was two other witnesses

24  out there who had yet to testify in this trial that were

25  introduced to the jury.  Is that correct?

1      MR. PENDER:  That's correct.

2      THE COURT:  So when you all -- where were you in proximity

3  to her?

4      MR. PENDER:  I was standing at the doorway, not this

5  doorway but the doorway to go out into the hallway.

6      THE COURT:  Yup.

7      MR. PENDER:  And they were on the bench.

8      THE COURT:  Okay.

9      MR. PENDER:  And the gentleman that just was in here was

10 standing against the wall.

11     THE COURT:  Okay.  And did the young lady, Ms. McCue, go

12 over to the gentleman who let just left that was standing

13 against the wall?

14     MR. PENDER:  She went over to the gentleman and the young

15 lady who previously testified, and they were talking about a

16 ticket that Officer Griffin had issued and what was on the

17 ticket and went on about that.

18     THE COURT:  Okay.  So you heard a conversation relative to

19 a ticket that --

20     MR. PENDER:  About Officer Griffin's testimony, yes.

21     THE COURT:  Was there anything else?

22     MR. PENDER:  No, I did not hear anything else.

23     THE COURT:  All right.  All right.  Thank you, Officer.

24 You may step down.

25     MR. PENDER:  Okay.

1          MR. BEY:  I mean --

2          THE COURT:   No, hold on.  Hold on.

3          All right.  So based on what I heard from Officer Pender,

4     the issue was sort of collaterally related to a ticket that had

5     been issued for a citation issued to you with a wrong date of

6     birth.  I don't think -- even though it does violate the

7     sequestration order, I'm not going to deny anybody from

8     testifying based on that.

9          So are you ready to call Mr. -- and I forget his name

10    already.

11         MR. BEY:  Akif Bey.

12         THE COURT:  Akif Bey.

13         MR. BEY:  Can I say something?

14         THE COURT:  Sure.  You got to stand up when you talk.

15         MR. BEY:  Prior -- prior to that, Mr. Griffin and Pender

16    were discussing the whole case in the court.  I just didn't say

17    nothing because I thought -- I thought they could do that.  But

18    since the sequestration order is on everyone --

19         THE COURT:  Yeah.

20         MR. BEY:  -- I should have told you that Mr. Griffin and

21    Pender were in court discussing the entire thing.  When -- when

22    we walked out to the recess --

23         UNIDENTIFIED MALE:  Multiple times.

24         MR. BEY:  -- multiple times.  I just never brought it up

25    because I know how they get special privileges.  They get all

1  the best parking downstairs.  He's able to walk in as a -- as a

2  -- as a what -- plaintiff and swing the machete around the whole

3  courtroom.  One day I saw him do that, so I wasn't going to -- I

4  assumed --

5       THE COURT:  All right.

6       MR. BEY:  -- they could violate, and you guys wouldn't say

7  nothing.

8       THE COURT:  Sir, I'm not -- all I needed to do was find out

9  what the conversation was about.  It's innocuous.  Meaning it's

10 not that big of a deal, so I'm going to let you call Mr. Bey,

11 okay.

12      MR. BEY:  Okay.  So how come Pender and Griffin can be in a

13 corner together huddled --

14      THE COURT:  I can't --

15      MR. BEY:  -- discussing something?

16      THE COURT:  I can't put that milk back in the bottle right

17 now, okay?  So --

18      MR. BEY:  More and more of this.  This is --

19      THE COURT:  All right.

20      MR. BEY:  Wow.  I don't think Judge Crane would approve of

21 any of this.

22      THE COURT:  Well unfortunately, you don't have Judge Crane

23 here.

24      MR. BEY:  I know.

25      THE COURT:  All right.

1       MR. BEY:  It is unfortunate I don't have Judge Crane.

2       THE COURT:  All right.  You can call that witness.  Oh, we

3  got to bring the jury in.

4       MR. BEY:  Akif Bey --

5       DEPUTY CLERK:  Yeah, the jury's ready.

6       MR. BEY:  -- to the stand.

7       (Pause)

8       MR. BEY:  Well at least now I know.

9       THE COURT:  Sir, you can keep your comments to yourself.

10  Okay.

11      DEPUTY CLERK:  Court.  All rise.  Jury in.  Be careful

12  stepping up.  Thank you.

13      (Jury in at 2:50 p.m.)

14      THE COURT:  Please be seated.  Thank you.

15      All right.  Thank you, ladies and gentlemen.

16      Mr. Bey, you can call your next witness.

17      MR. BEY:  Akif Bey to the stand.

18      THE COURT:  Just watch your step, sir, going up.  And watch

19  your step stepping up.  Thank you.

20      COURT CLERK:  Your Honor, he's previously been sworn.

21      THE COURT:  Okay.  You may be seated.

22                      AKIF BEY, WITNESS, PREVIOUSLY SWORN

23                            DIRECT EXAMINATION

24  BY MR. BEY:

25  Q    How you doing today, Mr. Bey?

1   A    Good.  Good.

2   Q    How you feeling?

3   A    Feeling good.

4   Q    Good.  Good.  On the night in question --

5        MR. BEY:  All right.  Well first -- first of all, can I

6   approach?  I would like to see the Exhibit 3.  Oops.  Sorry.

7   BY MR. BEY:

8   Q    Who do you know that guy in the picture to be?  I mean, I

9   know what -- I know what the authorities want him to be.  Who do

10  you know him to be?

11  A    I know him as Mr. Bey.

12  Q    All right.  And how do you know him as Mr. Bey?

13  A    I know him as Leonitus Jabir Bey.

14  Q    How long have you know him?

15  A    I'll say four or five years.

16  Q    All right.  And does -- does he go around calling himself

17  Leonitus Jabir Bey as some sort of joke or to be a belligerent,

18  or is that his way of hiding from somebody?  What do you know?

19  Why does he call himself that?

20  A    Well we all found out that we have a nationality, and we

21  proclaimed it.

22  Q    Right.

23  A    And proclaiming our nationality, we know that in law,

24  that's what it stands in law, nationality.

25  Q    Right.  Okay.

1   A    So that's what we did.

2   Q    Now I want you to tell me --

3        MR. BEY:  Your Honor, may I approach?

4        THE COURT:  You may.

5   BY MR. BEY:

6   Q    I got another document here for you to look at.  I'm going

7   to turn --

8        THE COURT:  Exhibit 3?

9        MR. BEY:  Exhibit 3.

10  BY MR. BEY:

11  Q    On this, right, that -- that -- that citation there written

12  by -- you seen one of those before.  You seen those things

13  before?

14  A    Yes.

15  Q    Right?

16  A    Yes.

17  Q    And police give those out?

18  A    Yes.

19  Q    And you said something about nationality.  What's the --

20  under race in there, what does he have for race?

21       MR. DEVOE:  Objection.

22       THE COURT:  Yeah.  Again, can I --

23       MR. BEY:  Can't win.

24       THE COURT:  Mr. Bey, I've told you five times, do not speak

25  to the jury until your closing argument.  That's the fifth time

1   I've had to admonish you.

2        MR. BEY:  I made a comment to myself in the jury's

3   direction.

4        THE COURT:  No, you didn't.

5        (Sidebar commenced at 2:53 p.m.)

6        THE COURT:  And what do you --

7        MR. BEY:  I'm asking him about --

8        THE COURT:  Okay.  You can ask him --

9        MR. BEY:  You give me another (indiscernible) to try to --

10       THE COURT:  No, sir.  Sir.  Sir.

11       MR. BEY:  -- make me --

12       THE COURT:  Sir, go ahead and ask him.

13       MR. BEY:  Why (indiscernible) issue everybody else.

14       (Sidebar concluded at 2:53 p.m.)

15       MR. BEY:  Oh, I'm going to tell you.

16  BY MR. BEY:

17  Q    What -- what -- what letter -- oh, sorry.  What's in the

18  box for race on that piece of paper?

19  A    It says "B".

20  Q    B.

21  A    So I'm guessing it's --

22  Q    Just the letter B?

23  A    Letter B.

24  Q    It doesn't have an actual nation or a nationality, but just

25  the letter B?

1   A    Yes.  Just the letter B.

2   Q    Oh.

3   A    Capital B.

4   Q    Do you know what the B stands for?

5   A    I'm guessing black.  That's best guess.

6   Q    And is black a nationality?

7   A    No.  Got no standing in law.

8   Q    No standing in law --

9   A    No.

10  Q    -- being black, right?  Okay.  Are we black people?

11  A    No.

12  Q    But here on the ticket, it says B for black, right?

13  A    Correct.

14  Q    All right.  On the night in question, right, the 22nd of

15  January 2019, where were you in route to when you -- actually,

16  how did you come in -- how did you come encounter to the whole

17  situation?

18  A    I was on my way -- I was traveling, actually, to go pick my

19  empress up at her domicile, and on the way I took the route of

20  where Jabir domicile, that's 4th Ave, going all the way down.

21  The intersection, I'm guessing, is Mammoth Road --

22       MR. BEY:  May I approach?

23       THE COURT:  You may.

24  BY MR. BEY:

25  Q    You can use this to see what -- there's three pictures

1   there.

2       MR. DEVOE:  Your Honor, I don't believe I've seen this

3   document.

4       THE COURT:  Yeah, I think it's --

5       MR. BEY:  Oh, it's --

6       THE COURT:  I think it's a photograph.

7       MR. BEY:  It's a photograph.

8       THE COURT:  Is it the same photograph?

9       MR. BEY:  Thank you.

10      MR. DEVOE:  It's the same?

11      MR. BEY:  Yeah, it's the same.

12      MR. DEVOE:  Okay.  Sorry.  Thank you.  Thank you.

13      MR. BEY:  That's all right.

14      THE WITNESS:  Yeah.  So, yes. I was going down on 4th,

15  coming to the intersection at Mammoth Road, where I came to the

16  -- I think it's the flashing lights, the flashing --

17  BY MR. BEY:

18  Q   On your way down to 4th, before you came to the

19  intersection of that flashing light, did you hear any sirens?

20  A   No, I didn't hear or see any sirens.

21  Q   Go ahead.  Continue.

22  A   When I was at the light.

23  Q   And how did you come into contact --

24  A   And the -- while I was at the light waiting to go -- to go

25  across, I saw Jabir's truck making a right to go onto 4th Ave.

1    And then after he took the right, that's when I realized the cop

2    car was following him with no lights on.

3         So I kind of figured -- I start wondering to myself, what's

4    going on here.  So I continue my journey going forward, looking

5    in my mirrors and all that.  That's when I saw the lights came

6    on from the cop car.  So I kind of, like, start speeded up a

7    little bit to go get my girl, because I realized something's not

8    right.  So I went and grabbed her.  On the way back, I took the

9    same route.

10        On the way -- when I approach -- no, when I got on 4th Ave,

11   I could see a number of flashing lights, so I pulled up,

12   approached the scene to find out what's going on, right.  I got

13   on the scene.  I saw Jabir.  He was in handcuff.  I think I knew

14   -- I knew Bey, he was --

15   Q    So at this time you were just pulling --

16   A    Just pulling up --

17   Q    You were just coming back from --

18   A    Just coming back from --

19   Q    -- where you were headed to --

20   A    Yeah.

21   Q    -- and you pulled up into the driveway.

22   A    Yeah.  Not in the driveway.  I was pulled on the road --

23   Q    On the road.

24   A    -- because there was, like, six, seven cop cars.

25   Q    How many cop cars were there?

1   A      Six to seven cop cars.

2   Q      Oh, six to seven.

3   A      On the road.

4   Q      On the road.

5   A      So I -- I parked the automobile on the side.

6   Q      Uh-huh.

7   A      I always travel with my little folder with my constitution

8   and rights of travel, because I travel.  I don't drive.  So I

9   always travel just in case if I get pulled over.  So I grabbed

10  my little folder, I -- I hopped out of the car to figure out

11  what was going on.  Right away, I saw them in handcuffs.  So I

12  -- I think it was Mr. Pender Allen -- what's his name?

13  Q      Pender Allen.

14  A      Pender Allen.  Yeah, but I think it's Mr. Allen.

15  Q      Yeah.

16  A      I approach, and I asked him, "What's going on here?"  And

17  he, right away, told me to step back.  Get back off the scene.

18  I told him, that's my brother.  We're family.  We're one family.

19  I need to know what's going on.  I see him in handcuff.  So he

20  told me, "He was driving on the wrong side of the road."  He

21  pulled him over.  He didn't stop, made him look small.  I think

22  he said --

23  Q      Wait.  Wait.  Wait.

24  A      He made him look small.  Yeah, that's what he said.  He

25  said --

1   Q    He said that?

2   A    Yeah.  He said he made him --

3   Q    The words coming out of his --

4   A    You -- you made him look small in front everybody because

5   he pulled you over, and you didn't stop.

6   Q    This came out of the police officer's mouth?

7   A    Yes.

8   Q    Okay.  Continue.

9   A    So I said to him, "Well I understand that's -- if he's

10  driving on the wrong side of the road" -- no, he said -- and

11  then he continued to said he had to chase you.  He had to chase

12  you all the way down, but I don't see where the chase is from,

13  because from Mammoth to 4th Ave.  That's not a chase.  And he

14  said you was driving on the wrong side of the road.  He pulled

15  you over.  But when I asked him where he was -- where he pulled

16  you over from, he said he was at the McDonald's, or next to the

17  TD Bank, back somewhere on that side.  I forgot where he said he

18  was parked.

19  Q    Uh-huh.

20  A    So I said, "If he was coming down on Mammoth on the wrong

21  side of the road" --

22       MR. DEVOE:  Objection.

23       THE COURT:  Yeah.  I think we're getting into an awful lot

24  of conversation.  So why don't we --

25       THE WITNESS:  Oh, sorry.

1        THE COURT:  Keep asking him a question.

2        THE WITNESS:  Sorry.  Sorry.  Sorry.  Sorry.

3        THE COURT:  Because we're just getting a narrative.

4        THE WITNESS: Okay.

5   BY MR. BEY:

6   Q    You -- you spent -- so you -- you were there until I was

7   put in -- until the suspect was put in the wagon?

8   A    Yes.  In the paddy wagon.  The paddy wagon came up.

9   Q    And taken away.

10  A    Yes, I was there.

11  Q    Did you hang around after that?

12  A    Yes.  I was there until you were gone and everything was

13  cleared up.

14  Q    You saw them just go around vehicles searching.  What --

15  what -- what was the issue -- what did you see them do to the

16  vehicle when they were looking at --

17  A    They -- they -- they were checking the plates out.  They

18  were shining a flashlight on the -- on the -- on the little

19  sticker that we have on the side where we --

20  Q    Oh.

21  A    -- that's our, basically, that's our registration.

22  Q    Yeah.

23  A    They were checking that out.  He was looking at the plates

24  laughing saying, "Oh, Moorish plates, ha."  Start open the car,

25  start searching, and they were -- and they were just doing --

1  well, they was -- they were doing, I guess, what they

2  supposed --

3  Q    You --

4  A    -- to do, I guess.

5  Q    You recognize both those officers that are here today?  You

6  seen them there the night on the scene?

7  A    It was a lot of officer.

8  Q    There was a lot of them.

9  A    There was -- there was a lot of public service was out that

10 night, but I remembered Mr. Allen --

11 Q    Mr. Allen.

12 A    -- because he was the one I was having the conversation

13 with.

14 Q    Okay.  Now when you were having this conversation with him,

15 did he already have a machete in his hand?

16 A    No.

17 Q    Didn't have the machete yet?

18 A    He didn't have the machete in his hand at the time.

19 Q    This is you having a full-blown conversation with him, no

20 machete in his hand?

21 A    No machete in his hands.

22 Q    What was happening while you guys were having a

23 conversation?

24 A    While I was having -- well when he allowed me to have a

25 conversation with him --

1   Q    Uh-huh.

2   A    -- he --

3   Q    He allowed you, you say?

4   A    When he allowed me to have the conversation with him --

5   Q    He had to allow you.  Why did he have -- why did he have to

6   allow you?

7   A    Because right off the bat when I start talking about a

8   constitution, he told me he didn't want to hear it.

9   Q    Didn't want to hear it.  When you started talking about the

10  Constitution, he didn't want to hear it?

11  A    He didn't want to hear it.

12  Q    The same thing they swore a oath to?

13  A    Yes.

14  Q    All right.  All right.  But --

15  A    So I was there, still -- still doing what I'm doing.  So I

16  the -- the -- the -- the -- I think it was the other -- I don't

17  -- I don't remember the name, but it was four, five other policy

18  enforcer, they were just going through the car --

19  Q    Uh-huh.

20  A    -- and searching.

21  Q    Uh-huh.  When did the machete pop up?

22  A    And I think it was skinny -- one of the skinny officer.  I

23  forgot the name.  The skinny, tall ones, he's the one that

24  dragged it from the back seat and said, "Oh, found a machete."

25  Q    And -- and then did what with it?  What did he do with the

1   machete after he said he found it?

2   A    Not sure what happened after he said he found a machete.

3   Q    But at that point --

4   A    Don't want to lie.

5   Q    At that point, when the officer who -- the unrecognizable

6   officer found the machete, you were in a conversation with Mr.

7   Pender?

8   A    Mr. Pender.  He --

9   Q    Mr. Pender wasn't searching --

10  A    He was --

11  Q    -- the car at all, was he?

12  A    No.

13  Q    Oh.

14  A    He was -- it was me and him having a conversation, and the

15  other policy enforcer were all over in the car with the lights

16  going through it.

17       MR. DEVOE:  No further questions.

18       THE COURT:  All right.

19       Attorney DeVoe.

20                    CROSS-EXAMINATION

21  BY MR. DEVOE:

22  Q    Mr. Bey, you've known the defendant for how long?

23  A    Pardon me?

24  Q    How long have you known the defendant for?

25  A    I'd say for five years, somewhere around there.

1  Q    You called him your brother, I believe.  What do you mean

2  by that?

3  A    Yeah.  So we're family.  One movement.

4  Q    You consider him family?

5  A    Yeah.

6  Q    You want to help him out?

7  A    Not really, because he's family I want to help him out.

8  He's standing on right and square.

9  Q    So on January 22nd of 2019, you said you were driving on --

10  A    I was traveling.

11  Q    -- on Mammoth Road.  Is that correct?

12  A    I was traveling.

13  Q    Okay.  You were traveling on Mammoth Road.  Is that

14  correct?

15  A    Correct.  Correct.

16  Q    You were in a vehicle?

17  A    No, I wasn't traveling on Mammoth Road.  I was traveling on

18  4th Ave going towards Mammoth Road.  Mammoth Road is the

19  intersection, but I was traveling on 4th Ave.

20  Q    I see.  Were you driving away from 109 4th towards Mammoth

21  Road?  Is that the direction you were traveling in?

22  A    Say that again.

23  Q    Which direction on 4th Ave were you traveling?

24  A    I was traveling towards 4th.  I was traveling away from 4th

25  Ave to go over on Mammoth Road.

180

1    Q    Okay.

2    A    So I was leaving 4th Ave to go over to Mammoth Road.

3    Q    So you were leaving 4th Ave?

4    A    Yes.

5    Q    Eventually, you came back to 4th Ave?

6    A    Yes.  I took the same route that I took.

7    Q    By the time you came back to 109 on 4th Ave, there were six

8    to seven cop cars there.

9    A    About that, yeah.

10   Q    And when you arrived on the scene, the defendant was

11   already in handcuffs.  Is that correct?

12   A    Both of them, yes.

13   Q    And you saw a machete being removed from the pickup truck,

14   correct?

15   A    Yes.

16        MR. DEVOE:  No further questions.

17        THE COURT:  All right.

18        Anything further, Mr. Bey?

19        MR. BEY:  One other question.

20                    REDIRECT EXAMINATION

21   BY MR. BEY:

22   Q    Mr. Bey, you -- you know Leonitus Jabir Bey as a working

23   man, right?  He's a work -- is he a working man?

24   A    Correct.

25        MR. DEVOE:  Objection.

1       THE COURT:  Sustained.

2   BY MR. BEY:

3   Q    What does he do for work?

4       MR. DEVOE:  Objection.

5       THE COURT:  I'll allow it.  I'll give you some leeway here.

6   You can ask him.  So, go ahead.

7   BY MR. BEY:

8   Q    What does he do for work?

9   A    Well from my knowledge I know you have a company.

10  Q    Uh-huh.

11  A    You do little bit of everything, mostly painting.

12  Q    Uh-huh.

13  A    Yardwork, if it's necessary.

14  Q    Uh-huh.

15  A    A little bit everything.

16  Q    Have I ever hired any of my family members in this movement

17  to work with me?

18      MR. DEVOE:  Objection.

19  BY MR. BEY:

20  Q    Have I ever worked with my --

21      THE COURT:  I'll allow --

22      MR. BEY:  I'm getting -- I'm bringing it some -- I'm

23  bringing it somewhere.

24      THE COURT:  All right.

25      MR. BEY:  I'm not just dragging this out.

1       THE COURT:  But you're gone beyond the scope --

2       MR. BEY:  I'm bringing it somewhere.

3       THE COURT:  -- of the cross.  But go ahead.

4  BY MR. BEY:

5  Q    Have I ever worked with the brothers on jobs?

6  A    Yes.

7  Q    Have you ever -- haven't I -- have you ever seen the truck

8  full of tools?

9  A    Always.

10 Q    Always.  You know what, I'm just going to disclose this.  I

11 know that we keep machetes around all the time.  Remember when I

12 saw --

13      MR. DEVOE:  Objection.

14      THE COURT:  That's -- you're testifying now.

15      MR. BEY:  Oh, sorry.

16      THE COURT:  You got to ask a question.

17      MR. BEY:  Okay.  Okay.  Okay.

18      THE COURT:  All right.

19      MR. BEY:  All right.

20 BY MR. BEY:

21 Q    Where -- where do we buy machetes from?

22      MR. DEVOE:  Objection.

23      THE WITNESS:  Walmart.

24 BY MR. BEY:

25 Q    Where else sells them?

183

1   A     Home Depot, Lowe's.

2   Q     Right.

3   A     I got mine from the Lowe's.

4   Q     You got yours from Lowe's?

5   A     Yeah.

6   Q     Oh, so you still have yours?

7   A     Yes.

8   Q     Use it as a tool?

9   A     Yes.

10  Q     It's a dangerous weapon.  And when you went to purchase the

11  machete, did they say you needed a license for that dangerous

12  weapon?

13        MR. DEVOE:  Objection.

14        THE COURT:  That objection is sustained.

15  BY MR. BEY:

16  Q     So -- but you have one?

17  A     Yes, I do.

18  Q     Do you call it a dangerous weapon?

19        MR. DEVOE:  Objection.

20        THE WITNESS:  No.

21        THE COURT:  Sustained.  Disregard the witness's last

22  statement.

23  BY MR. BEY:

24  Q     Do you use it as a dangerous weapon?

25        THE COURT:  Sustained.  Sir, you're going -- wrap it up.

184

1    BY MR. BEY:

2    Q    So machetes can be purchased from Walmart, Ace Hardware,

3    Home Depot, and all the regular places?

4    A    Yes.

5    Q    You don't need a license to buy it, right?

6    A    Just need the notes.

7    Q    Just the need the note.

8    A    Yeah.

9    Q    Like the Federal Reserve notes.

10   A    Federal Reserve notes.

11   Q    And you seen me use these tools before?  You seen me go to

12   work and use these tools?

13   A    Yes.

14        MR. BEY:  No further questions.

15        THE COURT:  Anything further, Attorney DeVoe?

16        MR. DEVOE:  Nothing further, Your Honor.

17        THE COURT:  All right.

18        Thank you, sir.  You may step down.

19        THE COURT:  Mr. Bey, any further witnesses?

20        MR. BEY:  Can I call Pender Allen back to the stand?

21        THE COURT:  Pender Allen?

22        MR. DEVOE:  Officer Pender.

23        MR. BEY:  Officer Pender.

24        THE COURT:  Okay.  Can I see you at sidebar?

25        (Sidebar commenced at 3:08 p.m.)

1          MR. BEY:  I just had a few questions that I might have

2     missed.  I was hoping if I could request him.

3          THE COURT:  All right.

4          MR. BEY:  Okay.  It's okay?

5          THE COURT:  Let me ask you, because understand that --

6          MR. BEY:  And it's going --

7          THE COURT:  -- you went through a colloquy.  You know,

8     self-representation, I'm giving you some latitude on some

9     things.  One of the things is that we have to adhere to the

10    rules of trial procedure as well.

11         MR. BEY:  And when -- this is not my first trial.

12         THE COURT:  No, I know.

13         MR. BEY:  It's actually my third.

14         THE COURT:  I know.  I know.  And you're getting --

15         MR. BEY:  This process --

16         THE COURT:  You've got experience.

17         MR. BEY:  How can it be so different with the procedures

18    from one trial to another?

19         THE COURT:  Well I think --

20         MR. BEY:  It's like super different.

21         THE COURT:  It could be different charges.

22         MR. BEY:  They're all the same charges, My Honor.

23         THE COURT:  I don't know.

24         MR. BEY:  They're repeated.  They're the same stuff.

25         THE COURT:  Okay.  What do you want to ask Officer Pender?

1       MR. BEY:  I just -- it's questions about his -- what he

2   wrote in here, and I forgot to question him about this.  He kind

3   of does the 25 --

4       THE COURT:  Okay.

5       MR. BEY:  -- to a -- to a --

6       THE COURT:  Right now, that's not any --

7       MR. BEY:  That's not in here.  All right.  So --

8       THE COURT:  Okay.

9       MR. BEY:  -- we'll -- we'll --

10      THE COURT:  All right.  So let me ask you this: are you

11  going to present any other evidence?

12      MR. BEY:  Besides everything I have over there.  I'm going

13  to testify myself.

14      THE COURT:  Okay.  All right.  So when you go and testify

15  it's -- because you're not going to have anybody to be able to

16  ask you questions --

17      MR. BEY:  Right.

18      THE COURT:  -- okay.  So if you could just give me, prior

19  to you --

20      MR. BEY:  I'm just going to use my federal -- the -- I'm

21  going to use my -- the notes from the federal report as evidence

22  to my name.

23      THE COURT:  Okay.

24      MR. BEY:  Because he keeps trying to call me Leon Campbell.

25      THE COURT:  Yeah, but I don't think that's --

1      MR. BEY:  It's very relevant.  It's very relevant, because

2  you guys are trying to charge Leon Campbell.  Who you have in

3  front of you --

4      THE COURT:  Okay.

5      MR. BEY:  -- is Jabir Leonitus Bey.

6      THE COURT:  Okay.  But you're not charged with false name

7  or anything like that.

8      MR. BEY:  I know that, but they need to -- the people must

9  know that.

10      THE COURT:  Well you can tell them what you call yourself

11  and how you came to be.  That's okay.

12      MR. BEY:  And the rights and the laws behind it, because I

13  didn't just -- this isn't just me made it up.

14      THE COURT:  No, no, no.

15      MR. BEY:  I have to follow a bunch of laws to get where I

16  am today.

17      THE COURT:  Okay.  If you want to add something, but what

18  I'm saying is before you go into a narrative -- just tell me

19  what the subject matter is so that the Commonwealth and myself

20  know what's coming.

21      MR. BEY:  Okay.

22      THE COURT:  Because otherwise we don't have the question.

23      MR. BEY:  So when I'll rule to Your Honor how -- how -- who

24  I am --

25      THE COURT:  Yup.

1      MR. BEY:  -- is number one.

2      THE COURT:  Yup.

3      MR. BEY:  We have a government and world protective

4  violation, and the -- which I know a lot of people are not

5  familiar with, but we exist.

6      THE COURT:  Okay.

7      MR. BEY:  It's kind of -- it kind of hurts to know that you

8  guys --

9      THE COURT:  Okay.

10     MR. BEY:  -- don't know about us.

11     THE COURT:  So you can tell them, but you can't go into any

12  editorial about -- you know, just that this is my name, this is,

13  you know --

14     MR. BEY:  I will go to --

15     THE COURT:  -- about -- about you guys don't understand us.

16     MR. BEY:  Oh, no.  Yeah.

17     THE COURT:  You just let them know that you are --

18     MR. BEY:  Every brother in this nation --

19     THE COURT:  -- a part of --

20     MR. BEY:  -- is United States Constitutionally approved.

21  I'm not going to take it --

22     THE COURT:  Okay.

23     MR. BEY:  -- on the wild history that's about --

24     THE COURT:  Again, you can let them know about the nation

25  that you belong to, the rights that you feel that you have --

1       MR. BEY:  And the Constitution still discussing?

2       THE COURT:  Yeah.

3       MR. BEY:  The laws when it comes to driving without a

4   license, operating --

5       THE COURT:  Well see, but you're not charged with driving

6   without a license.

7       MR. DEVOE:  Yeah, he is.

8       THE COURT:  Oh, excuse me.  Excuse me.  Okay, a suspension.

9   Okay, it's suspension, but not without a license.  Okay.

10      MR. BEY:  Okay.

11      THE COURT:  Okay.  All right.  But, you know, Attorney

12   DeVoe, if you think this goes off the rails, you can object.

13   It's just kind of hard --

14      MR. DEVOE:  Yeah.

15      THE COURT:  -- without a question.  Okay.

16      MR. BEY:  I can ask it in the form of a question.

17      THE COURT:  Yeah.  I'll --

18      MR. BEY:  Okay.

19      THE COURT:  I'll let you give a narrative.  Just tell me

20   where you're -- where you're going, okay?

21      MR. BEY:  Where I'm going.

22      THE COURT:  All right?

23      MR. BEY:  All right.

24      THE COURT:  Okay.

25      (Sidebar concluded at 3:12 p.m.)

1     THE COURT:  All right.  Ladies and gentlemen, typically you

2  may have seen that usually there's a question and an answer, a

3  question from the attorney or Mr. Bey, and then an answer from

4  the witness.  Mr. Bey is going to testify.  He represents

5  himself, so there's not going to be that question.  What he is

6  going to do is he is going to take the stand, he's going to let

7  me know the area in which he wants to testify, and then I'll

8  allow him to testify or not testify to a certain thing.  So I

9  just want you to know it's not typical of what we have, except

10  it happens when people are representing themselves.  Okay.

11     Mr. Bey.

12     MR. BEY:  Uh-huh.

13     THE COURT:  You want to take the stand?

14                    LEON CAMPBELL, WITNESS, SWORN

15                        DIRECT EXAMINATION

16     THE COURT:  All right.  And, Mr. Bey, your first area?

17  Your first subject area you want to testify to.

18     THE WITNESS:  Well let's clear up the driving without a

19  license situation.  All right.

20     So I don't know -- hi, ladies and gentlemen of the jury.

21  Sorry, you guys been here a while.

22     I don't know how much you guys know about the Constitution

23  driving and traveling, right?  Driving and traveling are two

24  different things.  I don't want to take you guys down a whole,

25  huge road of a bunch of stuff where they don't teach us.  And at

1  the end of the day, when you get trouble they tell you, you got

2  no one but yourself to blame and you should have known better.

3  So I had to go figure this stuff out.  I had to go learn these

4  things.

5       This book alone here in front of you cost me 100 bucks just

6  to get it off a third-party person on eBay.  So it's not cheap,

7  but you need to find out what the law to become a better citizen

8  to do good, to honor your mothers and your fathers so that your

9  days may be long on Earth.  So I took that route, and the books

10  is what helped me to get to that route.

11       Driving is international commerce.  The government and the

12  states get their little permission to pass their rules and

13  regulations on it.  Unless you're being paid internationally for

14  commerce, none of us here are driving.  I sure am not being paid

15  internationally.  I haven't even seen the contract for

16  international commerce, but you can look it up and Google it.

17  It's there, and it's real.  I would look my -- I had my -- my

18  jaws on the floor, my eyebrows up here.

19       So that's how come every time they pull you for a little

20  infraction, your day can go from, oh, a quick little fine to it

21  can be hell on Earth, because they link you to the whole driving

22  thing.

23       Traveling, on the other hand, which is protected by the

24  Constitution, right?  The pursuit of one's happiness to travel

25  the highways and byways encumbered and unfettered is different,

1   protected by a Constitution.

2        And they, along with the officers that were questioned,

3   swore an oath, an oath to it.  Just like I'm on the stand and

4   I'm under -- like, I'm under oath here.  Perjury is a crime.

5   They also swore an oath.  Perjury for them would be a crime.

6   The oath that they swore is to protect the constitutional

7   rights.

8        Do you know what the Constitution says about our rights to

9   travel?  It says that no state -- no state or -- or agency can

10  take an inherent right, levy it, or put taxes on it.  License it

11  or put taxes on it.  But yet, we're all getting up to renew

12  licenses and being taxed for it.

13       And mind you, when you want to go from your house to

14  Hannaford's for eggs or milk, you're being charged.  The

15  Constitution said that we have all inherent right to do that

16  free.  No license, no permission to get up and travel, whether

17  -- and -- and -- and whatever the means of locomotion is in that

18  time you have entitled to right to It.

19       So it doesn't mean you got to get up and get on the bus or

20  get on your feet and walk.  If automobiles are what's traveling,

21  taking people around, the Constitution protects that.  You go up

22  in a automobile and travel from point A to point B.

23       So I said, you know what, this has to be bogus.  Let me go

24  see if it's for real.  I already went to traveling --

25       MR. DEVOE:  Objection.

1      THE COURT:  See, that's --

2      THE DEFENDANT:  I'm going to stop there, because I know

3  they were going to --

4      So that's -- I guess, right, so there is -- there's some

5  reality to it, but it's, like, on a need to know basis, I guess.

6  They don't want everyone to know.  They don't all of us to know.

7  They want all of us under their jurisdiction and -- and -- and

8  subjection, which totally goes against diversity of citizenship

9  and diversity of state, which the Constitution protects as well.

10  The same thing, right?  That's one instance.

11      So they are trying to say I have a suspended license under

12  that third-party contractual name, which I've already been

13  through the rings and the ropes with it about that in this very

14  courtroom, and I'm still here standing in front of you.  If --

15  if -- if it went any other way, you would --

16      MR. DEVOE:  Objection.

17      THE WITNESS:  -- probably looking at me --

18      THE COURT:  Yeah --

19      THE WITNESS:  -- in a glass --

20      THE COURT:  Mr. Bey --

21      THE WITNESS:  Oh.  All right.

22      THE COURT:  Mr. Bey.  Mr. Bey.

23      THE WITNESS:  Sorry.

24      THE COURT:  Move on.

25      THE WITNESS:  Now let's get to the machete, right?  It's --

1    I'm wielding a dangerous weapon.

2         They sell it at Walmart.  They sell it Ace Hardware.  They

3    sell it at Home Depot.  It's only 12.99, depending on the size

4    you buy.  So you mean to tell me that --

5         THE COURT:  And, Mr. Bey, I'm going to let you continue,

6    but you're interspersing your testimony with final arguments.

7    Just tell them where you obtained the machete.

8         THE WITNESS:  Okay.

9         THE COURT:  Okay.

10        THE WITNESS:  So I -- I -- I obtained my machete

11   specifically from Walmart, because I was in Walmart at the time

12   and I saw it and I was like, "Oh, this would be cool."  Because

13   I do -- I do land -- I have a company, I paint as a company.

14        Is it okay if I say my company name, maybe?  Can I do a

15   promotion?

16        THE COURT:  Yeah.

17        THE WITNESS:  So I have a company --

18        THE COURT:  Not for promotional purposes.  Just let them

19   know where you work.

20        THE WITNESS:  Oh, okay.

21        I have a company.  I paint.  I paint, I do landscaping,

22   everything, and a machete is part of the tools that I use to cut

23   through and make sure your -- your weeds are out, any kind of

24   sticks or trees you want out of the way.  That's one of my

25   tools.  I have a chainsaw.  So many tools that they could

1  possibly come in and say it's a dangerous weapon.  I guess

2  anything they look it's a dangerous weapon.

3      The whole reaching for it, as you can see, the

4  inconsistencies with their testimony about where they found

5  it --

6      THE COURT:  And again --

7      THE WITNESS:  Oh, is that argument?

8      THE COURT:  That's argument.

9      THE WITNESS:  Okay.

10      THE COURT:  Tell them what you want them to know.

11      THE WITNESS:  So they're trying to say that I'm driving

12  without a license, which I'm not.  I'm traveling.  The

13  Constitution protects it.  They all know it.  I already asked

14  them about it before, and I'm still here in front of you.

15      Then they're saying I'm wielding a dangerous weapon, which

16  I didn't know you could buy a dangerous weapon from Walmart or

17  Home Depot or Ace Hardware store and things of that nature.  So

18  I guess anything in Walmart and those places can be a dangerous

19  weapon, if that's the case.

20      But it's -- it's -- they have the burden.  They have the

21  burden to prove me guilty beyond a reasonable doubt, and they

22  still haven't showed us, me or you, where this weapon was

23  dangerous that they found, in its sheath.  Where they found it

24  is up in the air, because, allegedly, several different people

25  found it all at once.

1        MR. DEVOE:  Objection, Your Honor.

2        THE WITNESS:  Right?  So --

3        THE COURT:  Again, you're getting into argument.

4        THE WITNESS:  It's still in the -- is still in the sheath,

5   whoever found it, whatever.  And it's a dangerous weapon because

6   it's a machete, or is it a dangerous weapon because --

7        THE COURT:  No, sir, that's -- again, this is testimony,

8   not -- you're going to have a chance to --

9        THE WITNESS:  Again --

10        THE COURT:  -- argue again.

11        THE WITNESS:  And this is --

12        THE COURT:  This is just testimony.

13        THE WITNESS:  Okay.  So in testimony I'm testifying, pretty

14   much, on --

15        THE COURT:  What happened that day.

16        THE WITNESS:  That day.

17        THE COURT:  Yeah.

18        THE WITNESS:  Okay.  Oh, okay.

19        So in the report, this Mr. Pender Allen says that he saw me

20   coming down the --

21        THE COURT:  And again, like I told you, you can't talk

22   about anybody else.  You can argue that later.  This is what you

23   say happened that day.

24        THE WITNESS:  Oh, just all I say?

25        THE COURT:  Yeah.  Yeah.

1        THE WITNESS:  All right.  Okay.  Okay.  Okay.

2        MR. DEVOE:  Your Honor, I'd also ask that the witness not

3   look at anything.

4        THE COURT:  All right.  If you want to just put that --

5   well he can refresh his recollection.

6        MR. DEVOE:  Yes.  Yeah.

7        THE COURT:  So I'll let -- I'll let -- go ahead.

8        THE WITNESS:  Oh, I can?  Okay.

9        So this is what I think happened, right?  So, first of all,

10  there's, like, a discrepancy of what is criminal and civil.

11       THE COURT:  No, no, no.  Just tell them what happened, and

12  then you can argue that in your closing argument, okay?

13       THE WITNESS:  Okay.

14       So and just to refresh my memory, I'm looking at the

15  picture, right?  The alleged left lane, he's saying I went

16  straight in the left.

17       Can I use this?

18       THE COURT:  Sure.

19       THE WITNESS:  Like, how it's painted here on the floor like

20  that?

21       THE COURT:  Well they can see it.  Just tell me -- just

22  explain it to them.

23       THE WITNESS:  Right.  So you see how you can see the arrow

24  on the floor under the car here?  The pumpkin is in the picture,

25  so this is last year sometime around Halloween, because that

1   church always does that.

2       Now if you go there now, today, you can't see that on the

3   floor.  It's not there.  So I only know it's a left turn lane

4   because I've lived over there for so long, but anyone else who

5   is not in the area, they're going straight.  I've seen hundreds

6   of cars go straight through it.  I've even followed cars going

7   straight because you can't see what's on the floor.  But, right,

8   granted, it's a left turning lane.

9       So I'm not going to sit here -- stand here and be, like,

10  "Oh, I'm Mr. Perfect."  If anything, the only thing they would

11  have me for is a civil infraction of a lane violation for -- for

12  going straight in a left turning lane.

13      Where all this other stuff is stemming from, I think it's

14  an emotional thing going on --

15      MR. DEVOE:  Objection.

16      THE COURT:  Yeah.  That's -- that can be your argument.

17      THE WITNESSES:  Okay.

18      THE COURT:  What -- it's about what you happened --

19      THE WITNESS:  Like we've heard on the stand, they claim

20  sirens.  I didn't hear any sirens.  I'm not --

21      I used to want to be police growing up until I found out

22  the kind of truth about them.  Now I'm trying to be something

23  else.  I don't want to be part of the problem.  I want to be

24  help.

25      So, like, there's no way I would try to defy this guy in my

1  own neighborhood living right there.  I didn't hear any sirens.

2  When I saw the lights, I feared for my safety, because what's

3  going on now with social media everywhere, police shooting and

4  killing individuals --

5  MR. DEVOE:  Objection.

6  THE COURT:  Yeah.

7  THE WITNESS:  -- and going home to kiss their babies --

8  THE COURT:  Sir, sir, that's improper --

9  THE WITNESS:  -- gives me --

10  THE COURT:  That would be improper.

11  THE WITNESS:  Okay.

12  THE COURT:  Okay.

13  THE WITNESS:  So, I mean, we all have the right to be

14  fearful, right?  To fear for our lives.

15  THE COURT:  Your testimony is you were afraid, right?

16  THE WITNESS:  Right.

17  THE COURT:  Okay.  All right.

18  THE WITNESS:  So, and I found out in law that you don't

19  have to pull over.  You can pull over in a designated place

20  where you feel safe.  So you don't have to pull over in a dark

21  alley on the side of the road when you see lights where they can

22  do anything to you and get away with it.  Pullover where you

23  feel safe publicly, lights everywhere, camera, action.  And

24  that's what I did, with the driveway of my domicile, the place

25  where I domicile, less than -- less than 200 meters away.

1    I took them to my house where I feel safe.  My mother-in-

2  law is inside, my wife's inside, my -- my -- my dogs are inside.

3    Who else was there that day?  The neighbors were upstairs.

4  They love me because I do all the landscaping for the house, so

5  they would definitely come outside.  Everyone was home, so I

6  took them home where I felt safe.  Safe to then respond to this

7  -- the -- the dilemma, the going straight in a left turning

8  lane.

9    But when the -- when my window was approached, I was

10  totally thrown aside by all the screaming and the gun pointed at

11  me.  That wasn't mentioned.  So I got nervous.  So I'm like,

12  this guy has a gun out, so I clasped the steering wheel.  And I

13  told him, "I can't put the window down because my alternator is

14  going."  The lights are flicking in the truck.  That's what made

15  me not pullover, because the alternator was flickering.

16    If I pulled over, you're going to have my F-150 in the

17  middle of Mammoth Road and lights and tow trucks and everything.

18  So I said, let me pullover to my house.  Worst-case scenario I'm

19  out of the way of traffic, out of everyone's way.  Not to -- to

20  impede traffic on the street.  And I'm at my house.  I'm not

21  running from you.  If anything, you come inside and get me if

22  I'm at my house.  You understand?  I don't take police to my

23  house just to be belligerent.  That's ridiculous.

24    So with knowing what I got going on, alternator flickering,

25  battery about to die, I think -- I think the judgment I made,

1  I'm doing this guy a favor because I'm not running.  I'm just

2  going to bring him somewhere where I feel safe, and then I'll be

3  able to talk to him and explain to him, and then as men we would

4  just work it out.  If I get a ticket, or even if I get a

5  arrested or whatever the case, I would handle it like a man.

6  I'm not trying to be a tough guy.  I'm going to handle it.

7      But with me explaining to him that I can't wind the window

8  down, I have to -- I told him, "I have to open the door to talk

9  to you.  The alternator is dying."  He's too busy yelling.  Me

10  and him opened the door simultaneously.  His hand hits the

11  doorknob while I'm opening it.  So this is him pulling and me

12  pushing the door to open it.

13      Gun in one hand, and I'm clasping the steering wheel.  I'm,

14  like, "Is that necessary?  There's no need for that."  Like, I'm

15  right here, we can -- we can talk.

16      Give me -- his words, this is -- "Is this what you want?"

17      At this point, my mother-in-law is at the window now,

18  because he's doing all the yelling.  No sirens.  Just lights,

19  flashing lights, and this guy yelling.

20      After the first initial reach, jab, punch, that's when my

21  guest in the car, Chico, begins to film.  That's -- he -- we all

22  speak, because at a point, I can refresh my -- my -- my --

23      I can look at this, right?

24      THE COURT:  You can look at it to refresh, not read from

25  it.

1        THE WITNESS:  Right.  I'm just looking to --

2        Because at a point -- at a point, right, he -- he then said

3    it just stops, it goes blank, and we're just yelling.  Nothing

4    that brought us to the yelling.  It's just he asked the

5    question, and we start screaming.

6        Like, I mean, I guess there's individuals in the world like

7    that, but I'm not one of them.  I'm not one of them.  I'm

8    coherent.  I can -- I can converse with you as an adult, as a

9    human being.  We can converse intellectually.  Or and -- and if

10   you want to -- if you want to go further south with me, I can go

11   there with you as well.

12       My IQ is kind of up there.  I'm not a brute is what they

13   would like to, like, give the depiction of when it comes to us

14   so-called people.  Like, you see already what they do all the

15   time.  Everyone has a nationality, but for me, for some reason,

16   anyone in my -- in my complexion, we just get letters.  They

17   classify us as letters.  H for Hispanic, B for black --

18       THE COURT:  All right.  Mr. Bey --

19       THE WITNESS:  -- this that, just letters.

20       THE COURT:  Mr. Bey, that's argument.

21       THE WITNESS:  All things that have no nation and no

22   protection by law.  So yeah, as black, they can come say that

23   the machete's a weapon, he driving without a license --

24       MR. DEVOE:  Objection.

25       THE COURT:  Sir --

1    THE WITNESS:  -- but as me in my --

2    THE COURT:  Mr. Bey --

3    THE WITNESS:  -- free national capacity --

4    THE COURT:  Mr. Bey -- Mr. Bey, that's argument.

5    THE WITNESS:  Oh.

6    THE COURT:  Tell them what happened.

7    THE WITNESS:  Okay.

8        So then, after he -- he had to pull me out the vehicle,

9    because I'm terrified.  He has a gun in his hand, the Taser.  I

10   don't -- it was yellow, so I'm assuming it was the Taser.  It's

11   not the actual gun.  It was yellow and had stripes on it.

12       So I'm clasped to the wheel.  He's pulling me.  I got my --

13   my brother filming.  He steps out to go around to film.  I tried

14   to -- I said, "Stay in the car.  Don't --" but he goes around to

15   him.  He still has his -- he's still focused on me.  He's not

16   even focused that Chico went around to film.

17       He's still punching me in the face.  So I'm, like, "We can

18   talk.  You don't have to hit me.  Like, here I am.  I'm not

19   running.  You don't have to hit me repeatedly."  I'm telling

20   this guy, like, "We can talk."  I know you're still going to

21   arrest me, but let's see if we can diffuse, that way it's not

22   this crazy, oh, oh, oh.  You're going to get your arrest, you're

23   going to get your collar, and then I'm going to be able to keep

24   my dignity.  But I guess that wasn't the case.

25       So once he got me off the steering wheel, and -- and this

1 -- I probably can't even say this because this was brought to me

2 outside, but it is pertaining to the case.  I'm not sure.  I

3 don't know.  Can I please --

4       THE COURT:  No, he has to --

5       THE WITNESS:  He has to hear it?

6       (Sidebar commenced at 3:28 p.m.)

7       THE WITNESS:  I was sent a letter from, I'm assuming the

8 federal court, giving me disclosure to his private standing

9 information that he --

10       THE COURT:  Okay.

11       THE WITNESS:  -- he's a martial arts black belt expert.

12       THE COURT:  Okay.  That's still (indiscernible).

13       THE WITNESS:  Still.  So I can --

14       THE COURT:  Just keep it to testimony and not argument,

15 okay?

16       THE WITNESS:  Okay.

17       (Sidebar concluded at 3:29 p.m.)

18       THE COURT:  Okay.

19       THE WITNESS:  All right.  When it comes to the -- the --

20 the reaching in the middle thing, I don't know what he's talking

21 about.  Like, I had a guest in the passenger's seat, so if any

22 turning to the middle, I would be turning to my guest.  He's in

23 the -- in the passenger seat with me.  I don't know what the

24 whole reaching was.  They never even found nothing in the area

25 he described reaching.

1    He drags me out the car, judo flips me to the ground.  Like

2  he said, it was still a little snow on the side and stuff, so

3  there's a -- I do a lot of gardening at my house.  There's a

4  garden, and I grow tomatoes, mints, everything.  So he's right

5  by my flower bed.  My flower bed has a little snow in it, and

6  that's where he threw me down.  So I'm edged -- I'm literally

7  sideways, half on the two by four -- four by four plank, and

8  half on the concrete, already cuffed.  By the time -- by the

9  time the witnesses you saw came, by the time my mother-in-law

10  came out, already cuffed.  Mind you, I was resisting.  Already

11  cuffed in seconds.  According to him, he said I was resisting.

12    So after the cuffing and the escort -- he says to me -- he

13  says to me, oh -- no, no, he didn't even say nothing.  He was

14  just so upset he dragged me over to the wagon, dragged Chico to

15  the wagon.  And I'm asking him about my truck because I'm, like,

16  "Don't tow my truck, because I'm in my driveway."  And he's,

17  like, "Oh, I'm still going to tow your truck."

18    So after them, I guess, having a laugh about the whole

19  Moorish thing and my nationality, they laughed it off, they

20  towed the truck.  Took the plates off, towed the truck.  Not

21  caring about any of my paperwork that I have established about

22  it.

23    And then we went to the -- I was able to -- I was able to

24  go to court the next morning, that day and --

25    THE COURT:  Well you're beyond --

1       THE WITNESS:  I'm beyond the case?

2       THE COURT:  Yeah.

3       THE WITNESS:  Okay.

4       So -- oh, and my mother-in-law came out.  My mother-in-law

5  had to ask him, "Why are you doing that?"

6       MR. DEVOE:  Objection.

7       THE COURT:  I'll let that stand.

8       THE WITNESS:  She came, and she asked him.  He told her,

9  "Oh, because he didn't pull over when I told him to."  And then

10 she -- she --

11      MR. DEVOE:  Objection, Your Honor.

12      THE COURT:  Now that's going into hearsay, so the first

13 part stands, but now --

14      THE WITNESS:  Right.

15      THE COURT:  -- it's --

16      THE WITNESS:  So there was nothing that she could do as far

17 as saving me or protecting me.  She just had to ask him what --

18 what did he do, and why are you doing that to him.

19      So then on my way to the wagon, India come -- India comes

20 out.  Akif pulls up.  I'm thrown in the wagon, and I get

21 escorted -- I get taken away.  And I'm watching -- I count -- I

22 counted  -- I counted -- because I counted.  I remember while

23 being walked to the wagon, I started to count the cop cars.  I

24 counted 14 cars.  Fourteen.  The four in the driveway, and then

25 on the way being walked out to the street, on both -- the street

1    was massacred with police.  Fourteen cars that our tax dollars

2    pay for, for a civil infraction.  For going straight in a left

3    turning lane.

4         I don't see where the machete stuff --

5         THE COURT:  All right.

6         THE WITNESSS:  -- they're making up --

7         THE COURT:  That's argument.

8         THE WITNESS:  I don't see --

9         THE COURT:  So anything else for your testimony?

10        THE WITNESS:  Does it matter that one of the officers has

11   priors?

12        THE COURT:  Sir --

13        (Sidebar commenced at 3:32 p.m.)

14        THE COURT:  All right.  You know better, okay?

15        THE WITNESS:  I was just going --

16        THE COURT:  I already heard it, and I already told you that

17   that is excluded.

18        THE WITNESS:  All right.

19        THE COURT:  Okay.  All right.

20        THE WITNESS:  All right.

21        THE COURT:  Okay.  I think we've finished up the narrative

22   of your testimony --

23        THE WITNESS:  Yeah.

24        THE COURT:  -- as to what happened that day --

25        THE WITNESS:  Yeah.

1      THE COURT:  -- your version of what happened, correct?

2      THE WITNESS:  Yes.

3      THE COURT:  Okay.  So hold on a second now.  So we're

4  going to get into final arguments, and that's where you can

5  argue, okay?

6      MR. DEVOE:  I would like to ask some questions first.

7      THE COURT:  Okay.  So, Attorney DeVoe, while I have you

8  here, these are -- these are the verdict slips, so each charge

9  is on there.  This one is carrying a dangerous weapon, the

10  license.  This is the -- so I just have to show you that.

11      THE WITNESS:  I'm sorry.

12      THE COURT:  Okay.  All right.  So I'll let you cross him.

13      MR. DEVOE:  Okay.  Thank you.

14      (Sidebar concluded at 3:33 p.m.)

15      THE WITNESS:  That's my testimony at this point.

16      THE COURT:  Okay.

17      THE WITNESS:  Is he questioning me?

18      THE COURT:  Yeah.  Yeah.

19      So, Attorney DeVoe.

20      MR. DEVOE:  Thank you, Your Honor.

21      THE WITNESS:  So can I just finish one sentence?

22      THE COURT:  Oh, before you begin --

23      MR. DEVOE:  Sure.

24      THE COURT:  As long as it doesn't --

25      THE WITNESS:  Oh, yeah.  So what the charges, failure to

209

1    stop, I don't see how, when I stopped --

2         THE COURT:  Again -- again --

3         THE WITNESS: Uh-huh.

4         THE COURT:  That's argument.  You said you stopped.

5         THE WITNESS:  Yeah.

6         THE COURT:  But you already told them that you stopped when

7    you got to your house.

8         THE WITNESS:  I know.  I just wanted to bring it to

9    perspective, like --

10        THE COURT:  Oh, no, but you can do that in your closing

11   argument, sir.

12        THE WITNESS:  Okay.

13        THE COURT:  Okay.  All right, Attorney DeVoe.

14        MR. DEVOE:  Thank you, Your Honor.

15                        CROSS-EXAMINATION

16   BY MR. DEVOE:

17   Q    Mr. Bey, you prefer I call you that?

18   A    Yes.  I prefer my free national name.

19        MR. DEVOE:  Your Honor, I'd like to approach.

20        THE COURT:  Okay.

21        MR. DEVOE:  And if I could have Exhibit 3?  Thank you.

22   BY MR. DEVOE:

23   Q    Mr. Bey, I'm handing you what's been previously marked as

24   Exhibit 3.  Is that image of your face?

25   A    Huh?

210

1    Q    Is that image your face?

2    A    This handsome fellow here?

3    Q    That handsome fellow there.

4    A    That's a good-looking guy.  Yeah, that is.  He look -- he

5    look like me, kind of.

6    Q    That is your face?

7    A    He kind a look like me, yeah.

8    Q    My question to you, sir, is: is that your face?

9    A    Well, yeah, yeah, yeah.  Whose face would it be?

10   Q    Thank you.

11        Officer Pender didn't have a gun drawn, correct?

12   A    I don't know what the weapon was.  It was bright yellow in

13   his hand, and it was aimed at me, and the -- oh, the fear

14   doesn't let you make --

15   Q    My question was just, he didn't have a gun drawn, did he?

16   A    I don't know.  I don't know what the weapon was in his hand

17   was.

18   Q    You saw a yellow device in his hand?

19   A    Yeah.

20   Q    That's the only device you saw in his hand?

21   A    Yeah.  Cops have shot kids for yellow devices and called it

22   guns.

23   Q    Sorry --

24        THE COURT:  Sir --

25        MR. DEVOE:  There's no --

1        THE WITNESS:  It could have been a gun.

2        MR. DEVOE:  -- question pending.

3        THE WITNESS:  It could have been painted yellow.

4        THE COURT:  Okay.

5   BY MR. DEVOE:

6   Q    On January 22nd, 2019, you were driving your pickup truck.

7   Is that correct?

8   A    Nope.  I was traveling in my pickup truck.

9   Q    Were you behind the steering wheel of that pickup truck?

10  A    I was.

11  Q    On that day, there was a machete in your car, wasn't there?

12  A    Yes.

13  Q    So you have a lawsuit pending against Officer David Allen

14  Pender, don't you?

15  A    I do.

16  Q    In that lawsuit, you're seeking $9 million from him --

17  A    Well it wasn't just --

18  Q    -- correct?

19  A    -- Pender Allen.  It ended up being him -- he was the only

20  one who District allowed me to go against.  The other names,

21  which totaled the 9 million in cost were -- those claims were

22  dismissed.  But Pender having --

23  Q    You would agree with me that you are seeking money from

24  Officer Pender?

25  A    No.  Officer Pender wouldn't be the one to pay me.

1  According to law, I would be seeking money from the state.

2  Q    Sir, that's not my question.  Are you seeking money for

3  actions of Officer Pender?

4  A    No.

5  Q    Your lawsuit does not involve Mr. Pender's actions?

6  A    It does involve his actions.  You asked me what I'm

7  seeking, though.

8  Q    In that lawsuit involving Officer Pender's actions, you're

9  seeking money?

10 A    Absolutely not.

11 Q    I'm sorry.  Could you repeat that?

12 A    Absolutely not.

13 Q    You are not seeking money in that lawsuit?

14 A    No.  Money is just a perk that comes with the suit.  You

15 can't go through with the suit unless you put an amount in

16 claim.  You cannot file it.

17 Q    You put a $9 million amount in it, correct?

18 A    I put $9 million.

19 Q    Thank you.

20      MR. DEVOE:  No further questions, Your Honor.

21      THE COURT:  All right.

22      Thank you, sir.  You may step down.

23      THE COURT:  All right.  Ladies and gentlemen, that

24 concludes the evidence portion of the trial.  We'll now begin

25 with the closing arguments.  As I told you, the Commonwealth has

1    the burden of proof.  With that being said, Mr. Bey will go

2    first.

3         And we're going to limit closing arguments to 10 minutes,

4    maybe 15.  Okay?

5         All right.  Mr. Bey.

6         MR. BEY:  Closing arguments?

7         THE COURT:  Yeah.

8                    DEFENDANT'S CLOSING ARGUMENT

9         MR. BEY:  People, ladies and gentlemen of the jury, I urge

10   you to think for a second, because this is what they love to get

11   us to not do is think.  They don't like it when we think,

12   because when we think, it makes them keeping their foot on our

13   next harder.  When we think and we do things, it makes them have

14   to get up and focus more on their job wherever they work in the

15   system to help this whole beautiful thing go around, right?

16   This -- this blessed country we have in America, with so much

17   diversity and everyone's here, we all can live the land of the

18   free home of the brave, right?  We're all here.  Americans,

19   right?  Right.

20        How we got to that point is everything I'm here standing up

21   for, the Constitution, right?  The organic Constitution, not the

22   one that they rewrote.  But they all -- all of these, even this

23   municipal court we're in, has to adhere to the Supreme Court.

24   And they're deciding cases according to the Supreme Court.

25   According to the Supreme Court, we don't -- we don't need a

1  license, tags, any of that to travel, to travel unencumbered and

2  unfettered from point A to point B.

3      I understand if you work for a company or if you work for

4  the government, you are required to have a license to do that

5  because the government is under the Far Act.  They have to tell

6  everyone they're here and doing whatever business they're doing.

7  Anyone who works with them also has to tell us that they're here

8  doing what they're doing.  That's why they need licenses.

9      But you and me to go to Hannaford's to buy a bag of apples,

10  or to go pick up crickets for my reptiles at Petco, I don't need

11  it.  I got to ask permission?

12      Do you have to ask permission to go use the bathroom in

13  your own house?  No, I don't think you do.

14      So the -- the Constitution protects us that we don't have

15  to ask permission to go to the corner store for a bag of apples

16  or crickets to feed your lizard, right?

17      And that's all I'm standing up here being honorable.  And

18  they're trying to say I was driving without a license.  When

19  driving, right?  Should I -- should I spend the time to look up

20  the definition, because I know we're in a rush.  Right?  When

21  driving, I just want us to have some clarity.

22      Look it up.  This is the fifth edition, Black's Law.

23      (Pause)

24      All right.  Driving requires a contract and a payment of a

25  contract, and both parties has to know about the contract.

1    Do -- do we all know we're in international commerce?  I

2  don't think we do.  I think I sound crazy to you guys up here,

3  right?  International commerce?  What is this guy talking about?

4  But it's real.  I bought the books to find out it's real to

5  prove my mind, and I when -- when I had to find out all these

6  things.

7    So they swear an oath to the Constitution that protects us

8  that they have to adhere to under all cases.  They can't -- they

9  can't just come here and say that you did this, and because you

10 did this, we're going to do this to you.  They can't.  There's

11 procedures to follow.  And this court has to adhere to supreme,

12 supreme to the federal, so forth and so on.  And they all swore

13 an oath.

14    And -- and this, I'm finding out, is not even an Article 3

15 courtroom.  Meaning, Article 3 courtroom, you -- you have to be

16 Article 3 to -- to argue a crime, a criminal offense.  Meaning,

17 if this is not a Article 3 courtroom, they're not allowed to

18 argue a criminal offense.  It says it in books.  It says in the

19 Constitution, Article --

20    (Pause)

21    THE COURT:  It's Article 3, sir.

22    (Pause)

23    MR. BEY:  Okay.  All right, what are we looking for?

24 Article --

25    (Pause)

1      MR. BEY:  Give me one second to find it.

2      (Pause)

3      MR. BEY:  Here it is.  Make sure it's right.  Article

4  Number 1.  Article 3.  Here we go.

5      "The judicial power of the United States shall be vested in

6  the Supreme Court."  Right?

7      "And in such inferior courts," the municipals, "as Congress

8  may, from time to time, ordain and establish the judges both of

9  the supreme and inferior courts shall hold their offices during

10  good behavior and shall at times receive their services and

11  compensation which shall not diminish during the continuance of

12  office.  The judicial power shall extend to all cases -- the

13  judicial power shall extend to all cases."

14      Meaning, what the Supreme Court says about driving without

15  a license, it stretches all the way down here to municipal about

16  driving without a license.  So if the Supreme Court says you

17  don't need a license to drive, to travel, they have to adhere to

18  it too down in this municipal.  It's not just the big guys

19  saying it and the little guys get to just run around and do what

20  they want.

21      No, it says right here.  "The laws of the United States and

22  treaties made or which shall be made under their authority to

23  all cases affecting ambassadors, other the public ministers, and

24  counsels."  Counsel.  Counsels.  Right?

25      "To all cases of amorality."  Right?  And, "Maritime

1  jurisdiction."

2      "To controversies to which the United States shall be a

3  party to, controversies between two or more states, between a

4  state and a citizen of another state."

5      Between citizens of different states, between citizens of

6  the same state, "Claiming land under grants of different states

7  and between a state or the citizen thereof and foreign states,

8  citizens or subjects."

9      I don't think we all know what that means.  I literally

10  just read where and why they can't do what they're doing.  I

11  shouldn't even be here having this discussion.  They swore an

12  oath to this.

13      So if I was to lie there after they swear to tell the truth

14  and whole truth and not to, it's perjury.  They'd lock me up.

15      So how are we not holding everyone accountable all the way

16  across the board?  How come some people get held accountable and

17  others don't?  That's not the way this -- this country was set

18  up.  America wasn't built like that.

19      America was built from cultures and nations fighting for

20  what they believe in and coming together to all get one

21  understanding so we can all coexist here together.  Someone

22  wrote a contract, someone had to sign a contract, the people had

23  to adhere to the contract, right?

24      So if I'm just -- I'm not -- they -- they -- unless they

25  are telling you I'm murdering people and committing injury, I'm

1   only adhering to what the papers say.  I'm just trying to figure

2   out where do we stand in this life.  Is this law?  Is this

3   legal?  Am I supposed to, or am I not supposed to?

4        Then I find out if you do things that you don't know and

5   don't understand in the long run, it will bite you when you

6   don't know what you're doing.  When you sign certain paperwork

7   that you're going thinking that they're out looking for your

8   best interest, later on you pay for it in life because you

9   didn't know what you were doing before.  So I started to read

10  these things.  Even down to the birth certificate, it's a

11  contractual clause that allows them to do certain things to you.

12  Unless you know, you won't know what's happening to you.

13       So we as people need to definitely -- because we all have

14  children.  I have two children.  I'm pretty sure we'll have

15  children.  Children are coming up.  They plan to do some things

16  to our children that's not even it's -- it's -- it's outlandish.

17  So I'm just making a stand now.

18       If the paperwork -- if the Constitution says I can travel

19  free and unencumbered and unfettered from point A to point B, no

20  -- no state or -- or -- or officer shall put a tax or a levy on

21  an incoherent right to travel, then I don't think I'm doing

22  anything wrong, but these guys seem to say otherwise.

23       Not only that, this is what they want to do.  Upon me

24  expressing my right to travel here in Massachusetts so much, and

25  I'm still here to talk to you, the RMV went ahead to create

1 their own, with my free national card -- they took my free

2 national name, and they created a DMV -- they actually created a

3 license for me under my free national name, and then I went to

4 find out this, right?

5       Where is it?  Where is it?

6       (Pause)

7       It's a Mass general law.  Oh, come on.  It's a Mass general

8 law that says -- that says right here -- and this is for the

9 driving without a license.

10      "No other person shall so operate unless licensed by the

11 registrar unless he possesses a receipt issued under Section 8

12 for persons licensed in another state or country or unless he

13 possesses a valid driver's permit issued under Section 8B."

14      So I went to Lawrence, the office in Lawrence, because

15 there is none in Lowell, so they sent me to Lawrence --

16      MR. DEVOE:  Not in evidence --

17      THE COURT:  Yeah, yeah, yeah --

18      MR. DEVOE:  -- Your Honor.

19      THE COURT:  You're arguing facts not in evidence, sir.

20 Okay?

21      MR. BEY:  Huh?

22      THE COURT:  You're arguing facts that weren't in evidence,

23 so continue with your argument.  And you got a couple minutes,

24 okay?

25      MR. BEY:  Okay.

1      But -- and they want to argue that Leon Campbell is -- is

2   traveling under a suspended license.  Why aren't they arguing

3   that Leonitus Jabir Bey has a license made by their very

4   registrar RV?  But without my permission, because no one gave me

5   a receipt.  And this is -- let me make sure I got it right here.

6      "Administration of government public ways and work motor

7   vehicles," Section 10, Part 1, Title 14, Section 90, general

8   laws, Massachusetts General laws.

9      Still, I'm not even making this up.  They wrote this.  No

10  receipt, but yet I have a license in my free national name that

11  they already suspended already, but I still can't find the

12  receipt.  But they created it.  You see that?  Off their own

13  will and intent.

14      I do, that Leon Campbell guy has a receipt, because they

15  did that when I thought -- they did that when I thought I was

16  black and had no nationality and nothing else was going on for

17  me.  I thought this was my only way out.  That's why they did

18  that, but when I found another way out, they went ahead and

19  tried to take that away, too.  But they didn't give me a receipt

20  for that one, so it's a problem.

21      How do I have a receipt for this guy but no receipt for

22  this guy?

23      All right.  And do I need to -- I mean, a machete being a

24  dangerous weapon when you can buy it at Walmart, Ace Hardware,

25  or Lowe's, and we definitely already have to head to the stores

1  and tell them like, "Hey, you guys need to take these down while

2  my children come and shop here because they're dangerous

3  weapons."  Is that what we're about to do, tell everyone who

4  sells a tool or something to aid you in work that it's a

5  dangerous weapon, you can't use it?

6       They don't have no evidence of me chopping anyone up with

7  it.  No evidence of me threatening anyone with it.  No evidence

8  of me doing a standoff with it.  No evidence of none of that.

9       Just talk about something in the middle console that wasn't

10  even the machete.  That wasn't even the machete.  The machete

11  was in the back, and they're talking about something in the

12  middle console, right?  It's a dangerous weapon.

13       THE COURT:  All right.  Sir, that's 12 minutes.  Can you

14  wrap it up?

15       MR. BEY:  So take note that the officers' testimonies were

16  inconsistent.  One said he found in the middle, one found in the

17  back.  I showed you where my -- my -- my mother-in-law and my

18  witnesses were there in the driveway, and according to my

19  witnesses, a third-party officer found it and handed it.

20       So somebody's -- I don't know.  Somebody's lying.  But

21  we're under oath, so I wouldn't dare say people are lying under

22  oath.  But, hey, you never know, right?

23       So the inconsistencies of the report, it's found here, but

24  it was there.

25       Traveling without a license, is I'm protected that by the

1  Constitution so much that they went ahead and created a license

2  for me under free national name and didn't give me the receipt.

3       So either way, I don't know what they're trying to charge

4  me here with for today.  They're going to tell you a bunch of

5  stuff just to get --

6       And then the resisting arrest part.  How would I resist

7  arrest when I was under arrest?  I was already arrested.  At

8  what part did I resist it?  When he was punching me in the face,

9  or when he threw me on the floor?  Or, I guess, probably when I

10  cling to the steering wheel in fear for my life because he had a

11  gun pointed at my window.  Or a Taser, whatever they want --

12  it's still a weapon, and I don't recognize it and I'm scared.

13       I'm -- as -- I know we look -- they say black people look

14  just whatever, whatever, but I'm scared, okay?  When it comes to

15  certain things, scared.

16       So when he pulled that weapon and I cling, and if they want

17  to say that -- I don't see -- once he ripped me off the steering

18  wheel and threw me down into cuffs, we walked to the wagon, you

19  know, no problem.

20       He even asked me, "Oh, what -- why did you do what you did?

21  You seem to be an intelligent man."

22       I said --

23       THE COURT:  All right.  Sir, Mr. Campbell, you're almost

24  there.  You got --

25       MR. BEY:  All right.

1        THE COURT:  -- 20 seconds.

2        MR. BEY:  Oh, all right.

3        So they want to say I was driving while suspended.  I think

4   that's all hearsay because they -- first, we have to figure out

5   to the -- from the RMV who's who.  Were Leon Campbell here or

6   were Leonitus Jabir Bey?  What are we doing here?

7        And where's my receipt for Leonitus Jabir Bey?  Seeing as

8   how this Leon Campbell guy, you guys can do anything you want

9   with him, because on the birth certificate it's a full capital

10  name.  He has no nationality, no religion, no nothing.  So you

11  can do what you want with that.  But not me, not flesh and

12  blood.

13       THE COURT:  All right.  Thank you --

14       MR. BEY:  My nationality, my law protects me.

15       THE COURT:  -- Mr. Bey.  Thank you very much.

16       MR. BEY:  The law protects flesh and blood.

17       THE COURT:  Attorney DeVoe.

18       MR. DEVOE:  Thank you, Your Honor.

19                      COMMONWEALTH'S CLOSING ARGUMENT

20       MR. DEVOE:  This case is about the defendant's lack of

21  respect.  His lack of respect for the law, for the people on the

22  road, for the police, and everything you've heard about in

23  testimony today speaks of that lack of respect.  Five criminal

24  charges alone for his conduct, his choices, and his lack of

25  respect on January 22nd of this year.

1      First, negligent operation.  The defendant essentially

2  admitted to every single piece of negligent operation in front

3  of you.  He was operating his vehicle, behind the steering wheel

4  in the pickup truck, on Mammoth Road.  You heard him say that he

5  went through the left turn only lane knowing it was a left turn

6  only lane.

7      You'll see the pictures of it anyway in Exhibit 1.  You can

8  see many signs that say left turn only.  You heard Officer

9  Pender describe how it's a left turn only.  He goes straight,

10  that's negligent.  He almost hits a car.

11      But then he continues to bob and weave out of traffic,

12  including across the double yellow lines as he tries to avoid

13  Officer Pender.

14      And that brings us to our second charge, failure to stop.

15      Again, you have the pictures of Mammoth Road.  The

16  defendant talked to you about being in fear, but Mammoth Road is

17  a busy, commercial street with shops everywhere you can park,

18  but, yet, he drove all the way down Mammoth Road, all the way

19  down to 4th Avenue before finally pulling over.  Officer Pender

20  testified that was three quarters of a mile away.  He could have

21  stopped at any time before that.

22      He didn't have to cross the double yellows and cause cars

23  to swerve, cause cars to hit their brakes, slam into their

24  brakes to avoid getting into an accident.  That endangered lives

25  and vehicles there.

1    Failure to stop also requires that the Commonwealth show

2  that he was signaled to stop by a police officer.  You heard the

3  lights and sirens from Officer Pender, and whatever the

4  defendant said, he at least agreed that there were lights.  The

5  officer was on uniformed patrol.  It was obvious that he was

6  demanding the defendant to stop based on his authority and, yet,

7  the defendant didn't.

8    Unlicensed operation.  It's not relevant whether Mr. Bey,

9  or Mr. Campbell, if he wants to go by that name, this name.

10  What's relevant is that the Commonwealth of Massachusetts has

11  suspended his ability to drive in the state of Massachusetts.

12  And you have two exhibits showing that.  First, his license

13  information has been entered into evidence.  You can see it, it

14  has his picture on it, it's Exhibit 3.  The defendant says it's

15  his face.  It says "suspended".

16    You also have reports from the RMV for his driver history.

17  It says that his -- and you can read it.  It says his license to

18  drive in Massachusetts was suspended as of December of last

19  year.  He cannot operate a car in Massachusetts.  Yet he

20  continues to believe that he can call himself by a different

21  name and operate a motor vehicle.  Again, the lack of respect

22  for the road, for the roads everyone drives on.

23    Resisting arrest.  You heard the testimony of Officer

24  Pender describing the situation he was in.

25    MR. BEY:  Objection.  He's --

226

1          THE COURT:  No, he -- that's okay.  He can testify to

2     facts, as long as the facts were in evidence.

3          Go ahead.

4          MR. BEY:  Well he said something that's not --

5          THE COURT:  Go ahead, Attorney DeVoe.

6          MR. DEVOE:   Thank you.

7          You heard Officer Pender testify.  He testified how there

8     were two individuals and just him in the beginning.  How the

9     defendant, who was right in front of him, still inside of his

10    vehicle, unwilling to respond to his commands, how another

11    person, the other occupant in the vehicle, came around right

12    next to him.  And there he is pinned in, one person in front of

13    him, one person to the side, a car behind them, a door to the

14    side, and ordering the defendant to get out of the car.  The

15    defendant refuses.

16         He pulls on the defendant to get out of the car.  The

17    defendant pulls him back.  You heard the testimony of Officer

18    Griffin about that struggle back and forth.  Officer Pender

19    takes out his Taser to try to bring some order to the situation,

20    and the defendant slaps it out of his hand.

21         Each part of resisting is there.  The judge will tell you

22    the law on resisting arrest.

23         There are four pieces to it: preventing an arrest, the

24    arrest of the defendant, under the color of his authority.  He

25    was on uniformed patrol.  That he resisted by physical force or

1   created a substantial risk of injury to another.  Both of those

2   are here.  The physical force, slapping the Taser, pulling

3   against the officer, substantial risk to others, driving on the

4   road as he did.

5       If as you consider the credibility of the witnesses that

6   were in front of you, think about how Officer Pender testified.

7   He's an officer of the Lowell Police Department and has been for

8   over 30 years.  And on direct he was emotional about his

9   testimony, his recollection of those events.  They happened.  It

10  was credible testimony.  I submit to you, you can believe that

11  he was there two on one, Taser slapped out of his hand,

12  uncertain what was going to happen next.

13      The last element of resisting arrest is that the defendant

14  was knowingly acting.  Of course, again, uniformed patrol,

15  there's no way the defendant didn't know what was happening.

16      The last charge in this case is possessing a dangerous

17  weapon during an arrest for breach of the peace.  Breach of the

18  peace is here.  That's negligent operation.  That's his actions

19  during this resisting.  You can see that here.

20      The dangerous weapon, being the machete, was under the

21  defendant's control.  It's in his car.  You heard many witnesses

22  say they saw the machete being pulled out of the car.  It wasn't

23  to not pulled out of the car.  Whether one describes the machete

24  as being next to or behind, because you turn towards the center

25  console, doesn't mean that the machete wasn't there.  It doesn't

1  mean that Officer Pender was wrong when he saw the defendant

2  reaching for it.

3       The question of whether or not the machete is dangerous,

4  one --

5       Can I see Exhibit 2?

6       This device certainly can be dangerous.  You can see it for

7  yourselves.  It's 18 inches long.  It's a machete with a long

8  blade.  You saw Officer Pender take it out.  It's January.  A

9  person doesn't need a machete in January, especially not one

10 that they reach towards it while an officer is approaching them.

11 That's a dangerous weapon.

12      Many things can be dangerous weapons.  Anything you can buy

13 in Walmart can be dangerous weapons.  A baseball that can be

14 dangerous, a golf club can be dangerous, a machete, as used

15 here, as in the facts before you, was dangerous.

16      Again, think carefully about the evidence that you heard

17 and saw today.  Listen carefully to the judge's instructions

18 when you hear them about the law.  Look at each element without

19 favor or bias, and when you do, you will see that the defendant

20 is guilty beyond a reasonable doubt of these five offenses.

21      Thank you very much.

22      THE COURT:  Thank you, Attorney DeVoe.

23      All right, ladies and gentlemen, it's now 4 o'clock.  It'll

24 take me about 25 minutes to give you my final instructions, and

25 that won't give you any time to deliberate.  So what we're going

1 to do is we're going to recess until tomorrow morning.  Because

2 there's another jury coming in, we're going to reconvene this

3 jury at 9:30.  So the court officer will tell you where to go.

4 So tomorrow morning we'll convene at 9:30 to have final

5 instructions in your deliberations.

6   So with that being said, I just have to let you know again

7 do not discuss this case with anyone during overnight when you

8 go home tonight.  The only thing you could tell your family and

9 friends is that you are empaneled on a criminal case -- or you

10 were empaneled on a case in Lowell District Court.  You can't

11 even tell them what kind of case until this case is over.

12   So with that, everybody is free until 9:30 tomorrow

13 morning.

14   DEPUTY CLERK:  All rise.  Jury out.  Be careful stepping

15 down.

16   (Jury out at 4:01 p.m.)

17   THE COURT:  All right.  9:30 tomorrow morning.  Okay, sir?

18   MR. BEY:  Thank you.

19   COURT CLERK:  So, Mr. Campbell, your other matters -- or,

20 Mr. Bey, your other matters will go over into tomorrow as well.

21   MR. BEY:  What other matters?

22   COURT CLERK:  You were arraigned on the matter today.  You

23 have a payment case on for today.  You had a probable cause that

24 was dismissed today.  So that one --

25   MR. BEY:  I was arraigned on --

1      COURT CLERK:  -- stands dismissed.

2      MR. BEY:  -- other matters today?

3      COURT CLERK:  And you were sentenced on a disposition.  So

4  two other matters, sir.  Payment and an arraignment.  Thank you.

5      MR. BEY:  Oh, I didn't go to the arraignment yet.

6      THE COURT:  Yeah.

7      COURT CLERK:  Your arraignment was --

8      THE COURT:  We had --

9      COURT CLERK:  -- this morning.

10      THE COURT:  We arraigned you this morning, sir.

11      MR. BEY:  Huh?  What is that?

12      THE COURT:  All right.  So 9:30 tomorrow morning.

13      COURT CLERK:  Thank you.

14      THE COURT:  Thank you.

15      COURT CLERK:  Thank you, Judge.

16      (Proceedings adjourned at 4:02 p.m., recommencing September

17  4, 2019)

18

19

20

21

22

23

24

25

231

CERTIFICATION

I, EILEEN DHONDT, court-approved transcriber, do hereby certify that the foregoing is a true and accurate transcript from the record of the court proceedings in the above-entitled matter.

I, EILEEN DHONDT, further certify that the foregoing is in compliance with the Administrative Office of the Trial Court directive on transcript format.

I, EILEEN DHONDT, further certify that I neither am counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that I am not financially nor otherwise interested in the outcome of the action.

_____

EILEEN DHONDT, CET 807

Aequum Legal Transcription

Dated:  January 24, 2020



**The Commonwealth of Massachusetts**
**OFFICE OF COURT MANAGEMENT, Transcription Services**

## AUDIO ASSESSMENT FORM

*For court transcribers:* *Complete this assessment form for each volume of transcript produced, and include it at the back of every original and copy transcript with the certificate page, word index, and CD PDF transcript.*

**TODAY'S DATE:** January 24, 2020 **TRANSCRIBER NAME:** Eileen Dhondt

**CASE NAME:** Commonwealth v. Campbell **DOCKET NUMBER:** 1911CR000365

**RECORDING DATE:** September 3, 2019 **TRANSCRIPT VOLUME:__1___OF__2__**

---

*(circle one)* **TYPE:  CD  TAPE        QUALITY:  <mark>EXCELLENT</mark>     GOOD       FAIR       POOR**

*(circle all that apply)* **ISSUES** *(include time stamp):*

**background noise**               **time stamp: 2:22:53,**

**low audio**                      _____

**low audio at sidebar**           **11:45:00,    11:46:37,    11:46:40,    12:34:34,**
                                   **12:35:43,    12:47:17,    12:47:21,    12:47:27,**
                                   **12:47:40,    12:47:42,    12:47:51,    12:47:55,**
                                   **2:16:40,  2:20:54,  2:38:47,  2:38:50,  2:53:22,**
                                   **2:53:29, 3:28:47,**

**simultaneous speech**            **12:39:20,**

**speaking away of microphone**    **2:30:55,**

**other:**                         **time stamp: _____**

_____          _____

_____          _____

_____          _____

**COMMENTS:_____**

**$**

**$9 (3)**
211:16;212:17,18

**[**

**[sic] (1)**
96:7

**A**

**ability (4)**
48:14;51:12;62:19;
225:11
**able (40)**
19:22;25:23;27:3;
33:13,18;35:8;42:14;
45:11,18;46:21;
65:25;66:1,7;81:12,
16;82:3;87:19;95:23;
116:2,11;119:19;
122:9;124:22;125:7,
11,14;126:8;134:10;
139:5,7;140:5;
141:15;144:16;
153:17;165:1;186:15;
201:3;203:23;205:23,
23
**above (1)**
68:15
**absolutely (4)**
95:14;138:16;
212:10,12
**abuse (2)**
103:1,5
**abused (1)**
103:13
**academy (3)**
70:9;121:7,11
**accept (1)**
60:16
**acceptance (1)**
20:21
**accepted (2)**
22:4,13;55:5;57:9
**access (4)**
54:25;55:1;57:4,4
**accessing (1)**
123:24
**accident (2)**
64:5;224:24
**accordance (1)**
85:13
**According (12)**
18:16;32:4,9;62:20,
23;68:1;93:14;
205:11;212:1;213:24,
25;221:18
**accountable (2)**
217:15,16
**accounts (1)**

35:15
**accurate (1)**
73:6
**accused (2)**
39:17;57:19
**accusing (1)**
58:19
**Ace (4)**
184:2;194:2;
195:17;220:24
**acknowledge (2)**
77:21,23
**acquaint (1)**
58:10
**across (7)**
71:23;72:6,20;
150:8;171:25;217:16;
224:12
**Act (1)**
214:5
**acted (2)**
63:16;102:17
**acting (4)**
17:13;55:9;57:14;
227:14
**action (2)**
23:7;199:23
**actions (6)**
78:17;212:3,5,6,8;
227:18
**activated (1)**
74:11
**actual (6)**
25:6;26:12,13;
28:24;169:24;203:11
**actuality (1)**
81:8
**actually (7)**
100:12;109:11;
129:4;170:15,18;
185:13;219:2
**add (1)**
187:17
**additionally (1)**
52:3
**address (14)**
10:7;13:20;15:22;
20:17;26:16;84:1,5,7,
9;97:1,7;118:8;
122:13;159:18
**addressed (1)**
9:14
**adhere (7)**
90:2;185:9;213:23;
215:8,11;216:17;
217:23
**adhering (1)**
218:1
**adjourned (1)**
230:16
**Administration (1)**
220:6
**administrative (2)**

103:9;104:11
**admissible (2)**
22:8;61:15
**admit (4)**
11:13;12:25;14:23;
82:23
**admitted (9)**
61:10;73:19;83:1;
84:15,17;85:17,20;
88:17;224:2
**admitting (1)**
13:23
**admonish (2)**
117:16;169:1
**admonished (2)**
117:20;161:1
**adult (1)**
202:8
**advanced (1)**
134:24
**advised (1)**
14:17
**advocate (1)**
62:19
**affect (2)**
48:13;51:12
**affecting (3)**
55:10;57:15;216:23
**affects (1)**
32:16
**affiliates (1)**
32:1
**affirmative (8)**
41:20,23;42:1,4,7,
12,16;119:22
**afraid (1)**
199:15
**afternoon (6)**
30:5,8;63:9;148:17;
160:18,19
**afterwards (7)**
13:19;79:14;83:10;
105:17,18;122:5;
141:3
**again (45)**
5:23;6:17;10:6,15;
16:16;26:16;27:23;
33:7;38:20;41:10;
47:21;50:11;56:14;
60:4;63:7;66:11;79:6;
80:23;81:3,20;93:20;
98:18;100:24;105:22;
111:11;112:10;
114:11;115:9;130:14;
168:22;179:22;
188:24;195:6;196:3,
7,9,10,21;209:2,2;
224:15;225:21;
227:14;228:16;229:6
**against (20)**
16:17;24:13,18,21;
36:11,13,17,18,21,25;
49:20;55:11;57:16;

79:22;163:10,13;
193:8;211:13,20;
227:3
**agency (2)**
132:15;192:9
**aggressively (4)**
97:13;102:2,4,5
**ago (2)**
68:18;162:18
**agree (3)**
60:11;61:19;211:23
**agreed (1)**
225:4
**agreement (2)**
31:16;67:11
**ahead (14)**
30:13;59:18;71:25;
153:4;169:12;171:21;
181:6;182:3;197:7;
218:25;220:18;222:1;
226:3,5
**ahold (3)**
26:5,8;27:3
**aid (9)**
123:16,17;124:6;
139:1,3,4,4;144:15;
221:4
**aided (1)**
144:21
**aimed (1)**
210:13
**air (2)**
118:25;195:24
**aka (3)**
31:25;39:24;67:10
**Akif (14)**
35:21;41:8;160:2,4,
5,7,17,21;164:11,12;
166:4,17,22;206:20
**allegations (7)**
25:6;44:11,12;
47:11,12,23,24
**alleged (5)**
54:18;56:21;
101:15;106:11;
197:15
**allegedly (1)**
195:24
**Allen (18)**
86:9,19,21,23,25;
144:17;154:1;173:12,
13,14,14;176:10,11;
184:20,21;196:19;
211:13,19
**alleviate (1)**
52:14
**alley (1)**
199:21
**alleyway (2)**
123:22;125:2
**allow (13)**
12:16,24;16:16,21,
23;17:4,9;116:17;

177:5,6;181:5,21;
190:8
**allowed (8)**
37:24;113:2;
130:24;176:24;177:3,
4;211:20;215:17
**allows (1)**
218:11
**almost (4)**
64:5;144:20;
222:23;224:10
**alone (4)**
60:19,24;191:5;
223:24
**along (2)**
75:2;192:2
**altercation (2)**
126:4;141:3
**alternator (2)**
200:13,15,24;201:9
**always (11)**
48:4;59:15,23;
89:15;95:15;117:14;
173:7,9;182:9,10;
198:1
**ambassadors (1)**
216:23
**America (3)**
213:16;217:18,19
**Americans (1)**
213:18
**amorality (1)**
216:25
**amount (2)**
212:15,17
**amplify (1)**
46:19
**answered (1)**
137:14
**anticipate (2)**
7:16;29:16
**anymore (1)**
23:11
**apart (1)**
72:6
**Apartment (2)**
54:12;79:20
**apologies (2)**
101:3,3
**apparently (1)**
126:22
**appear (3)**
19:11;60:24;72:17
**appearance (1)**
30:10
**appeared (2)**
122:19;155:1
**appearing (1)**
72:24
**appears (4)**
22:25;23:5;24:12,
24
**apples (2)**

214:9,15
**applies (2)**
60:16;62:14
**apply (2)**
60:8;90:9
**approach (35)**
18:22;43:11;44:5,
21;47:19;50:9,24;
72:9;81:24;83:14;
84:24;94:21;95:2,21;
97:11,11,13,14,15,15,
16;101:16;123:18,19;
127:21;129:8;133:2;
145:10;149:10;167:6;
168:3;170:22;172:10;
173:16;209:19
**approached (14)**
64:20,20;76:22;
77:10;98:8;100:10,
15;102:2;122:10;
124:4;139:8,9;
172:12;200:9
**approaching (3)**
77:12;115:7;228:10
**appropriate (1)**
64:13
**approve (1)**
165:20
**approved (1)**
188:20
**approximately (9)**
70:14,24;72:3;
76:10;121:5,13;
128:19;129:2;157:11
**area (12)**
19:24;66:6;70:19;
71:2;100:21;121:25;
137:2;190:7,16,17;
198:5;204:24
**argue (11)**
27:11;32:7;100:24;
102:8;196:10,22;
197:12;208:5;215:16,
18;220:1
**arguing (5)**
143:25;144:1;
219:19,22;220:2
**argument (19)**
32:5,6;67:20;94:1;
168:25;195:7,8;
196:3;197:12;198:16;
202:20;203:4;204:14;
207:7;209:4,11;
213:8;219:23;223:19
**argumentative (1)**
109:21
**arguments (9)**
60:3,4,7;92:2;
194:6;208:4;212:25;
213:3,6
**arise (1)**
61:3
**Arm (1)**

100:5
**armed (2)**
54:19;56:23
**around (32)**
64:11;65:7;79:10,
23,24;80:5;96:16;
100:4;101:16;104:25;
106:15,20;107:14;
109:14;115:4;124:8;
151:19;156:2;165:2;
167:16;175:11,14;
178:25;182:11;
192:21;197:25;
203:13,14,16;213:15;
216:19;226:11
**arraign (1)**
4:12
**arraigned (1)**
229:22,25;230:10
**arraignment (4)**
4:10;230:4,5,7
**arranged (1)**
122:22
**arrest (50)**
8:12,20;39:19;55:7,
10;57:11,15;65:4;
66:8,23,25;78:7,12,
13,14,21;79:1,6;
81:16,22;82:3;83:4,8;
85:22;105:24;109:6;
123:16;125:11;
138:10,11,12,17;
140:10,10;144:16,17,
20,23,24;203:21,22;
222:6,7,7;225:23;
226:22,23,24;227:13,
17
**arrested (8)**
54:17;56:21;
115:21;144:22;
152:17,17;201:5;
222:7
**arresting (1)**
16:23
**arrests (1)**
141:1
**arrive (4)**
62:25;81:4;127:4;
144:21
**arrived (16)**
65:25;81:10,17;
109:15,25;115:3,18,
24;123:12;125:8;
139:24,25;140:13,13,
15;180:10
**arriving (1)**
123:14
**arrow (1)**
197:23
**artfully (1)**
61:11
**Article (17)**
18:8,10,11,12,13,

18;77:3;125:19;
215:14,15,16,17,19,
21,24;216:3,4
**arts (1)**
204:11
**ascertained (1)**
83:9
**aside (2)**
74:1;200:10
**assault (3)**
108:22;109:3,8
**assaulted (1)**
80:8
**asserted (3)**
28:8,16,18
**assertion (2)**
28:15,16
**assign (1)**
33:10
**assigned (2)**
70:18;121:17
**assigning (1)**
30:17
**assignment (3)**
53:19;70:17;121:15
**Assistant (4)**
40:12,16;57:25;
59:11
**assumed (2)**
134:5;165:4
**assuming (3)**
132:20;203:10;
204:7
**astronomer (1)**
16:9
**astronomy (1)**
16:9
**attached (1)**
24:25
**attacking (2)**
78:25;79:7
**attempt (5)**
55:8;57:12;80:4;
122:7;123:17
**attempted (4)**
74:11;122:4,8;
123:16
**attempting (1)**
139:15
**attend (2)**
70:8;121:6
**attended (1)**
121:10
**attention (13)**
4:8;64:6,21;65:17;
70:14;71:10,16;
77:19;80:1;104:23;
121:12;135:13;
154:22
**attested (1)**
14:5
**Attorney (32)**
5:3;9:11,19;32:4;

40:13,16;43:2;52:20;
53:10;59:9,11;63:12;
67:4;69:9,19;117:8;
120:6,13;145:8;
146:25;156:24;162:3;
178:19;184:15;
189:11;190:3;208:7,
19;209:13;223:17;
226:5;228:22
**attorney's (1)**
60:6
**August (1)**
34:16
**authenticated (1)**
14:4
**authenticity (1)**
23:4
**authorities (1)**
167:9
**authority (12)**
55:9;57:14;63:17;
77:25;78:14;79:1,4;
81:21,22;216:22;
225:6;226:24
**authorized (2)**
54:21;56:25
**automobile (2)**
173:5;192:22
**automobiles (1)**
192:20
**availability (1)**
25:25
**Ave (32)**
54:11;70:19,25;
72:21;73:5;74:20;
75:3,12,16,16,25;
76:6,9,11,19;82:2;
84:11;96:25;150:24;
157:6;170:20;171:25;
172:10;174:13;
179:18,19,23,25;
180:2,3,5,7
**Avenue (9)**
64:15,19;75:17;
97:1,4,5,7;150:25;
224:19
**avoid (3)**
64:11;224:12,24
**aware (4)**
42:2;90:11;101:14;
148:7
**away (19)**
46:3;78:12;80:13,
13,22;127:2;134:14,
14;155:10;173:11,17;
175:9;179:20,24;
199:22,25;206:21;
220:19;224:20
**awful (1)**
174:23

**B**

**babies (2)**
68:9;199:7
**back (50)**
7:4,11,12,14;9:2;
26:9;64:13;65:16,25;
67:1;74:19;75:10;
79:24;80:13,22;95:7;
107:24;113:10;
115:10,12,21;117:22;
118:21;119:16;123:9;
124:13,15;126:20;
128:12;133:21;
137:22;153:20;158:5;
159:20;162:17;
165:16;172:8,17,18;
173:17,17;174:17;
177:24;180:5,7;
184:20;221:11,17;
226:17,18
**backing (1)**
65:17
**backup (5)**
80:20;109:15,25;
110:11;115:18
**bad (2)**
67:25;128:11
**badge (1)**
57:23
**badly (1)**
132:21
**bag (2)**
214:9,15
**Bank (1)**
174:17
**bar (1)**
42:19
**bartender (1)**
49:17
**baseball (1)**
228:13
**based (11)**
35:4;42:15;45:12,
19;48:19;52:5,7;61:7;
164:3,8;225:6
**basically (1)**
175:21
**basis (4)**
104:5,7,8;193:5
**bat (1)**
177:7
**bathroom (1)**
214:12
**batteries (1)**
56:5
**battery (4)**
108:22;109:3,8;
200:25
**bearing (1)**
48:18
**beautiful (1)**
213:15
**became (2)**
34:17;102:7

**become (2)**
62:19;191:7

**becomes (2)**
62:3;63:4

**becoming (2)**
70:8;121:6

**bed (2)**
205:5,5

**began (1)**
63:18

**begin (6)**
37:18;63:1,10;
119:23;208:22;
212:24

**beginning (2)**
105:24;226:8

**begins (3)**
63:21;85:12;201:21

**behalf (3)**
17:5;42:11;59:22

**behaved (2)**
102:21,24

**behavior (1)**
216:10

**behind (22)**
74:16;76:21,25;
91:24;92:11,14;
115:20;126:24;
127:17;136:16,17,22;
137:3,11,22;138:18;
145:2;187:12;211:9;
224:3;226:13;227:24

**believable (1)**
60:21

**believes (2)**
137:19;154:23

**believing (1)**
68:7

**belligerent (3)**
110:5;167:17;
200:23

**belong (1)**
188:25

**belongings (2)**
53:21;127:16

**belt (1)**
204:11

**bench (3)**
82:10;95:5;163:7

**Besides (3)**
108:12;124:11;
186:12

**best (8)**
38:10;112:17,18;
116:8;118:17;165:1;
170:5;218:8

**better (3)**
191:2,7;207:14

**BEY (644)**
4:5,16,22,24;5:2,16,
24;6:10,13,18,25;7:5,
7,10,12,17;8:8,11,17,
23,25;9:2,5,9,12,15,

15,15,16,17,24;10:4,
9,22;11:22,25;12:6,
10,12,18,23;13:1,6,
11,14,16,18,23;14:2,
7,9,10,12,14,16,19,21,
25;15:2,4,7,9,11,20;
17:2,5,8,12,16,18,21;
18:2,4,8,10,16,18,20,
22;19:1,5,8,13,15,18,
23,25;20:2,4,7,9,11,
13,15,18,20,23,25;
21:2,5,9,12,16,25;
22:4,10,13,18,20,23;
23:9,11,14,16,22;
24:4,7,12,14,20;25:1,
5,7,10,17,20;26:1,3,6,
10,12,15,18,21;27:1,
5,7,11,22,24;28:2,6,
10,20,22;29:1,4,11;
30:6,8,13,18,19,20;
31:3,4,4,7,8,11,13,13,
15,18,20,22,25;32:4,
7,12,15,16,22;33:2,3,
7,11,13,15,18,21,25;
34:2,4,13;35:6,10,14,
21,22,25;36:3,6,11,
13,16,20,23,25;37:2;
38:2,4,7,14,18,20,24;
39:3,16,16,23,24;
40:1,3,6,6;41:8,9;
42:18;43:2,5;49:2,6,
8;52:1,17;53:13,14;
54:11;67:5,6,9,10,18,
22,24;68:18,20,21,22,
23,24,25;69:1,2,3,4,5,
6,7,10;73:14,16;86:6,
8,13,16,18;87:17,19,
21,23,24;88:5,6,7,8,
14,16,19,22,25;89:3,
5,7,9,15,18,22,25;
90:2,5,7,11,13,15,19,
22,24;91:4,6,9,12;
92:2,4,5;93:19,21,23,
25;94:2,14,15,17,19,
22,24;95:3,5,10,11,
12,14,16,18,25;96:2,
5,12;98:18,21,24;
100:24;101:1,3,4;
103:4,8,12,19,22,24;
104:2,4,7,9,13,17,19,
23,25;105:4,8,11,14;
107:3,5,8,15;108:25;
109:2,8,12,23;111:3,
14;112:16,19,21,25;
113:2,4,6,8;116:9,12;
117:6;118:5,7,9,15,
19;119:2;128:7,9;
129:8,10,17,20,21;
130:9,11,17,19,21,24;
131:1,2;133:2,4,16,
18,21,24;134:1;135:8,
10,13,15,17,22,25;
136:3,7,10,12,14;

137:7,9,16,20,21;
138:1,4,7,9;142:20,
22,23;143:25;144:1,4,
7;145:6;147:3,4,13,
20,25;148:3,5,7,10,
12,15,21,23;149:8,10,
13,16,18,19;150:7,17,
20;153:5;154:7,8,13,
21;155:8;156:22;
157:25;158:2,4,7,10,
12,23,24;159:4,8,25;
160:2,4,4,5,6,7,9,11,
13,15,17,21,22;
162:12;164:1,11,11,
12,13,15,20,24;165:6,
10,12,15,18,20,24;
166:1,4,4,6,8,16,17,
17,22,24,25;167:5,7,
11,12,13,17;168:3,5,
9,10,23,24;169:2,7,9,
11,13,15,16;170:22,
24;171:5,7,9,11,13,
17;172:14;175:5;
178:22;180:18,19,21,
22,22;181:2,7,19,22,
25;182:2,4,15,17,19,
20,24;183:15,23;
184:1,14,19,20,23;
185:1,4,6,11,13,15,17,
20,22,24;186:1,5,7,9,
12,17,20,24;187:1,5,
5,8,12,15,21,23;
188:1,3,7,10,14,16,18,
20,23;189:1,3,10,16,
18,21,23;190:3,4,11,
12,16;193:20,22,22;
194:5;202:18,20;
203:2,4,4;209:17,23;
213:1,5,6,9;215:23;
216:1,3;219:21,25;
220:3;221:15;222:25;
223:2,6,7,14,15,16;
225:8,25;226:4;
229:18,20,21,25;
230:2,5,11

**beyond (10)**
42:9;58:24;59:1,5;
61:5;182:1;195:21;
205:25;206:1;228:20

**bias (3)**
42:2;62:24;228:19

**big (2)**
165:10;216:18

**birth (10)**
67:10;130:5,17;
131:7;145:25;146:2,
5;164:6;218:10;223:9

**bit (5)**
51:22;119:3;172:7;
181:11,15

**bite (1)**
218:5

**black (10)**

170:5,6,10,10,12;
202:17,22;204:11;
220:16;222:13

**Black's (4)**
28:2;36:6;138:4;
214:22

**blade (1)**
228:8

**blame (1)**
191:2

**blank (1)**
202:3

**blessed (1)**
213:16

**blocked (1)**
125:1

**blocking (2)**
122:19;123:24

**blood (4)**
16:12;31:11;
223:12,16

**blue (3)**
74:11,16;76:8

**board (1)**
217:16

**bob (1)**
224:11

**bodily (2)**
55:13;57:18

**body (2)**
116:24,25

**bogus (1)**
192:23

**book (1)**
191:5

**booked (1)**
66:18

**books (4)**
32:9;191:9;215:4,
18

**born (3)**
131:22;132:1,23

**Boston (3)**
22:25;23:8;84:3

**both (28)**
29:23;44:13;47:13;
48:1;50:17;51:6;
52:21;66:7;75:18,21;
93:17;99:12,13;
102:7,16;109:15,24;
110:15;115:14;
116:14,22;126:19;
176:5;180:12;206:25;
214:25;216:8;227:1

**bottle (1)**
165:16

**bottom (2)**
94:13;112:16

**bought (1)**
215:4

**box (12)**
43:5;44:3,19;47:4,
18;50:7,23;51:18;

52:15;84:3;119:15;
169:18

**boxed (1)**
80:3

**brakes (4)**
72:1;75:9;224:23,
24

**brave (1)**
213:18

**breach (4)**
54:18;56:22;
227:17,17

**break (8)**
25:20;26:8;34:8;
63:5,7;117:14,15,17

**Bridge (7)**
71:14,18,23;72:21;
75:4;91:22,23

**brief (3)**
24:11;56:1;116:10

**briefly (5)**
41:3;72:19;122:21;
145:9;147:6

**bright (1)**
210:12

**bring (9)**
18:23;22:17;32:9;
37:4;52:23;53:19;
58:20;90:15;104:23;
105:2;118:23;119:6,
7;135:23;159:22;
166:3;201:2;209:8;
226:19

**bringing (5)**
126:13;147:14;
181:22,23;182:2

**brings (1)**
224:14

**brother (6)**
51:9,12;173:18;
179:1;188:18;203:13

**brothers (1)**
182:5

**brought (6)**
38:15;64:5;154:22;
164:24;202:4;204:1

**brute (1)**
202:12

**bucks (1)**
191:5

**building (4)**
79:20,22;80:2;
118:11

**built (2)**
217:18,19

**bunch (4)**
132:15;187:15;
190:25;222:4

**bunches (1)**
141:4

**burden (6)**
42:9;59:14,23;
195:20,21;213:1

**bus (1)**
192:19
**bush (2)**
123:2
**business (10)**
11:19;13:25;14:2,3,
6,23;15:24;16:16;
20:20;214:6
**Busy (4)**
28:20;75:4;201:9;
224:17
**buy (9)**
159:5,13;182:21;
184:5;194:4;195:16;
214:9;220:24;228:12
**buys (1)**
12:12
**byways (1)**
191:25

**C**

**call (53)**
5:23;6:17;10:6,11;
25:23;26:11,15,16,19;
30:23;34:19;42:20;
43:6,10;48:6;67:25;
68:5,10;69:11,12;
92:24;95:21;110:14;
121:22;122:6;141:2,
5,7,8,23;142:1,2,2,3;
143:11,11;147:4;
148:10,12;149:22,23;
154:17;164:9;165:10;
166:2,16;167:19;
183:18;184:20;
186:24;187:10;
209:17;225:20
**called (14)**
17:10;37:20;40:19,
20;42:22;75:14;82:1;
85:24;111:15;141:10,
12,23;179:1;210:21
**caller (2)**
68:10,10
**call-in (1)**
93:4
**calling (5)**
7:16;30:18;35:24;
110:15;167:16
**call-ins (2)**
92:23;143:14
**calls (5)**
96:8;120:7;141:16;
143:16;144:11
**calm (2)**
97:14,18
**came (49)**
65:6;71:25;72:7;
79:9,14,23,23,24;
80:5;81:25;83:10;
97:24;101:6,15,16;
103:9;104:14;109:13;

126:21,22;142:3,3,4;
143:16;144:11,16;
150:12;151:13,14;
152:16,19,20;153:25;
157:11,14;161:15;
171:15,18;172:5;
174:6;175:8;180:5,7;
187:11;205:9,10;
206:4,8;226:11
**camera (5)**
124:14,17,20,21;
199:23
**cameras (2)**
116:24,25
**Campbell (50)**
4:3;6:23;9:8,13;
10:14;16:8,9,13,18;
26:25;30:15,18,21;
31:24;32:14;33:1;
34:19;39:16,24;
54:11;65:18;78:7,8;
79:25;80:14,15,21,22;
81:12,19;83:10,21;
84:11;90:22;96:16;
111:17,20;118:22;
145:22;150:3;186:24;
187:2;190:14;220:1,
14;222:23;223:5,8;
225:9;229:19
**can (200)**
7:8,15,24;8:7;13:6,
6;14:12;19:23;20:15;
22:2;25:8,11,24;26:8,
18,19;27:19,20,23;
29:15;30:5;32:5,7;
33:16;35:9,11;37:11,
18;40:24;41:4,6;
42:18;43:24;44:15;
46:18,24,24;47:16;
50:4,17,20;51:15;
52:14,22;53:6,7;54:1;
56:8,10;62:9;63:5;
67:14;68:8,11;69:11,
23;72:21;75:1,17;
76:9;77:13,15;79:15;
85:11;87:5,21;88:12;
89:11,13,21,22,22;
90:13;91:2,10,24;
93:22;94:1,20;95:1;
98:7;103:17;104:21,
21;111:13;112:12,17,
18;116:8,13;118:17;
120:17;126:18;127:4;
128:12;129:17;130:8;
132:1;133:2;135:8,8,
23;136:4;138:4,6,8;
141:19,21;147:15;
148:10;149:3,10,16;
151:20;153:19;
154:13,18;156:10;
158:5;159:17,20,22;
162:6;164:13;165:12;
166:2,9,16;167:5;

168:22;169:8;170:25;
181:6;184:2,20,24;
185:17;187:10;
188:11,24;189:12,16;
191:16,20,21;192:9;
194:14;195:3,18;
196:22;197:5,8,12,17,
21,23;198:16;199:19,
21;201:15,15,22,23,
24;202:8,8,9,10,22;
203:17,20,21;204:3,
13;208:4,21;209:10;
213:17;217:21;
218:18;220:24;
221:13;223:8,11;
224:7,17;225:13,17,
20;226:1;227:10,19;
228:5,6,6,12,12,13,13,
14
**can't (1)**
37:11
**cap (1)**
77:5
**capacity (3)**
90:16,18;203:3
**Capital (2)**
170:3;223:9
**car (55)**
63:22;66:2;68:5;
78:25;79:21;96:6;
97:10;99:1,3,4,7,8,9;
101:6,13;109:13;
111:9,19;114:19,20,
25;115:1,1,3,5,8,12;
121:16,18;122:12,15;
124:15,15;126:22;
156:10;172:2,6;
173:10;175:24;
177:18;178:11,15;
197:24;201:21;
203:14;205:1;211:11;
224:10;225:19;
226:13,14,16;227:21,
22,23
**card (1)**
219:1
**care (1)**
63:17
**careful (9)**
69:16;117:23;
119:15;120:11;
148:18,19;159:23;
166:11;229:14
**carefully (3)**
41:12;228:16,17
**caring (1)**
205:21
**Carroll (1)**
58:1
**carry (4)**
54:16,16;56:19,19
**Carrying (9)**
8:14;39:17;54:15;

56:18;66:24;82:20,
21;109:4;208:9
**cars (32)**
64:4,11;75:5,24;
92:17,21;96:17;
140:21,22;151:15,16,
19;152:4,6,9,10,12,
13,14;155:10;157:11;
172:24,25;173:1;
180:8;198:6,6;
206:23,24;207:1;
224:22,23
**case (83)**
5:12;6:11;12:8;
21:16,19;22:5;23:19,
22;24:3;25:1;29:14;
30:3;34:11,23;35:11;
40:17,19;41:19,22,24;
42:5,14;43:21;44:11;
45:11,18;46:7;48:1;
49:5,12,13,25;50:2,
16;51:4;52:7;53:18;
58:9,17,23;60:12,13,
16;61:7;62:5,7,8,15,
20;63:15,18,21;
66:13;68:12;82:20,
21,22;89:10;117:6,16,
18;119:16,19,23;
145:23;147:18,20;
162:12;164:16;173:9;
195:19;201:5;203:24;
204:2;206:1;223:20;
227:16;229:7,9,10,11,
11,23
**cases (11)**
89:23,24;102:25;
104:15,16;213:24;
215:8;216:12,13,23,
25
**cash (1)**
68:9
**cause (13)**
4:8;5:6,11;6:12;
30:17;42:24;49:1;
51:20,21;52:16;
224:22,23;229:23
**causing (5)**
55:12;57:17;64:5;
66:4;96:18
**cell (2)**
101:8;124:21
**center (4)**
65:13;66:10;
138:18;227:24
**certain (6)**
24:24;29:5;190:8;
218:6,11;222:15
**Certainly (7)**
4:13;5:7;11:14;
25:2,11;69:12;228:6
**certificate (3)**
67:11;218:10;223:9
**certified (3)**

11:13,16;15:19
**certify (2)**
85:12,13
**chainsaw (1)**
194:25
**challenge (5)**
30:16;33:9;42:23,
25;52:23
**challenges (4)**
33:6;8;52:16,25
**chance (2)**
9:25;72:15;196:8
**Chapter (4)**
55:6;57:10,13;
85:14
**charge (12)**
16:19;55:7,15;
57:20;66:15,23;
132:1;187:2;208:8;
222:3;224:14;227:16
**charged (18)**
4:17;24:14;54:15,
22;55:3,14;56:16;
57:1,7,11;58:22;59:7;
135:17;142:15,22;
187:6;189:5;192:14
**charges (24)**
8:12,13;16:17;24:8;
39:22;43:21;56:12,
14,15;59:20;61:5;
66:13;79:6;107:3,5;
108:22;109:2,4;
135:10;142:20;
185:21,22;208:25;
223:24
**chase (5)**
108:4;174:11,11,
12,13
**chased (1)**
75:15
**cheap (1)**
191:6
**check (1)**
132:6
**checked (1)**
126:16
**checking (2)**
175:17,23
**checks (1)**
68:9
**Chico (6)**
64:25;65:6;124:3;
201:21;203:16;
205:14
**Chico's (1)**
147:20
**chief (1)**
147:18
**children (7)**
103:14;218:14,14,
15,15,16;221:2
**chilly (1)**
71:5

**choices (1)**
  223:24
**choose (2)**
  14:12;59:12
**chooses (1)**
  13:9
**chopping (1)**
  221:6
**chosen (1)**
  62:17
**church (2)**
  91:24;198:1
**citation (7)**
  21:15;129:23,24;
  131:3;146:5;164:5;
  168:11
**citizen (3)**
  191:7;217:4,7
**citizens (3)**
  217:5,5,8
**citizenship (1)**
  193:8
**city (5)**
  36:1;54:14;70:4,5;
  71:1
**civil (5)**
  8:21;23:7;197:10;
  198:11;207:2
**civilian (1)**
  49:22
**civilians (1)**
  81:23
**claim (3)**
  96:14;198:19;
  212:16
**Claiming (1)**
  217:6
**claims (3)**
  24:18,21;211:21
**clarification (1)**
  32:24
**clarity (4)**
  13:24;17:12,18;
  214:21
**clasped (2)**
  200:12;203:12
**clasping (1)**
  201:13
**classify (2)**
  36:9;202:17
**clause (1)**
  218:11
**clear (3)**
  71:5,7;190:18
**cleared (1)**
  175:13
**clearing (1)**
  105:25
**clearly (1)**
  112:19
**CLERK (125)**
  4:3,6,12,14,17;
  5:18;6:16,20,23;7:1,6,

8,14;8:7;9:8;10:11,
14,17;13:4,5;26:11,
24;32:24;33:3;35:7,
19,23;36:1,5;39:1,4,6,
8,9,14,24;40:2,11,18,
23;41:1,3,5,6,8,9,15;
42:18;43:10;44:2,4,5,
6,7,18,20,21,23;47:3,
6,7,18;50:7,22;51:17;
53:3,7,20,24;54:1,3,8;
55:18,21,24;56:2,5,8,
10,15;58:1,16;69:14,
16;117:23;118:8,10,
12,14,18,21,24;119:5,
8,10,13,15;120:2,9,
11;146:17,21,23;
148:14,16;154:22;
155:3,6;159:22;
160:7;162:8,10,15;
166:5,11,20;229:14,
19,22;230:1,3,7,9,13,
15
**cling (2)**
  222:10,16
**Clinton (1)**
  67:25
**clock (1)**
  15:5
**close (3)**
  67:1;72:3;76:11
**closed (1)**
  114:3
**closely (1)**
  66:14
**closest (1)**
  49:2
**closing (15)**
  60:4;67:20;92:2;
  93:22,24;135:22;
  136:3;168:25;197:12;
  209:10;212:25;213:3,
  6,8;223:19
**clothing (2)**
  77:3;125:19
**club (1)**
  228:14
**code (1)**
  132:15
**coexist (1)**
  217:21
**Coffey (2)**
  38:22;39:11
**C-O-F-F-E-Y (1)**
  38:22
**coherent (1)**
  202:8
**cold (3)**
  63:20;66:11;118:3
**collar (1)**
  203:23
**collaterally (1)**
  164:4
**collect (2)**

97:14,18
**collide (1)**
  72:2
**colloquy (1)**
  185:7
**color (3)**
  55:9;57:14;226:24
**combative (1)**
  108:13
**comfortable (1)**
  119:4
**coming (19)**
  7:11;71:14,23;
  72:20;75:8;115:4;
  161:23;162:8,17;
  171:15;172:17,18;
  174:3,20;187:20;
  196:20;217:20;
  218:15;229:2
**commands (2)**
  124:15;226:10
**commence (1)**
  4:2
**commenced (21)**
  43:4,14;44:8,24;
  47:8,20;50:10,25;
  67:17;88:11;95:13;
  103:20;130:12;135:9;
  146:19;147:9;154:15;
  169:5;184:25;204:6;
  207:13
**commences (1)**
  51:19
**comment (1)**
  169:2
**comments (1)**
  166:9
**commerce (5)**
  191:11,14,16;
  215:1,3
**commercial (1)**
  224:17
**commissioner (1)**
  38:9
**committed (1)**
  59:6
**committing (3)**
  54:18;56:22;217:25
**Commonwealth (57)**
  4:3,4;5:8,12,14;
  6:23,24;7:19;8:9,19;
  9:8,10;10:6,14,15,20,
  24;13:22;18:15;24:1;
  26:24;27:2,18;29:17;
  32:14;34:11,18;
  35:14,15;38:2;39:15;
  40:12;42:20;52:21;
  53:10,12;59:1,5,9,15,
  24;61:5;62:22;63:11;
  66:19;83:20;85:16;
  89:20;104:10;118:21;
  120:7;147:1,2;
  187:19;212:25;225:1,

10
**COMMONWEALTH'S (2)**
  63:14;223:19
**Commonwealth's (8)**
  11:2,12;12:24;
  32:18;73:19;83:1;
  84:17;85:20
**communicate (2)**
  62:4,5
**community (1)**
  38:10
**company (8)**
  20:9;181:9;194:13,
  13,14,17,21;214:3
**compensation (1)**
  216:11
**competence (2)**
  21:13;88:4
**competency (12)**
  21:12;88:15,16,19,
  20,23;89:1,1,5,9,11;
  91:7
**complaint (17)**
  24:12,18,24;25:3,6;
  32:19,21;47:12,24;
  54:9,12;57:24;58:17,
  18,21;59:20;61:5
**complaints (1)**
  58:2
**complexion (1)**
  202:16
**comply (1)**
  119:19
**compromised (1)**
  24:8
**concerned (1)**
  51:22
**concerning (1)**
  24:13
**concerns (2)**
  11:15;15:18
**concluded (22)**
  43:9;44:1,17;47:2,
  17;50:6,21;51:16;
  53:9;67:23;91:11;
  96:4;105:13;130:20;
  136:9;146:24;148:9;
  155:7;169:14;189:25;
  204:17;208:14
**concludes (1)**
  212:24
**conclusion (1)**
  58:14
**conclusions (3)**
  60:3,21;62:9
**concrete (1)**
  205:8
**condition (1)**
  82:17
**conditioner (1)**
  119:1
**conduct (2)**
  62:13;223:24

**conflicts (1)**
  61:2
**confused (5)**
  20:18;88:22,22,25;
  91:9
**Congress (1)**
  216:7
**consider (8)**
  58:14;60:9,23;
  61:25;62:12;153:3;
  179:4;227:5
**console (6)**
  65:13;66:10;
  138:18;221:9,12;
  227:25
**conspicuously (1)**
  57:23
**constitute (1)**
  19:16
**constituted (1)**
  18:14
**Constitution (20)**
  13:18;173:7;177:8,
  10;189:1;190:22;
  191:24;192:1,8,15,21;
  193:9;195:13;213:21,
  21;214:14;215:7,19;
  218:18;222:1
**constitutional (6)**
  18:5,6,8,10,13;
  192:6
**Constitutionally (1)**
  188:20
**contact (4)**
  20:13;122:7,8;
  171:23
**contained (1)**
  15:23
**content (5)**
  53:2,11,12,13,14
**continuance (4)**
  30:3,9;33:15;
  216:11
**continue (13)**
  30:6;35:5;38:1;
  64:15;73:3;75:13;
  90:13;101:5;171:21;
  172:4;174:8;194:5;
  219:23
**continued (7)**
  6:1,2;64:10;74:19;
  79:7,8;174:11
**continues (2)**
  224:11;225:20
**contract (8)**
  6:10;191:15;
  214:24,25,25;217:22,
  22,23
**contractual (5)**
  9:13;31:15;67:11;
  193:12;218:11
**control (11)**
  54:17,20;56:20,23;

58:11;65:22,23;
97:20;109:1;112:23;
227:21
**controversies (2)**
217:2,3
**convene (1)**
229:4
**conversation (16)**
117:19,20;154:18,
19;161:9;163:18;
165:9;174:24;176:12,
14,19,23,25;177:4;
178:6,14
**converse (2)**
202:8,9
**cool (10)**
93:8,8,8,8;97:13,
18;109:10;132:22,23;
194:12
**cop (9)**
48:2;104:25;172:1,
6,24,25;173:1;180:8;
206:23
**cops (2)**
49:17;210:21
**copy (6)**
6:15,16;9:25;10:2;
12:7;14:4
**corner (3)**
70:25;165:13;
214:15
**correctly (1)**
35:20
**cost (2)**
191:5;211:21
**Counsel (8)**
4:5;6:25;9:9;13:4,5,
11;27:1;216:24
**counsels (2)**
216:24,24
**count (11)**
7:22,24;8:2,14,15,
16,19,20,20;206:21,
23
**counted (4)**
206:22,22,22,24
**country (5)**
58:3,4;213:16;
217:17;219:12
**counts (5)**
7:20;8:4,23;35:16;
67:2
**couple (2)**
10:7;219:23
**course (14)**
16:1;28:18;60:15;
61:3,14;62:3;63:2,4;
70:13;101:2;117:19;
136:6;143:17;227:14
**COURT (865)**
4:3,6,7,11,12,13,14,
14,17,20,23,25;5:3,5,
13,17,18,19,22;6:9,

11,15,16,17,19,20,21,
23;7:1,6,8,11,13,14,
15,18,23;8:1,3,6,7,9,
14,18,24;9:1,4,6,8,11,
14,16,18,22,22,24;10:1,
4,11,12,14,16,19,23;
11:4,6,8,10,18,24;
12:4,11,13,19,24;
13:2,4,7,13,15,17,19,
25;14:3,8,11,13,15,
18,20,22;15:1,3,5,8,
10,12,15,17;16:2,4,6,
11,15,25;17:3,7,9,15,
17,20,22,25;18:3,6,7,
9,11,11,12,12,14,17,
18,19,21,24,24;19:3,
7,9,11,14,16,19,22,24;
20:1,3,5,8,10,12,14,
16,19,22,24;21:1,4,6,
11,18,21;22:2,6,12,
14,19,21,22,25;23:3,
7,8,10,13,15,21,24;
24:1,6,15,17,22;25:4,
8,11,14,18;26:2,4,7,
11,14,16,19,22,24;
27:3,6,10,12,23,25;
28:5,9,14,15,19,21,
25;29:2,16,19,22,24;
30:1,4,7,9,12,14,19;
31:1,5,9,12,14,17,19,
21,23;32:3,5,11,13,
19,23,24;33:3,4,8,12,
14,17,20,23;34:1,3,5,
7,9,14,22;35:1,4,7,9,
13,17,19,23;36:1,5,
10,12,14,18,22,24;
37:1,3,6,9,12,17;38:3,
6,8,16,19,22;39:4,9,
14,24;40:2,4,10,11,
18;41:1,5,8,10,15;
42:18;43:2,5,10,15,
17,20,24;44:2,5,7,9,
15,18,21,25;45:2,5,7,
10,16,22,24;46:2,5,7,
10,13,15,17,21,24;
47:3,7,9,16,18,21;
48:5,8,10,12,16,22;
49:4,7,9,21;50:1,4,7,
11,13,16,20,22;51:1,
4,8,11,15,17,20,24;
52:1,12,18;53:1,3,6,7,
8,10,13,15,18,24;
54:1,3,8,9,10;55:23,
25;56:3,8,10,13,15;
58:8;62:5;67:4,7,16,
19;68:17,19,21,23,25;
69:2,4,6,8,11,19;
72:10;73:14,17,21;
74:1,4,6;77:8;82:25;
83:15;84:16,25;85:8,
19;86:5,11,14,14;
87:17,20,22;88:5,7,9,
12,15,18,21,23;89:2,

4,6,8,10,12,17,19,23,
24,24;90:1,2,3,4,6,6,7,
7,8,12,14,18,22;91:3,
5,7,10;92:2;93:18,20,
22,24;94:1,14,16,18,
20,23;95:1,4,9,11,14,
17,19;96:1,3,10;
98:18,23;100:24;
101:2;103:3,7,11,16,
18,21,23;104:1,3,5,
14,16,18,21,24;105:2,
7,9,12;107:1,4,7,11;
108:24;109:1,4,21;
110:25;111:2,13;
112:17,20,23;113:1,3,
5,7;116:8;117:7,10,
13;118:1,6,11,13,17,
21,23,25;119:3,13,18,
22;120:3,5,13;
125:23;127:22;128:6;
129:9,18;130:8,10,13,
16,18,25;133:3,15,17,
20,22,25;135:6,12,14,
16,18,24;136:1,5,8,
13;137:6,8,14,18;
138:3,6,8;142:21;
143:25;144:3;145:7,
11;146:13,18,20,22,
25;147:2,5,8,16,19,
24;148:1,4,6,8,10,21;
149:3,6,11,15;150:18;
152:24;154:3,5,13,16,
25;155:4;156:23;
157:21,24;158:1,3,5,
7,20,22;159:3,10,17,
20,25;160:3,5,9,12,
14,16,18,20,22;161:1,
5,9,12,14,16,19,21,24;
162:2,5,7,9,11,13,15,
17,21,23;163:2,6,8,
11,18,21,23;164:2,12,
14,16,19,21;165:5,8,
14,16,19,22,25;166:2,
9,11,14,18,20,21;
168:4,8,22,24;169:4,
6,8,10,12;170:23;
171:4,6,8;174:23;
175:1,3;178:18;
180:17;181:1,5,21,24;
182:1,3,14,16,18;
183:14,21,25;184:15,
17,19,21,24;185:3,5,
7,12,14,16,19,21,23,
25;186:4,6,8,10,14,
18,23,25;187:4,6,10,
14,17,22,25;188:2,6,
9,11,15,17,19,22,24;
189:2,5,8,11,15,17,19,
22,24;190:1,13,16;
193:1,18,20,22,24;
194:5,9,16,18;195:6,
8,10;196:3,7,10,12,
15,17,21,25;197:4,7,

4,6,8,10,12,17,19,23,
24,24;90:1,2,3,4,6,6,7,
7,8,12,14,18,23;
5,7,10;92:2;93:18,20,
22,24;94:1,14,16,18,
20,23;95:1,4,9,11,14,
17,19;96:1,3,10;
98:18,23;100:24;
11,18,21;198:16,18;
199:6,8,10,12,15,17;
201:24;202:18,20,25;
203:2,4,6;204:4,8,10,
12,14,18;205:24,25;
206:2,7,12,15;207:5,
7,9,12,14,16,19,21,24;
208:1,3,7,12,16,18,22,
24;209:2,4,6,10,13,
20;210:24;211:4;
212:21,23;213:7,23,
23,24,25;215:11,21;
216:6,14,16;219:17,
19,22;221:13;222:23;
223:1,13,15,17;226:1,
5;228:22;229:3,10,17,
19,22;230:1,3,6,7,8,9,
10,12,13,14,15
**courtroom (24)**
5:10;7:2,8;13:7;
30:24;31:22;37:18;
39:10;48:20;61:8;
62:13,16;68:16;77:1;
125:17;156:20;
160:10;161:6;162:19;
165:3;193:14;215:15,
15,17
**courts (3)**
18:13;216:7,9
**Court's (1)**
119:16
**covered (1)**
143:12
**Crane (10)**
4:9;7:3,9;9:2,4,5;
18:16;165:20,22;
166:1
**Crayton (2)**
16:22;17:10
**crazy (3)**
29:13;203:22;215:2
**create (1)**
218:25
**created (7)**
55:12;57:17;219:2,
2;220:12;222:1;227:1
**credibility (2)**
28:17;227:5
**credible (1)**
227:10
**crevice (1)**
136:20
**crevices (1)**
136:24
**crickets (2)**
214:10,16
**crime (7)**
48:17;54:18;56:21;
58:20;192:4,5;215:16
**criminal (8)**
4:21;42:5;58:23;
197:10;215:16,18;
223:23;229:9

11,18,21;198:16,18;
199:6,8,10,12,15,17;
201:24;202:18,20,25;
203:2,4,6;204:4,8,10,
12,14,18;205:24,25;
206:2,7,12,15;207:5,
7,9,12,14,16,19,21,24;
208:1,3,7,12,16,18,22,
24;209:2,4,6,10,13,
20;210:24;211:4;
212:21,23;213:7,23,
23,24,25;215:11,21;
216:6,14,16;219:17,
19,22;221:13;222:23;
223:1,13,15,17;226:1,
5;228:22;229:3,10,17,
19,22;230:1,3,6,7,8,9,
10,12,13,14,15
**cross (6)**
29:23;74:23;146:4;
182:3;208:12;224:22
**crossed (2)**
74:17;75:7
**cross-examination (10)**
19:21;22:7,17;29:7;
86:7;128:8;157:1;
158:8;178:20;209:15
**cross-reference (1)**
38:10
**cruiser (4)**
64:17,20;121:19;
122:12
**cuff (1)**
116:2
**cuffed (3)**
205:8,10,11
**cuffing (1)**
205:12
**cuffs (4)**
106:12;115:19;
153:6;222:18
**cultures (1)**
217:19
**current (1)**
5:5
**custody (7)**
10:5;105:16,21;
106:3,7;107:9,13
**cut (6)**
71:24;72:6;73:24;
74:19;75:10;194:22
**cutoff (2)**
74:9,9
**cutting (1)**
64:4

---

**D**

**DA (10)**
87:21;98:8,8,8,9,9,
9,9,10,10
**danger (2)**
55:2;57:6
**dangerly (1)**
96:7
**dangerous (44)**
8:14;39:17;54:15,
20;56:18,24;66:24;
68:1,6,14,14;109:5;
128:13;158:17,18;
159:1;183:10,11,18,
24;194:1;195:1,2,15,
16,18,23;196:5,6;
208:9;220:24;221:2,
5,12;227:16,20;228:3,
6,11,12,13,14,14,15
**dangerously (1)**
93:5
**dare (1)**
221:21
**dark (1)**

199:20
date (26)
12:13,14,19;13:2;
24:13;27:19,22;
54:13;85:8;130:5,17;
131:3,7,18,24,24;
132:6,7,9,14,25;
144:5;145:25;146:2,
5;164:5
dates (3)
34:12,19,24
David (8)
40:22;63:24;69:13,
18,25;86:22,23;
211:13
day (24)
20:12;27:20;29:11;
34:4;53:19;68:11;
70:15;71:3,5,7;
121:13;146:10;
155:24;156:20;165:3;
191:1,20;196:15,16,
23;200:3;205:24;
207:24;211:11
days (2)
46:4;191:9
deal (3)
27:12;48:23;165:10
dealing (2)
23:16;141:25
December (1)
225:18
decide (5)
49:13;59:14;60:14;
61:7;68:12
decided (1)
14:13
deciding (1)
213:24
decision (2)
26:3;50:2
decisions (1)
90:3
Declarant (1)
28:5
defendant (102)
4:12;11:21;39:21;
41:17,18;42:3,6,9,10;
53:13,14;54:15;
56:16;58:2,22,23;
59:1,2,4,6,9,12,22,24,
25;62:6,23;63:16,21,
25;64:1,4,5,9,14,18,
22,24,25;65:3,5,8,12,
22;66:1,3,8,10,18,21,
23;67:2;74:9;75:2;
77:7;78:9,11,21;
79:18;80:4;81:14;
83:3,8,11,22;85:22;
91:20;92:16;102:13;
107:13;125:12,22,25;
126:9,12;145:23;
146:4;157:3,8,14;

159:13;178:22,24;
180:10;193:2;224:1,
16;225:4,6,7,14;
226:9,14,15,16,17,20,
24;227:13,15;228:1,
19
DEFENDANT'S (2)
67:8;213:8
defendant's (8)
11:15;34:25;64:8,
21;77:18;82:3;
223:20;227:21
defense (2)
27:17,21
defined (3)
55:5;57:9,13
definitely (5)
12:9;126:4;200:5;
218:13;220:25
definition (1)
214:20
defy (1)
198:25
deliberate (1)
228:25
deliberating (1)
60:10
deliberations (4)
58:11;60:8;62:11;
229:5
demanding (1)
225:6
demographic (2)
11:17;84:10
deny (2)
35:5;164:7
Department (11)
40:22;41:2;54:10,
14;57:25;63:25;
120:23,25;121:3;
128:16;227:7
depend (1)
52:7
depending (2)
22:7;194:3
depends (1)
49:24
depiction (1)
202:13
Depot (4)
183:1;184:3;194:3;
195:17
deprived (1)
27:21
DEPUTY (52)
10:17;13:5;39:1,4,
6;40:23;41:3,6,9;
44:4,6,20,23;47:6;
53:20;55:18,21,24;
56:2,5;69:14,16;
117:23;118:8,10,12,
14,18,24;119:5,8,10,
13,15;120:2,9,11;

146:17,21,23;148:14,
16;154:22;155:3,6;
159:22;160:7;162:8,
10;166:5,11;229:14
describe (13)
65:7,11,14,20;75:1,
17;77:15;79:15;
116:8,13;122:21;
126:18;224:9
described (4)
81:6;123:22;
126:13;204:25
describes (1)
227:23
describing (3)
73:9;110:13;225:24
designated (1)
199:19
detail (2)
60:7;77:15
detailed (1)
58:13
determine (5)
60:18,19,25;61:3,4
device (4)
55:21;210:18,20;
228:6
devices (4)
46:18;53:4;62:15;
210:21
DEVOE (208)
4:4;5:3,4,7,15,21;
6:24;7:21,24;8:2,5;
9:10,11,19,21,23,25;
10:3,10,15;11:1,5,7,
14,19;14:24;15:13,16,
18;16:5,7,12,22;
17:23;19:4,6;21:14,
19;22:1,24;23:4,23;
24:11,16,24;27:2;
29:18,21,23,25;30:2;
34:6,8,10,15,23;35:3;
37:5,8,10;40:13,15,
16;43:2;51:22,25;
52:10,20,25;53:10,12;
63:12,13,15;67:4;
69:9,12,19,20,22;
72:9,11;73:12,20,23;
74:7;77:6,9;82:23;
83:2,14,16,17;84:14,
18,24;85:1,17,21;
86:4;103:2,6,10,15,
17;104:8,10;112:15;
117:8,9;118:2,16;
119:7,9,11;120:6,7,
13,14,16;125:21,24;
127:21,23,25;128:5;
130:7,14,16;145:8,9,
14;146:12,25;147:1,6,
10,17;148:2;150:16;
152:23;154:2,12;
156:24,25;157:2,20;
159:2,9,12;162:3,4;

168:21;171:2,10,12;
174:22;178:17,19,21;
180:16,25;181:4,18;
182:13,22;183:13,19;
184:15,16,22;189:7,
12,14;192:25;193:16;
196:1;197:2,6;
198:15;199:5;202:24;
206:6,11;208:6,7,13,
19,20,23;209:13,14,
16,19,21,22;210:25;
211:2,5;212:20;
219:16,18;223:17,18,
20;226:5,6;228:22
Dictionary (3)
28:3;36:6;138:5
Didn't (1)
96:15
die (1)
200:25
different (14)
31:18;66:13;
128:21;131:17;
158:16;185:17,20,21;
190:24;191:25;
195:24;217:5,6;
225:20
difficult (1)
47:13
diffuse (1)
203:21
dignity (1)
203:24
dilemma (1)
200:7
diminish (1)
216:11
direct (2)
29:23;69:21;
120:15;148:22;
166:23;190:15;227:8
direction (3)
169:3;179:21,23
disabled (1)
46:1
disclose (2)
136:4;182:10
disclosure (1)
204:8
discovered (1)
105:15
discovery (1)
104:10
discrepancy (2)
93:15;197:10
discuss (7)
37:20,22;62:8;
117:16;119:19;161:1;
229:7
discussing (4)
164:16,21;165:15;
189:1
discussion (1)

217:11
Discussions (1)
62:9
dismiss (4)
5:12;6:7;135:14,15
dismissed (12)
5:13;21:17;24:18,
20,20;51:10;53:23;
135:11;147:21;
211:22;229:24;230:1
disorderly (3)
107:3,6,7
Dispatch (1)
122:8
dispatched (2)
121:22,24
displayed (1)
57:22
disposition (3)
4:8;7:9;230:3
disregard (3)
61:20,22;183:21
disrupt (1)
13:9
distance (1)
76:10
District (8)
22:21;23:8;40:12,
16;54:10;59:11;
211:20;229:10
disturbance (2)
54:19;56:22
diversity (3)
193:8,9;213:17
diverted (1)
80:1
Division (1)
54:10
DMV (1)
219:2
Docket (4)
4:14;7:1,16;54:9
document (16)
22:24;23:5;26:12;
72:12;83:16,18,19;
84:2,4,14;85:2,3,18;
145:15;168:6;171:3
documents (12)
5:25;6:1,5,6;13:1;
14:23;22:4,11,11;
24:2,12;88:17
dogs (1)
200:2
dollars (1)
207:1
domicile (5)
36:3;170:19,20;
199:24,25
don't (2)
148:2,3
done (9)
31:20;82:13;94:24;
115:22;119:5;136:12;

147:20;150:14;158:1
**door (25)**
64:23;65:3;77:20;
78:4,6;79:21,21;80:2;
98:12;99:1,11,15,16,
18,22,25;100:13;
102:9;113:21;123:2,
3;201:8,10,12;226:13
**doorknob (1)**
201:11
**doorway (3)**
163:4,5,5
**double (4)**
74:18,24;224:12,22
**doubt (8)**
42:10;58:24;59:2,6;
61:6;68:13;195:21;
228:20
**down (49)**
15:8;38:23;63:20,
22;64:22;68:3;71:8,9;
75:15;77:20;89:4;
94:8,13;98:2;117:11,
24;118:25;124:18;
125:8;126:15;134:11;
138:25;146:13;
151:23;157:22;
159:17,23;162:6;
163:24;170:20;
171:14,18;174:12,20;
184:18;190:24;
196:20;200:13;201:8;
205:6;212:22;216:15,
18;218:10;221:1;
222:18;224:18,19;
229:15
**downstairs (2)**
53:5;165:1
**Dracut (1)**
73:2
**dragged (4)**
115:2;177:24;
205:14,14
**dragging (1)**
181:25
**drags (1)**
205:1
**draw (4)**
38:12;58:20;60:4;
67:21
**drawn (4)**
62:9;71:10,13;
210:11,15
**Dressed (1)**
70:23
**drew (1)**
71:16
**drive (4)**
173:8;216:17;
225:11,18
**driver (11)**
76:22;85:3;98:1;
108:10;125:10,14,15;

126:5,19;143:15;
225:16
**driver's (24)**
76:25;78:4;79:25;
80:15;81:12,14;
100:10;122:20;123:2,
3,5;124:23;125:10;
127:17;136:16,17,22,
25;137:11,22;138:18;
145:2,16;219:13
**drives (1)**
225:22
**driveway (19)**
79:20;122:13,25;
123:1,9;127:1;
151:21,22;152:1,7,11;
153:15;155:9;172:21,
22;199:24;205:16;
206:24;221:18
**driveways (1)**
122:14
**driving (38)**
6:2;15:19,19;63:21,
25;64:25;68:3,15;
69:1;92:24;93:5;96:7,
17;173:20;174:10,14;
179:9,20;189:3,5;
190:18,23,23;191:11,
14,21;195:11;202:23;
211:6;214:18,19,21,
24;216:14,16;219:9;
223:3;227:3
**drove (2)**
153:12;224:18
**duly (2)**
55:4;57:8
**dumb (1)**
110:20
**During (31)**
37:17;39:1;60:15;
61:3,14;62:3,5;63:1,
4;65:11;66:3,24;
78:16;81:24;83:3,7;
101:2;117:17,18;
119:20;124:12;126:9;
136:5;140:11;147:10,
15;216:9,11;227:17,
19;229:7
**duty (2)**
57:14;60:16
**dwellings (1)**
75:18
**dying (1)**
201:9

---

**E**

**ear (2)**
45:4;46:12
**earlier (2)**
21:17;113:21
**early (4)**
29:14;34:18;63:21;

121:16
**Earth (2)**
191:9,21
**easier (1)**
46:19
**easily (2)**
110:12,13
**easy (1)**
115:15
**eBay (1)**
191:6
**edged (1)**
205:6
**EDI (1)**
20:11
**edition (1)**
214:22
**editorial (1)**
188:12
**effect (1)**
52:6
**efficient (1)**
60:13
**eggs (1)**
192:14
**either (12)**
35:8;41:18;42:3;
77:16;94:16;107:1;
113:23;118:12,13;
124:11;131:15;222:3
**electrical (1)**
20:9
**electronic (1)**
62:15
**element (3)**
32:20;227:13;
228:18
**else (23)**
12:15;21:8;25:16;
32:8;39:7;46:10;
47:25;81:23;106:13;
108:15;121:2;142:3;
158:3;163:21,22;
169:13;182:25;
196:22;198:4,23;
200:3;207:9;220:16
**else's (2)**
135:18;154:19
**emotional (3)**
24:10;198:14;227:8
**emotionally (2)**
24:8;114:6
**empanel (1)**
33:9
**empaneled (2)**
229:9,10
**empanelment (2)**
25:19;37:17
**employed (2)**
70:1;120:20
**empress (1)**
170:19
**empty (1)**

97:24
**encounter (2)**
126:10;170:16
**encumbered (1)**
191:25
**end (4)**
11:11;59:4;89:14;
191:1
**endanger (5)**
8:11;66:16;92:17,
21;109:5
**endangered (1)**
224:24
**ended (4)**
84:13;126:22;
139:5;211:19
**ending (1)**
122:1
**enforce (3)**
87:10;91:13;128:22
**enforcement (4)**
70:18;87:7;88:4;
128:21
**enforcer (11)**
21:13;87:6,6,8,10,
11,13,15,25;177:18;
178:15
**enforcers (3)**
21:10;87:10;153:15
**engage (3)**
62:14;117:19,20
**enough (1)**
137:16
**enter (7)**
4:20;12:1;17:5,8;
18:22;40:3;147:18
**entered (2)**
39:21;225:13
**entire (5)**
23:22;59:14;
143:17;144:12;
164:21
**entitled (1)**
192:18
**entity (1)**
16:9
**erratic (1)**
143:15
**erratically (1)**
141:25
**escape (2)**
123:6,8
**escort (2)**
153:8;205:12
**escorted (1)**
206:21
**especially (1)**
228:9
**essentially (1)**
224:1
**establish (2)**
21:23;216:8
**established (1)**

205:21
**estimate (1)**
76:10
**Even (29)**
8:17;22:4;36:6;
62:8;98:13;104:19;
109:11;131:22,24;
132:1;161:2;164:6;
191:15;198:6;201:4;
203:16;204:1,24;
205:13;213:22;
215:14;217:11;
218:10,16;220:9;
221:10,10;222:20;
229:11
**evening (4)**
63:19;93:2;121:13,
16
**event (1)**
81:6
**events (6)**
21:20;24:13;25:2;
84:12;86:2;227:9
**eventually (8)**
64:18;66:5;76:5;
81:4;108:5;123:25;
126:7;180:5
**Everybody (10)**
39:7;41:4;56:1;
88:9,10;117:22;
119:18;169:13;174:4;
229:12
**Everybody's (1)**
119:22
**everyone (15)**
24:21;30:20;32:8;
90:16;122:21;126:25;
156:7;164:18;193:6;
200:5;202:15;214:6;
217:15;221:3;225:22
**everyone's (2)**
200:19;213:17
**everywhere (3)**
199:3,23;224:17
**evidence (63)**
11:11;14:1;20:16;
21:10;22:20;23:20;
24:25;25:3;28:7,10,
10,13,14;42:11,15;
45:13,19;58:7,18;
59:3,16,19,21;60:1,2,
4,5,6,20,20,21;61:7,
10,11,13,16,22;62:12,
23;66:14,15,20;
67:21;68:12;82:14;
105:9;135:24;136:1,
5;147:17;186:11,21;
212:24;219:16,19,22;
221:6,7,7,8;225:13;
226:2;228:16
**exact (2)**
107:16,16;143:4
**exactly (2)**

34:17;126:3
**exam (2)**
90:14,15
**EXAMINATION (8)**
69:21;120:15;
145:13;148:22;158:9;
166:23;180:20;
190:15
**except (3)**
24:21;30:18;190:9
**exception (2)**
14:6;21:7
**exceptions (1)**
29:8
**excerpt (1)**
15:19
**excluded (1)**
207:17
**exclusive (1)**
60:19
**excuse (5)**
31:2;75:7;125:14;
189:8,8
**exhibit (26)**
18:25;25:15;73:12,
17,19;82:24,25;83:1;
84:16,17;85:19,20;
127:23;128:2;145:10,
16;149:16,20;167:6;
168:8,9;209:21,24;
224:7;225:14;228:5
**exhibits (4)**
15:14;61:9;149:10;
225:12
**exist (1)**
188:5
**exit (2)**
78:14;97:10
**exited (4)**
76:21;79:11,15;
82:2
**exiting (1)**
65:5
**expect (2)**
59:18;67:21
**experience (2)**
51:11;185:16
**expert (1)**
204:11
**explain (4)**
59:17;129:19;
197:22;201:3
**explaining (3)**
153:21,22;201:7
**explicit (1)**
37:11
**expressed (1)**
41:25
**expressing (1)**
218:24
**extend (2)**
216:12,13
**extent (2)**

41:24;60:25
**eyebrows (1)**
191:18
**eyes (1)**
115:14

## F

**F-150 (1)**
200:16
**fabricated (1)**
24:8
**face (20)**
39:25;40:20;41:6;
104:20;105:1;108:10,
16;114:13,14,17,23;
115:1;203:17;209:24;
210:1,6,8,9;222:8;
225:15
**facing (2)**
123:2;124:18
**fact (5)**
15:22;48:12;52:5;
58:21;135:10
**facts (13)**
29:6;35:2;49:13;
50:2;60:18,19;89:10;
144:1;219:19,22;
226:2,2;228:15
**Failed (1)**
142:18
**failing (6)**
8:20;55:14;109:6;
141:13;142:1,4
**fails (1)**
142:11
**failure (9)**
39:19;57:19;66:15;
78:13,22;142:15;
208:25;224:14;225:1
**fair (26)**
27:18,18,19;43:21;
44:13;45:12,18;
47:13,25;48:14,18,25;
49:5,11;50:17;51:5,
13;52:9,13;60:13;
73:6;94:22,23;95:16;
104:22;131:22
**fairly (2)**
37:10;108:12
**fairness (1)**
62:10
**false (2)**
8:2;187:6
**familiar (1)**
188:5
**family (7)**
173:18,18;179:3,4,
7;181:16;229:8
**far (8)**
25:24;29:9;38:8;
50:17;51:5;63:6;
206:16;214:5

fathers (1)
191:8
**favor (3)**
130:3;201:1;228:19
**favorable (1)**
17:13
**fear (7)**
62:24;80:8,25;
199:14;210:13;
222:10;224:16
**feared (3)**
110:8,11;199:2
**fearful (1)**
199:14
**February (3)**
21:16;85:9;132:19
**Federal (12)**
12:7;18:12,13,17;
22:25;90:9;184:9,10;
186:20,21;204:8;
215:12
**feed (1)**
214:16
**feel (8)**
80:17,25;126:23;
188:25;199:20,23;
200:1;201:2
**feeling (6)**
65:21;132:19,20,
21;167:2,3
**feet (5)**
64:12,16;72:6,7;
192:20
**fell (1)**
80:16
**fellow (5)**
62:9;93:13,14;
210:2,3
**felt (1)**
200:6
**FEMALE (1)**
146:15
**few (4)**
9:23;134:16;
136:12;185:1
**fidgeted (1)**
100:7
**fidgeting (9)**
78:18;82:12;100:4,
5,5,6,17;101:7,12
**fifth (2)**
168:25;214:22
**fight (3)**
80:18;114:11,11
**fighting (2)**
152:18;217:19
**figure (4)**
173:10;191:3;
218:1;223:4
**figured (1)**
172:3
**file (5)**
7:21;11:25;12:5,8;

212:16
**filed (2)**
24:12;150:12
**film (4)**
133:13;201:21;
203:13,16
**filming (8)**
29:5;117:3;133:11;
138:25;139:9,23;
140:6;203:13
**final (6)**
16:22;62:7;194:6;
208:4;228:24;229:4
**finally (3)**
42:13;60:6;224:19
**financial (1)**
45:21
**find (22)**
34:3,4;52:8;59:4;
66:19;67:2;68:4;82:6;
94:3;98:7;136:19;
156:16;159:1;165:8;
172:12;191:7;215:4,
5;216:1;218:4;219:4;
220:11
**finding (2)**
150:9;215:14
**fine (7)**
9:15,17;35:6;99:21;
138:14;148:25;
191:20
**finish (1)**
208:21
**finished (4)**
25:23;46:8;161:3;
207:21
**first (39)**
13:9;18:4;24:15,16,
17;34:17;48:2;52:21;
57:25;59:9;69:11;
72:18,20;76:8;81:5;
84:9,20;85:11;
123:12;128:14;
129:19;133:2;140:13;
143:9;148:10,14;
167:5,5;185:11;
190:16,17;197:9;
201:20;206:12;208:6;
213:2;223:4;224:1;
225:12
**fist (1)**
114:3
**fit (1)**
152:9
**five (15)**
4:6;66:13;67:2;
72:7;105:22;147:14;
157:4;159:19,21;
167:15;168:24;
177:17;178:25;
223:23;228:20
**flashing (5)**
171:16,16,19;

172:11;201:19
**flashlight (1)**
175:18
**flesh (4)**
16:12;31:11;
223:11,16
**flickering (2)**
200:15,24
**flicking (1)**
200:14
**flies (1)**
68:8
**flips (1)**
205:1
**floor (7)**
152:20;191:18;
197:19,24;198:3,7;
222:9
**flower (2)**
205:5,5
**focus (1)**
213:14
**focused (2)**
65:17;203:15,16
**folder (2)**
173:7,10
**Folks (1)**
39:1
**follow (9)**
53:21;62:23;64:8;
75:13;148:16,16,17;
187:15;215:11
**followed (3)**
96:6,16;198:6
**following (7)**
56:17;59:8;76:13;
82:3;85:22;96:13;
172:2
**foot (2)**
97:12;213:12
**footage (9)**
133:13,14,18;
134:2,2,3,4,5;147:23
**force (7)**
8:12;55:11;57:16;
65:21;131:4;226:25;
227:2
**foreign (1)**
217:7
**forever (1)**
81:8
**forgery (3)**
5:17;6:6,7
**forget (1)**
164:9
**forgot (4)**
109:2;174:17;
177:23;186:2
**form (2)**
98:19;189:16
**formal (1)**
58:19
**formally (1)**

58:22

**formed (1)**
  41:25

**forth (4)**
  124:13;126:20;
  215:12;226:18

**forum (2)**
  13:8,8

**forward (6)**
  7:19;8:3,10,23;
  23:12;172:4

**found (39)**
  66:10,14;69:5;82:8,
  9,17,20;93:9,11,14,
  17;94:3,7,8;106:2;
  107:22;127:14;128:2;
  137:10;144:25;
  156:19;167:20;
  177:24;178:1,2,6;
  195:4,23,23,25;196:5;
  198:21;199:18;
  204:24;220:18;
  221:16,16,19,23

**four (15)**
  11:5;81:9;105:22;
  121:1;128:19;129:2,
  3;157:4;167:15;
  177:17;205:7,7,7;
  206:24;226:23

**Fourteen (2)**
  206:24;207:1

**fourth (2)**
  34:10;66:23

**frame (2)**
  96:10;105:21

**free (16)**
  11:23;12:10,16;
  30:23;112:2;192:16;
  203:3;209:18;213:18;
  218:19;219:1,1,3;
  220:10;222:2;229:12

**freezing (2)**
  118:12,13

**friends (2)**
  49:18;229:9

**front (34)**
  7:3,9;15:6;31:1,7,
  13;65:8;79:21;80:1;
  82:15;100:21,21,21,
  23;122:18;124:18;
  134:5;136:20;138:21;
  143:1,4;152:5,6;
  153:11;157:11;174:4;
  187:3;191:5;193:14;
  195:14;224:2;226:9,
  12;227:6

**frustrated (1)**
  161:15

**full (4)**
  150:2;152:5;182:8;
  223:9

**full-blown (1)**
  176:19

**Full-body (1)**
  100:5

**fullest (1)**
  162:1

**fun (1)**
  68:11

**function (2)**
  60:14,18

**funny (1)**
  142:13

**further (27)**
  10:11;26:11,15;
  77:13;85:12,13;86:4;
  117:6,7,8,9;128:5;
  145:6;146:12;156:22;
  157:20,25;159:8;
  178:17;180:16,18;
  184:14,15,16,19;
  202:10;212:20

## G

**gap (1)**
  102:8

**garden (1)**
  205:4

**gardening (1)**
  205:3

**garment (1)**
  57:23

**gave (5)**
  35:10;88:10;
  134:20;154:24;220:4

**General (10)**
  55:6;58:9,10;85:13;
  88:3;91:15;219:7,7;
  220:7,8

**gentleman (9)**
  77:4;78:10;122:19;
  123:4;125:20;134:5;
  163:9,12,14

**gentlemen (17)**
  39:10,15;40:15,18;
  41:10;43:10;63:15;
  117:13;119:18;
  152:25;159:18;
  166:15;190:1,20;
  212:23;213:9;228:23

**gestures (2)**
  77:13,15

**gets (1)**
  98:25

**girl (1)**
  172:7

**given (5)**
  9:24;34:23;48:24;
  49:12;158:14

**gives (1)**
  199:9

**giving (4)**
  42:23;98:14;185:8;
  204:8

**glass (1)**

193:19

**glasses (1)**
  94:18

**glimpse (1)**
  6:5

**Global (1)**
  64:2

**goes (10)**
  38:9;52:21;63:6;
  98:25,25;189:12;
  193:8;202:3;203:14;
  224:9

**golf (1)**
  228:14

**Good (37)**
  5:3,4;10:15,16;
  26:7;34:4;39:10;
  40:15;41:10;42:19,
  24;43:15,16;44:9,25;
  45:1;47:9,21;50:11,
  12;51:1;86:25;
  128:12,23;132:20;
  148:17;149:2;155:19;
  160:18,19;167:1,1,3,
  4,4;191:8;216:10

**good-looking (1)**
  210:4

**Google (1)**
  191:16

**government (5)**
  188:3;191:11;
  214:4,5;220:6

**grab (3)**
  7:24;53:20;100:9

**grabbed (5)**
  81:11;111:21,22;
  172:8;173:9

**grabs (1)**
  84:19

**Granted (2)**
  67:24;198:8

**grants (1)**
  217:6

**gravity (1)**
  22:11

**gray (1)**
  63:23

**great (1)**
  76:10

**green (2)**
  64:3;95:6

**greet (1)**
  40:7

**Griffin (20)**
  41:1,3;65:24;81:5,
  7,10,18;119:9;120:8,
  12,17,19,20;128:10;
  145:15;163:16;
  164:15,20;165:12;
  226:18

**G-R-I-F-F-I-N (1)**
  120:19

**Griffin's (2)**

147:10;163:20

**ground (10)**
  65:19;125:3,5;
  126:13;127:2,7;
  140:5;153:6;157:15;
  205:1

**grounds (1)**
  22:10

**grow (1)**
  205:4

**growing (1)**
  198:21

**guess (5)**
  49:24;123:22;
  134:15;142:14;
  143:21;170:5;176:1,
  4;193:4,5;195:1,18;
  202:6;203:24;205:18;
  222:9

**guessing (3)**
  169:21;170:5,21

**guest (5)**
  101:13;109:13;
  201:21;204:21,22

**guilt (2)**
  58:19,21

**guilty (18)**
  4:21,22;39:21;40:3;
  42:6,9;58:3,5,5,24;
  59:1,5,24;67:2;68:13;
  69:5;195:21;228:20

**gun (10)**
  110:10;200:10,12;
  201:13;203:9,11;
  210:11,15;211:1;
  222:11

**guns (1)**
  210:22

**guy (19)**
  24:9;139:9;149:20,
  23;150:4;155:17;
  167:8;198:25;200:12;
  201:1,6,19;203:20;
  210:4;215:3;220:14,
  21,22;223:8

**guys (29)**
  16:8,8;40:6;67:9;
  68:16;89:15;91:24;
  94:19;105:5;116:6;
  134:24;136:19;
  142:14;153:13;
  155:23;165:6;176:22;
  187:2;188:8,15;
  190:21,22,24;215:2;
  216:18,19;218:22;
  221:1;223:8

**guy's (3)**
  115:12;132:1;
  149:22

## H

**ha (1)**

175:24

**hailing (1)**
  141:16

**hair (1)**
  162:21

**half (6)**
  29:21;121:5;129:2,
  3;205:7,8

**Halloween (1)**
  197:25

**hallway (1)**
  163:5

**hand (53)**
  39:12;41:14,14;
  54:6;63:3,5;65:15,18;
  80:15;97:15,22;
  101:19;108:12,16,19,
  19,20;109:10;110:4,
  19;111:1,5,8,24;
  112:10;113:10,14,20,
  22,23,25;114:2,3,4,5,
  9,15,25;132:24;
  139:19;176:15,18,20,
  20;226:20;227:11

**handcuff (2)**
  81:18;172:13;
  173:19

**Handcuffed (2)**
  134:13,14

**handcuffing (2)**
  85:22;126:14

**handcuffs (13)**
  81:16;116:15;
  125:3,7,9;126:19,25;
  127:2,7;137:25;
  152:21;173:11;
  180:11

**handed (3)**
  35:19;158:17;
  221:19

**handful (1)**
  157:5

**handing (5)**
  72:12;83:18;85:2;
  128:1;209:23

**handle (9)**
  109:24,25;110:1,
  15;115:5,6,7;201:5,6

**handling (1)**
  109:15

**hands (8)**
  97:24;112:2;
  115:20;116:14,18,20,
  22;176:21

**handsome (2)**
  210:2,3

**handwriting (2)**
  94:9;129:12

**handwritten (1)**
  94:10

**hang (1)**

175:11
**Hannaford's (2)**
192:14;214:9
**happen (3)**
117:17;143:14;
227:12
**happened (20)**
78:23;80:12;85:23;
102:12;123:19;125:6;
153:7;161:7,18,20;
178:2;196:15,23;
197:9,11;198:18;
203:6;207:24;208:1;
227:9
**happening (3)**
176:22;218:12;
227:15
**happens (3)**
135:19;142:11;
190:10
**happiness (1)**
191:24
**happy (1)**
11:8
**hard (3)**
122:18;134:20;
189:13
**harder (1)**
213:13
**Hardware (4)**
184:2;194:2;
195:17;220:24
**harm (1)**
126:16
**hate (1)**
112:21
**He's (1)**
203:15
**head (5)**
7:8;8:7,25;29:20;
220:25
**headed (2)**
71:15;172:19
**heading (3)**
72:21;73:1,1
**hear (29)**
10:23,24;45:4;
46:16;48:19;54:1;
56:8;63:2,24;64:7;
65:2,24;78:2;143:14;
151:1,2,4;161:24;
163:22;171:19,20;
177:8,9,10,11;198:20;
199:1;204:5;228:18
**heard (36)**
17:1;27:15;34:6;
41:24;43:7,17;44:10,
11;45:2,4;47:10,11,
22,23;50:13;51:2;
58:16;103:17;147:6;
151:10,12;152:24;
153:2;163:18;164:3;
198:19;207:16;

223:22;224:4,8;
225:2,23;226:7,17;
227:21;228:16
**hearing (7)**
28:6,7,12;52:11,12,
14;53:4
**hearken (2)**
54:8;58:7
**hearsay (15)**
14:6;19:17;21:5,6;
28:3,10,14,22;29:1,2,
8;36:8,9;206:12;
223:4
**held (4)**
6:20;10:11;26:11;
217:16
**hell (1)**
191:21
**Hello (2)**
40:7;67:9
**help (11)**
11:20;46:3;98:22,
23;101:24;115:3,24;
179:6,7;198:24;
213:15
**helped (2)**
81:17;191:10
**helpful (2)**
46:15;56:6
**here's (1)**
27:13
**herself (1)**
161:23
**Hey (3)**
146:18;221:1,22
**Hi (2)**
40:7;190:20
**hide (2)**
77:17;100:9
**hiding (2)**
100:20;167:18
**high (1)**
103:14
**highways (1)**
191:25
**Hillary (1)**
67:25
**himself (9)**
58:3;79:13;126:7;
139:6,7;167:16,19;
190:5;225:20
**hired (1)**
181:16
**Hispanic (1)**
202:17
**historical (4)**
84:5,7,10,10
**history (7)**
15:19,20;49:12;
85:3;150:9;188:23;
225:16
**hit (5)**
80:24;108:19;

203:18,19;224:23
**hits (2)**
201:10;224:10
**hitting (1)**
72:7
**hold (15)**
5:22;8:18;10:4;
13:7;27:10;67:19;
94:9;101:6;130:10;
162:13,13;164:2,2;
208:3;216:9
**holding (3)**
124:14,17;217:15
**home (11)**
68:8;122:22;183:1;
184:3;194:3;195:17;
199:7;200:5,6;
213:18;229:8
**honest (1)**
14:19
**Honor (87)**
4:6;5:4,7,15;7:21;
8:5;9:21;10:15;11:1,
2,15;15:13,18;16:22;
17:12,24;19:4;21:14;
22:24;23:23;24:11;
29:18;30:2,2;32:7,24;
34:6;35:7;37:5,10;
45:15;53:12,14;56:5,
11;63:13;69:12,20;
72:9;73:12,20;77:6;
82:23;83:14;84:14,
24;85:17;86:4;95:3;
101:3;103:17;112:15;
117:9;118:2;120:7,
14;125:21;127:21;
128:5;130:7;135:5;
138:1;145:6,9;147:1,
6;150:16;156:22;
159:8;162:4,15;
166:20;168:3;171:2;
184:16;185:22;
187:23;191:8;196:1;
197:2;206:11;208:20;
209:14,19;212:20;
219:18;223:18
**honorable (1)**
214:17
**hoping (1)**
185:2
**hopped (2)**
113:10;173:10
**hot (2)**
118:12,13
**hour (2)**
29:21;63:21
**house (26)**
32:4;79:20;82:2;
92:10;108:5,5;
122:24,24;123:2,23;
126:21,22;150:22,23,
24;153:11;192:13;
200:1,4,18,20,22,23;

205:3;209:7;214:13
**houses (3)**
66:5;75:18,21
**huddled (1)**
165:13
**huge (1)**
190:25
**Huh (3)**
209:25;219:21;
230:11
**human (2)**
16:12;202:9
**hundred (2)**
64:12,16
**hundreds (1)**
198:5
**hurts (1)**
188:7
**husband (1)**
46:1

**I**

**I'm (1)**
205:6
**ID (2)**
8:2;84:10
**idea (5)**
93:1,3,4,7;101:19
**identification (2)**
16:23;17:10
**identified (2)**
125:22;162:19
**identify (5)**
11:20;77:3,7;79:13;
125:19
**identity (1)**
15:22
**image (5)**
11:16,16;83:21;
209:24;210:1
**images (2)**
72:24;73:6
**immediately (3)**
59:13;79:22;92:11
**impartial (18)**
42:14;43:22;44:13;
45:12;47:13;48:1,14,
18,25;49:5,12;50:17;
51:5,13;52:9,14;
62:18,20
**impede (2)**
124:9;200:20
**impeded (5)**
124:6;133:10;
134:10;139:4,20
**impeding (1)**
139:9
**important (1)**
60:20
**imposed (1)**
7:3
**improper (2)**

199:8,10
**inbound (2)**
75:8;96:18
**inches (1)**
228:7
**incidence (1)**
124:12
**Incident (3)**
125:11;132:12,13;
133:11
**include (1)**
61:8
**including (5)**
24:25;34:15;63:2;
117:17;224:12
**incoherent (1)**
218:21
**income (1)**
46:3
**inconsistencies (2)**
195:4;221:23
**inconsistent (1)**
221:16
**in-court (1)**
16:23
**indeed (1)**
66:19
**India (9)**
35:21;41:5;148:12,
14,15,16,20;206:19,
19
**indicated (1)**
56:16
**indiscernible (22)**
51:21;53:3,4;89:23;
91:5;95:17;104:8,11,
12,13,14,16,18;
130:15;135:13;
137:25;146:16;
154:23,24;169:9,13;
204:12
**individual (20)**
25:21;32:25;99:6,
18,19,19,22;123:10,
21,24;124:14,22;
133:10;135:3,4;
138:25;139:16,20;
153:2;160:9
**individually (1)**
43:6
**individuals (16)**
66:7;76:24;106:1;
110:12;122:23;
123:11,14;124:11;
126:19,24;127:1,4;
140:23;199:4;202:6;
226:8
**individual's (2)**
123:25;160:10
**inference (1)**
58:21
**inferior (2)**
216:7,9

**information (11)**
  8:2;11:17;13:14;
  15:21;23:17;84:5,7,
  11;145:17;204:9;
  225:13
**informed (1)**
  113:5
**infraction (3)**
  191:20;198:11;
  207:2
**infractions (1)**
  8:22
**inherent (2)**
  192:10,15
**initial (1)**
  201:20
**injury (4)**
  55:13;57:18;
  217:25;227:1
**innocence (2)**
  59:3,25
**innocent (2)**
  42:6;58:24
**innocuous (1)**
  165:9
**inside (13)**
  76:24;77:13;101:7,
  8;113:15;122:20;
  127:14;156:3;200:2,
  2,2,21;226:9
**instance (1)**
  193:10
**instant (1)**
  151:13
**instead (4)**
  64:3,9;65:4,17
**instruct (2)**
  60:7,15
**instructed (1)**
  160:23
**instruction (2)**
  11:8,11
**instructions (6)**
  58:13;62:7;119:19;
  228:17,24;229:5
**instrument (2)**
  6:1,2
**intellectually (1)**
  202:9
**intelligent (1)**
  222:21
**intend (1)**
  35:23
**intending (1)**
  19:17
**intends (1)**
  34:19
**intent (1)**
  220:13
**interaction (7)**
  65:11;78:16;81:24;
  83:3,7;105:23;126:2
**interest (2)**

**41:21;218:8**
**international (4)**
  191:11,16;215:1,3
**internationally (2)**
  191:13,15
**interrupt (1)**
  55:18
**intersection (5)**
  75:4;170:21;
  171:15,19;179:19
**interspersing (1)**
  194:6
**into (48)**
  61:10;64:10,12,13;
  68:7;74:18;75:16;
  76:6,9,19;79:20;
  82:14;90:20;96:8;
  97:7;107:9,9,13,13,
  20;108:5;117:18;
  123:1;124:25;125:3;
  126:7;137:24;138:23;
  143:15,15,16;153:8;
  156:11;159:20;163:5;
  171:23;172:21;
  174:23;187:18;
  188:11;196:3;206:12;
  208:4;222:18;224:23,
  24;225:13;229:20
**introduce (9)**
  25:3;31:23;32:25;
  35:8;40:2,14;58:9,16;
  59:19
**introduced (1)**
  162:25
**introducing (1)**
  32:25
**investigation (1)**
  62:13
**investigator (1)**
  62:18
**invitees (2)**
  55:1;57:5
**involve (2)**
  212:5,6
**involved (1)**
  122:4
**involves (1)**
  21:20
**involving (1)**
  212:8
**IQ (1)**
  202:12
**issue (12)**
  26:17;52:2;58:4;
  62:22;90:18,19,21,22;
  91:7;164:4;169:13;
  175:15
**issued (9)**
  32:20,21;54:12;
  131:4;163:16;164:5,
  5;219:11,13
**issues (2)**
  62:24;104:11

**issuing (1)**
  124:15
**it's (1)**
  66:11

---

**J**

---

**jab (1)**
  201:20
**Jabber (1)**
  31:2
**Jabey (1)**
  31:2
**Jabir (26)**
  9:15;12:10;14:9;
  31:3,4,13,24;32:15;
  33:1,2,3;39:16;40:6;
  54:11;67:10;150:7;
  158:12;167:13,17;
  170:20;172:13;
  180:22;187:5;220:3;
  223:6,7
**Jabir's (1)**
  171:25
**Janice (1)**
  58:1
**January (36)**
  12:14,20;21:20;
  54:12,13,16,23;55:4,
  7,15;56:18;57:2,8,11,
  20;58:1;63:18;66:11;
  70:14;121:12;143:19,
  20,20,21,22,23;144:2,
  3,4;157:10;170:15;
  179:9;211:6;223:25;
  228:8,9
**January's (1)**
  143:22
**jaws (1)**
  191:18
**job (4)**
  67:24;135:18,19;
  213:14
**jobs (3)**
  158:13,16;182:5
**John (1)**
  38:22
**joke (1)**
  167:17
**journey (1)**
  172:4
**Judge (22)**
  4:8;7:3,9;9:4,5;
  17:13,16;18:16;
  24:17;38:21,22;
  39:11,23;53:3;55:21;
  111:12;118:24;
  165:20,22;166:1;
  226:21;230:15
**judges (2)**
  60:19;216:8
**judge's (1)**
  228:17

**judgment (1)**
  200:25
**judicial (5)**
  89:13,20;216:5,12,
  13
**judo (1)**
  205:1
**July (5)**
  24:17;34:16,16,18
**jumped (1)**
  12:9
**jumping (1)**
  90:20
**June (2)**
  4:19;34:15
**jurisdiction (4)**
  89:21,22;193:7;
  217:1
**juror (63)**
  41:14,16;43:12,13,
  16,19,23;44:2,5,14,
  18,21;45:1,4,6,9,14,
  18,20,23,25;46:3,6,9,
  12,14,16,20,23;47:1,
  3,5,15,19;48:2,7,9,11,
  15,21,25;49:16,24;
  50:3,9,12,15,19,22,
  24;51:3,7,10,14,17,
  20,22;52:2,10;54:2;
  55:18;56:9;120:4
**jurors (14)**
  37:4;39:6;41:12;
  42:19,21,23;53:20,23;
  60:11;62:9,21;
  100:25;118:3,7
**jury (66)**
  4:7;6:2;7:4;11:7,
  10;13:21;33:21;
  34:10;38:4,9,15;39:4,
  5,11,13,25;40:2,14,
  15,21;41:7;43:10;
  44:3,19;45:11;46:17;
  47:4,18;50:7,23;
  51:18;53:1,15;54:5,7,
  8;58:7,8;63:15;67:9;
  73:20;86:16;87:5,5;
  90:16;117:23,25;
  118:23;119:13,14,21;
  129:17;136:3;159:22,
  24;162:25;166:3,11,
  13;168:25;190:20;
  213:9;229:2,3,14,16
**jury's (2)**
  166:5;169:2
**juvenile (2)**
  51:9,10

---

**K**

---

**Kalieve (2)**
  28:13,13
**karate (1)**
  109:18

**keep (14)**
  30:18;46:25;62:11;
  69:6;89:4;99:19;
  105:5;115:14;154:16;
  166:9;175:1;182:11;
  203:23;204:14
**keeping (2)**
  127:2;213:12
**keeps (2)**
  112:21;186:24
**kept (3)**
  16:1;78:18;82:8
**key (1)**
  15:21
**kids (1)**
  210:21
**killer (1)**
  68:1
**killing (1)**
  199:4
**kind (22)**
  27:11;41:21;68:6;
  101:7;110:20;116:6;
  122:15;124:20;
  139:14;149:21;172:3,
  6;186:2;188:7,7;
  189:13;194:23;
  198:22;202:12;210:5,
  7;229:11
**kinds (1)**
  158:16
**kiss (2)**
  68:9;199:7
**knew (2)**
  172:13,14
**knife (2)**
  106:2;136:15
**knock (5)**
  108:20;112:10,11;
  113:20,22
**knocked (15)**
  110:3,18,23;111:1,
  4,8;113:9,14,24;
  114:2,3,5,9,14,17
**knocking (2)**
  80:16;108:12
**knocks (3)**
  108:16,18,19
**knowing (2)**
  200:24;224:5
**knowingly (3)**
  55:8;57:12;227:14
**knowledge (3)**
  103:13;158:25;
  181:9
**known (10)**
  31:24;32:15;33:1;
  34:17;39:16;54:11;
  157:3;178:22,24;
  191:2
**knows (2)**
  89:12;156:7
**Kyle (10)**

41:1;65:24;94:3,4,
5;119:9;120:8,9,12,19
**K-Y-L-E (1)**
120:19

# L

**lack (5)**
223:20,21,23,24;
225:21
**ladies (17)**
39:10,15;40:15,18;
41:10;43:10;63:15;
117:13;119:18;
152:25;159:18;
166:15;190:1,20;
212:23;213:9;228:23
**lady (4)**
161:5;162:18;
163:11,15
**land (3)**
194:13;213:17;
217:6
**landing (1)**
65:18
**landscaping (2)**
194:21;200:4
**lane (21)**
64:1,3,11,13,13;
71:17,19,24,25;72:1;
75:8;92:1;197:15;
198:3,8,11,12;200:8;
207:3;224:5,6
**lanes (2)**
71:18;72:5
**languages (1)**
40:7
**large (3)**
127:17;138:17;
152:7
**last (25)**
4:9;17:9;22:20;
45:9,10;55:14;69:24;
84:19;120:18;143:19,
20,21,22,22;144:2,3;
149:3;152:23,25;
154:16;183:21;
197:25;225:18;
227:13,16
**lasted (1)**
105:22
**Lastly (1)**
57:19
**later (6)**
20:12;59:13;92:2;
100:25;196:22;218:8
**latitude (1)**
185:8
**laugh (1)**
205:18
**laughed (1)**
205:19
**laughing (1)**

175:24
**Lauren (3)**
34:17;160:13,14
**law (59)**
8:11;28:2;36:6;
42:15;45:13,19;55:5;
56:25;57:9;58:13,25;
59:2,24;60:8,14,16,
17;62:14;63:17;
85:13;87:6,7,8,10,10,
10,11,13,15,25;88:2,
4;89:13;91:13,15;
128:20,22,23,24;
137:4;138:4;167:23,
24;170:7,8;191:7;
199:18;200:2;202:22;
212:1;214:22;218:2;
219:7,8;223:14,16,21;
226:22;228:18
**Lawrence (3)**
219:14,14,15
**laws (12)**
18:14;55:6;88:3;
89:20;90:8,9;187:12,
15;189:3;216:21;
220:8,8
**lawsuit (5)**
211:13,16;212:5,8,
13
**lawyers (1)**
41:18
**lead (1)**
62:9
**leads (1)**
60:22
**leaning (2)**
124:25;138:23
**learn (5)**
62:16;79:14;83:10;
123:25;191:3
**least (5)**
26:6;34:18,24;
166:8;225:4
**leave (8)**
13:10;37:14,19;
39:2;102:8;103:9;
157:23,24
**leaving (2)**
180:2,3
**lectern (1)**
147:14
**leeway (1)**
181:5
**left (30)**
46:12;64:1,2,4;
71:17,18,19,20,24;
72:22,23;75:20;85:8;
92:1;122:25;151:23;
161:6;162:19;163:12;
197:15,16;198:3,8,12;
200:7;207:2;224:5,5,
8,9
**legal (2)**

58:10;218:3
**legalese (2)**
36:7;138:2
**Leon (31)**
4:3;6:23;9:8;10:14;
14:14;16:7,8,12,17;
26:24;31:24;32:14;
33:1;39:16;54:10;
83:10,21;84:11;
111:17,20;118:21;
145:22;150:1,3;
186:24;187:2;190:14;
220:1,14;223:5,8
**Leonitus (21)**
12:10;14:9;31:24;
32:15;33:1;39:16;
40:6;54:11;67:10;
150:5,6;151:10;
152:20;158:11;
167:13,17;180:22;
187:5;220:3;223:6,7
**less (2)**
199:25,25
**let's (1)**
91:10
**letter (8)**
19:1,7;169:17,22,
23,25;170:1;204:7
**letters (3)**
202:16,17,19
**levy (2)**
192:10;218:20
**Lexis (1)**
83:16
**liberty (1)**
25:2
**license (42)**
4:17;6:3;11:16,16;
12:5;66:18;68:15;
69:1;84:10;85:15;
98:3,4,8,13;145:16;
183:11;184:5;189:4,
6,9;190:19;192:10,
16;193:11;195:12;
202:23;208:10;214:1,
4,18;216:15,16,17;
219:3,9;220:2,3,10;
221:25;222:1;225:12,
17
**licensed (4)**
55:4;57:8;219:10,
12
**licensees (2)**
55:1;57:5
**licenses (2)**
192:12;214:8
**lie (3)**
59:18;178:4;217:13
**lies (1)**
61:4
**life (5)**
110:8,11;218:2,8;
222:10

**light (7)**
4:18;64:3;71:3;
151:1;171:19,22,24
**lights (29)**
64:8,17;74:11,16;
76:8,15;91:20;92:7;
108:1,7;151:2,5,6,9,
10;171:16;172:2,5,
11;178:15;199:2,21,
23;200:14,17;201:18,
19;225:3,4
**likely (1)**
146:8
**likes (1)**
67:25
**lim (1)**
11:7
**limine (4)**
11:12;13:22;14:22;
17:23
**limit (1)**
213:3
**line (1)**
91:25
**lines (3)**
74:18,24;224:12
**link (1)**
191:21
**list (2)**
11:3;35:10
**listed (3)**
84:1,3;145:25
**listen (4)**
40:5;41:12;66:14;
228:17
**literally (2)**
205:6;217:9
**little (16)**
71:5;82:11;119:3;
162:18;172:7;173:7,
10;175:18;181:11,15;
191:12,19,20;205:2,5;
216:19
**live (4)**
19:24;157:6,8;
213:17
**lived (2)**
84:9;198:4
**lives (4)**
55:2;57:5;199:14;
224:24
**living (1)**
199:1
**lizard (1)**
214:16
**located (4)**
136:15,16;138:18;
145:2
**lock (1)**
217:14
**locomotion (1)**
192:17
**Logistically (1)**

15:13
**logistics (1)**
118:2
**long (39)**
15:5,8;28:23;29:20;
33:23;66:11;70:5;
81:6;87:11,12,25;
92:9;105:20,21;
106:5,8,13,19,23;
107:9,10,11;120:24;
121:4;128:17;129:1;
134:11;147:14;157:3;
167:14;178:22,24;
191:9;198:4;208:24;
218:5;226:2;228:7,7
**look (39)**
10:7,20,24;61:17;
66:6;67:24;68:9;
72:13,15;83:19;89:4;
90:1;95:23,24;96:20;
98:6;129:11;132:7;
138:4;151:23;155:19;
168:6;173:21,24;
174:4;191:16,17;
195:2;197:3;201:23,
24;210:4,5,7;214:19,
22;222:13,13;228:18
**looked (2)**
77:16;79:19
**looking (22)**
24:1;82:1;122:24;
131:17;142:5,24;
143:2,4;147:22,22;
152:2,4,5;156:3;
172:4;175:16,23;
193:17;197:14;202:1;
215:23;218:7
**lose (1)**
62:19
**lot (10)**
49:17;92:9;124:13;
151:15;174:23;176:7,
8,9;188:4;205:3
**loud (1)**
102:7
**love (2)**
200:4;213:10
**Lowell (34)**
4:19;36:4,5;39:17;
40:22;41:1,5,8;54:10,
12,14,14;57:25;63:19,
22,24;70:4,6;71:1;
79:5;84:11;103:13;
116:24;120:23,24;
121:10;128:16,17,17;
129:4;132:15;219:15;
227:7;229:10
**Lowe's (4)**
183:1,3,4;220:25
**lunch (3)**
117:14,19;119:20
**lying (2)**
221:20,21

## M

**Ma'am (23)**
41:6;43:15,24;44:9,
15,20,23,25;47:21;
49:10,11;50:4,8,20;
54:1;56:8,9;119:24;
148:17;149:4;157:21;
158:5;159:17
**machete (60)**
54:21;56:24;66:11,
24;82:8,9,13,15;83:5;
93:9,11,14;105:15;
107:22;127:17,19;
128:2,12;137:10;
138:17;144:25;
156:16,18,19;157:17;
158:25;159:5,13;
165:2;176:15,17,18,
20,21;177:21,24;
178:1,2,6;180:13;
183:11;193:25;194:7,
10,22;196:6;207:4;
211:11;220:23;
221:10,10,10;227:20,
22,23,25;228:3,7,9,14
**machetes (4)**
159:1;182:11,21;
184:2
**machete's (1)**
202:23
**Madame (1)**
39:8
**mailed (1)**
66:21
**mailing (1)**
15:25
**makes (5)**
37:10;59:11;61:17;
213:12,13
**making (10)**
17:18,21;77:13;
122:18;123:16;139:5;
171:25;207:6;218:17;
220:9
**MALE (1)**
164:23
**Mammoth (43)**
63:22;64:2,10;
66:22;68:3;70:19,25;
71:15,21;72:21,25;
73:1,4,7,10;74:19,21;
75:1,3,10,11,22;
92:25;93:5;96:16,25;
170:21;171:15;
174:13,20;179:11,13,
17,18,18,20,25;180:2;
200:17;224:4,15,16,
18
**man (11)**
30:22;31:6,6;32:1,
2;67:10;111:15;

180:23,23;201:5;
222:21
**managed (3)**
6:5;132:22;138:24
**manner (1)**
58:19
**Manny (1)**
64:25
**many (21)**
7:15;29:17;34:24;
42:24;48:4;74:23;
76:23;140:8,20,22,23;
151:16,18;152:4;
158:14,17;172:25;
194:25;224:8;227:21;
228:12
**Maritime (1)**
216:25
**mark (1)**
15:14
**marked (10)**
64:17;70:20;73:19;
83:1;84:17;85:20;
121:19;128:1;145:16;
209:23
**martial (1)**
204:11
**Mass (6)**
73:2;84:11;88:3;
91:15;219:7,7
**Massachusetts (26)**
14:1;18:15;36:3;
39:17;41:5,8;54:10;
63:19,22;66:20,22;
70:12;74:21;83:20;
84:3;85:16;89:20;
90:6,8,10;218:24;
220:8;225:10,11,18,
19
**massacred (1)**
207:1
**match (3)**
83:22;116:2,4
**matter (24)**
4:7,9,9,16;5:6,8,8,
11,20,23;6:17,19;7:3;
10:5,6,11;28:7,12,16;
61:11;134:15;187:19;
207:10;229:22
**matters (14)**
4:6;6:20,21;9:6,12,
20;10:12;26:22;
158:7;229:19,20,21;
230:2,4
**Matter's (1)**
26:11
**may (57)**
4:12;12:4,21;13:11;
21:14;34:6;39:7;
41:15;43:1;53:24;
59:12,13,13,21;60:14;
61:2,14,15,25;62:4,5,
12,13,15;72:9,10;

73:20;77:6;83:14,15,
16;84:24,25;117:11;
125:21;126:23;
127:21,22;129:8,9;
133:3;145:9;146:13;
147:6;148:21;157:21;
163:24;166:21;168:3,
4;170:22,23;184:18;
190:2;191:9;212:22;
216:8
**maybe (8)**
140:14;141:2;
147:13;151:19;
152:13;157:4;194:14;
213:4
**McAvinnue (3)**
73:5;75:19,20
**McCue (12)**
29:9;34:17,23;35:2;
160:13,14;161:6,10;
162:7,7,19;163:11
**McCue's (1)**
29:3
**McDonald's (1)**
174:16
**mean (30)**
12:23;13:12;27:14;
30:2,20;49:2,14;
67:14;77:24;90:2;
105:24,24;110:2;
111:2;112:12;115:6;
116:7;126:18;138:2,
10;164:1;167:8;
179:1;192:19;194:4;
199:13;202:6;220:23;
227:25;228:1
**meaning (5)**
105:25;165:9;
215:15,16;216:14
**means (4)**
55:12;57:17;
192:17;217:9
**media (1)**
199:3
**members (9)**
39:11;53:16;54:5,8,
25;57:4;58:7,8;
181:16
**memory (1)**
197:14
**men (1)**
201:3
**mental (2)**
90:16,18
**mentally (1)**
132:11
**mention (1)**
142:13
**mentioned (2)**
88:17;200:11
**merely (1)**
58:19
**meters (1)**

199:25
**middle (14)**
85:5;100:4,21,23;
136:19,19,20,24;
200:17;204:20,22;
221:9,12,16
**might (16)**
22:8,16;25:23;
46:21;53:5;55:2;57:6;
60:4;61:21;88:25;
98:5,15;109:11;
126:15;147:13;185:1
**mile (3)**
76:12,12;224:20
**milk (2)**
165:16;192:14
**million (4)**
211:16,21;22:17,
18
**mind (6)**
34:25;62:11;99:5;
192:13;205:10;215:5
**mine (1)**
183:3
**mine's (1)**
22:13
**ministers (1)**
216:23
**minor (1)**
128:24
**mints (1)**
205:4
**minutes (16)**
26:6;33:25;81:9;
105:23;106:4,15,20;
107:14;147:14,22;
159:19,21;213:3;
219:23;221:13;
228:24
**miracle (1)**
118:16
**mirrors (1)**
172:5
**misinformed (1)**
5:24
**miss (1)**
102:1
**missed (2)**
98:5;185:2
**mistake (1)**
146:8
**Mom (3)**
153:23,25;154:1
**moment (2)**
65:20;80:17
**moments (3)**
134:15,16,22
**money (6)**
211:23;212:1,2,9,
13,14
**month (1)**
146:10
**Moorish (2)**

175:24;205:19
**more (19)**
7:17;42:24;52:5;
58:6,12;62:1;64:16;
77:15;119:3;136:12;
140:14,24;141:1,2;
161:22;165:18,18;
213:14;217:3
**morning (28)**
4:10;5:3,4;10:15,
16;29:24;38:9;39:10;
40:15;41:10;43:15,
16;44:9,25;45:1;47:9,
21;50:11,12;51:1;
205:24;229:1,4,13,17;
230:9,10,12
**most (1)**
81:20
**mostly (1)**
181:11
**mother-in- (1)**
200:1
**mother-in-law (7)**
20:2,4;201:17;
205:9;206:4,4;221:17
**mothers (1)**
191:8
**motion (14)**
11:12,15;12:17,25;
13:22;14:22;15:18;
16:21,22,23;17:1,9,
10;35:5
**motions (8)**
9:22;10:7,20;11:5,
7;13:20;17:23;78:17
**motor (52)**
8:12,15,16,22;
11:13;16:18;39:18,
19;54:22,23;55:3,5,
15;57:1,2,7,9,20;
66:16,17;71:24;
74:12,19;75:6,15;
76:21,21;77:11;
78:15;79:6,9;83:21,
24;85:6,15;86:1;
91:16;96:18;97:17;
104:15;109:6;122:1;
129:23;130:2;141:2,
8,12;142:9;143:9,12;
220:6;225:21
**mouth (2)**
68:8;174:6
**move (7)**
80:13;82:23;96:18;
150:18,19;152:23;
193:24
**moved (4)**
100:7,8;127:16;
133:13
**movement (2)**
179:3;181:16
**moving (4)**
5:12;8:23;13:3;

23:11

**much (14)**
26:4;71:25;80:3;
100:5;115:13;152:9,
10;190:22;196:14;
213:16;218:24;222:1;
223:15;228:21

**multiple (4)**
122:8;141:15;
164:23,24

**multitenant (1)**
79:19

**Municipal (4)**
121:10;213:23;
216:15,18

**municipals (1)**
216:7

**murdering (1)**
217:25

**must (12)**
58:20;59:4;60:10,
11;61:4,7;62:8;87:10;
88:2;134:25;135:1;
187:8

**myself (10)**
12:6;41:15;123:4;
126:11;136:25;141:1;
169:2;172:3;186:13;
187:19

## N

**name (58)**
9:13;11:23;12:10;
16:10;30:23;32:2;
37:20;38:20,22;
40:16,20;67:10;
69:23,24;79:14;83:8;
84:10;86:20,21,22,25;
91:21;94:13;120:17,
18;123:25;133:7;
148:14;149:4,22,23,
24;150:2,4,5,8,11;
160:10,12,20;164:9;
173:12;177:17,23;
186:22;187:6;188:12;
193:12;194:14;
209:18;219:2,3;
220:10;222:2;223:10;
225:9,9,21

**named (1)**
111:9

**names (4)**
35:10,20;83:12;
211:20

**narrative (4)**
175:3;187:18;
189:19;207:21

**Nasciemento (7)**
35:21;41:5;148:12,
20;149:1;157:3;
158:11

**N-A-S-C-I-M-E-N-T-O (1)**

149:5

**nation (4)**
169:24;188:18,24;
202:21

**national (10)**
11:23;12:10;30:23;
203:3;209:18;219:1,
2,3;220:10;222:2

**nationality (12)**
150:14;167:20,23,
24;168:19;169:24;
170:6;202:15;205:19;
220:16;223:10,14

**nations (1)**
217:19

**nature (4)**
11:20;24:4;135:23;
195:17

**near (2)**
66:9;138:18

**necessary (5)**
62:3;63:17;68:6;
181:13;201:14

**need (34)**
4:22,24;6:13;7:1;
25:20;26:4;35:8;53:5;
74:4;86:12;90:25;
91:1;95:20,21;
104:23;137:7;156:11,
12;173:19;184:5,6,7;
187:8;191:7;193:5;
201:14;213:25;214:8,
10;216:17;218:13;
220:23;221:1;228:9

**needed (2)**
165:8;183:11

**Needham (1)**
70:12

**negatively (1)**
61:17

**neglect (2)**
55:16;57:21

**negligent (8)**
8:15;39:18;54:22;
57:1;224:1,2,10;
227:18

**negligently (3)**
55:1;57:5;66:16

**neighborhood (1)**
199:1

**neighbors (1)**
200:3

**neither (1)**
18:20

**nervous (1)**
200:11

**neutral (3)**
17:16,17;32:17

**new (3)**
4:21;119:6;140:19

**next (30)**
14:22;40:24;53:19;
59:19;65:10;68:10;

73:25;74:10;76:20;
78:23;80:12,19;
81:15;85:23;103:7;
109:10;119:7;123:15;
125:1,6;126:14;
137:3;159:25;166:16;
174:16;205:24;
213:13;226:12;
227:12,24

**night (19)**
92:24;93:6,6;
128:14;132:24;140:9;
143:14,16,17;144:8,
12,13;149:9;150:21;
152:15;167:4;170:14;
176:6,10

**nine (5)**
7:19;129:6,7;
130:11;131:4

**Nobody (1)**
93:8

**nodding (1)**
119:22

**nolle (3)**
7:22,24;8:19

**nomenclature (1)**
142:12

**none (5)**
38:7;158:21;
191:14;219:15;221:8

**nonresidents (1)**
91:16

**non-testimonial (2)**
11:19;15:24

**Nope (2)**
24:20;211:8

**nor (1)**
18:20

**normal (1)**
71:5

**notarized (1)**
19:1

**notary (1)**
19:12

**note (10)**
16:20;17:3;36:14,
16,19;38:12,16;62:4;
184:7;221:15

**noted (2)**
22:12,14

**notes (5)**
12:7;184:6,9,10;
186:21

**notice (2)**
89:13,20

**noticed (1)**
124:8

**noting (1)**
35:20

**November (1)**
146:3

**number (82)**
40:18;41:14,16;

43:12,16,19,23,24;
44:2,2,5,7,14,16,18,
18,21;45:1,4,6,9,14,
20,23,25;46:3,6,9,12,
14,16,20,23,25;47:1,
3,3,5,15,16,18,19;
48:2,7,9,11,15,21;
49:16,24;50:3,5,7,9,
12,15,19,20,22,22,24;
51:3,7,10,14,15,17,17,
20,22;52:11;54:2,9;
55:19;56:9;82:25;
120:4;149:16;156:3;
172:11;188:1;216:4

**numbers (2)**
42:22;43:11

**numerous (4)**
75:4,18,24;85:24

## O

**oath (15)**
25:1;61:13;62:21,
23;177:12;192:3,3,4,
5,6;215:7,13;217:12;
221:21,22

**object (11)**
16:5;22:10;30:3;
31:25;38:14;42:21;
61:14;82:23;93:17;
108:20;189:12

**objecting (3)**
38:12,14;103:23

**Objection (55)**
4:22;11:22;16:20;
17:2,3;22:12,14;
34:13;36:14,19,24;
37:1;38:8,12,16;49:1,
3;61:18,19,24;62:2;
73:14,15,16;103:2,6,
10,15;112:15;130:7;
150:16,19;152:23;
154:2,12;159:2;
168:21;174:22;
180:25;181:4,18;
182:13,22;183:13,14,
19;192:25;193:16;
196:1;198:15;199:5;
202:24;206:6,11;
225:25

**objections (1)**
103:19

**objection's (1)**
22:15

**obliged (1)**
59:22

**observe (11)**
71:21;74:15,23;
76:23;78:17;123:11;
124:22;125:11,14;
126:1;127:19

**observed (4)**
29:4;64:14;76:19;

123:6

**obtain (1)**
12:7

**obtained (3)**
12:4;194:7,10

**obvious (1)**
225:5

**Obviously (2)**
110:3;111:6

**occasion (2)**
78:4;121:22

**occupant (2)**
79:11;226:11

**occupants (1)**
76:23

**o'clock (6)**
63:7,8,8;117:22;
118:1;228:23

**O'Donnell (6)**
71:14,18;72:20;
75:4;91:22,23

**off (24)**
29:11,19;64:4;
65:16,17,23;71:24;
72:6;73:24;75:11;
103:9;107:24;131:3;
153:8,12;173:17;
177:7;189:12;191:6;
203:25;205:19,20;
220:12;222:17

**offense (15)**
4:18;12:14,19,21;
13:2;21:11,15,19;
24:14;27:15;32:20;
54:13;66:14;215:16,
18

**offenses (5)**
15:21,25;59:6;
66:25;228:20

**offer (4)**
12:15;23:15;60:3;
73:12

**offered (5)**
28:7,12,15;152:24;
153:1

**office (2)**
216:12;219:14

**officer (192)**
8:21;18:24;21:23;
22:1,2,8,21;23:1;24:5,
13,18;29:4;40:22,23,
24;41:1,3,15;48:3,5,
13;49:22,23;52:5,6;
53:19;55:8,11,13,17;
57:13,16,18,22,24;
62:5;63:24;64:6,7,9,
11,14,15,17,18,19;
65:2,7,7,11,13,14,20,
24;66:1,9,16;69:13,
14,16,23;70:1,4,5,8;
72:12,15;73:24;74:1;
77:6;79:5;81:4,5,6,10,
17;83:18;85:2;87:3,4,

7,12,15,16;88:1;
90:25;91:13;93:14;
102:8;104:11;107:11;
108:23;109:3,7,8;
110:25;112:18;
117:11;120:8,11,17,
19,20,24;121:2,4,6;
122:3,4,7,12,19;
123:5,7,16,17,19,23,
24;124:6,10,11,14,16,
25;125:9,22,25;126:5,
6,12;128:1,22;129:4,
5;138:21;140:13,25;
141:9,10,15;145:15;
146:13,15;147:10;
152:18,18;153:7;
154:22;155:25;
156:15,18;159:20;
162:10,11,17;163:16,
20,23;164:3;176:7;
177:22;178:5,6;
184:22,23;185:25;
210:11;211:13,24,25;
212:3,8;218:20;
221:19;224:8,13,19;
225:2,3,5,23;226:7,
17,18;227:3,6,7;
228:1,8,10;229:3

**officers (17)**
16:24;23:1;66:4,6;
68:5;81:17,23;85:24;
125:7;140:8;141:1;
144:20;153:18;
155:18;176:5;192:2;
207:10

**officers' (1)**
221:15

**officer's (1)**
174:6

**offices (1)**
216:9

**official (2)**
55:9;57:14

**often (1)**
158:11

**Ojai (1)**
48:3

**old (3)**
51:9;91:25;118:11

**once (13)**
37:18;38:15;74:25;
76:19;99:14,14;
115:24,24,24;126:25;
195:25;203:25;
222:17

**oncoming (1)**
74:18

**One (104)**
4:7,9,25;5:9,9,16;
6:5,6,7;7:22;8:19;
11:2;12:2,15;14:13,
22;16:17;19:1,7;21:9,
9;23:1;24:16,17;28:3;

29:12;32:1,7,9;41:17;
43:25;45:9,10;49:2;
52:10,12,23,24;59:14;
78:24;84:19;93:17;
101:21,22;102:7;
107:3,5;109:19,19;
110:10;115:4;116:14;
118:2;119:6;122:4,
13;139:16;140:19;
141:1;142:20;149:11;
154:16,25;155:23;
156:8;159:9,18;
165:3;168:12;173:18;
176:12;177:22,23;
179:3;180:19;183:16;
185:9,18;188:1;
191:2;193:10;194:24;
201:13;202:7,7;
207:10;208:9,21;
211:20,25;213:22;
216:1;217:20;220:4,
20;221:16,16;226:12,
13;227:11,23;228:4,
9;229:24

**ones (3)**
52:15;95:19;177:23

**one's (3)**
4:7,8;191:24

**only (28)**
29:12;32:7;38:2;
49:3;61:12;62:12;
64:3,24;71:20;100:5;
110:10;126:24;136:5;
151:5;158:7;194:3;
198:3,10;210:20;
211:19;218:1,23;
220:17;224:5,6,8,9;
229:8

**onto (15)**
64:15;71:15;73:5;
74:20;75:10,12,19;
92:19;96:10,14,17,19,
25;97:1;171:25

**Oops (1)**
167:6

**open (14)**
13:8;62:11;64:23;
77:20;78:6;98:12;
99:1;114:3;118:10,
18;123:3;175:24;
201:8,12

**opened (14)**
65:3;78:4,5;79:21;
99:11,14,16,16,18,21,
25;100:1;113:21;
201:10

**opening (12)**
59:10,11,12,16;
60:5;63:10,14;67:5,8,
18,19;201:11

**open-mindedness (1)**
52:8

**operate (8)**

54:23;55:5;57:2,9;
85:15;219:10;225:19,
21

**operating (10)**
4:17;8:11;55:15;
57:20;66:16;73:10;
109:5;141:25;189:4;
224:3

**operation (17)**
8:15,16;16:18;
39:18,19;54:22;55:3;
57:1,7;66:17;91:15;
109:5;126:3;224:1,2;
225:8;227:18

**opinion (1)**
31:8

**opinions (1)**
41:25

**opportunity (3)**
10:20;59:10;60:3

**opposite (3)**
64:10;92:19;96:17

**ordain (1)**
216:8

**order (13)**
8:13;11:8;37:7,8,
23;58:20;59:8;65:16,
22;160:24;164:7,18;
226:19

**ordered (1)**
80:13

**ordering (1)**
226:14

**orderly (1)**
60:13

**ordinary (1)**
16:1

**organic (1)**
213:21

**originally (1)**
91:22

**others (4)**
94:24,24;217:17;
227:3

**otherwise (7)**
37:22;40:4;55:4;
57:8;81:23;187:22;
218:22

**out (189)**
13:9;22:17;26:18;
28:14,17;34:4;38:15;
65:6,9,15,15,18;66:2;
67:21;68:4,8;75:5,6;
77:11;79:2,4,9,10,23;
80:4,6,7,16,21;81:12,
12,14;92:6,7,9;96:18;
98:7,22;99:1,3,4,7,8,
9;101:6,15,24;102:9;
105:25;106:12,14;
108:1,12,16,19,20;
109:1,10;110:3,18,23;
111:1,4,8,9,10,19,20,
21,23,25;112:5,8,10,

11;113:9,10,12,14,17,
18,20,22,23,24;114:2,
4,5,9,14,19,25;115:2,
3,12;117:23,25;122:9,
18;123:9;125:5,10;
126:6,7,21,22;127:1;
135:3;139:15,18;
144:15,21;146:22;
147:25;150:9;151:23;
152:2,4,5,14,16,19;
153:13,20;154:10;
156:5,8,19;157:11,12;
159:22,24;161:15,23;
162:24;163:5;164:22;
165:8;167:20;168:17;
172:12;173:10,10;
174:3,6;175:17,23;
176:9;179:6,7;
181:25;191:3,7;
194:23,24;198:21;
199:18;200:12,19,19;
201:4;203:8,13;
205:1,10;206:4,20,25;
215:4,5,14;218:2,4,7;
219:4;220:17,18;
223:4;224:11;226:14,
16,19,20;227:11,22,
23;228:8;229:14,16

**outbound (9)**
64:2,10;71:15,18;
73:1;74:19;75:1,6,7

**outcome (1)**
135:19

**outer (1)**
57:23

**outlandish (1)**
218:16

**out-of-court (1)**
19:20

**outside (25)**
33:24;57:23;62:15,
16;66:5;82:21;91:2;
150:25;151:1,9,13,14,
15,19;152:20;153:23,
25;156:10,11,17;
157:14;161:6,8;
200:5;204:2

**outstanding (1)**
105:6

**over (55)**
8:25;10:20;12:10;
27:20;49:22;71:14;
74:12,13,17,17,19;
75:7,10,22,25;76:4;
79:1;81:22;86:16;
90:20;92:19;100:7,7,
8;116:18;123:3;
124:8;143:17;144:12;
147:14,22;148:18,18;
163:12,14;173:9,21;
174:5,15,16;178:15;
179:25;180:2;186:12;
198:4;199:19,19,20;

200:16;205:14;206:9;
224:19;227:8;229:11,
20

**overhear (1)**
154:9

**overheard (2)**
28:24;154:10

**overnight (1)**
229:7

**overrule (2)**
61:24;150:18

**own (15)**
32:2;36:7,13,17,20,
25;38:7,15;49:3;
62:14;90:8;199:1;
214:13;219:1;220:12

**owned (1)**
91:16

**P**

**paddy (2)**
175:8,8

**page (9)**
84:1,4,4,7,20;85:5;
143:1,4,9

**paid (3)**
103:9;191:13,14

**paint (3)**
194:13,21,21

**painted (4)**
71:20;72:22;
197:19;211:3

**painting (1)**
181:11

**panel (3)**
30:16;39:11;53:1

**paper (4)**
23:21;58:18;144:4;
169:18

**papers (1)**
218:1

**paperwork (5)**
31:15;150:12;
205:21;218:6,18

**paragraph (1)**
85:12

**Pardon (8)**
15:1;17:7;18:9;
20:3;30:7;49:7;160:3;
178:23

**park (1)**
224:17

**parked (5)**
64:19,20;126:23;
173:5;174:18

**parking (3)**
76:3;92:9;165:1

**part (12)**
16:13;20:20;61:1;
98:5;188:19;194:22;
198:23;206:13;220:7;
222:6,8;226:21

participate (1)
  127:12
participation (1)
  53:17
particular (9)
  16:19;20:5;38:13;
  43:20;53:18;89:13;
  92:3;122:3;153:1
parties (7)
  17:13;59:17;61:10,
  14;62:6;117:18;
  214:25
party (2)
  61:17;217:3
pass (3)
  42:20;123:9;191:12
passed (1)
  75:5
passenger (7)
  29:5;65:1,6;84:20;
  101:12;123:1;204:23
passenger's (2)
  79:24;204:21
past (2)
  74:18;138:24
path (2)
  123:6;133:10
patrol (6)
  71:10;140:20;
  155:10;225:5;226:25;
  227:14
patted (1)
  126:15
Pause (35)
  10:18;16:3;19:10;
  23:6,25;25:13;30:11;
  35:18;37:16;38:25;
  53:25;55:20;56:4,7;
  69:15;72:14;73:22;
  101:25;119:12;120:1,
  10;127:24;142:17;
  145:12;149:12;158:6;
  160:8;162:14;166:7;
  214:23;215:20,22,25;
  216:2;219:6
Pawtucket (1)
  81:25
Pawtucketville (1)
  71:1
pay (4)
  12:7;207:2;211:25;
  218:8
payment (4)
  4:9;214:24;229:23;
  230:4
peace (4)
  54:19;56:22;
  227:17,18
peers (4)
  38:7,15;49:3;52:3
Pender (115)
  23:1;24:13,18,21;
  40:22,23,24;63:24;

64:6,7,9,12,14,18,19;
65:2,7,11,14,20;66:1,
9;69:13,14,18,23,25;
70:1;72:12,15;77:7;
86:21,23;87:3,4;
104:11;122:4,7,20;
123:7,16,17,20,23,24;
124:6,10,11,14,16,25;
125:9,25;126:5,6,12;
134:8;138:21,21;
139:1,21;140:2,13,25;
141:9,10,15;142:13;
144:15;154:1,23;
162:16,20,22;163:1,4,
7,9,14,20,22,25;
164:3,15,21;165:12;
173:12,13,14;178:7,8,
9;184:20,21,22,23;
185:25;196:19;
210:11;211:14,19,22,
24,25;212:3;224:9,13,
19;225:3,24;226:7,
18;227:6;228:1,8
P-E-N-D-E-R (1)
  69:25
Pender's (5)
  65:7;122:12;139:8;
  212:5,8
pending (4)
  23:8,11;211:2,13
people (31)
  49:14;65:1;66:5;
  68:7;69:5;81:25;82:2;
  86:17;90:20;93:21;
  95:15;104:25;126:21,
  23;127:2;160:23;
  170:10;187:8;188:4;
  190:10;192:21;
  195:24;202:14;213:9;
  217:16,22,25;218:13;
  221:21;222:13;
  223:21
people's (1)
  104:23
percipient (2)
  27:13;34:20
peremptories (1)
  52:20
peremptory (2)
  33:5,8
Perfect (1)
  198:10
Perjury (3)
  192:4,5;217:14
perk (1)
  212:14
permission (7)
  86:14;191:12;
  192:16;214:11,12,15;
  220:4
permit (2)
  61:24;219:13
person (30)

49:23;54:16,17,20;
56:19,20,23;58:19;
64:24;76:25;92:16;
100:4,17;105:6;
113:9;114:13,22;
122:20;124:15,18;
126:8;131:22;145:19;
152:16;191:6;219:10;
226:11,12,13;228:9
personal (1)
  127:16
personally (3)
  48:11;155:17;
  159:13
persons (1)
  219:12
person's (1)
  135:20
perspective (2)
  53:23;209:9
pertaining (1)
  204:2
Petco (1)
  214:10
phase (1)
  27:8
phone (5)
  26:19;33:24;101:8,
  13;124:21
phonetic (5)
  28:13,20;29:3;
  57:24;64:25
photo (3)
  72:24;91:25;145:17
photograph (4)
  145:19;171:6,7,8
photographs (1)
  73:18
photos (2)
  72:13;91:23
phrased (1)
  61:11
physical (7)
  23:16,18;55:10;
  57:15;126:4;226:25;
  227:2
physically (8)
  108:18;111:22,23,
  25;112:5,8;122:21;
  125:5
pick (4)
  12:2;14:12;170:18;
  214:10
pickup (31)
  63:23,25;64:1;65:9,
  19;71:14,21;72:3;
  73:9,24;74:13,23;
  75:11;76:5,9,13,22,
  23,24;77:1,12;97:7;
  98:9;122:16;127:8,
  10;180:13;211:6,8,9;
  224:4
picture (10)

72:20,25;73:4;
83:22;149:24;150:4;
167:8;197:15,24;
225:14
pictures (3)
  170:25;224:7,15
piece (6)
  22:20;23:21;35:19;
  58:18;169:18;224:2
pieces (2)
  15:21;226:23
pinned (1)
  226:12
pinpoint (2)
  106:3;107:11
place (13)
  49:8;54:24,25;57:3,
  4;66:7;78:7;81:16;
  84:12;125:7;126:4;
  199:19,24
placed (10)
  42:19;65:4;78:13;
  82:14;83:7;85:25;
  125:2;126:19;127:6;
  137:24
places (3)
  58:3;184:3;195:18
placing (2)
  78:20,21
plaintiff (1)
  165:2
plan (1)
  218:15
plank (1)
  205:7
plates (6)
  107:23;143:11;
  175:17,23,24;205:20
play (2)
  16:13;99:5
plea (6)
  4:20,22;25:19;
  39:21;40:3;95:22
Please (42)
  39:6,11,14,24;
  40:11,14,20;41:14;
  42:18;43:11,11;44:2,
  5,18,21;47:3,7,18,19;
  50:7,9,22,24;51:17;
  53:21;54:5;69:23;
  72:13;77:3;83:18;
  85:11;99:9;117:24;
  119:16;120:17;
  125:19;131:5;146:17;
  148:13,16;166:14;
  204:3
pled (1)
  58:2
pm (37)
  67:17,23;70:15,24;
  71:8;88:11;91:11;
  95:13;96:4;103:20;
  105:13;117:25;

118:20,20;119:14;
130:12,20;135:9;
136:9;146:19,24;
147:9;148:9;154:15;
155:7;159:24;166:13;
169:5,14;184:25;
189:25;204:6,17;
207:13;208:14;
229:16;230:16
PO (1)
  84:3
point (41)
  22:9,16;56:13;65:2,
  23;79:9;80:5,9,10;
  81:24;83:3;98:13;
  102:7;110:24;111:24;
  112:3;114:21,22;
  115:9;118:2;127:1;
  137:18;139:19;141:4;
  147:15;153:23;161:5;
  178:3,5;192:22,22;
  201:17,22;202:2,2;
  208:15;213:20;214:2,
  2;218:19,19
pointed (10)
  65:16;110:17,22;
  112:13;139:16;140:3;
  156:5,8;200:10;
  222:11
poke (1)
  126:15
police (78)
  8:21;24:25;39:20;
  40:22;41:1;48:3;
  49:22,23;52:4,6;
  54:14;55:8,11,13,14,
  17;57:12,16,18,19,22,
  25;63:25;64:15;
  66:15;70:4,5,8,20;
  79:5;82:1;86:1,2;
  87:12,15,16;88:1,4;
  90:24;91:13;92:23;
  105:10;109:7,8;
  116:24;120:23,24;
  121:3,4,6,10,19;
  128:16,17,18,20,20,
  22;129:1,4,5;130:11;
  131:4;142:18;146:15;
  151:15,16;152:6,10;
  168:17;174:6;198:21;
  199:3;200:22;207:1;
  223:22;225:2;227:7
policies (3)
  36:7,13,17
policy (8)
  21:10,13;36:20,25;
  87:5;153:15;177:17;
  178:15
pool (9)
  38:9,11,11,13,14;
  39:25;40:14,21;41:7
pop (2)
  131:25;177:21

**portion (1)**
212:24
**pose (1)**
41:11
**position (3)**
52:6;139:8,10
**positions (1)**
62:10
**positive (1)**
137:3
**possesses (2)**
219:11,13
**possessing (1)**
227:16
**possible (3)**
40:8;75:22,25
**possibly (1)**
195:1
**post (7)**
138:2,2,10;140:10,
11;144:23,24
**postpone (1)**
59:13
**potential (1)**
68:10
**power (3)**
216:5,12,13
**precisely (1)**
62:17
**predate (2)**
13:1,12
**predated (1)**
22:4
**predates (3)**
12:14,18,22
**prefer (2)**
209:17,18
**prejudice (2)**
42:2;62:24
**preliminary (2)**
9:19,22
**prematurely (1)**
62:10
**presence (1)**
20:17
**present (10)**
5:10;42:10;43:13;
44:7,21;47:7;59:10,
21;160:22;186:11
**presented (3)**
61:8;62:12,16
**presenting (2)**
105:5,7
**presumed (2)**
42:6;58:23
**pretty (7)**
80:3;115:13;
132:20;146:15;152:7;
196:13;218:14
**prevent (5)**
25:8;55:8,8;57:12,
12
**preventing (1)**

226:23
**previously (8)**
128:1;145:15;
146:4;162:15;163:15;
166:20,22;209:23
**principles (2)**
58:10;60:7
**print (2)**
12:15;94:10
**printed (2)**
12:4,21
**prior (17)**
15:25;34:11;49:12;
51:9;70:8;83:4;88:10;
102:25;103:5;105:3;
121:2,6;140:10,11;
164:15,15;186:18
**priors (1)**
207:11
**private (2)**
104:11;204:8
**privileges (1)**
164:25
**probable (5)**
4:8;5:6,11;6:12;
229:23
**probably (13)**
4:25;46:20;49:2;
63:8;72:5,7;76:11;
81:8;134:15;140:14;
193:17;204:1;222:9
**problem (12)**
24:10;45:20,21;
46:12;52:11,12;
89:18;150:11,15;
198:23;220:20;
222:19
**procedural (1)**
40:4
**procedure (1)**
185:10
**procedures (4)**
30:24;31:22;
185:17;215:11
**proceed (5)**
25:19;38:4,6;59:8;
148:21
**proceeding (1)**
15:4
**PROCEEDINGS (8)**
4:1,2;6:22;9:7;
10:13;13:9;26:23;
230:16
**process (4)**
37:18;38:1;116:8;
185:15
**proclaimed (1)**
167:21
**proclaiming (1)**
167:23
**produce (2)**
59:3,25
**progress (1)**

124:6
**promised (1)**
62:21
**promotion (1)**
194:15
**promotional (1)**
194:18
**proof (3)**
59:14,23;213:1
**proper (2)**
25:3;30:24
**properly (1)**
31:20
**proposed (2)**
11:7,10
**prosecution (4)**
42:3,8;59:12,19
**prosecutor (1)**
58:25
**prospective (1)**
41:11
**pross (1)**
7:22
**prossed (1)**
8:20
**prossing (1)**
7:25
**protect (1)**
192:6
**protected (4)**
18:5;191:23;192:1;
221:25
**protecting (1)**
206:17
**protection (1)**
202:22
**protective (1)**
188:3
**protects (7)**
192:21;193:9;
195:13;214:14;215:7;
223:14,16
**prove (9)**
28:7,12;29:5;59:1,
3,24,25;195:21;215:5
**proved (2)**
59:5;61:5
**proven (2)**
42:6;58:24
**provided (5)**
10:20;35:7;104:10;
134:4;147:13
**proving (1)**
42:9
**proximity (1)**
163:2
**public (18)**
13:8;54:19,24,24;
55:1,2;56:22;57:3,4,
6;66:17,22;71:1;
74:21;103:13;176:9;
216:23;220:6
**publicly (1)**

199:23
**published (1)**
73:20
**pull (26)**
12:1,1;29:4;65:25;
74:11,13,17;75:22,25;
76:19;79:1;80:4,7;
81:21;92:19;107:10;
112:8;113:10;126:7;
139:15;191:19;
199:19,20;203:8;
206:9
**pulled (33)**
75:16;76:4,9,21;
79:17,20;80:6;92:6,7,
11,14;108:1,5;
111:21;114:19;123:1;
125:9,9;126:6;
140:21;156:18;
172:11,21,22;173:9,
21;174:5,14,15;
200:16;222:16;
227:22,23
**pulling (11)**
90:20;112:5;
115:12;126:6;144:21;
172:15,16;201:11;
203:12;224:19;227:2
**Pullover (1)**
199:22;200:15,18
**pulls (4)**
97:7;206:20;
226:16,17
**pumpkin (1)**
197:24
**pumpkins (1)**
91:24
**punch (9)**
80:24;81:2;108:10;
114:13,13;152:21;
153:1,7;201:20
**punched (7)**
65:22;104:19;
108:14;113:24;
114:17,22;115:1
**punching (5)**
104:25;151:11;
154:17;203:17;222:8
**purchase (1)**
183:10
**purchased (1)**
184:2
**purposes (2)**
17:13;194:18
**Pursuant (1)**
143:5
**pursuit (11)**
75:14;122:1;141:3,
8,12;142:5,6,9;143:7,
9;191:24
**pushed (1)**
65:23
**pushing (1)**

201:12
**put (34)**
14:13,14;21:10,22;
23:19;24:6;25:5,5;
27:20;29:3;30:15;
43:5;46:17;52:1,3;
74:1;98:13,19;127:7;
128:12;135:24;136:1,
2;165:16;175:7,7;
192:10,11;197:4;
200:13;212:15,17,18;
218:20
**puts (1)**
104:19
**putting (1)**
125:9

**Q**

**quarreling (1)**
106:11
**quarters (3)**
76:12;79:22;224:20
**quick (3)**
40:8;138:1;191:20
**quiet (1)**
39:2
**Quite (1)**
146:17
**quote (1)**
28:13

**R**

**race (3)**
168:20,20;169:18
**radio (1)**
144:12
**Ragene (1)**
57:24
**rail (1)**
102:13
**rails (1)**
189:12
**raise (5)**
39:12;41:14;54:5;
63:3,4
**raised (2)**
52:2;158:8
**reach (7)**
80:22,23;108:13;
113:17,18;201:20;
228:10
**reaching (14)**
65:12;66:10;82:8;
100:18,19,23;114:20,
25;115:8;195:3;
204:20,24,25;228:2
**reacted (1)**
52:8
**read (17)**
19:9;56:13;85:11;
130:5,17,24;131:3,7,

8;141:17,18,19,21;
201:24;217:10;218:9;
225:17
**ready (24)**
5:9,19,21;33:12;
34:11;35:14,15,16;
37:3,4,5;38:4,5,6;
80:18;113:17;114:11,
11;118:23,24;119:10,
25;164:9;166:5
**reaffirming (1)**
95:20
**real (5)**
16:12;191:17;
192:24;215:4,4
**reality (1)**
193:5
**realized (2)**
172:1,7
**really (7)**
49:14;67:12,20;
124:24;126:11;162:1;
179:7
**re-ask (1)**
113:2
**reason (8)**
12:13;20:6;33:10;
42:13,24;45:10,17;
202:15
**reasonable (8)**
42:10;58:24;59:2,6;
61:6;68:13;195:21;
228:20
**rebut (1)**
12:16
**recall (12)**
71:3;117:2;122:13,
15;126:9,11;127:4;
132:9,9,12,18;144:11
**receipt (10)**
219:11;220:5,10,
12,14,19,21,21;222:2;
223:7
**receive (1)**
216:10
**received (2)**
21:16;61:12
**Recess (4)**
118:20;119:20;
164:22;229:1
**recipient (1)**
25:21
**recite (1)**
58:16
**reckless (1)**
92:24
**recklessly (2)**
90:21;93:5
**recognize (11)**
48:4;83:19;128:2;
145:16,19,21;149:14,
20;156:16;176:5;
222:12

**recollection (2)**
197:5;227:9
**recommence (4)**
6:22;9:7;10:13;
26:23
**recommencing (1)**
230:16
**reconvene (2)**
159:21;229:2
**record (40)**
11:19,22;13:25;
14:2,3,6,10,23,25;
15:2,3,9;16:16,20;
17:19;18:4;22:15;
23:18;26:24;35:10,
11;36:23,24;38:21;
41:16;43:13;52:1;
53:2;61:23;69:24;
77:6,8;93:4;118:21;
120:18;125:21,23;
149:15,17;157:10
**recorded (1)**
15:10
**recorder (1)**
101:19
**recording (3)**
101:8,10,16
**recordings (1)**
101:14
**records (9)**
11:13,25;12:20,22;
15:23,24,24,25;
147:12
RECROSS-EXAMINATION (1)
159:11
**rectify (1)**
25:24
**red (2)**
15:5;77:5
**redacted (1)**
15:20
**redactions (1)**
15:20
**REDIRECT (4)**
145:13;158:9;
159:9;180:20
**refer (3)**
30:22;31:23;86:25
**reference (1)**
147:11
**referred (3)**
58:25;87:2;111:17
**referring (1)**
78:8
**reflect (6)**
35:11;77:6,8;
125:21,23;149:15
**refresh (5)**
96:22;197:5,14;
201:22,24
**refresher (1)**
98:14
**refuse (4)**

55:16;57:21;77:23;
79:8
**refused (4)**
77:21;78:14;79:8;
99:1
**refuses (1)**
226:15
**refusing (2)**
65:9;102:10
**regarding (2)**
86:2;103:25
**Registrar (5)**
14:5;16:1;85:6;
219:11;220:4
**registration (6)**
11:16;98:3,4,8,14;
175:21
**Registry (3)**
11:13;83:20,24
**regress (1)**
123:9
**regular (1)**
184:3
**regularly (2)**
152:9,11
**regulations (1)**
191:13
**reinstatement (1)**
85:14
**reject (1)**
61:24
**related (8)**
21:11,12,12,13,15,
15;41:17;164:4
**relates (5)**
18:13;21:19;90:4,5,
7
**relating (1)**
27:15
**relationship (2)**
49:19;51:12
**relative (2)**
23:19;163:18
**relevance (4)**
11:20;21:23;24:2,4
**relevancy (1)**
16:7
**relevant (9)**
16:17,19;22:5,16;
23:16;187:1,1;225:8,
10
**religion (1)**
223:10
**remain (3)**
39:2,6,6
**remaining (3)**
53:16,20,23
**remarks (4)**
58:9,12;135:22;
136:3
**remember (9)**
30:23;59:23;94:4;
132:20;143:19;146:5;

177:17;182:11;
206:22
**remembered (1)**
176:10
**remind (1)**
88:9
**remove (1)**
126:8
**removed (5)**
6:8;125:2;157:17;
160:10;180:13
**removing (1)**
125:25
**render (4)**
42:14;45:12,18;
48:19
**renew (1)**
192:11
**repeat (3)**
6:3;74:8;212:11
**repeated (1)**
185:24
**repeatedly (3)**
63:16;108:11;
203:19
**rephrase (2)**
45:16;111:13
**rephrasing (1)**
112:21
**replacement (2)**
52:23;56:3
**replying (1)**
124:15
**report (15)**
24:25;47:7;85:3;
86:2;92:23;99:25;
105:10;133:5,7,10;
141:17;142:25;
186:21;196:19;
221:23
**reports (1)**
225:16
**representation (1)**
9:13
**representations (1)**
73:6
**representative (1)**
32:2
**represented (1)**
40:12
**representing (2)**
13:15;190:10
**represents (1)**
190:4
**reptiles (1)**
214:10
**request (3)**
5:14;37:8;185:2
**requesting (2)**
30:9;37:7;118:16
**require (2)**
59:2,25
**required (2)**

116:25;214:4
**requires (4)**
58:25;62:10;
214:24;225:1
**reread (1)**
56:15
**rescheduled (1)**
35:12
**research (1)**
62:14
**resembles (1)**
150:4
**Reserve (3)**
12:7;184:9,10
**residents (1)**
81:25
**resist (5)**
91:1,2;134:18;
222:6,8
**resistance (1)**
126:5
**resisted (2)**
66:23;226:25
**resisting (17)**
8:12,20;39:19;55:7;
57:11;107:5,7,8;
109:6;205:10,11;
222:6;225:23;226:21,
22;227:13,19
**resolutions (1)**
32:4
**resolve (1)**
61:2
**resource (1)**
48:5
**respect (8)**
53:3;56:12;63:17;
223:21,21,23,25;
225:21
**respective (1)**
56:1
**respond (4)**
64:22;122:9;200:6;
226:10
**responded (1)**
52:6
**responding (3)**
41:16;122:2,6
**response (11)**
10:25;41:20,23;
42:1,4,7,12,16;48:24;
79:3;152:23
**responsibility (3)**
60:12;61:2,16
**rest (2)**
89:19;117:6
**restaurant (1)**
49:17
**resting (1)**
28:17
**restrain (2)**
66:1,7
**rests (2)**

147:1,2
**result (1)**
37:24
**Resume (1)**
119:16
**retire (2)**
58:14;60:8
**review (1)**
24:11
**rewrote (1)**
213:22
**ridiculous (1)**
200:23
**right (406)**
4:20,25:5:3,19,22,
23;6:5,17;8:3,6;9:18,
19;10:1,19,25;11:10;
13:3,10,25;14:7,21,
24;16:15;17:8,14,20,
22;18:1;19:11,16,24;
20:14,16;21:21,22;
22:2,19;23:3,9;24:22,
23;25:4,7,12,16;26:2,
4,7;28:2,13,25;29:13,
24;30:14,15,16;31:1,
5,6,7,9,21;33:9,17,23;
34:1,3;35:4;37:2,6,9,
9,12,17,17;38:8,16;
39:12;40:10,23;
42:23;43:15,24;44:4,
15,15,23;46:7,21,24;
48:8,16,22;49:4,10,
11;50:4,20;51:11,15;
52:15,19;53:8,15;
54:5,25;55:25;56:5;
57:3;63:16;64:14;
65:8,10;67:7,13;
68:11,14,14;69:8,9,
19;71:1,18,25;72:1,
20;73:4,5,14;74:20;
75:12;76:6;77:14;
78:10;79:1,8;82:8,10,
11,15,25;84:12;
85:15;86:5,16;87:10,
11,23;88:4;91:8,8,13,
13,15,23,24;92:11,14,
21;93:8,9;94:24;95:1;
96:3,7,15,19,19;97:6,
8;98:6,16,25;99:2,16;
100:8,21,23,23;101:6,
24;102:10,12;104:21,
24;105:8,12;108:1;
109:10,11;110:2;
112:20,23;113:1,6,22;
114:5;117:10,13,15,
22;118:1;119:18;
122:24,25;125:20;
128:6,7,13,14,23,24;
129:1,16;131:6,13,18;
132:2,14,15,22,23;
133:8,9,12;134:24;
135:2;136:8,24;
137:1;138:17,19,20;

140:8,19,25;141:11;
142:7,19;143:8;
144:18;145:3;146:11;
147:2;148:4,6,10,18;
149:9;150:11,17,18,
21;151:9,12,23;
152:7;153:4,10;
154:21;155:4,6;
156:4,23;157:12,15,
18,21;158:5;159:17,
18;160:22;161:5;
162:2,6,9,9,17,23;
163:23,23;164:3;
165:5,16,19,25;166:2,
15;167:5,12,16,22,25;
168:11,15;170:10,12,
14,14;171:13,25;
172:1,8,12;173:11,17;
177:7,14,14;178:18;
179:8;180:17,23;
181:24;182:18,19;
183:2;184:5,17;
185:3;186:6,7,10,14,
17;189:11,22,23;
190:1,16,19,23;
191:24;192:10,15,18;
193:4,10,21,25;196:2;
197:1,4,9,15,23;
198:7;199:1,13,14,15,
16,17;201:15,23;
202:1,2,18;204:19;
205:4;206:14;207:5,
14,18,19,20;208:12;
209:13;212:21,23;
213:5,15,18,19,19,21;
214:16,19,20,24;
215:3,23;216:3,6,21,
24,25;217:23;218:21,
24;219:4,8;220:5,23;
221:12,13,22;222:23,
25;223:2,13;226:9,
11;228:23;229:17;
230:12
**righthand (1)**
78:18
**rights (6)**
18:5;173:8;187:12;
188:25;192:7,8
**rings (1)**
193:13
**ripped (1)**
222:17
**rise (8)**
39:4;53:20,22;
117:23;119:13;
159:22;166:11;
229:14
**risk (4)**
55:12;57:17;227:1,
3
**RMV (6)**
11:22;12:9;20:23;
218:25;223:5;225:16

**Road (61)**
63:22;64:2,10;
66:22;68:3;70:19,25;
71:6,15,20,21;72:21,
25;73:1,4,7,10;74:20,
21;75:1,3,9,10,11,21,
22,24;92:20;93:5;
96:17,18,25;143:15;
170:21;171:15;
172:22,23;173:3,4,20;
174:10,14,21;179:11,
13,17,18,18,21,25;
180:2;190:25;199:21;
200:17;223:22;224:4,
15,16,18;225:22;
227:4
**roadmaps (1)**
59:17
**roads (1)**
225:22
**rocket (1)**
106:8
**role (1)**
62:18
**roll (3)**
64:22;77:20;98:2
**rollcall (1)**
121:16
**rolled (1)**
99:10
**room (1)**
159:20
**ropes (1)**
193:13
**route (6)**
170:15,19;172:9;
180:6;191:9,10
**rule (2)**
14:6;187:23
**ruled (1)**
32:13
**rules (4)**
14:1;61:16;185:10;
191:12
**ruling (3)**
22:9;36:18,20
**run (3)**
117:18;216:19;
218:5
**running (4)**
104:25;200:21;
201:1;203:19
**rush (1)**
214:20
**RV (1)**
220:4

---

## S

**safe (6)**
199:20,23;200:1,6,
6;201:2
**safety (3)**

55:2;57:5;199:2
**Salam (1)**
40:7
**same (29)**
6:3,6;11:22,23;
22:11;23:13;32:1;
35:2;52:22;61:22;
68:22;80:14;82:17;
93:19;95:12;107:16;
115:10;138:13;
146:10;171:8,10,11;
172:9;177:12;180:6;
185:22,24;193:10;
217:6
**Saris (1)**
24:17
**save (2)**
11:10;67:14
**saving (1)**
206:17
**saw (41)**
22:24;27:15;63:25;
65:12;73:24;74:9;
77:15;82:1;92:1;92:20;
92:6,10,16,19;101:7,
12;122:23;151:2,5;
153:6;156:18;157:12,
17;158:25;165:3;
171:25;172:5,13;
173:11;175:14;
180:13;182:12;
194:12;196:19;199:2;
205:9;210:18,20;
227:22;228:1,8,17
**saying (22)**
19:19;28:22,23;
40:5;79:8;81:19;89:7;
90:13;99:8,19;
107:23;110:5,11;
113:9,12;136:3;
161:24;175:24;
187:18;195:15;
197:15;216:19
**scared (4)**
114:8;222:12,14,15
**scattered (1)**
127:15
**scenario (1)**
200:18
**scene (25)**
65:8,25;66:6;79:15;
81:17,24;82:18;
83:12;85:24;122:10,
17;123:6,11,14;
125:8;126:17,18;
127:5;128:3;140:9;
172:12,13;173:17;
176:6;180:10
**schedule (1)**
63:6
**scheduled (4)**
4:7,10;6:11;34:10
**scheduling (2)**

27:8;29:12
**school (7)**
48:3,12,13;73:5;
75:19,20;103:14
**schools (1)**
67:12
**science (1)**
106:8
**scope (1)**
182:1
**screaming (2)**
200:10;202:5
**search (3)**
82:3;106:13;127:12
**searched (10)**
66:9,18;127:8,10;
155:13,14,15,16,17,
23
**searching (5)**
82:6;175:14,25;
177:20;178:9
**seat (38)**
37:25;43:24;44:2,
16,18;46:25;47:3,16,
18;48:23;50:4,7,20,
22;51:15,17;52:11;
77:1;80:1,15;81:13,
14;82:10,10;100:21;
127:17;136:16,17,20,
22,25;137:11,22;
138:18;145:2;177:24;
204:21,23
**seated (12)**
39:7,14;40:11;43:1;
46:17;51:21;52:11;
53:24;119:16;136:25;
166:14,21
**seats (2)**
78:19;98:9
**sec (1)**
13:11
**second (15)**
15:18;72:25;84:1,4,
7;85:11;132:13,18;
140:13;146:20,21;
208:3;213:10;216:1;
224:14
**seconds (5)**
92:13,14;106:4;
205:11;223:1
**Section (8)**
55:6;57:10,13;
85:14;219:11,13;
220:7,7
**sections (1)**
73:10
**secured (2)**
126:17,18
**seeing (4)**
96:13;117:2;
123:14;223:7
**seeking (8)**
32:12;211:16,23;

212:1,2,7,9,13
**seem (5)**
32:17;93:17;105:5;
218:22;222:21
**seemed (2)**
81:8;126:25
**seemingly (1)**
126:6
**seems (1)**
16:19
**seized (1)**
82:13
**selection (1)**
53:17
**self- (1)**
14:3
**self-representation (1)**
185:8
**sell (3)**
194:2,2,3
**sells (2)**
182:25;221:4
**send (2)**
6:1;62:4
**sends (1)**
38:9
**sense (1)**
12:3
**sent (4)**
5:25;6:6;204:7;
219:15
**sentence (3)**
7:2;85:11;208:21
**sentenced (1)**
230:3
**September (1)**
230:16
**sequestration (6)**
37:7,8,23;160:24;
164:7,18
**serious (2)**
30:21;146:15
**serve (1)**
49:17
**service (1)**
176:9
**services (1)**
216:10
**session (4)**
7:2,8;8:25;119:16
**set (3)**
53:7;120:3;217:17
**seven (10)**
30:16;33:9;127:1;
140:14;152:12,13;
172:24;173:1,2;180:8
**several (11)**
64:4,12,16;71:19;
73:24;74:10,18;75:6,
8;96:17;195:24
**shall (11)**
42:20;216:5,9,10,
11,12,13,22;217:2;

218:20;219:10
**share (2)**
22:11;34:20
**shared (1)**
23:17
**sheath (2)**
195:23;196:4
**sheet (1)**
95:6
**Shh (4)**
34:14;88:18,18,18
**shift (3)**
70:17;121:15,16
**shining (1)**
175:18
**shirt (1)**
77:5
**shivering (1)**
118:5
**shooting (1)**
199:3
**shop (1)**
221:2
**shops (1)**
224:17
**short (6)**
116:2,4;121:25;
127:6;140:13;162:21
**shot (1)**
210:21
**shoulder (1)**
124:9
**shout (1)**
13:9
**shouting (1)**
66:4
**Shoved (2)**
78:12;80:22
**shoving (1)**
80:14
**show (22)**
23:24,24;24:6,7;
25:22;28:16;66:20;
81:5,7;86:12;92:1;
94:20,21,21;95:6,6,
15,21;129:17;153:2;
208:10;225:1
**showed (2)**
195:22;221:17
**showing (3)**
24:2;145:15;225:12
**shown (2)**
15:20;149:16
**shows (1)**
24:9
**shriveling (1)**
115:11
**sic (1)**
159:9
**side (59)**
19:13;32:18;60:2;
65:7,10;75:1,6,7,9,23;
76:1,3;77:17;78:4,19;

79:23,24;80:5,15,23;
82:10,11,12;92:17,19;
96:18;97:17;100:10,
20;113:18;122:20,25;
123:2,3,5;124:23;
125:10;127:17;
136:16,17,22,25;
137:11,22;138:18;
143:15;145:2;158:13;
173:5,20;174:10,14,
17,21;175:19;199:21;
205:2;226:13,14
**sidebar (56)**
43:3,4,9,11,14;44:1,
5,8,17,22,24;47:2,7,8,
17,19,20;50:6,9,10,
21,24,25;51:16,19;
53:9;67:17,23;88:11;
91:11;95:13;96:4;
103:17,20;105:13;
130:12,20;135:7,9;
136:9;146:19,24;
147:7,9;148:9;
154:15;155:7;169:5,
14;184:24,25;189:25;
204:6,17;207:13;
208:14
**sides (9)**
43:22;44:13;47:14;
48:1;50:18;51:6;71:6;
75:18,21
**sideways (1)**
205:7
**sign (2)**
217:22;218:6
**signaled (3)**
55:16;57:21;225:2
**signature (3)**
36:8;95:7,20
**signed (5)**
19:12;28:23;57:24;
62:4;95:19
**signs (2)**
71:19;224:8
**similar (1)**
34:20
**Simple (2)**
106:8;130:17
**simultaneously (3)**
125:8;144:20;
201:10
**single (1)**
224:2
**siren (4)**
74:11,16;76:17;
151:1
**sirens (16)**
64:8,17;76:8;92:7;
108:1,7;151:3,4,7;
171:19,20;198:20,20;
199:1;201:18;225:3
**Sit (5)**
10:17;45:11,18;

50:1;198:9
**sitting (8)**
52:15;76:25;77:1,4;
95:5;113:17;125:17,
20
**situation (9)**
26:9;52:14;65:15,
22;66:5;170:17;
190:19;225:24;
226:19
**six (12)**
60:10;127:1;
131:15;140:14;
152:11,12,12,13;
172:24;173:1,2;180:7
**six-month (1)**
70:12
**size (1)**
194:3
**skinny (3)**
177:22,22,23
**slam (3)**
72:1;75:8;224:23
**slapped (9)**
65:18;109:9,9,9;
113:23,24;114:25;
139:18;227:11
**slapping (1)**
227:2
**slaps (1)**
226:20
**slice (1)**
82:11
**slips (1)**
208:8
**small (3)**
173:21,24;174:4
**Smith (42)**
64:25;65:6,9,16,17,
23,25;66:3;78:24;
79:7,9,11,13,15,16,
23;80:1,5,11,21;
81:11,18;83:4;101:6,
17;102:1,7,12,15,17;
110:14,17;114:12;
115:9;124:3,4,19;
125:1,7;126:13,20;
147:11
**smooth (1)**
126:3
**snow (5)**
71:6;107:23;
143:12;205:2,5
**snowbank (1)**
123:3
**so-called (3)**
68:4;92:16;202:14
**social (1)**
199:3
**sole (1)**
60:19
**solely (7)**
42:15;45:12,19;

48:19;49:22;52:5;
61:7
**solid (1)**
74:17
**somebody (5)**
31:1;110:24;
135:18;154:19;
167:18
**Somebody's (2)**
221:20,20
**someone (10)**
19:17,21;38:23;
68:1;93:5;131:25;
132:23;159:1;217:21,
22
**something's (1)**
172:7
**sometime (1)**
197:25
**sometimes (3)**
43:8;46:14;58:25
**somewhat (1)**
59:17
**somewhere (7)**
29:13;137:2;
174:17;178:25;
181:23;182:2;201:2
**soon (2)**
62:18;75:19
**sorry (30)**
9:21;30:19;38:20;
52:10;84:4,6;86:10;
90:23;116:19;123:2;
130:22;131:19;133:2;
135:4;141:6;142:4;
167:6;169:17;171:12;
174:25;175:2,2,2,2;
182:15;190:21;
193:23;208:11;
210:23;212:11
**sort (7)**
104:2;117:3;
121:18;136:20;
152:17;164:4;167:17
**sorts (1)**
156:13
**sound (1)**
215:2
**south (1)**
202:10
**speak (8)**
13:11;26:5;65:3;
153:17,19;155:5;
168:24;201:22
**speaking (2)**
78:16;124:12
**speaks (2)**
36:7;223:23
**special (1)**
164:25
**specific (3)**
27:22;41:13,16;
137:4

**specifically (1)**
194:11
**specifics (1)**
137:7
**speculate (1)**
61:21
**speech (1)**
126:21
**speeded (1)**
172:6
**speedy (1)**
4:24
**spell (3)**
69:23;120:17;149:3
**spend (1)**
214:19
**spent (1)**
175:6
**spots (1)**
56:1
**square (1)**
179:8
**squared (2)**
134:14,14
**stake (1)**
41:21
**stamp (2)**
83:24;85:5
**stance (3)**
139:12,13,14
**stand (24)**
37:15;39:24;40:14,
20,23;41:3;42:18;
54:5;86:12,16;
148:12,18;164:14;
166:6,17;184:20;
190:6,13;192:3;
198:9,19;206:7;
218:2,17
**standby (1)**
139:17
**standing (17)**
31:7,13;39:6,7;
123:10,22;139:23;
163:4,10,12;170:7,8;
179:8;193:14;204:8;
213:20;214:17
**standoff (1)**
221:8
**stands (4)**
167:24;170:4;
206:13;230:1
**start (14)**
11:8,12;56:11;63:7;
88:10;102:13,13;
108:4;172:3,6;
175:24,25;177:7;
202:5
**started (8)**
71:9;77:11;81:11;
102:8;147:23;177:9;
206:23;218:9
**state (18)**

18:14;28:20;60:17;
69:23;90:6,7;120:17;
192:9,9;193:9;212:1;
217:4,4,6,7;218:20;
219:12;225:11
**stated (3)**
28:12;107:22;
157:10
**statement (14)**
19:20;28:3,10,14,
15;29:6;59:11,13;
63:14;67:8,18,20;
153:3;183:22
**statements (8)**
33:21;59:10,16;
60:5;61:15;63:11;
79:3;98:19
**States (11)**
18:12;23:8;188:20;
191:12;216:5,21;
217:2,3,5,6,7
**stating (1)**
17:19
**station (4)**
86:1;92:24;96:8;
143:16
**stationed (1)**
70:24
**status (2)**
5:5;84:20
**stay (9)**
37:18;46:3;56:1;
80:13,13;89:22;
115:10,11;203:14
**stayed (2)**
65:5;74:16
**steering (7)**
200:12;201:13;
203:25;211:9;222:10,
17;224:3
**stemming (1)**
198:13
**step (25)**
41:6;44:6,20;47:6;
69:16;99:1,3,4,6,8,8;
102:9;117:11;119:15;
134:10;146:13;
157:21;159:17;162:6;
163:24;166:18,19;
173:17;184:18;
212:22
**stepped (1)**
65:6
**stepping (9)**
69:17;117:23;
120:11;148:18,19;
159:23;166:12,19;
229:14
**steps (1)**
203:13
**stick (1)**
126:16
**sticker (1)**

175:19
**sticks (1)**
194:24
**stiffened (1)**
124:9
**still (37)**
33:18;36:9;45:14;
65:9;71:6;91:9;
100:15,17;114:20;
115:5;124:23;132:22;
153:11,13;156:13;
177:15,15;183:6;
189:1;193:14;195:14,
22;196:4,4;203:15,15,
17,20;204:12,13;
205:2,17;218:25;
220:9,11;222:12;
226:9
**stood (1)**
126:15
**stop (36)**
8:21;25:22;39:20;
55:14,16,16;57:19,21,
21;64:9,15;66:15;
75:9,15;78:13,22;
81:21;102:10;109:6;
122:4;141:13;142:1,
4,11,15,18;147:21;
149:3;173:21;174:5;
193:2;209:1;224:14;
225:1,2,6
**stopped (5)**
75:24;209:1,4,6;
224:21
**stops (1)**
202:3
**store (2)**
195:17;214:15
**stores (1)**
220:25
**story (1)**
31:18
**straight (14)**
64:4;71:25;80:24;
135:4;152:4,5;
197:16;198:5,6,7,12;
200:7;207:2;224:9
**straw (8)**
30:22;31:6,6;32:1,
2;67:10;111:9,15
**street (20)**
68:3;75:21;76:3,4;
81:25;90:20;91:21;
92:17;96:9,9,10,14,
24;121:25;122:10,14;
200:20;206:25,25;
224:17
**stretch (1)**
63:5
**stretches (1)**
216:15
**stricken (1)**
61:23

**strike (2)**
48:25;152:23
**stripes (1)**
203:11
**strong-arms (1)**
104:19
**struggle (7)**
115:23,25;116:1,
10,13;152:17;226:18
**struggling (2)**
115:18,20
**studies (1)**
150:10
**stuff (17)**
20:23;68:22;71:6;
102:14;128:24;
132:16;134:10;136:4;
150:12,12;185:24;
190:25;191:3;198:13;
205:2;207:4;222:5
**subdue (3)**
110:13;139:5,7
**subdued (1)**
140:6
**subject (6)**
19:20;22:16;29:7;
111:15;187:19;
190:17
**subjection (1)**
193:8
**subjects (2)**
109:24;217:8
**submit (1)**
227:10
**submitted (1)**
62:7
**submitting (1)**
11:1
**subsequent (1)**
4:18
**subsequently (1)**
144:22
**substance (1)**
15:21
**substantial (5)**
55:12;57:17;
137:16;227:1,3
**substantially (1)**
82:17
**substitute (1)**
58:12
**successfully (1)**
66:7
**Sudbury (1)**
121:3
**suit (2)**
212:14,15
**summons (6)**
22:20,22,23,25;
23:7;26:12
**sun (2)**
63:20;71:8
**super (2)**

67:25;185:20
**supervisor (2)**
140:15,17
**supplemental (1)**
55:22
**support (1)**
59:19
**supposed (5)**
67:25;133:19;
176:2;218:3,3
**supposedly (1)**
156:2
**Supreme (13)**
89:23,24;90:3,7;
213:23,24,25;215:11,
12;216:6,9,14,16
**Sure (40)**
5:7;12:9;17:18,21;
20:13;27:20;34:17;
35:20;43:6,17;44:9;
45:2;47:9,22;48:7;
50:13;51:1;68:13;
94:3;96:7;104:24;
128:25;132:7,9;
133:5,5;138:12;
144:21;147:8;159:10;
164:14;178:2;191:14;
194:23;197:18;204:2;
208:23;216:3;218:14;
220:5
**surrounding (1)**
66:6
**suspect (22)**
108:5,9,18;111:9,
25;112:10;113:14;
114:5,9;115:2,4,5,7,8,
19,25;116:16,20;
117:2;131:4;153:6;
175:7
**suspects (6)**
105:15,20;106:7,
14;109:15;110:16
**suspect's (1)**
113:17
**suspended (11)**
4:18;66:19,20;
84:21;193:11;220:2,
11;223:3;225:11,15,
18
**suspension (4)**
15:23;66:21;189:8,
9
**sustained (13)**
61:20;103:3,7,11,
16;154:3,13;158:20;
159:3;181:1;183:14,
21,25
**swear (3)**
54:4;215:7;217:13
**swerve (2)**
92:16;224:23
**swerving (5)**
64:10,12;68:3;96:6;

143:15
**swing (1)**
165:2
**swore (6)**
177:12;192:3,5,6;
215:12;217:11
**SWORN (14)**
39:13;42:22;54:7;
57:25;58:4;61:9;
69:18;120:12;148:20;
160:17;162:15;
166:20,22;190:14
**swung (1)**
113:24
**sympathy (1)**
62:24
**system (1)**
213:15

**T**

**table (2)**
10:17;77:4
**tagged (1)**
82:14
**tags (1)**
214:1
**talk (14)**
26:1;77:25;93:21;
100:25;154:23;
164:14;196:21;201:3,
8,15;203:18,20;
218:25;221:9
**talked (5)**
12:13;27:17;37:11;
93:23;224:16
**talking (8)**
31:5;132:6;163:15;
177:7,9;204:20;
215:3;221:11
**tall (1)**
177:23
**tapped (1)**
77:21
**Taser (39)**
65:15,18;80:6,7,10,
16;97:14,22;108:12,
16,18;109:9,9;110:3,
10,17,23;111:4;112:3,
9,10,11;113:9,14,20,
22;114:14,17,25;
115:9;139:16,18;
140:3;203:9,10;
222:11;226:19;227:2,
11
**tax (2)**
207:1;218:20
**taxed (1)**
192:12
**taxes (2)**
192:10,11
**TD (1)**
174:17

**teach (1)**
190:25
**teaching (1)**
67:13
**telling (8)**
72:22;78:25;81:20,
21;90:24;115:9;
203:19;217:25
**ten (1)**
106:3
**tend (2)**
49:21;141:3
**term (1)**
61:19
**terrified (1)**
203:9
**test (5)**
88:3,12,15,23;
89:12
**testified (8)**
37:21,22;76:5;
157:17;163:15;
224:20;226:7;227:6
**testify (22)**
21:24;22:1;25:1,8,
11;27:14;29:14;35:2;
37:13,24;64:7;
160:23;162:24;
186:13,14;190:4,7,8,
8,17;226:1,7
**testifying (9)**
23:1;28:6,11;61:13;
138:3;161:3;164:8;
182:14;196:13
**testimonies (1)**
221:15
**testimony (33)**
21:2;28:14,24;
34:21;37:15,20;
49:21;52:4;60:23;
61:2,9;63:24;65:24;
146:6;147:10;154:24;
161:2;163:20;194:6;
195:4;196:7,12,13;
199:15;204:14;207:9,
22;208:15;223:23;
225:23;226:17;227:9,
10
**Thanks (1)**
155:6
**that's (2)**
48:4;109:1
**That'll (3)**
73:17;84:16;85:19
**therefore (2)**
42:24;58:3
**therein (1)**
28:16
**thereof (1)**
217:7
**thereto (1)**
30:17
**thinking (2)**

65:21;218:7
**third (4)**
7:2,8;73:4;185:13
**third-party (4)**
30:21;191:6;
193:12;221:19
**Thirty-three (1)**
70:7
**though (10)**
8:17;14:25;20:18;
22:5;25:20;34:2;36:6;
77:16;164:6;212:7
**thought (12)**
19:5;33:18;52:2;
65:14;81:3;133:13;
134:2;164:17,17;
220:15,15,17
**threatening (3)**
55:10;57:15;221:7
**three (17)**
8:21,25;11:7;46:4;
72:13;73:17;76:12;
81:9;104:20;121:5;
122:22;140:14,20,24;
141:2;170:25;224:20
**threw (4)**
138:25;205:6;
222:9,18
**throughout (4)**
58:11;68:4;105:23;
140:11
**throw (3)**
81:2;135:3;138:25
**thrown (2)**
200:10;206:20
**thumbprint (2)**
19:13;36:8
**thus (1)**
28:17
**ticket (15)**
21:9;129:14,22;
130:5,14;132:4,8,11,
23;163:16,17,19;
164:4;170:12;201:4
**tickets (1)**
90:20
**ticking (1)**
15:8
**tight (1)**
79:22
**times (9)**
35:11;74:23;75:5;
104:20;122:8;164:23,
24;168:24;216:10
**title (3)**
11:12;48:9;220:7
**today (31)**
4:7;7:4;20:6;21:17;
23:1;25:22;34:2,16;
38:11;46:8,9;48:20;
67:9;70:23;77:1;86:9,
19;125:17;128:10;
148:24;166:25;176:5;

187:16;198:2;222:4;
223:23;228:17;
229:22,23,24;230:2
**Today's (1)**
21:19
**together (3)**
165:13;217:20,21
**told (24)**
62:12;65:4;77:25;
78:12;79:5;83:9;
95:23;106:20;117:13;
133:18;164:20;
168:24;173:17,18,20;
177:8;196:21;200:13;
201:8;206:8,9;
207:16;209:6;212:25
**tomatoes (1)**
205:4
**tomorrow (6)**
229:1,4,12,17,20;
230:12
**tonight (1)**
229:8
**took (25)**
65:15;71:17;74:20;
75:12;84:12;96:14,
19;105:20;106:7;
107:10,12,12,16;
125:5;134:22;170:19;
172:1,8;180:6,6;
191:9;200:1,6;
205:20;219:1
**tool (2)**
183:8;221:4
**tools (7)**
158:14;182:8;
184:11,12;194:22,25,
25
**top (6)**
29:19;56:11;84:1,
20;85:3,8
**total (4)**
121:1;129:4,5,6
**totaled (1)**
211:21
**totally (2)**
193:8;200:10
**tough (1)**
201:6
**tow (3)**
200:17;205:16,17
**toward (2)**
100:8,8
**towards (17)**
42:3;66:10;72:21;
73:1;77:12;79:10,25;
80:2,24;81:2;82:12;
124:10;179:18,20,24;
227:24;228:10
**towed (5)**
86:1;155:12,13;
205:20,20
**town (2)**

36:1;54:13
**traffic (7)**
64:11;70:18;74:18;
121:17;200:19,20;
224:11
**train (1)**
134:24
**training (5)**
70:9;121:7,10;
134:24,25
**transportation (1)**
127:3
**transported (1)**
85:25
**trash (1)**
127:15
**travel (14)**
173:7,8,8,9;191:24;
192:9,16,22;214:1,1;
216:17;218:18,21,24
**traveling (22)**
75:2,3;170:18;
179:10,12,13,17,17,
19,21,23,24,24;
190:23,23;191:23;
192:20,24;195:12;
211:8;220:2;221:25
**treaties (1)**
216:22
**trees (1)**
194:24
**trembling (2)**
118:7,9
**trial (49)**
4:7,24;5:5,8,9,19,
20;6:19;7:4;16:1;
17:14;28:6;32:14;
34:10;37:15,19;39:1,
15;40:5;42:21;54:9;
58:3,9,11,14,20;59:4,
8;60:15;61:3,14;62:3;
63:2,4,10;67:1;68:20;
88:10;89:14;119:17,
23;133:19;136:6;
160:24;162:24;
185:10,11,18;212:24
**trick (1)**
68:7
**tried (11)**
27:16;60:13;64:21;
109:4;123:18,19;
124:8,9;139:4;
203:13;220:19
**tries (1)**
224:12
**trooper (1)**
97:10
**troopers (1)**
105:25
**trouble (1)**
191:1
**truck (75)**
29:4;63:23;64:1,1,

65:9,19;71:14,21;
72:4;73:9,24;74:13,
23;75:11,13;76:5,9,
13,22,23,24;77:1,12;
79:2,4,10,24;80:16,
21;97:7,7,11;98:9;
107:24;111:10,20,21,
23,25;112:4,8,9;
113:10,12,15,18;
122:16,18,22;123:1;
125:10;127:8,10;
155:11,11,16,17,23;
156:2;157:18;158:14;
159:1;171:25;180:13;
182:7;200:14;205:15,
16,17,20,20;211:6,8,
9;224:4
**trucks (1)**
200:17
**true (9)**
14:4;42:14;62:25;
90:9;102:25,25;
103:5,9,13
**truly (1)**
62:22
**trust (3)**
6:1,1;148:5
**truth (8)**
28:7,12,16;61:4;
153:3;198:22;217:13,
14
**try (15)**
12:20;16:8;19:23;
20:15;24:3;40:8;58:4;
62:20,22,24;77:18;
138:24;169:9;198:25;
226:19
**trying (35)**
6:7;29:3,4,5;74:16;
75:15;77:16;80:20,
21;91:1;94:23;95:16,
18;98:21;100:9;
108:13;109:17,18,18;
112:16;115:10;
116:15;123:8;140:2;
144:1;152:17;186:24;
187:2;193:11;195:11;
198:22;201:6;214:18;
218:1;222:3
**Tucker (1)**
40:16
**turn (18)**
64:3;71:20;72:22,
23;73:5;75:11,19;
92:1;96:14;118:25;
137:2;168:7;198:3;
224:5,5,8,9;227:24
**turned (6)**
64:7;76:6,8;96:9;
100:5;120:2
**Turning (9)**
70:14;96:10;
121:12;198:8,12;

200:7;204:22,22;
207:3
**two (52)**
5:9,25;6:6;7:17;
29:18,19;30:16;33:5,
8,10,25;34:19;35:20,
23;42:23;46:4;52:20,
20,21;65:1;68:18;
71:17,18;72:5,6;
76:24;81:11;106:4;
110:12,12,12;123:4,
21;126:24;128:21;
131:17;140:14,20,20,
23;141:1,2;155:18;
162:23;190:23;205:7;
217:3;218:14;225:12;
226:8;227:11;230:4
**two-way (2)**
75:21;76:2
**type (2)**
94:10,11
**typical (1)**
190:9
**typically (1)**
190:1

**U**

**Ultimately (1)**
61:4
**um (2)**
151:17;154:11
**unanimous (1)**
60:10
**unavailable (1)**
25:21
**uncertain (1)**
227:12
**unclear (1)**
147:12
**uncomfortable (1)**
63:4
**under (45)**
14:1,5;18:12,14;
25:1;29:7;54:17;55:9;
56:20,23;57:13,14;
61:13,15;65:4;66:8,
25;78:7,12,13,21;
79:6;83:8;97:20;
112:6;168:20;192:4,
4;193:7,11;197:24;
214:5;215:8;216:22;
217:6;219:3,11,13;
220:2;221:21,21;
222:2,7;226:24;
227:20
**underneath (5)**
65:19;80:16;84:20;
112:4,9
**understood (8)**
43:7,18;44:10;45:3;
47:10,22;50:14;51:2
**unencumbered (2)**

214:1;218:19
**unfettered (3)**
191:25;214:2;
218:19
**unfortunate (1)**
166:1
**unfortunately (1)**
165:22
**UNIDENTIFIED (2)**
146:15;164:23
**uniform (5)**
57:22;70:22;
121:20;155:25;
156:15
**uniformed (3)**
225:5;226:25;
227:14
**unit (1)**
121:17
**United (6)**
18:12;23:8;188:20;
216:5,21;217:2
**unless (16)**
21:22;49:1;58:24;
59:5;86:12;103:23;
135:24,25;143:9;
191:13;212:15;
217:24;218:12;
219:10,11,12
**unlicensed (8)**
8:15;16:18;39:18;
55:3;57:7;66:17;
109:5;225:8
**unrecognizable (1)**
178:5
**unregistered (1)**
130:2
**unrest (1)**
139:5
**unsure (1)**
48:24
**unto (2)**
94:24,25
**unwilling (1)**
226:10
**up (87)**
6:21;9:6;10:12;
18:23;24:22;25:23;
26:22;32:10;38:2;
41:6;43:6;53:7;60:15;
67:16;69:17;77:20;
81:5,7;84:13;95:5,6;
96:16,17;97:17;
99:10,13,14,14;
101:13;102:2,13;
105:2;107:10;119:15;
120:11;124:9;126:15,
22;131:25;135:23;
138:4;139:5;140:5,
21;148:19;164:14,24;
166:12,18,19;170:19;
172:6,11,16,21;175:8,
13;177:21;183:25;

187:13;190:18;
191:16,18;192:11,16,
19,21;195:24;198:21;
202:12;206:20;207:6,
21;211:19;213:14,20;
214:10,17,19,22;
215:2;217:14,18;
218:15;220:9;221:6,
14
**upon (8)**
22:7;28:17;42:20;
54:24;56:21;57:2;
82:6;218:23
**uproar (1)**
66:4
**upset (3)**
114:6,8;205:14
**upstairs (1)**
200:3
**urge (1)**
213:9
**use (21)**
8:12;33:13,18;
46:18;52:21;55:10;
57:15;61:20;62:15;
65:21;170:25;183:8,
24;184:11,12;186:20,
21;194:22;197:17;
214:12;221:5
**used (6)**
141:24;142:8;
143:5,6;198:21;
228:14
**using (7)**
55:10,11;57:15,16;
92:7;150:11,14
**usually (2)**
67:11;190:2

**V**

**valid (1)**
219:13
**value (1)**
28:17
**van (6)**
106:12,14,15;
107:9,10,13
**Varnum (2)**
70:19,25;72:21;
75:3;76:11
**vehicle (112)**
8:12,15,16,22;
16:18;39:18,19;
54:17,20,23,24;55:3,
5,16;56:20,24;57:1,2,
7,9,21;64:6,8,19,20,
21,24;65:1,5,5,6;66:9,
16,17;70:20;71:11,13,
16,17;74:9,12,15;
75:15,22;76:19,21,22;
77:10,11,13;78:15;
79:6,9,11,16;80:4;

82:4,7;83:21;85:15;
86:1;91:16;92:6;
96:13;97:10,17;
100:14;104:15;109:6;
113:17;115:4;122:1,
20;123:23;124:23,25;
126:1,7,8;127:18;
129:23;130:2;138:22,
23;139:15;141:3,8,12,
13,25;142:4,9,11;
143:7,9,12;144:22;
147:23;153:8,24,25;
156:3,12,13,17;
175:16;179:16;203:8;
224:3;225:21;226:10,
11
**Vehicles (18)**
11:13;71:24;72:1,3;
73:25;74:10,19;75:6,
8,25;83:24;85:6;
90:21;96:18;153:11;
175:14;220:7;224:25
**venire (1)**
53:16
**vent (2)**
161:21,22
**venting (3)**
161:17,23,25
**verbally (2)**
78:25;79:7
**verdict (11)**
9:2;42:15;45:12,19;
48:19;58:15;60:9,10,
11;62:25;208:8
**version (1)**
208:1
**vested (1)**
216:5
**victim (1)**
48:17
**video (5)**
147:11,12,13,20,21
**videotaping (1)**
134:6
**view (1)**
147:15
**viewed (1)**
134:4
**VIN (2)**
156:3,8
**vindicate (1)**
6:2
**violate (2)**
164:6;165:6
**violation (5)**
4:18;8:11;37:23;
188:4;198:11
**violence (4)**
23:17,18;55:11;
57:16
**violent (1)**
24:4
**visible (1)**

92:1
**visual (1)**
28:24
**voice (1)**
89:4

## W

**wagon (18)**
85:25,25;106:18,
22,23;107:17,20;
140:16;153:12;175:7,
8,8;205:14,15;206:19,
20,23;222:18
**wait (7)**
13:21;15:14,15;
119:24;173:23,23,23
**waiting (5)**
80:20;127:3;
131:25;161:6;171:24
**walk (5)**
134:7;140:5;
151:23;165:1;192:20
**walked (5)**
97:17;164:22;
206:23,25;222:18
**walking (3)**
100:12,14;102:2
**walkway (1)**
139:21
**wall (2)**
163:10,13
**Walmart (12)**
159:6,7,14;182:23;
184:2;194:2,11,11;
195:16,18;220:24;
228:13
**wants (5)**
11:9;99:5;147:17;
190:7;225:9
**warning (1)**
88:10
**warrant (2)**
54:18;56:21
**Watch (6)**
44:6,20;47:6;69:16;
166:18,18
**watching (2)**
116:7;206:21
**way (60)**
40:23;44:4,23;
54:24;55:5;57:3,9;
60:13;61:17,22;
66:22;71:1;74:21;
95:6,7;96:19;99:3,10;
102:18,21;108:4,7,11;
110:12;114:6;117:24;
118:4;122:24;125:5;
126:16;131:15;
144:16;147:25;
148:18;154:18;
167:18;170:18,19,20;
171:18;172:8,10;

174:12;193:15;
194:24;198:25;
200:19,19;203:21;
206:19,25;216:15;
217:15,17;220:17,18;
222:3;224:18,18;
227:15
**ways (1)**
220:6
**weapon (39)**
8:11,14;39:18;
54:15,20;56:18,24;
66:24;68:14,15;81:3;
109:5;128:13;159:1;
183:10,12,18,24;
194:1;195:1,2,15,16,
19,22;196:5,6;
202:23;208:9;210:12,
16;220:24;221:5,12;
222:12,16;227:17,20;
228:11
**weapons (6)**
126:17;158:17,18;
221:3;228:12,13
**weather (1)**
71:3
**weave (1)**
224:11
**weeds (1)**
194:23
**weeks (1)**
68:18
**weigh (1)**
60:23
**weight (1)**
62:1
**weren't (3)**
95:23;115:3;219:22
**whacked (1)**
80:15
**what's (29)**
5:5;17:10;24:2;
84:1,9;91:21;94:24;
111:16;127:9;143:5;
146:2;149:23;150:4;
160:10,12;169:18;
169:17;172:3,12;
173:12,16,19;187:20;
192:20;198:7;199:2;
209:23;218:12;
225:10
**whatsoever (1)**
77:25
**wheel (8)**
200:12;201:13;
203:12,25;211:9;
222:10,18;224:3
**whenever (1)**
30:22
**where's (1)**
223:7
**wherever (1)**
213:14

**Whew (1)**
151:17
**white (1)**
77:4
**whole (21)**
23:22;25:14;29:11;
76:13,15,17;82:12;
105:22,25;140:11;
152:5;164:16;165:2;
170:16;190:24;
191:21;195:3;204:24;
205:18;213:15;
**who's (3)**
23:1;132:23;223:5
**Whose (1)**
210:9
**wide (3)**
68:3;76:2,3
**wielding (2)**
194:1;195:15
**wife (2)**
154:23;160:11
**wife's (1)**
200:2
**wild (1)**
188:23
**willing (2)**
27:7;50:1
**win (1)**
168:23
**wind (1)**
201:7
**window (19)**
64:22,23;77:20,21;
78:2;98:2;99:10,13,
14;100:11;113:18;
156:5,9,10;200:9,13;
201:7,17;222:11
**windows (2)**
118:10,18
**winter (3)**
63:20;66:12,25
**wish (1)**
67:5
**wishes (2)**
25:1;59:22
**wit (2)**
54:21;56:24
**within (3)**
15:23;21:6;72:7
**without (26)**
6:3,7;19:20;30:17;
33:10;42:23;62:24;
63:16;68:13,15;69:1;
152:9;189:3,6,9,15;
190:18;195:12;
202:23;214:18;
216:14,16;219:9;
220:4;221:25;228:18
**witness (139)**
5:9;11:2;25:21;
26:9;27:14;28:11;

34:24;35:20;37:22;
49:22;60:25;61:1,25;
69:11,18;74:3,5;92:3;
107:14;111:1;116:10;
117:12;119:5,7;
120:12;144:5;146:14;
147:4;148:11,20;
149:5,7;153:1;154:4,
6,17,19;155:1,1,3,4;
157:23;158:21;
159:25;160:17,19,21,
25;161:4,8,11,13,15,
17,20,22;162:1;166:2,
16,22;171:14;174:25;
175:2,4;182:23;
183:20;190:4,14,18;
193:17,19,21,23,25;
194:8,10,17,20;195:7,
9,11;196:2,4,9,11,13,
16,18,24;197:1,2,8,
13,19,23;198:19;
199:7,9,11,13,16,18;
202:1,19,21;203:1,3,
5,7;204:5,7,11,13,16,
19;206:1,3,8,14,16;
207:8,10,15,18,20,23,
25;208:2,11,15,17,21,
25;209:3,5,8,12;
211:1,3
**witnessed (1)**
21:3
**witnesses (29)**
5:9;7:15,17;19:2,7;
29:18,19;34:20;35:2,
7,9,23;40:19,20;
41:19;60:24;61:9,11,
12;62:6;63:3;162:23;
184:19;198:17;205:9;
221:18,19;227:5,21
**WITNESSS (1)**
207:6
**witness's (2)**
21:2;183:21
**wondering (1)**
172:3
**word (4)**
138:2;141:24;
142:8;143:5
**words (3)**
137:24;174:3;
201:16
**work (21)**
20:7;29:12,15;
30:23;45:23;49:16;
70:3;120:22;128:14;
180:23;181:3,8,17;
184:12;194:19;201:4;
213:14;214:3,3;
220:6;221:4
**worked (4)**
121:3;158:11;
181:20;182:5
**working (5)**

55:21;70:15;
121:13;180:22,23
**works (2)**
20:9;214:7
**world (2)**
188:3;202:6
**Worst-case (1)**
200:18
**Wow (1)**
165:20
**wrap (2)**
183:25;221:14
**wrestle (2)**
81:12;116:6
**wrestled (1)**
81:14
**wrestling (5)**
81:11;116:2,4,6,7
**write (6)**
35:9;86:2;98:15,15;
132:23;142:25
**writing (3)**
90:19;132:8,10
**written (2)**
132:14;168:11
**wrong (10)**
75:9;143:10,15;
164:5;173:20;174:10,
14,20;218:22;228:1
**wrote (17)**
38:23;94:8;96:19;
108:17;129:14;130:5;
132:4,5,14,15,15;
138:8;141:14,14;
186:2;217:22;220:9

## Y

**Yardwork (1)**
181:13
**year (10)**
63:18;132:13;
143:21,22;144:9,11;
157:10;197:25;
223:25;225:19
**years (16)**
48:4;70:7;88:1;
121:1,5;128:19;
129:2,3,7;130:11;
131:4;157:4,4;
167:15;178:25;227:8
**yelling (10)**
66:4;97:15;102:13;
110:5;126:20;201:9,
18,19;202:3,4
**yellow (9)**
74:18,24;203:10,
11;210:12,18,21;
211:3;224:12
**yellows (1)**
224:22
**Yep (1)**
19:8

**you're (1)**
  203:22
**young (4)**
  161:5;162:18;
  163:11,14
**Yup (11)**
  9:1;15:7;50:15;
  67:6;86:24;118:14;
  131:14;143:8;163:6;
  187:25;188:2

**Z**

**zero (1)**
  131:15

**0**

**01852 (1)**
  84:11
**02205 (1)**
  84:3

**1**

**1 (24)**
  8:4,8,14;44:2;
  47:19;48:2,7,9,11,15,
  21;49:16,24;50:3;
  54:12;55:6;57:10;
  63:6;73:13,17,19;
  216:4;220:7;224:7
**1/22/2019 (1)**
  144:10
**1:00 (2)**
  63:7;117:14
**10 (7)**
  147:22;151:19;
  152:6,14;157:11;
  213:3;220:7
**10:36 (1)**
  10:13
**100 (1)**
  191:5
**109 (17)**
  54:11;64:19;75:16;
  76:6,9,19;79:19;82:2;
  84:11;97:2,3;98:8;
  150:24,25;157:6;
  179:20;180:7
**11/20/19 (5)**
  131:15,19,20,25;
  146:5
**11:14 (1)**
  26:23
**11:31 (1)**
  39:5
**11:36 (1)**
  43:4
**11:36:46 (1)**
  43:9
**11:37 (3)**
  43:14;44:1,8

**11:37:56 (1)**
  44:17
**11:38 (1)**
  44:24
**11:39 (1)**
  47:2
**11:40 (3)**
  47:8,17,20
**11:43 (2)**
  50:6,10
**11:44 (4)**
  50:21,25;51:16,19
**11:46 (1)**
  53:9
**11th (1)**
  34:15
**12 (1)**
  221:13
**12.99 (1)**
  194:3
**12:07 (1)**
  67:17
**12:08 (1)**
  67:23
**12:33:12 (1)**
  88:11
**12:36 (1)**
  91:11
**12:39 (2)**
  95:13;96:4
**12:46 (1)**
  103:20
**12:48 (1)**
  105:13
**12:59 (2)**
  117:25;118:20
**14 (2)**
  206:24;220:7
**15 (6)**
  26:6;106:15,20;
  107:14;147:22;213:4
**17 (5)**
  43:12,16,19,23;
  44:2
**18 (5)**
  44:5,7,14,18;228:7
**18-inch (4)**
  54:21;56:24;66:11,
  24
**18th (1)**
  34:15
**19 (1)**
  132:14
**1911CR1969 (1)**
  5:13
**1911CR365 (1)**
  54:9
**19-1969 (1)**
  5:11
**19-365 (1)**
  5:8
**1969 (1)**
  5:18

**1983 (1)**
  146:3
**1st (1)**
  24:17

**2**

**2 (15)**
  8:4,8,15;44:16,18;
  63:8;82:24,25;83:1;
  84:4;117:22;118:1;
  127:23;128:2;228:5
**2/20 (1)**
  131:11
**2/26/19 (4)**
  131:10,12,13,15
**2:00 (2)**
  63:7;117:14
**2:02 (1)**
  118:20
**2:04 (1)**
  119:14
**2:16 (2)**
  130:12,20
**2:20 (1)**
  135:9
**2:21 (1)**
  136:9
**2:31 (3)**
  146:19,24;147:9
**2:32 (1)**
  148:9
**2:38 (1)**
  154:15
**2:39 (1)**
  155:7
**2:43 (1)**
  159:24
**2:50 (1)**
  166:13
**2:53 (2)**
  169:5,14
**20 (26)**
  4:19;44:21;45:1,4,
  6,9,14,20,23,25;46:3,
  6,9,12,14,16,20,23;
  47:1,3;51:22;52:10;
  54:2;56:9;120:4;
  223:1
**200 (1)**
  199:25
**2010 (1)**
  121:10
**2018 (1)**
  143:22
**2019 (30)**
  4:15,19;5:18;7:1;
  12:5,14,20,21;21:20;
  54:13,13,16,23;55:4,
  7,15;56:18;57:2,8,12,
  20;58:1;70:14;85:9;
  121:12;144:11;
  170:15;179:9;211:6;

  230:17
**20th (2)**
  34:16;146:3
**22 (4)**
  47:5,15;54:16;
  70:14
**22nd (20)**
  54:13,23;55:4,7,15;
  56:18;57:2,8,11,20;
  63:18;66:11;121:12;
  132:25;144:8;157:10;
  170:14;179:9;211:6;
  223:25
**23 (1)**
  85:14
**23rd (3)**
  21:20;54:12;58:1
**25 (2)**
  186:3;228:24
**26th (3)**
  21:16;132:13,18
**291 (1)**
  7:1

**3**

**3 (31)**
  8:4,8,16;18:8,10,11,
  12,13,18;46:25;47:3;
  52:11;55:19;84:5,16,
  17;145:10,16;149:16;
  167:6;168:8,9;
  209:21,24;215:14,15,
  16,17,21;216:4;
  225:14
**3:08 (1)**
  184:25
**3:12 (1)**
  189:25
**3:28 (1)**
  204:6
**3:29 (1)**
  204:17
**3:32 (1)**
  207:13
**3:33 (1)**
  208:14
**30 (1)**
  227:8
**30th (2)**
  12:4,21
**32-B (1)**
  57:13
**33 (1)**
  88:1

**4**

**4 (9)**
  7:24;8:19;47:16,18;
  63:8;85:19,20;
  228:23;230:17
**4:01 (1)**

  229:16
**4:02 (1)**
  230:16
**4458 (1)**
  4:14
**4th (43)**
  54:11;64:15,19;
  73:5;74:20;75:12,16,
  16,17,25;76:6,9,19;
  82:2;84:11;96:25;
  97:1,4,5,7;121:25;
  122:10,14;150:24,25;
  157:6;170:20;171:14,
  18,25;172:10;174:13;
  179:18,19,20,23,24,
  24;180:2,3,5,7;224:19

**5**

**5 (5)**
  8:4,8,20;50:5,7
**55889 (1)**
  84:3

**6**

**6 (13)**
  8:4,8,20;50:9,12,15,
  19,20,22,23;70:15,24;
  71:8
**6:00-6:15 (1)**
  63:19
**6:15 (1)**
  121:13
**68 (1)**
  57:13

**7**

**7 (9)**
  50:24;51:3,7,10,14,
  15,17,17,20
**7-Eleven (1)**
  72:25

**8**

**8 (2)**
  85:9;219:11
**8B (1)**
  219:13
**8th (1)**
  34:16

**9**

**9 (1)**
  211:21
**9:12 (1)**
  4:2
**9:21 (1)**
  6:22
**9:30 (5)**

229:3,4,12,17;
230:12
**9:52 (1)**
9:7
**90 (4)**
55:6;57:10;85:14;
220:7