UNITED STATES DISTRICT COURT
                     DISTRICT OF MASSACHUSETTS

LEONITUS JABIR BEY,                 )
                                    )
         Plaintiff,                 )
                                    )
    v.                              )   C.A. No. 19-10219-PBS
                                    )
COMMONWEALTH OF MASSACHUSETTS,      )
et al.,                             )
                                    )
         Defendants.                )

                       **MEMORANDUM AND ORDER**

                          **March 30, 2021**

Saris, D.J.

# I. Introduction

Pro se plaintiff Leonitus Jabir Bey brings this action under 42 U.S.C. § 1983, alleging that Lowell Police Officer David Allen Pender unlawfully arrested him and used excessive force against him during a traffic stop in Lowell.[1] Now before the Court are the parties' cross motions for summary judgment. For the reasons stated below, Officer Pender's motion for summary judgment is **ALLOWED** as to the claim for unlawful arrest

---

[1] In a July 1, 2019 order (Dkt. 8), the Court reviewed Bey's complaint pursuant to 28 U.S.C. § 1915(e)(2). The Court concluded that the only discernable claims over which the Court could exercise jurisdiction were the claims against Officer Pender under 42 U.S.C. § 1983 for a violation of Bey's Fourth Amendment right to be free from unlawful arrest and the use of excessive force.

and **DENIED** as to the claim for the use of excessive force. Bey's cross motion for summary judgment is **DENIED**.

## II. Background

### A. Bey's Affidavit[2]

The Court summarizes the relevant parts of the affidavit Bey attached to his complaint.  Dkt. 1-1 at 13-14.  On January 22, 2019, at approximately 6:00pm, Bey was driving[3] in his truck in Lowell when the alternator started to malfunction.  Bey then chose to drive straight from a left turn only lane to get his rapidly failing car off the road as soon as possible.  After this maneuver, Officer Pender turned on his flashing lights and followed Bey.  Although Bey saw the flashing lights, he did not immediately pull over.  He decided that, because his automobile was shutting off and on and losing power, it would be safer to stop on the street where his home was located, which was approximately 500 feet away.

Bey thought that, after he stopped, he would be able to explain his situation to Officer Pender and that, at worst,

---

[2] In contravention of this Court's Local Rules, Bey did not file a Statement of Material Facts of record as to which it is contended that there exists a genuine issue to be tried.  See L.R. 56.1.  In the interest of justice, the Court will consider the affidavit Bey filed with his complaint and his testimony in the subsequent criminal trial.

[3] For purposes of this action, Bey's distinction between "driving" and "travelling" is irrelevant.

Officer Pender would issue him a traffic ticket.  Instead, an angry Officer Pender pointed a Taser gun at Bey and screamed at Bey to show his hands.  Bey informed Officer Pender he could not lower his window because the truck had died.  Officer Pender then screamed at Bey to open the driver's door, which Bey did.  Bey assured Officer Pender that aggression was not necessary and attempted to calm the officer, only to have Officer Pender punch him in the face several times.  In fear, Bey clasped his steering wheel.  At the same time Officer Pender reached for his handcuffs, he dropped his Taser gun.  Officer Pender then attempted to place the handcuffs on Bey, who was still seated in his truck, and delivered more blows to Bey's face.

Bey stepped out of this truck, hoping it would deescalate the situation.  Instead, Officer Pender immediately threw Bey to the ground and proceeded to handcuff him.

Bey was subsequently charged with six crimes arising from his encounter with Officer Pender:  carrying a dangerous weapon; negligent operation of a motor vehicle; unlicensed operation of a motor vehicle; furnishing false identification information to law enforcement; resisting arrest; and failing to stop for a police officer.

    **B.**    **Trial Proceedings**

On September 3, 2019, after the commencement of this action, Bey went to trial in Lowell District Court on five of

the six criminal charges arising out of the above-described events of January 22, 2019. Bey represented himself.

Officer Pender included the transcript of the proceedings as an exhibit to his Statement of Facts in support of his motion for summary judgment. The Court highlights pertinent information from this document. Dkts. 22-3, 22-4.

### 1.   Officer Pender's Direct Examination

During the direct examination, Officer Pender testified that, on January 22, 2019 at approximately 6:00pm, he was conducting traffic enforcement at the corner of Mammoth Road and Varnum Avenue in Lowell. His attention was drawn to a pickup truck vehicle (later identified as the vehicle Bey was driving) in the left lane of Mammoth Road, which had two lanes in the direction that the truck was traveling. Road signs and painting on the road indicated that the left lane was only for vehicles making a left turn. Instead of turning left, the pickup truck "cut the motor vehicles off that were in the right lane, and then he came straight ahead, so much so that the vehicles in the right lane had to slam the brakes on so not to collide," coming "within probably five feet of hitting each other." Dkt. 22-3 at 71-72.

Officer Pender then "activated [his] blue lights and siren and attempted to pull the motor vehicle over." Id. at 74. Instead of pulling over, the truck "crossed over the solid

4

double yellow lines into the oncoming traffic" and "went past several motor vehicles," causing several vehicles "to slam their brakes on to stop as he went on the wrong side of the road." Id. at 74, 75.  Then the truck "cut back over, continued outbound on Mammoth Road and took a right onto 4th Ave." Id. at 74.

After the truck pulled over on 4th Avenue, Officer Pender pulled behind the truck, exited his police vehicle, and approached the driver of the truck.  Officer Pender observed two individuals in the truck.  As he approached the truck, Officer Pender could see Bey, the driver, "making further gestures inside the vehicle . . . to his right," and "[i]t looked as though [Bey] was trying to either get something or hide something on the side of him." Id. at 77.  Bey "would not open up his door or roll down his window, so [Officer Pender] tapped on the window." Id.  Bey "refused to acknowledge that [Officer Pender] was there" and told Officer Pender that he "had no authority whatsoever to talk to him." Id. at 77-78.

Officer Pender opened Bey's door to place him under arrest. Bey "[s]hoved [Officer Pender] away, [and] asked [Officer Pender] why he was under arrest." Id. at 78.  Officer Pender "told him he was being placed under arrest for failure to stop." Id.  Bey replied that Pender "had no authority to arrest him and refused to exit the motor vehicle." Id.  Bey "kept fidgeting

5

with something on the righthand side of him, between the seats." Id.  Bey and his passenger were "verbally attacking [Officer Pender] and telling [Officer Pender] [he] had no authority and no right to pull him over or arrest him and that he didn't have to get out of the truck."  Id. at 78-79.  This exchange happened again.

At some point, Bey's passenger exited the vehicle and "came out around the truck towards [Officer Pender]."  Id. at 79.  Because of the configuration of the truck, police vehicle, surrounding structures, and the passenger's approach, Officer Pender was "pretty much boxed in by them."  Id. at 80.  By that point, Officer Pender had had pulled out his Taser because he "was in fear that [he] was going to be assaulted."  Id.  Officer Pender pointed his Taser at the passenger and ordered him to stay away.  At the same time, Bey "was shoving [Officer Pender] from the driver's side seat, and [Bey] had then whacked [Officer Pender's] hand, knocking the Taser out, and it fell underneath of the truck."  Id.

At that moment, Officer Pender was in fear and felt "[r]eady to fight."  Id.  He was "trying to get [Bey] out of the truck," and "trying to get [the passenger] to back away from [him].  Id.  Bey "shoved [Officer Pender] again, and went to go reach for something on the side."  Id.  Officer Pender thought

6

Bey was "going for a weapon," id. at 81, and "hit [Bey] with a straight punch towards him," id. at 80.

A few minutes later, another officer arrived to assist Officer Pender. This second officer grabbed the passenger and the two began wrestling. Officer Pender "was able to wrestle [Bey] . . . out of the driver's seat" and "place handcuffs on [Bey] and arrest him." Id. at 81. Other officers who had arrived at the scene were able to handcuff the passenger.

### 2. Officer Griffin's Direct Testimony

Lowell Police Officer Kyle Griffin also testified at the trial. According to Officer Griffin, he was dispatched to the scene to backup Officer Pender. When the prosecution asked Officer Griffin what he observed when Officer Pender was removing Bey from his vehicle, Officer Griffin responded that " it wasn't exactly a smooth operation. It was definitely a physical altercation that was taking place between Officer Pender . . . and the driver. There was resistance on pulling [the driver] out. Officer Pender would be seemingly pulled into the vehicle and then pull himself out, until he eventually was able to remove the person from the vehicle." Id. at 126.

### 3. Bey's Direct Examination

Bey's trial testimony was consistent with his allegations in the affidavit he submitted with his complaint. The Court summarizes the relevant portion of his testimony.

7

Bey was aware that he had committed a lane violation by going straight from a left-hand turn only lane. He did not hear sirens, but he see did police lights. Bey did not pull over immediately because his alternator or his truck was flickering, and the battery was about to die. He thought that if he pulled over immediately, his car would get stuck in the middle of a busy road and would impede traffic. In addition, he did not want to pull over immediately because he "feared for [his] safety, because what's going on now with social media everywhere, police shooting and killing individuals." Id. at 199. He decided to continue driving until he could pull over at his domicile less than 200 meters away, where he felt "[s]afe to . . . respond to . . . the dilemma, the going straight in a left turning lane." Id. at 200. Bey believed he was "doing [the police] a favor because [he was] not running." Id. at 201. He intended to bring the officer "somewhere where [Bey] fe[lt] safe, and then [he would] be able to talk to [Officer Pender] and explain to him, and then as men we would just work it out." Id. Bey thought that even if he got a ticket, or "even if [he] [got] arrested or whatever the case, [he] would handle it like a man." Id.

When Officer Pender approached the window of Bey's truck, Bey was "totally thrown aside by all the screaming and the gun pointed at [him]." Id. at 200. Bey "got nervous," thought that

8

"this guy has a gun out, so [he] clasped the steering wheel." Id. Bey tried to explain to Officer Pender that he could not put the window down because the alternator was dying, but Officer Pender was "too busy yelling." Id. at 201. Bey and Officer Pender "opened the door simultaneously," with Bey pushing the door at the same time Officer Pender was pulling it. Id. Officer Pender yelled, "Is this what you want," and then delivered "the first initial reach, jab, punch" to Bey. Id.

Bey did not voluntarily exit the truck because he was "terrified." Id. at 203. Officer Pender had a Taser gun in his hand and Bey was "clasped to the wheel." Id. Bey's passenger stepped out of the truck to film the incident, even though Bey urged him to stay in the vehicle. Officer Pender was pulling Bey out of the truck and "still punching [him] in the face. Id. Bey said to Officer Pender, "We can talk. You don't have to hit me. Like, here I am. I'm not running. You don't have to hit me repeatedly." Id. Bey continued: "We can talk. I know you're still going to arrest me but let's see if we can diffuse, that way it's not this crazy . . . . You're going to get your arrest, you're going to get your collar, and then I'm going to be able to keep my dignity." Id.

Officer Pender then "drag[ged] [Bey] out the car, judo flip[ped] [him] to the ground," and cuffed him. Id. at 205.

Officer Pender did not say anything to Bey.  Officer Pender was "so upset he dragged [Bey] over to the wagon." Id.

### 4. Closing Arguments and Jury Instructions[4]

In closing arguments, Bey asserted, in relevant part:

> And then the resisting arrest part. How would I resist arrest when I was under arrest? I was already arrested. At what part did I resist it? When he was punching me in the face, or when he threw me on the floor? Or, I guess, probably when I cling to the steering wheel in fear for my life because he had a gun pointed at my window. Or a Taser, whatever they want -- it's still a weapon, and I don't recognize it and I'm scared.
>
> I'm -- as -- I know we look -- they say black people look just whatever, whatever, but I'm scared, okay? When it comes to certain things, scared.
>
> So when he pulled that weapon and I cling, and if they want to say that -- I don't see -- once he ripped me off the steering wheel and threw me down into cuffs, we walked to the wagon, you know, no problem.

Id. at 222.

With regard to the charge of resisting arrest, the prosecution argued:

> You heard Officer Pender testify.  He testified how there were two individuals and just him in the beginning.  How the defendant, who was right in front of him, still inside of his vehicle, unwilling to respond to his commands, how another person, the other occupant in the vehicle, came around right next to him.  And there he is pinned in, one person in front of him, one person to the side, a car behind them, a

---

[4] The testimonies of Officer Pender, Officer Griffin, and Bey on cross examination did not differ from their testimonies on direct examination in any way that is material to this memorandum and order.

10

>      door to the side, and ordering the defendant to get
>      out of the car.  The defendant refuses.
>
>           He pulls on the defendant to get out of the car.
>      The defendant pulls him back.  You heard the testimony
>      of Officer Griffin about that struggle back and forth.
>      Officer Pender takes out his Taser to try to bring
>      some order to the situation, and the defendant slaps
>      it out of his hand.
>
>           Each part of resisting is there.  The judge will
>      tell you the law on resisting arrest. . . .  [T]hat he
>      resisted [arrest] by physical force or created a
>      substantial risk of injury to another.  Both of those
>      are here.  The physical force, slapping the Taser,
>      pulling against the officer, substantial risk to
>      others, driving on the road as he did. . . . It was
>      credible testimony.  I submit to you, you can believe
>      that he was there two on one, Taser slapped out of his
>      hand, uncertain what was going to happen next.

Id. at 226-27.

In instructing the jury on the elements of resisting arrest, the court informed the jury that "resisting" consisted of "using or threatening to use physical force or violence against the officer or another person . . . Or by using some other means which created a substantial risk of causing bodily injury to the officer or another person."  Dkt. 22-4 at 19-20.

### 5.  **Jury Verdict**

The jury found Bey guilty of negligent operation of a motor vehicle, unlicensed operation of a motor vehicle, resisting arrest, and failure to stop for a police officer.  Officer Pender represents that Bey did not file an appeal of those convictions, and Bey has not offered evidence to the contrary.

11

**II. Standard**

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue is genuine if it can be resolved in favor of either party, and a fact is material if it has the potential of affecting the outcome of the case." Leite v. Bergeron, 911 F.3d 47, 52 (1st Cir. 2018) (quoting Tang v. Citizens Bank, N.A., 821 F.3d 206, 215 (1st Cir. 2016)(internal quotation marks and citations omitted)). When ruling on a motion for summary judgment, the court "view[s] the facts in the light most favorable to the party opposing summary judgment," Rivera-Colón v. Mills, 635 F.3d 9, 10 (1st Cir. 2011), but "conclusory allegations, improbable inferences, and unsupported speculation" are insufficient to create a genuine issue of material fact to survive summary judgment, Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009) (quoting Prescott v. Higgins, 538 F.3d 32, 39 (1st Cir. 2008)).

**III. Discussion**

Here, there is a genuine issue of fact concerning the actions of each party with regard to Officer Pender's traffic stop of Bey and the ensuing events. Were it not for Bey's convictions during the pendency of this action, the stark differences between each party's version of the events would

12

preclude summary judgment for either party on both claims. However, during the pendency of this action, Bey was convicted on criminal charges arising from the same events underlying the present civil claims. Thus, the parties' factual disputes are not material if Bey's claim is nonetheless barred by the "favorable termination" rule of Heck v. Humphrey, 512 U.S. 477 (1994).

In Heck, the Supreme Court held that, "in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." Id. at 486-87 (footnote omitted) (citing 28 U.S.C. § 2254). This rule applies not only where the plaintiff expressly states that his conviction or sentence is invalid, but also wherever "a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence." Id. at 487.

### A. Unlawful Arrest

Here, Bey's success on his claim for unlawful arrest would necessarily imply the invalidity of his conviction for failure

13

to stop for a police officer. Officer Pender testified that he observed Bey failing to stop after he turned on his police lights and siren. He also testified that he told Bey he was being arrested for failure to stop. Bey claims that he did not hear a police siren but that, when he saw the police lights, he traveled a very short distance to arrive at a safe place to stop his truck. The jury found Bey guilty of failing to stop for a police officer, apparently believing Officer Pender's testimony over Bey's testimony. Bey's commission of this crime was reason enough for Officer Pender to arrest Bey. See Mass. Gen. Laws ch. 90, §§ 21, 25. For Bey to prevail on his present claim for unlawful arrest arising from the same event, the factfinder would have to conclude that Officer Pender did not have probable cause to arrest Bey. Such a finding would necessarily imply the invalidity of Bey's criminal conviction for failing to stop for an officer. This result is untenable under Heck because Bey's conviction has not been reversed on appeal, otherwise invalidated by a court, or expunged by executive order.

### B. Excessive Force

In his memorandum in support the motion for summary judgment, Officer Pender argues, "Where Heck [sic] arises where a plaintiff has been convicted of a crime or pleaded guilty to a crime stemming from interactions with police officers, the First Circuit and other circuit courts have indicated that Heck serves

14

as a bar to the plaintiff's civil rights claim if the plaintiff maintains in that civil suit that he did nothing wrong and the officers employed excessive force." Dkt. 21 at 8-9.

This assertion is overbroad and unsupported even by the cases cited by Officer Pender.  When considering whether Heck bars an excessive force claim when the plaintiff was convicted of wrongdoing during the same transaction, the pertinent question is not merely whether the plaintiff maintains his innocence for the crime of which he was convicted.  The inquiry must be more thorough, and Heck will only bar the claim where a plaintiff's theory of relief depends on his innocence.

Massachusetts law provides that:

A person commits the crime of resisting arrest if he knowingly prevents or attempts to prevent a police officer . . . from effecting an arrest of the actor or another, by:

(1) using or threatening to use physical force or violence against the police officer or another; or

(2) using any other means which creates a substantial risk of causing bodily injury to such police officer or another.

Mass. Gen. Laws ch. 268, § 32B.

Here, through the testimony of Officer Pender, the prosecution introduced evidence that, after Officer Pender opened the door to arrest Bey, Bey shoved Officer Pender away and was verbally belligerent.  Officer Pender further testified that Bey continued to shove Officer Pender and whacked Officer

15

Pender's drawn Taser out of his hand.  Officer Griffin testified that he saw Bey pulling Officer Pender into his truck more than once before Officer Pender was able to remove Bey from his truck.

In arguing that Bey had resisted arrest by physical force or by creating a substantial risk of injury to another by, the prosecution pointed to the evidence of Bey pulling Officer Pender into the truck and Bey knocking the Taser out of Officer Pender's hand.  The jury could have relied on this evidence in finding that Bey had resisted arrest.  See, e.g., Commonwealth v. Katykhin, 794 N.E.2d 1291, 1292 (Mass. App. Ct. 2003) (finding that defendant resisted arrest by force when he verbally refused to get in a police cruiser; stood "almost like a plank of wood" and refused to bend to get into the cruiser; and started a "tug of war" with an officer who had his hand on the defendant's arm).

However, a jury's conclusion in the criminal trial that a defendant resisted arrest by pulling on Officer Pender and knocking the Taser out of his hand would not prevent a jury in a civil case from finding that Officer Pender used excessive force against Bey by repeatedly punching him before he resisted arrest.

For example, in Thore v. Howe, 466 F.3d 173 (1st Cir. 2006), the plaintiff, who had pled guilty to assault and battery

of three police officers with a car in his underlying criminal case, brought a claim of excessive force against the police officer who had shot him in the neck during the encounter. Id. at 175. The officer argued that Heck barred the excessive force claim because the plaintiff's conviction for assault and battery with a dangerous weapon was based on the very conduct that justified the subsequent shooting (i.e., refusal to obey commands to get out of his car and gunning his engine to start to get away). Id. at 179-80. Although the plaintiff asserted that he was innocent of assault and battery, he also argued that the shooting occurred after the assault when he was "stationary in a car, boxed in with nowhere to go, and posed no threat to the officers, who had been told that he had no gun." Id. at 180.

In reviewing the district court's grant of summary judgment, the First Circuit concluded that Heck barred the plaintiff's theory of liability based on his innocence. Id. at 180. However, with regard to the plaintiff's assertion that he posed no risk when he was shot, the First Circuit concluded that the record on appeal did not permit "a determination of the requisite relatedness" between the conduct giving rise to the conviction for assault and battery and the officer's shooting of the plaintiff. Id.; see also id. ("Just as it is true that a § 1983 excessive force claim after an assault conviction is not

17

necessarily barred by Heck, it is also true that it is not necessarily free from Heck.").[5]

In Bochart v. City of Lowell, C.A. No. 13-11753-FDS, 2016 WL 696087 (D. Mass. Feb. 19, 2016), plaintiff's conviction for resisting arrest and assault and battery of an officer did not completely preclude him from bringing a claim for the use of excessive force by the officer. Id. at *5-6. The court allowed plaintiff to go to trial on a theory of liability that, once the plaintiff had been subdued by the reasonable use of one pepper spray, the officer's alleged use of force after that point was unreasonable. Id.; see also Cendan v. Trujillo, 779 Fed. App'x 688, 690 (11th Cir. 2019) (per curiam) (holding that, where plaintiff had been convicted for resisting law enforcement with violence, Heck did not preclude his claim of excessive force by the arresting officer because plaintiff "could prevail [on the excessive force claim] based on 'a version of the facts which would allow the conviction to stand'" (quoting Dyer v. Lee, 488 F.3d 876, 883 (11th Cir. 2007))).

Because Heck does not bar Bey's claim for excessive force, the Court must consider whether there is a genuine issue of

---

[5] The First Circuit did uphold the grant of summary judgment on the excessive force claim on the ground that the plaintiff was judicially estopped from directly contradicting facts admitted at his plea colloquy. Id. at 180-87.

material fact that would prevent the Court from granting judgment as a matter of law to either party.  As set forth above, the sworn statements of Officer Pender and Bey differ greatly on facts that are material to Bey's claim of excessive force. Moreover, Officer Pender has a troubling disciplinary record, with a prior suspension for excessive force, which may be admissible under Fed. R. Evid. 404(b) depending on the circumstances.  Thus, the Court denies the motion for summary judgment for either party as to this claim.

### C. Qualified Immunity

Government officials sued in their individual capacities are immune from damages claims unless "(1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'"  District of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)).

Here, Officer Pender asserts that he is entitled to qualified immunity with regard to the single punch he says he threw.  However, Bey claims he was punched multiple times. Qualified immunity is therefore not appropriate at this stage of the litigation because its application depends on disputed material facts concerning what force Officer Pender actually used.  Cox v. Hainey, 391 F.3d 25, 29 (1st Cir. 2004); St. Hilaire v. City of Laconia, 71 F.3d 20, 24 n.1 (1st Cir. 1995).

19

Finally, Officer Pender's discussion of the Massachusetts Declaration of Rights is unnecessary because the Court has already ruled that this lawsuit is limited to claims under 42 U.S.C. § 1983 for a violation of Bey's Fourth Amendment right to be free from unlawful arrest and the use of excessive force. See supra note 1.

## III. Conclusion

Accordingly:

1.  The Court **ALLOWS** Officer Pender's motion for summary judgment as to the unlawful arrest claim and **DENIES** the motion as to the excessive force claim.  (Dkt. 20).

2.  The Court **DENIES** Bey's motion for summary judgment. (Dkt. 24).

3.  The Court **DENIES** Bey's motion to strike.  (Dkt. 26).


SO ORDERED.

/s/ Patti B. Saris
PATTI B. SARIS
UNITED STATES DISTRICT JUDGE