Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

```
-------------------------------)
LEONITUS JABIR BEY             )
     Plaintiff                 )
                               )
          vs.                  )   C.A. NO. 19-10219-PBS
                               )
DAVID PENDER                   )
     Defendant                 )
-------------------------------)
```

ORIGINAL

DEPOSITION OF LEONITUS JABIR BEY, a
Plaintiff in the above-entitled cause, taken on
behalf of the Defendant, reported by Patricia
Quirk, CSR, a Notary Public in and for the State
of Rhode Island and The Commonwealth of
Massachusetts, appearing remotely via ZOOM from
Bristol, Rhode Island, on May 20, 2020, scheduled
at 10:00 a.m.

PRESENT:

FOR THE PLAINTIFF....PRO SE
                BY:  LEONITUS JABIR BEY
                     P.O. BOX 1934
                     LOWELL, MA  01854

FOR THE DEFENDANT....LOUISON, COSTELLO, CONDON & PFAFF, LLP
                BY:  BRADFORD N. LOUISON, ESQUIRE
                     101 SUMMER STREET
                     BOSTON, MA  02110
                     (617) 439-0305

1                      I N D E X

2   WITNESS                                    PAGE

3      LEONITUS JABIR BEY

4      EXAMINATION BY LOUISON                  03

5

6                    E X H I B I T S

7

8   NO.    DESCRIPTION                        Page

9   REPORTER'S NOTE:
       (NO EXHIBITS WERE MARKED DURING THIS DEPOSITION)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1                 (DEPOSITION COMMENCED AT 10:33 a.m.)

2                      LEONITUS JABIR BEY

3    Being duly sworn, deposes and testifies as follows:

4                    THE REPORTER:  Would you state your full

5         name for the record, please.

6                    THE WITNESS:  Leonitus Jabir Bey.

7                    EXAMINATION BY MR. LOUISON

8    (WITNESS ASKED FOR IDENTIFICATION, DID NOT PROVIDE.
     IDENTITY CONFIRMED BY MR. LOUISON)

9                    MR. LOUISON:  It is my personal

10   knowledge that is him.

11      Q.  Did you want to go on the computer, or are you

12      going to use the phone?  What do you want to do?

13      A.  I actually had it sitting up from last night

14   because I was making sure it worked.

15      Q.  Mr. Bey, have you ever -- have you ever been in a

16      deposition before?

17      A.  I have not.

18      Q.  All right.  So basically, it's a procedure in a

19      civil suit in which the parties have the opportunity to

20      ask questions and get answers under oath.

21          A court reporter is taking everything down that I

22      ask you, and will take down your answers.  A transcript

23      will be made of today's deposition.  And I'll ask you

24      questions, you answer them.

25          If you don't understand a question, or if you

RHODE ISLAND COURT REPORTING

Page 4

1    have any other questions, just let me know.  If you

2    need to take a break -- it shouldn't take too long,

3    maybe about an hour or so, and we can get going.  Okay?

4    A.  Yes, sir.

5    Q.  You stated your name; do you go by any other

6    name?

7    A.  Nope.  No.  It depends.

8    Q.  Go ahead.

9    A.  Depends.  People like to force things on you.

10   There's people who do name calling, people call me

11   names, but I don't go by any other name, no.

12   Q.  I know the issue of the name, so I'm not going to

13   dwell on that.  But you've known by the name of Leon

14   Campbell before?

15   A.  No.  That name was forced on me by the

16   government, and then I was raised to believe that was

17   my name.  Then, once I started studying law, I found

18   out that is not my name, that is a government

19   contractual name, a third-party name, an international

20   commerce says we can trust access, birth certificate

21   name.  So, no.

22        Yes, I've been called that name before, but it

23   is not my common name.  Even growing up in the streets,

24   I denounced that name, so, no.

25   Q.  When did you stop using that name?

1    A.   When I was in -- when I was, like, nine years

2    old.

3    Q.   Okay.  What name did you take when you were nine

4    years old?

5    A.   I've always been called Lion, like lion, I've

6    always been called Lion.  Lion was always the name I

7    was called.

8    Q.   When did you take the surname Bey, B-E-Y?

9    A.   When I found out my ancestral heritage.

10   Q.   What year was that, if you know?

11   A.   I want to say that was 2016, the end of 2016.

12   Q.   Okay.  What's your date of birth, please?

13   A.   11/20/83.

14   Q.   That makes you...

15   A.   Thirty-six.

16   Q.   Thirty-six, nice.  What's your address?

17   A.   Well, I domicile at an address, at my P.O.

18   Box 1934, that's the address, Lowell.

19   Q.   You lived at 109 4th Avenue, Apartment One,

20   Lowell?

21   A.   Well, I lived with my buddy, in a domicile.

22   Q.   You domiciled --

23   A.   At that address.

24   Q.   Where were you born?

25   A.   America.

RHODE ISLAND COURT REPORTING

Page 6

```
 1    Q.   Okay.  Where did you grow up?  What town did you
 2    grow up in?
 3    A.   New York.
 4    Q.   Do you remember when you left New York?
 5    A.   I don't know, 2006 or '07, one of them.
 6    Q.   Sure.  Where did you go when you left New York?
 7    A.   Massachusetts.
 8    Q.   Did you live in any other states in the United
 9    States, other than New York and Massachusetts?
10    A.   Is this relevant to --
11    Q.   Yeah, I'm just trying to get some background
12    information.
13    A.   Yeah, but is it relevant to the case?
14    Q.   I just want to know if you've lived in any other
15    states.
16    A.   Do I get all the same information on Mr. Pender
17    Allen (sic) that you're gathering on me?
18    Q.   You could ask him questions in a deposition if
19    you want.  So, anyway, what other states have you lived
20    in?
21    A.   I can't recall.
22    Q.   Who do you live with now?
23    A.   My wife.
24    Q.   What's her name?
25    A.   Lauren McHugh.
```

Page 7

1    Q.   Anybody else?

2    A.   And Karen McHugh.

3    Q.   Who is she?

4    A.   Her mother, my mother-in-law, the woman that

5    came outside and had to tell Mr. Pender Allen to stop.

6    Q.   Okay.  Have you ever lived outside the United

7    States?

8    A.   I can't recall.

9    Q.   You can't recall if you ever lived outside the

10   United States?

11   A.   No, I cannot.

12   Q.   Wouldn't you remember that?

13   A.   I should, but, the amount of police brutality I

14   go through constantly, being hit, dragged, and cuffed.

15   Taking a lot of drugs, having to get rid of the pain

16   that the police caused me every day of my life, since I

17   was 11 years old.

18        I'm going to tell you now, a lot of what I can

19   remember is only police violence towards me.  I can't

20   really remember any of these extra questions you are

21   asking me, because I've been in surgery.  I've taken

22   drugs to get my leg back and my mind back, and it's all

23   due to police brutality.

24        All I can remember is the ill treatment from

25   them, so you're really going to waste all of our times

1   if you drag us into any of it, other than the facts of

2   where we need to go with this case.

3       Q.  When you talk about police brutality, you are

4       talking about from whom?

5       A.  From policy enforcers.

6       Q.  So, you indicated that you had a leg problem as a

7       result of police brutality?

8       A.  No.  I'm saying the leg problem was part of

9   my -- the reason why I can't remember a lot of things.

10      Q.  Okay.

11      A.  But I can't recall a lot of these things that

12  you are asking me.

13      Q.  But you kind of said that, was the leg problem as

14      a result of police brutality?

15      A.  The leg problem has nothing to do with anything

16  of what you are trying to ask.

17      Q.  Okay.  What's -- let me ask you this:  What's

18      your educational background?

19      A.  I did a year of college, and I'm self-taught,

20  self-studied, self-educated.

21      Q.  Did you graduate from high school?

22      A.  I did.

23      Q.  What high school?

24      A.  Evander Charles High School.

25      Q.  Where is that located?

Page 9

1    A.   In the Bronx.

2    Q.   What year did you graduate, if you recall?

3    A.   I can't recall.

4    Q.   The incident -- let me ask you this:  Have you --

5    other than this case, have you ever filed a lawsuit

6    before against anybody else?

7    A.   Not that I recall.

8    Q.   Do you recall how many times you've been arrested

9    by police or policy enforcers?

10    A.   No, I cannot recall.

11    Q.   Have you been arrested before the incident with

12    the Lowell Police Department?

13    A.   I can't recall.

14    Q.   Let me just finish the question because the court

15    reporter has to -- she's writing down my questions and

16    then just wait, and then she'll get your answer.

17        Have you ever been arrested, if you recall,

18    before January 2, 2019?

19    A.   I can't recall.

20    Q.   Did you do anything to prepare for today's

21    deposition?

22    A.   I went over my notes.  I thought that a

23    deposition was writing already.  Apparently, I

24    didn't -- what would I have had to done to prepare for

25    this deposition?

1    Q.  I'm just asking you if you did anything.  Other

2    than reading notes, did you look at anything else?

3    A.  Oh, yeah.

4    Q.  What?

5    A.  I went through Mr. Allen, I went over his

6    history again as a policy enforcer, and all the abuse.

7    I've kind of just been like piecing together like his

8    abusive history and seeing why he can be so abusive,

9    and trying to figure out a way as to how to point out

10   abusive cops like that.

11        So I can know for the future, know how to avoid

12   being struck or punched in the face and dragged out of

13   a car onto a floor.  Just know which policy enforcers

14   don't respect their constitution, that oath they have

15   sworn to uphold the constitution.

16        I kinda have been doing that.  I haven't really

17   been taking notes for the deposition, I've been taking

18   notes on how to protect myself against future police

19   brutality.

20   Q.  How would you describe your health prior to

21   January 22, 2019?

22   A.  My health was pretty good.  I have been trying

23   out new vegan things.

24        You are talking before my encounter with Mr.

25   Pender Allen, correct?

Page 11

1      Q.  So January 22, 2019 is the date, so that's what

2      I'm referring to.

3           Did you have any injuries or hospitalizations

4      prior to that at any time in your life?

5      A.  Any time in my life?

6      Q.  Yes.

7      A.  No, not like recently prior to it, ten years, I

8      mean, what is it, January 22nd, years prior.  I was --

9      2017 when I broke my femur bone.  That's the only

10     accident I've ever been where I've ever been

11     hospitalized, that, and then being attacked by Mr.

12     Cooper on 128, and then now Mr. Pender Allen.

13     Q.  I lost that.  You got attacked by whom?

14     A.  I got attacked by two state troopers in the

15     Danvers barracks, back in 2008, 2009, which I was told

16     by -- I was told by the Massachusetts attorney, someone

17     like you, a Commonwealth attorney, that it's within my

18     best interest not to take up a case against the state

19     troopers in Massachusetts because they can do what they

20     want.  That's what I was told after I was cuffed and

21     beat in the Danvers barracks.

22     Q.  What was that, was that as a result of an arrest

23     or a motor vehicle stop?

24     A.  It was a result of a motor vehicle stop, yes.

25     Q.  What happened?  Just briefly, you can summarize

Page 12

1      it.

2         A.   I didn't have a license, the cop arrested me and

3      took me to the barracks.  And a larger cop came out,

4      and the larger cop called me the N word, and began to

5      hit on me while I was cuffed to the bench while the

6      arresting officer was on the phone and did nothing.

7         Q.   Did you have to go to court for that case?

8         A.   Yes, I did.

9         Q.   And what happened?

10        A.   I'm going to tell you that it is irrelevant,

11     irrelevant bringing back trauma.  I don't want to talk

12     about it.  Can you please --

13        Q.   It is.  You see -- I'm going to tell you that it

14        is relevant because when you have a claim now, it's

15        relevant to find out if you're claiming injury or

16        emotional distress to find out if you've had prior

17        lawsuits?

18        A.   I don't want to revisit this kind of trauma, or

19     else I will have to take more pills, and I don't like

20     drugs.  I have to revisit this trauma, please, if you

21     don't mind.

22        Q.   Let me just ask you this:  Did you have trauma

23        from that incident?

24        A.   Being beat by a six-foot Canadian state trooper

25     while cuffed to a bench, or you mean by being punched

1   in the face by Pender Allen for not driving -- for

2   pulling into my driveway, which incident?

3      Q.  No, I'm talking about the one with the state

4   police?

5      A.  Are you asking if I was traumatized in fear for

6   my life?

7      Q.  Yes.

8      A.  I was, very traumatized.

9      Q.  Did you seek any medical treatment or psychiatric

10   treatment as a result of that?

11      A.  My mother, who is a holistic nurse.  My

12   girlfriend at the time who was a shrink, my best

13   friends, all the people who counsel me, my pastor.  I

14   think I sought a lot of counseling, a lot of

15   counseling, both times, still in counseling.

16      Q.  Who are you in counseling with now?

17      A.  A holistic psychological nurse, she counsels me

18   and treats me and keeps me better.  She is the one I

19   get herbal medicines from when the doctors only try to

20   give me drugs.

21      Q.  Tell me her name again, it broke up when you said

22   it.

23      A.  I'm going to leave her name off the record.

24      Q.  Okay.  Did she treat you for any trauma or

25   emotional distress from the incident with Officer

Page 14

1    Pender on January 22, 2019?

2      A.  Called my mother immediately and told her that

3    an officer punched me in the face several times, for

4    what reason, I do not know.  But when I go to court and

5    find out, I will tell you.

6      Q.  I'm sorry, I'm just confused because I'm having

7      trouble hearing it.

8          You are talking about your mother who you treated

9    with?

10     A.  My holistic interest, yes, my mother.

11     Q.  Okay.  And did she take any notes or keep any

12   records of any treatment?

13     A.  She does.

14     Q.  She does?

15     A.  Yes, she does.

16     Q.  Okay.  Are you still treating with her now?

17     A.  Every day.

18     Q.  Okay.  Are you going to introduce that treatment

19   at a -- in a trial in this case?

20     A.  No, I am not.  It's ancestral, and I can't do

21   that, I would need permission from the gods to do that

22   and I cannot.

23     Q.  You mentioned that you were beat you up by a

24     Canadian state trooper, what did you mean by that?

25     A.  I thought he was Canadian, he represented him

RHODE ISLAND COURT REPORTING

Page 15

1    himself to be Canadian.

2       Q.   I thought you said he was a Massachusetts state

3    trooper?

4       A.   He was.   I could tell you he looked Canadian, he

5    had an accent.

6       Q.   Okay, all right.

7       A.   Yeah, I'm profiling like the officers do all the

8    time, so I was just profiling.

9       Q.   I didn't know if he was a police officer from

10   Canada the way you said that?

11      A.   I was just judging by the way he said nigger in

12   a Canadian accent.   The nigger, he was like nigger,

13   huh.   Like one of those.

14      Q.   That's it.   Have you ever served time in prison

15   or a jail?

16      A.   Yes, jail.

17      Q.   And when was that and how long was it?

18      A.   I'm thinking 90 days I didn't have a license.

19   The jail out of Massachusetts, that's the only place

20   I've ever done jail time was in Massachusetts.

21      Q.   Which jail was that, do you remember?

22      A.   No, I can't recall.

23      Q.   Was it at the house of correction in Billerica or

24   something like that?

25      A.   Something like that, wherever the Danvers,

1   wherever they beat the people and take them, however,

2   whatever their jurisdiction is.  I think that's how you

3   would find that out.

4          I can't recall, and being rehabilitated, so.

5   Q.  Have you ever had any involvement with the Lowell

6   Police Department prior to that incident on January 22,

7   2019?

8   A.  No.  Any involvement in what way?

9   Q.  Any way.  Either being stopped, going there

10  making a complaint, calling the police for something,

11  anything you can think of?

12  A.  I can't recall.

13  Q.  This David Pender, did you know him or have any

14  involvement with him prior to that date?

15  A.  I never met him a day before in my life.

16  Q.  Do you know a person named Dennis Paige?

17  A.  I can't recall.

18  Q.  I had a document, it was a registration for the

19  truck you were in.  It said it was owned by a Dennis

20  Paige of 17 Bridle Path Way in Tyngsboro.  Does that

21  refresh your recollection?

22  A.  I don't know, I don't want to disclose anyone's

23  information that I didn't get permission to disclose.

24  I would literally have to go ask if I could give out

25  his information.  If you have his information, I don't

Page 17

 1  know how you got it, that's on you.  I personally do

 2  not disclose other people's information without their

 3  permission, so I couldn't tell you who that name is

 4  that you mentioned.

 5     Q.  When you were stopped that day, what kind of a

 6     vehicle were you in?

 7     A.  I was in a pickup truck, Ford pickup truck.

 8     Q.  Whose pickup truck was it?

 9     A.  My pickup truck.

10     Q.  How long had you had it prior to that date?

11     A.  I can't remember.

12     Q.  Do you remember who you bought it from?

13     A.  I do.

14     Q.  Who?

15     A.  I can't disclose that information, it's private.

16     Q.  Okay.  You can do whatever you want, I'm going to

17     say that you are not going to be able to disclose these

18     kinds of things at trial if you don't let us know ahead

19     of time.

20     A.  Why wouldn't I be able to disclose it at trial

21  if I don't tell it to you?  The constitution nor any of

22  the laws that I have read says that I don't have that

23  power, unless you are taking powers from me right now.

24     Q.  In a civil suit, you're obligated to present

25     evidence that you intend on presenting at trial.  So,

RHODE ISLAND COURT REPORTING

Page 18

1    you know, things that you are going to do at trial.

2         Let's say you are going to introduce records of

3    therapy treatment with your mother or that kind of

4    thing.  You've got to disclose it ahead of time.

5    A.  Well, I've seen a judge and been involved in the

6    case with Mr. Pender Allen, the judge allowed it.

7    Where they didn't introduce anything ahead of time.

8    They did it right in the middle of the case.

9         I'm a guy that lives and learns, so when I see

10   something that can be done by a judge or the DA or

11   anything -- I'm under the constitution -- I as a

12   people, people of the America, right, have all the same

13   equal rights and opportunity as that other person doing

14   X, Y, and Z in front of me.

15        So I'm going to do the same thing.  I'm not

16   going to throw myself out there, vulnerably.  I'm going

17   to do as I see the so-called leaders in front of me do.

18   So what the judge did, I'm going to do.

19   Q.  I'll ask you one more time, do you recall who you

20    bought the truck from?

21   A.  I do not.

22   Q.  Do you have it registered?

23   A.  I personally did not, that information is also

24   private.

25   Q.  Did you have the truck insured for auto

Page 19

1    insurance?

2       A.  I did not.  Me personally, I did not do any of

3    that.

4       Q.  Did it have a -- did it have a license plate on

5    it that night?

6       A.  Yes, it did.  It always had a license plate on

7    it.

8       Q.  What was the license plate, do you remember?

9       A.  I can't recall.  I can't recall.

10      Q.  Was it a Massachusetts license plate or was it

11   some other jurisdiction?

12      A.  Oh, no, it was definitely not Massachusetts

13   jurisdiction.  So they violated -- that's part of the

14   violation, it definitely wasn't their jurisdiction.

15      Q.  Did you have a driver's license from any

16   jurisdiction that day?

17      A.  From any jurisdiction?

18      Q.  Yes, a driver's license.

19      A.  The constitution is about jurisdiction, I did.

20   I had a right to drive.

21      Q.  I know, okay.  Where did you have a driver's

22   license issued from, that's what I want to know?

23      A.  From the constitution that says no states can

24   levy or take a right and put a tax on it, and if the

25   state chooses to take a right of the people and put a

Page 20

1   tax or levy or any things on it, the people are allowed

2   to take part in said right with impunity, according to

3   the constitution that everyone -- it protects my right

4   to travel unencumbered and unfettered along the

5   highways and byways of the land.

6       Q.   Do you still have that truck?

7       A.   I do.

8       Q.   Okay.  Do you have a driver's license currently?

9       A.   The same one as -- that one doesn't go anywhere,

10   it's like permanent.

11       Q.   All right, let me ask you a question.  Go ahead,

12   sorry.

13       A.   For the stenographer to get this.

14       I do not have an international commerce license,

15   no, I do not.  That license to do business with states

16   that recognize and the plastic that gave me permission

17   to move, that they may have tied up within their

18   jurisdiction, which it doesn't stop me from traveling

19   because the constitution protects my right to travel.

20       So that plastic international device, that you

21   are asking about, no, they have that tied up in their

22   stuff, and I believe that Mr. Pender Allen, along with

23   the judge and a few other people in the courtroom, they

24   are all friends with RMV, so they all got together and

25   worked together to tie up that piece of contractual

Page 21

1   agreement.

2       And they thought it would stop me, or they tied

3   it up because they want all my federal reserve notes,

4   but they've done it to other people and other people

5   have folded and allowed them to do it, but I'm not one

6   of those people who allow them to abuse me to a

7   contractual agreement.

8       Q.  Are you employed?

9       A.  I'm self-employed.

10      Q.  What do you do?

11      A.  I'm a painter.

12      Q.  How long have you been doing that?

13      A.  Three years.

14      Q.  When you say "a painter," like a house painter?

15      A.  Yes, I paint houses; interior, exterior.  I do

16  minor carpentry, I also do lawn care, I do pretty much

17  about everything.

18      Q.  Very good.  On the date of the incident,

19  January 22nd, you were so employed the same way?

20      A.  Correct.

21      Q.  Do you have a business name, or how do you go

22  about business?

23      A.  LLC.

24      Q.  I couldn't hear you, say it again, please.

25      A.  The business name is I Paint.

Page 22

1      Q.   I Paint, LLC, and it's at the address of 4th

2      Avenue in Lowell?

3      A.   Correct.

4      Q.   Who is Jamarti Taleid Abdullah Bey?

5      A.   My counselor.  I've got him here right now in

6      this conference call.

7      Q.   Let's talk about the date of the incident, the

8      incident in the police report anyway, said it happened

9      around 6 o'clock in the afternoon, or 6 o'clock in the

10     evening.  Where were you -- do you remember what you

11     did that day, prior to the involvement with Officer

12     Pender?

13     A.   I was just coming back to my car or seeing a

14     mechanic about the problem with my truck not staying

15     on.

16     Q.   And -- go ahead, what?

17     A.   What was that?

18     Q.   So what time had you gone to the mechanic?

19     A.   I can't recall the exact timing.  I do know it

20     was late afternoon.  Actually, like, it was around

21     evening, going into evening time.

22     Q.   Sure.  Do you have any recollection of what you

23     did before that during the day?

24     A.   I was at work, I think, yeah, I was at work.

25     Q.   And when you mean "at work," were you painting

Page 23

1    somebody's house or at some place of employment?

2    A.  No, actually I was back and forth to the junk

3    yard because I needed to get a transmission because my

4    truck needed a new transmission at the time.  It kept

5    shutting off on me.

6         So I was trying to do what I could do to get off

7    the road so I could get it fixed.  I didn't want to

8    have to spend tow truck money to tow the huge truck out

9    of wherever it would break down on me.

10   Q.  Where were you coming from just before you were

11   involved with Pender?

12   A.  I can't really recall.

13   Q.  Were you coming from the body shop or the

14   mechanic?

15   A.  I think so, it might have been J & R Autos, or

16   somewhere.

17   Q.  And where is that, do you know?

18   A.  Somewhere in Lowell.  I was coming from

19   somewhere in Lowell, it wasn't far.  I wasn't any where

20   far because I was having problems with the truck and I

21   couldn't go anywhere.

22   Q.  Okay.  Do you think you were coming from that

23   mechanic before you were stopped, or did you stop

24   anywhere in between?

25   A.  I can't recall.

Page 24

1    Q.   Okay.  And you said earlier you don't take any

2    medication, did you have any medication or alcoholic

3    beverages or anything like that prior to that day,

4    before you were stopped by the police?

5    A.   That day?

6    Q.   Yeah.  That day, on January 22, 2019, prior to

7    6:13 p.m., had you had any -- did you take any

8    medication for anything?

9    A.   No.

10   Q.   Did you take any alcoholic beverages?

11   A.   No.

12   Q.   Was anybody in the vehicle with you?

13   A.   Yes.

14   Q.   Who?

15   A.   Pathfinder Bey.

16   Q.   And who is Pathfinder Bey?

17   A.   He is my Co-Defendant, person in the car -- the

18   guest that was in the car with me, the guest who

19   recorded the entire incident.

20   Q.   Okay, what is his address?

21   A.   He is in Florida currently.

22   Q.   Do you know what his address is in Florida?

23   A.   I do not.

24   Q.   Do you know what town he lives in?

25   A.   I do not.

Page 25

1    Q.   Anybody else in the car with you?

2    A.   Nope.

3    Q.   Where were you heading when you were stopped by

4    the police?

5    A.   My domicile.

6    Q.   Who is Ashiko, A-S-H-I-K-O, Smith, is that the

7    same person as Pathfinder Bey?

8    A.   That is -- I'm pretty sure from what I recall,

9    that is the name that they kept calling          Mr.

10   Pathfinder this and kept trying to force him under so

11   they can assume jurisdiction over him.  A

12   jurisdictional name that they forced him to go by,

13   yeah, I remember them calling him that.

14   Q.   Tell me what happened as you were going over the

15   O'Donnell Bridge?

16   A.   Is that the bridge?

17   Q.   Yeah, I think from the report it says O'Donnell

18   Bridge.  Why don't you just describe what happened.

19   A.   As I was going over the bridge, my truck began

20   to flicker, the cabin lights began to flicker,

21   everything in the truck began to flicker.  So I assumed

22   the truck was going to shut off.

23        Immediately my brain thinks to get the truck out

24   of the way of pedestrians, the truck off the main road.

25   So I was in the left turning lane, and I wanted to go

RHODE ISLAND COURT REPORTING

Page 26

1   straight off the bridge, so I looked over to the car,

2   to the right of me, and I signaled to the car, hey, do

3   you mind if I go straight?  The guy was like sure, go

4   ahead, so when the lights changed instead of making a

5   left turn, I went straight.

6       Q.  Okay, let me ask you this:  That left lane, are

7       there signs or anything that says left lane only or

8       anything like that?

9       A.  No.  We were just spending a good amount of time

10  in the town after taking the turn more than once your

11  brain kind of makes it kind of a manual thing.

12      Q.  My understanding is that there are multiple signs

13      that say left turn only for that lane you were in?

14      A.  They probably just put those up now.

15      Q.  And that it was also painted on the ground, an

16      arrow or something like that, that indicates left turn

17      only, do you recall that?

18      A.  I'm not sure.  Because I did remember, I did ask

19  the person to the right of me if I could go straight.

20      Q.  Okay, but you definitely knew that you were in a

21      left lane that was intended to only turn left, not go

22      straight, right?

23      A.  No, because I see cars go straight in that lane

24  all the time so I thought I would do the same thing.

25  I've seen police do it.  Police go in that left turning

Page 27

1   lane and go straight.

2       Q.   But you are not supposed to, right?

3       A.   If the police can do it, we the people can do

4   it.  That's the law.  That's how it goes.  That's what

5   Abraham Lincoln said about everyone being equal.

6            So if the police can talk on their phones and

7   drive, so can we.  If the police go in the left turning

8   lane only and go straight so are the people.  The

9   people are going to see these things and we are going

10  to do it.  We're not killing or harming anyone.

11      Q.   That's what you did, right?

12      A.   No.

13      Q.   You went straight?

14      A.   I went straight, yes.

15      Q.   Do you remember how many lanes are on that bridge

16   going that way?

17      A.   Two lanes.

18      Q.   So you indicated to the guy that -- as you said,

19   then what happened?

20      A.   Then I went straight.

21      Q.   Now, the --

22      A.   Doing less than 20 miles an hour I went

23   straight.  I even -- I even had to stop to allow the

24   car going into McDonald's to turn in.  Stopped and

25   allowed the car to go into McDonald's.  That car went

Page 28

1    by, then I continued.

2         My truck is flickering on and off, so now the

3    truck wants to shut off.  I literally live -- 4th

4    Avenue from McDonald's, is less than 100 yards.  I said

5    why don't I try to get my truck out off the roadway and

6    into the safety of my driveway.  That way I don't got

7    to block up traffic with a tow truck, with all these

8    lights.  I don't want to disturb the people, let me

9    just get my truck out of the way.

10        So I slowly continued down 4th Avenue, saw one

11   of my brethren who was exiting, coming out of the

12   intersection of 4th Avenue.  I kindly waved to him,

13   gave him a wave, how are you doing, and made the right.

14    Q.  Let me ask you this:  Were there any other cars

15    to your right when you crossed that bridge going

16    straight other than the guy you spoke to?

17    A.  Nope.

18    Q.  You don't recall anybody honking the horns at you

19    or anything like that?

20    A.  Nope.  No, honking.

21    Q.  You don't recall any difficulty where you may

22    have gotten too close to a car and they thought you

23    were going to cut them off?

24    A.  No.

25    Q.  When did you first realize there was a police car

Page 29

1   behind you?

2      A.   When I was turning onto 4th Avenue.

3      Q.   How far is that from the bridge?

4      A.   Probably 100 yards, maybe.

5      Q.   How did you know that there was a police car

6   behind you?

7      A.   The lights.

8      Q.   And those are the blue lights that were blinking?

9      A.   Yup.

10      Q.   And was there a siren or any horn?

11      A.   No siren, nothing.

12      Q.   All right.  And where was the police car with the

13   blue lights from you?

14      A.   Well, I didn't know, when I was turning onto

15   4th, you can see behind you, like, you can see in all

16   your rearview mirrors and stuff.  When those lights

17   flash you can see the flickering in your mirror.

18         I saw the flickering, I'm not thinking anything

19   of it.  When I looked, turned and looked, I just saw a

20   cop car coming out of the McDonald's parking lot, and

21   that's me turning onto 4th Avenue.  I can see that.

22   The cop was working his way out of the McDonald's

23   parking lot.

24         I thought something must be going on, not

25   thinking it's for me.  I go all the way to my house.

Page 30

1   I'm literally into 4th Avenue like almost to Mount

2   Hope, on the Mount Hope side.  Then to my house there

3   comes the flashing lights on my street now.

4       Q.  When you were heading that way, was the police

5    car with the blue lights behind you?

6       A.  When I was heading in -- what was that?  When I

7   was heading that way?

8       Q.  When you went over the bridge and were heading

9    straight and then turned, was the police car behind

10   you?

11      A.  At the time when -- the police car wasn't behind

12   me until I was on 4th.

13      Q.  It broke up, could you say that again, please.

14      A.  He wasn't behind me until I made the turn onto

15   4th.

16      Q.  When you turned onto 4th, he was behind you?

17      A.  Yeah, he turned onto 4th and ended up behind me,

18   yeah at some point.  I made it into the driveway.

19      Q.  Well, he was behind you on 4th, what is it 4th

20    Street or 4th Avenue?

21      A.  4th Avenue.

22      Q.  Did you pull over to the right when you saw a

23    police car with its blue lights, or you kept on going?

24      A.  Well, the law says I can pull over where I feel

25    safe.

Page 31

1     Q.  Say that again, it broke up again.

2     A.  The law says that we have the right to pull over

3   in a safe place, where we feel safe, not crowded, you

4   know what I mean?

5         I saw the lights as soon as -- I assumed that

6   they were for me.  I said oh, well, my driveway is less

7   than 100 feet away from me, why not let me pull it into

8   the driveway and talk to the officer.  I didn't want to

9   pull over and talk to them and have to have the truck

10  towed.

11    Q.  Sure.  What was it that gave you the

12    understanding that the police car was for you?

13    A.  When he pulled into the driveway with me.

14    Q.  Yeah, you just said before, you said when I

15    realized that the police car was for me, I wanted to

16    pull over somewhere safe and pulled into your driveway?

17    A.  No, no, no, no.  In my mind, when I saw the

18  lights, I'm like wait, I assumed after he got onto 4th,

19  I'm like okay, maybe this must be for me, so I just

20  turned into my driveway.  That's when I realized it was

21  for me.

22        It wasn't at no point he was behind me, he was

23  trying to pull me over, and I didn't pull over.  I went

24  to my driveway, and he pulled into my driveway.

25    Q.  But I thought you said you had the right to pull

Page 32

1    over somewhere safe?  So it seems to me you knew it was

2    for you and you didn't want to pull over in the road,

3    you wanted to pull over in your driveway?

4        A.  No.  I was already 100 feet away from my

5    driveway with a place to pull over.

6        Q.  Is there a place to pull over on the right

7    against the curb?

8        A.  No, the street is not big enough.  And it's

9    pedestrian hours, and my driveway is less than 100 feet

10   away from me, who wouldn't pull into their driveway?

11       Q.  Was it dark out yet or was it still light?

12       A.  Yeah, it was in the dark time.

13       Q.  You pulled into the driveway, what happened next?

14       A.  I waited for -- to see what the issue was and a

15   taster came to the window, and then an officer behind

16   the taser.

17       Q.  And did the officer come up to your window?

18       A.  No.  A taser and two arms came up to the window.

19       Q.  What happened, what did you do?

20       A.  I had to turn all the way around to see the

21   officer behind his arms, and to see who was holding the

22   taser.  I had to turn all the way around and I --

23           Well, so what I tried to do immediately was put

24   the window down so I could talk to him.  But the truck

25   is flickering, going off and on at the same time, so

Page 33

1    the alternator is dying on me.  So the truck dies the

2    minute I pull into the driveway.  I shut it off, but

3    it's supposed to still have electrical so you can put

4    the window down.

5         So at this point the window is not going down,

6    the radio is flickering on and off, lights are

7    flickering on and off.  There's a cop screaming at my

8    window with a gun in his hand.  Found out it was a

9    taser, I thought it was a gun.

10        Now it just went from zero to panic mode super

11   quick because I saw a weapon.  I thought he was going

12   to come up to the window, maybe knock on the window.

13   Hey, what are you doing, maybe ask a question or two

14   first.

15        He banged on the window with the taser.  Like

16   here's the window, that's how he knocked on the window.

17   And he went, "Put the window down."

18        And I said I can't put the window down, the

19   truck is not working, and I'm showing him the motion of

20   me pressing the window down.  The window is not

21   working.  I'm trying.

22        Then he goes, "Open the door.  You want this?

23   You want this, open the door?" screaming while I'm

24   trying to comply.

25        You've got to understand that it's hard to

Page 34

1   comply or make it look like you're complying when

2   someone is frantically screaming and waving a weapon

3   around outside in your face.

4        I tried to open the door, I'm going to open the

5   door.  Before I could open the door he rips the door

6   open.

7        Q.  Then what happened?

8        A.  So now I'm terrified.  He rips the door open, I

9   am terrified.  He goes, "Do you want this?  Is this

10  what you want?  Do you want this?  Is this what you

11  want?"  Screaming, right, waking up my mother-in-law,

12  she's been in there.

13       Lights are flashing all through the thing.  I

14  clasped the steering wheel, because now I'm fearing for

15  my life because he's got a weapon in his hand, and he's

16  screaming if this is what I want.

17       I don't know if I hit someone on the way in, I

18  don't know if I killed a cat, I don't know what I did.

19  Last time I checked, driving without a license is not a

20  criminal offense, and it doesn't require a screaming,

21  so-called, officer at your window with a weapon in his

22  hand.

23       Q.  Let me ask you:  You pulled into the driveway, is

24        this a single-family house or multi-family house?

25       A.  Multi-family house.

Page 35

1      Q.   How many apartments are there?

2      A.   Three.

3      Q.   And the driveway, were there any other vehicles

4   in the driveway?

5      A.   Several other vehicles were in the driveway.

6      Q.   Where were they -- so you pull in, was there a

7   car in front of you, or to the left or the right?

8      A.   There was a car in front of me, two beside me,

9   we share the driveway with the neighbors.

10      Q.   Where was the police car?

11      A.   Behind my car.

12      Q.   And what -- when this was going on, as you

13   described, your passenger, where was he?

14      A.   Sitting right there, my guest was right there.

15      Q.   Did you eventually open the door, or did he open

16   the door, the police officer?

17      A.   Mr. Allen ripped the door open.

18      Q.   Then what happened?

19      A.   Then he asked me if this is what I want.  I

20   panicked and grabbed the steering wheel, I didn't know

21   what to do or say.  I don't want to be shot.  No one

22   wants to be shot.  No one knows what to do when you

23   have a weapon in your face by a screaming man.

24      Q.   Tell me what happened.

25      A.   So all I did was grasp the steering wheel.  My

RHODE ISLAND COURT REPORTING

Page 36

1    guest begins to ask what's the problem?  Which someone

2    was trying to talk to him to try to get some sort of

3    vocal from him.  It was all screaming.

4         After he asked me if this is what I want, he

5    punched me in the face several times, like three

6    strikes, he gave me three strikes; one, two, three.

7    Then my guest flares up, like he gets like scared and

8    pulls his phone out, and says, "Oh, my God, what are

9    you doing?"

10   Q.  Where was he when that happened, was he still

11    sitting in the passenger seat?

12   A.  In the passenger seat?  He was also trying to

13   talk to Mr. Pender while Mr. Pender was screaming.

14   Q.  Did he ever get out of the car?

15   A.  I'm getting to that point.

16   Q.  Did you hit the taser out of Officer Pender's

17    hand and knock it under the car?

18   A.  Let me tell you something, my mother-in-law saw

19   everything.

20   Q.  What's your mother-in-law's name?

21   A.  Karen McHugh.

22   Q.  And she lives with you, right?

23   A.  Yes.  But the courts wouldn't allow --

24   Q.  So let me stop you there.  So you left off, he

25    punched you, then what happened?

1      A.   My guest, Pathfinder, then panicked and pulled

2    his phone out and pushed record and began to record the

3    whole thing.   Then he punched me again, when -- after

4    Pathfinder pulled out his phone to record, that seemed

5    to agitate Mr. Pender again.

6          Then after he pulled out the phone to record, he

7    struck me again.   That's when my guest got out of the

8    car and went for a closer view, and asked Mr. Pender,

9    "What are you doing?  Why are you hitting him?  Why are

10   you hitting him?  Why are you hitting him?"

11     Q.   Where did he hit you?

12     A.   In my face.

13     Q.   How many times?

14     A.   I want to say, I counted six blunt strikes to my

15   left eye.   Six blunt strikes to the temple.   He struck

16   three, then he came back with the taser.   So the first

17   time he struck, he struck with the taser in his hand;

18   one, two, three, taser in hand.

19         The second time he came back, I didn't feel the

20   taser.   That must have been what gave me the scar in my

21   inner eye.   It must have been the taser he hit me with.

22   Then the second time he came back, I didn't feel the

23   taser when he was striking me.

24     Q.   Hold on for a minute.

25     A.   Hold on.   My hands were clasped to the steering

Page 38

1    wheel.  In order for me to hit anything out of someone

2    else's hand, I would need my hand to do so.  But I was

3    clasped to a steering wheel in fear for my life.

4        Q.  Stop right there for a minute.  Are you saying

5        that he hit you in the face with his taser?

6        A.  He had a taser in hand the first time he struck

7    me.

8            Let me ask you a question because I know you

9    guys want all these answers and stuff so you can make

10   everything nice and twisted up for you guys.

11           How does someone know where a taser is or

12   anything is in another man's hand when he is being

13   struck at the same time, in his face, in his mode of

14   visual, like in his mean of sight?  I'm being struck in

15   my sight, how would I see that?

16       Q.  I'm just asking you for your best observations.

17       I want to know whether or not he hit you with his fist,

18       whether he hit you with the taser, or did he hit you

19       with the other hand?

20       A.  I'm being insulted.  How would I observe

21   something if I'm being struck in the face?  In my mode

22   of observation, my eyes are what I use to observe.  I'm

23   being struck in my very eye at that moment.  How would

24   I observe anything?  Please tell me so because there

25   must be some skill that you know about that I don't

Page 39

1     know about.

2         Q.  With your eyes, did you see what he hit you with?

3         A.  I was busy being struck in my eye, how would I

4     see it?  He was striking me in my face, in my visual.

5     Pender Allen was punching me in my eye.  How would I

6     have seen it?  I only have two eyes.  One on the right

7     side.  Pender Allen had my whole left side of my face

8     busy with his fist and the taser in his hand.  How

9     would I -- I was fearing for my life.

10        Q.  I'm just asking you, if you didn't see it?

11        A.  All I did see was blue and the steering wheel

12    that I was trying to grab, and hoping that he didn't

13    discharge his weapon, that's all I saw.  I saw big

14    black and blue and my steering wheel.

15        Q.  What happened next?

16        A.  My guest screamed, "Why are you hitting him?

17    Why are you hitting him?  I'm recording.  Why are you

18    hitting him?  I'm recording." That's all I heard and

19    that's all I saw.

20            I saw black and blue, and I heard my guest

21    screaming, "Why are you hitting him?  Why are you

22    hitting?  I am recording."

23        Q.  Then what happened?

24        A.  Then I was dragged off the steering wheel onto

25    the floor, into the snow on my face, cuffed and put

Page 40

1    into the back of a van.

2        Q.  Do you know who did that?

3        A.  No, I do not.  Once again, I was being struck

4    several times by an officer, struck in my head, the

5    place where I do my thought, the place where I do my

6    visual.  I was being struck by an officer in the head

7    at that time.

8        Q.  That's your answer.  I just want to ask you, do

9        you know what police officer dragged you out of the car

10       into the snow?

11       A.  The same police officer that was striking me in

12   the face, the same police officer that struck me.

13       Q.  Who was that, that was Pender?

14       A.  Pender Allen, yes.

15       Q.  There were other police officers that arrived,

16       too, correct?

17       A.  There was at least 14 cop cars out there, at

18   least 14, they filled the street.

19       Q.  Did any other police officers touch you in any

20       way?

21       A.  No, only Mr. Pender Allen.

22       Q.  Pathfinder, what was he doing when you were

23       dragged out of the car, do you know?

24       A.  After I got flown down to the floor, I saw

25   Pathfinder also get put to the floor.  When I was

Page 41

1    thrown to the floor, I saw nothing but feet and car

2    tires, then another body hit the floor and that was

3    Pathfinder.

4        Q.  You say the floor, that's the ground?

5        A.  Yes.

6        Q.  Then what happened?

7        A.  Then we were put in the back of a van.

8        Q.  Tell me what happened after that.

9        A.  After I was struck, we were placed in the van.

10       Q.  Yes, then what happened?  Where did the van go?

11       A.  We went to Lowell.  While he was striking me, my

12   mother-in-law came outside, right, so she heard all the

13   noise, she came outside and asked "Why are you hitting

14   him?"

15           And then he couldn't answer her because he was

16   busy slamming me on the ground, and he told her "stay

17   there, this is none of your business."  He was

18   screaming at her.

19           Then after being taken to the van, my friend, my

20   brethren, pulls up into the driveway.

21       Q.  What's his name?

22       A.  His name is Akif Wasif Bey (phonetic), he's also

23   one of the witnesses, his testimony is in there.

24       Q.  Do you know how to spell that?

25       A.  Akif Wasif Bey.

Page 42

1    Q.   Spell it again?

2    A.   Akif, A-K-I-F, Wasif, W-A-S-I-F, Bey.

3    Q.   And what did he do?

4    A.   He pulled into the driveway to find out what was

5   I being -- what was I being attacked for.

6    Q.   Did he ask anybody that?

7    A.   He did.

8    Q.   Who did he ask?

9    A.   Mr. Pender himself.

10    Q.   Do you know what Pender said?

11    A.   According to Akif's testimony, Mr. Pender said I

12   made him look small, that's why he did what he did.  If

13   I would have stopped and -- he said if I would have

14   stopped, then he probably wouldn't have struck me or

15   been so aggressive with me.

16        But his words were, I made him look small, he

17   was made to feel small, he felt small, he was

18   embarrassed.

19        I did do a little research, and my

20   brother-in-law is a cop, and I thought you couldn't

21   operate emotionally.

22    Q.   Who is your brother-in-law?

23    A.   That's private information.

24    Q.   Are you going to call him as a witness in a

25    trial?

Page 43

1    A.   No, he's a cop in another town, Winchester

2    police, he is not police here.

3    Q.   And has he talked to you about this case?

4    A.   Oh, yes.  Oh, trust me, yes, yes.

5    Q.   Very nice.  What's his name?

6    A.   I would rather not say, it's not relevant to

7    this deposition.  He doesn't need to be involved in

8    this case.  He's just friendly outside advice of a

9    fellow officer who also shares all the capacities and

10   rules as Mr. Pender Allen Bey.  I know how much of a

11   violation or how much I was violated.

12   Q.   Let me ask you this:  Did you have a machete in

13    your car?

14   A.   Yeah, there was a machete in the car.

15   Q.   Where was it?

16   A.   Where it always is supposed to be, in the black

17   box, in the thing.  The machete was in the -- according

18   to them they found it -- according to Mr. Pender Allen,

19   he wants to say he found it in the middle console.  But

20   according to Akif Wasif Bey, Mr. Pender Allen didn't

21   find it.

22       The other slender, skinny officer found it and

23   called Mr. Pender Allen over and showed it to him.  He

24   saw it in the back seat pocket behind the driver's seat

25   of the truck, where it always stays when I do yard

Page 44

1 work.

2    Q.   Was it in a sheath of some sort or a container?

3    A.   In it's holster, in its sheath, yes.

4    Q.   When he came up to the car that you were fumbling

5 or looking for something between the seats, do you

6 recall that at all?

7    A.   No, I did not.  I did not take my eye off the

8 screaming cop at the window with the weapon in his

9 hand.  I didn't take my eye off of him, I was fearing

10 for my life.

11      We already took that to trial, and he lost that

12 one when he tried to make the machete, that you can buy

13 from Wal-Mart, that any 16-year old can walk into

14 Wal-Mart and purchase, he tried to make it look like a

15 weapon.

16      So, a $14 machete in this federal case, why are

17 we bringing that up?

18    Q.   So, let me ask you this:  When he was yelling at

19 you, did Pender tell you or ask you or demand you to

20 get out of the car?

21    A.   No, he kept asking, "Is this what you want?"

22    Q.   Did he say open the door, open the window, what

23 did he say?

24    A.   He said -- he said, "Open the door, is this what

25 you want?"

Page 45

1   Q.   And you kept your hands on the steering wheel; is

2   that correct?

3   A.   Like this,(witness indicating), up.   I was

4   trying to show him the window didn't work, and I said

5   I'm going to open the door.   Then even after complying,

6   and I saw that it wasn't de-escalating his demeanor,

7   his temper, his aggression, that's when I clasped the

8   steering wheel.

9         Once I saw him not coming down from his

10   outrageous, screaming anger, I said okay, this guy is

11   pretty upset.   He probably has other things going on.

12   I clasped the wheel because I was thinking this cop

13   might take all his might out on me, so I just braced

14   myself for the worse.

15   Q.   When you grasped the steering wheel, was the door

16   open or was it still closed?

17   A.   It was open at that time.

18   Q.   Who opened it?   Did he open it?

19   A.   Mr. Pender Allen opened it.

20   Q.   Did he say get out of the car?

21   A.   No, he said, is this what you want?

22   Q.   That's when you grabbed ahold of the steering

23   wheel?

24   A.   Yes.

25   Q.   How did you eventually get out of the car?   I

RHODE ISLAND COURT REPORTING

Page 45

1      Q.  And you kept your hands on the steering wheel; is

2    that correct?

3      A.  Like this,(witness indicating), up.  I was

4    trying to show him the window didn't work, and I said

5    I'm going to open the door.  Then even after complying,

6    and I saw that it wasn't de-escalating his demeanor,

7    his temper, his aggression, that's when I clasped the

8    steering wheel.

9          Once I saw him not coming down from his

10   outrageous, screaming anger, I said okay, this guy is

11   pretty upset.  He probably has other things going on.

12   I clasped the wheel because I was thinking this cop

13   might take all his might out on me, so I just braced

14   myself for the worse.

15     Q.  When you grasped the steering wheel, was the door

16   open or was it still closed?

17     A.  It was open at that time.

18     Q.  Who opened it?  Did he open it?

19     A.  Mr. Pender Allen opened it.

20     Q.  Did he say get out of the car?

21     A.  No, he said, is this what you want?

22     Q.  That's when you grabbed ahold of the steering

23   wheel?

24     A.  Yes.

25     Q.  How did you eventually get out of the car?  I

Page 46

1    know you said they pulled you out.

2    A.  Mr. Pender Allen grabbed my arm like so, ripped

3    it off, and then struck me again, and pulled me out and

4    threw me on the floor.

5    Q.  Moving forward, you were in the van, you went to

6    the Lowell Police Department station?

7    A.  I think that's where they took me.

8    Q.  And what happened there?

9    A.  We were processed.

10    Q.  And then what?

11    A.  We waited for court.

12    Q.  Did you have to stay the night, or were you

13    released?

14    A.  I was released the following day.

15    Q.  I'm sorry, I didn't mean to interrupt.  So nobody

16    bailed you out that night.  Did you have to stay there

17    until the morning, and they took you to court; is that

18    what happened?

19    A.  I chose court in the morning.  I didn't want to

20    give them their satisfaction of $40 bail, because they

21    are doing, like they have their own little -- not that

22    it's relevant, I stayed the night for court in the

23    morning.

24    Q.  Did you have any injuries as a result of being

25    punched?

Page 47

1     A.   Yeah.   I have a scar in the middle of my left

2     eye.   It's scarred now, it won't go away.   The minute

3     you cut me or touch me, my body likes to leave marks

4     everywhere I'm touched.   I have a scar and a line going

5     through my nostril up here.   Over here you can see the

6     darkness in my temple where he had stricken me, and

7     under my eye here.

8     Q.   Were you afforded any medical treatment while you

9     were at the police station?

10    A.   Nope.

11    Q.   Were you bleeding?

12    A.   No, just scratched.   Well, the blood from the

13    scratches, not like bleeding, like bloody blood.

14    Q.   Did they give you anything to stop the bleeding;

15    a Band-Aid or anything like that?

16    A.   No, they did not.   They only forced names on us.

17    Q.   After you went to court, what did you do?

18    A.   I went to see my mother-in-law for treatment.

19    Q.   I couldn't hear you, could you start that again?

20    A.   I went to see my mother for treatment.

21    Q.   What kind of treatment?

22    A.   My wife treated me.

23    Q.   What kind of treatment?

24    A.   Well, I needed facial treatment, and I needed

25    medical treatment.

Page 48

1    Q.  What kind of medical treatment or facial

2    treatment did you get?

3    A.  I needed a detox treatment.

4    Q.  You needed a what?

5    A.  I needed a detoxification from the encounter.

6    Every time, in my culture, every time we come in

7    encounter with colonialism we detox.  It's a spiritual,

8    cultural thing.  We detox every time that we're touched

9    by the opposition.

10   Q.  What does that involve, if you could describe it?

11   A.  It involves several herbs, which I will not

12   mention the names of.  It involves boiling water, it

13   involves oral intake.  You can do anal intake, you can

14   do pee pee hole intake.  There's a lot of ways to

15   administer this medicine.

16   Q.  Did you do that?

17   A.  Yeah, I detoxed.  My mom flushed me out, and she

18   had to give me a talk to bring my mind back to

19   stabilization.

20   Q.  Let me ask you this:  Any treatment for your

21   face, your eye?

22   A.  Ice pack, peroxide gel.

23   Q.  Did you go to any other doctors or hospitals or

24   clinics for anything?

25   A.  Unless you're considering them ultimate

Page 49

1   treatment, no, I went -- I got treated already, why

2   would I go to another treatment?  I didn't go to any

3   other doctors or any physicians or anything.

4       Q.  Okay.  You say in your lawsuit that you're

5    profiled as a black man, why do you say that?

6       A.  Who said that?  Profiled, no, no.  You guys just

7   listen to me for a minute.  I have proof of the

8   paperwork that they write, they -- and I asked the

9   court, and I am asking you, and I asked the federal

10  judge lady, and I'm going to ask again, what does that

11  letter mean when you guys put that on the paperwork for

12  us, what does it mean?

13          You've been "profiled," what does that mean?

14  Can you tell me what that means?  When they put the

15  letter B or H on these papers or stuff that you give

16  us, what do those letters mean?  Who is a B?

17      Q.  I don't know what you are talking about.

18      A.  That's profiling.  You said in the lawsuit, I

19  put profiling.  In the lawsuit, I put where you guys

20  write us and call us letters.

21      Q.  I don't call you anything, but what letter are

22   you talking about?

23      A.  On the ticket that Mr. Allen, along with his

24  partner, Kenny Griffin, that they like to write me

25  because.

Page 50

```
 1          The following day, Kenny Griffin came and took
 2    my truck, again.  After they took it and I got it back,
 3    he came a couple of days later and took it again, while
 4    it was parked not doing anything.
 5          So he puts on the paper the letter B under race,
 6    and then I see on another paper from Pender Allen the
 7    letter H.  I don't know what these letters mean.  I
 8    know I have a culture, I have a name, I have a history,
 9    but I don't know what the letter B stands for, and I
10    don't know what the letter H stands for, and nobody has
11    yet to tell me.
12    Q.  What is H, do you have any idea what H means?
13    A.  You've got to understand.
14    Q.  I don't know what H means.
15          Let me ask you this, I forgot to ask you this:
16     What did happen to your truck, that night, if you know,
17     after you were taken away?
18    A.  (Inaudible).
19    Q.  Start that again, it all broke up, please.
20    A.  They broke the Fourth Amendment and went ahead
21    and illegally searched and seized my truck.
22    Q.  Did they remove it from the driveway?
23    A.  Yes, they did.
24    Q.  Where did they take it?
25    A.  To their own personal pal.  They are in cahoots
```

RHODE ISLAND COURT REPORTING

Page 51

1   with the tow truck people, they are friends.  They took

2   it to one of their tow truck gang guys.

3       Q.  Did you eventually get it back?

4       A.  Yes, I did.

5       Q.  When did you get it back, the next day or another

6   day?

7       A.  I think it was the day after, if not, the next

8   day.

9       Q.  Didn't you say earlier that it was taken again?

10      A.  Yes, Kenny Griffin shows up a few days later

11  when the truck is parked outside the house and just

12  takes it, again.

13      Q.  And it was parked on the street?

14      A.  She actually -- so she -- she called her -- we

15  called her, she called her brother, who is a Winchester

16  police officer, to find out if Ken Griffin can do that

17  according to another cop.  You can't do that, but he

18  can do it anyway.

19          Then after she called another officer to find

20  out, Mr. Griffin said she could keep the truck, and he

21  wasn't going to take the truck.  And decided like -- I

22  guess he was going to leave, and then I pulled up, and

23  asked one question and then he flipped out and took the

24  truck.

25      Q.  What was the question you asked him?

Page 52

1       A.  The question was, how come she can keep the

2  truck, but if I come over here you are going to take

3  the truck, and he got aggravated and he said I've had

4  enough of that, and took the truck.

5       Q.  Where was it parked, in the street or the

6  driveway?

7       A.  It was moved out of the driveway so she could

8  move her car, and it was in the street for less than

9  one second.  Actually, he stood down the block, drove

10  out and came to take my truck, a parked -- no one is

11  doing anything, truck's parked, he is out there parked,

12  waiting.

13       Q.  Did you get a citation the second time for

14  anything?

15       A.  Nope.  I got -- that's the citation when he put

16  it --

17                 UNKNOWN FEMALE:  They took it anyways.

18       Q.  Listen, I'm happy that your wife is there, but

19  she can't participate.  Okay?  So, because, I don't

20  want her to be testifying.

21            What was the citation you got?

22       A.  A citation with the letter B on it.  I don't

23  know what that means, and he put that on my birth date

24  that I was born in 2020.  So, the citation, 2019, I'm

25  only a year old right now, according to Mr. Ken

Page 53

1  Griffin.

2    Q.  Did you get a second citation, or was that the

3    citation from the first night, or was that the second

4    time when they came over?

5    A.  The second night.

6    Q.  Okay.  And when?

7    A.  When I came back, I think they came back because

8  the first night when Mr. Pender Allen arrested me, they

9  were all pretty sure that I was not going to come out

10  of jail.  They were pretty sure that I would be

11  incarcerated fighting this behind bars.

12        Everyone was upset.  All of the court officers

13  were upset.  Everyone turned red like a cherry, even

14  the guy bringing me down to my property, you were so

15  rude to the judge.  I don't like how you were behaving

16  to the judge.

17        I'm like, brother, if I was rude to the judge,

18  why would she release me?  They got upset about that,

19  and then the next day, here they come again, and take

20  the truck again, and then put another letter on the

21  paper.  Whatever they want to do, I don't know.

22    Q.  Did they give you a citation?  What did it say on

23    the citation?

24    A.  It said I won't be born until November 20th of

25  2019.

Page 54

1    Q.   Yeah, I know that, but what did the citation say?

2    A.   I would have to go and look at the citation.  I

3    think it was parking, something.  I don't know.

4    Q.   Okay, let me ask you this:  What are you suing

5    for, what do you want?

6    A.   The amount or --

7    Q.   Whatever it is that you are seeking, tell me now,

8    if you want?

9    A.   I am seeking my amount in full.  I am seeking a

10   public apology from Mr. Pender Allen.  I'm seeking to

11   better my community.  I want to use to show my people

12   that, hey, we can sit down and talk and get to the

13   bottom of things without violence, but what the media

14   shows us, without cops shooting us for no reason,

15   without each other calling each other names, without

16   all of this unnecessary hate towards each other.

17        I want all of the officers to know not everyone

18   is punk pushover, that they can come and flash their

19   weapons, and we just bow our heads, and say, Oh, please

20   don't kill me.

21        Some of us of are going to take lawful steps to

22   fight back, so all of the counsels need to know that

23   they can't abuse all of the people out there.

24   Q.   What is your amount in full?

25   A.   My 9 million federal USD Federal Reserve Notes.

Page 55

1    Q.  How did you come up with your 9 million American

2    dollars for your demand?

3    A.  My face can't be fixed.  I can't even go outside

4    and not see flashing lights and my heart beat skips a

5    beat.  Do you know what kind of stress I was going

6    through?  I am down 24/7 of my life.  I used to want to

7    be an officer, now I fear for my life.

8        Their badge makes me cower in the corner.  I'm

9    supposed to be a man for my two children, I have a son

10   and a daughter.  How do I tell my son that the very

11   sirens outside that we're supposed to look at for

12   service and protection terrifies his father.  I get

13   sweaty palms in the site of police.  How are you guys

14   going to fix me besides the physical damage, how would

15   you guys fix me?

16   Q.  Okay, well said.  I just didn't know how you

17   calculated $9 million is going to fix it?

18   A.  I'm giving you the rundown, I'm also losing my

19   wife of nine years.

20   Q.  Why?

21   A.  She is tired of this.  I can't -- like -- it's

22   personal things but I do think the trauma from police

23   is affecting me in the bed.  It's affecting me

24   everywhere.  It's causing a chain reaction.  I'm losing

25   everything.  My company has been effected.  Pender

Page 56

1    Allen cost me over a million dollar contract.

2        Q.  How is that?

3        A.  A guy from UMass that controls all the painting

4    from UMass, I literally talks with that guy.  The next

5    day, instead of sitting down and talking to this guy,

6    I'm in jail telling the judge that this cop beat me.

7    That this is a miscommunication and we can fix this if

8    you guys would just please try to hear me out.  So I

9    loss that contract.

10       Q.  Wait a minute.  You had a potential meeting with

11       somebody from UMass?

12       A.  I had a meeting the next day, not a potential

13   meeting.  I had a meeting with the guy who has the

14   painting contract for UMass Lowell.

15       Q.  You couldn't go because you were in court.  So

16       could you have rescheduled that meeting?

17       A.  Yeah, I could have rescheduled, I called to

18   reschedule.  Now I'm placed on the back burner because

19   the contracts get bidded on.  So first come first

20   served.  So I have to wait then.  I'm on the back

21   burner, they are not waiting for a guy who plays cops

22   and robbers with the police.  No one is waiting for

23   that, time is money.

24       Q.  You are saying because you missed that meeting

25       that morning on January 23rd, that you lost the

Page 57

1    contract?

2    A.   Yes.

3    Q.   What was the contract for?

4    A.   To have all the -- I was going to get whatever

5    buildings he had for UMass along with whatever of his

6    own private property he had that he needed to flip and

7    resell.  I was going to get pretty much like a ten-year

8    cover-all my workers' work contract.

9    Q.   Does this guy work for UMass Lowell?

10   A.   No, he doesn't.  He's like a company, a big

11   company in painting, like he works with the state.

12   Q.   So he's got a private business and he does work

13   for UMass?

14   A.   I don't know the full details.

15   Q.   What's his name?

16   A.   I would have to go through my notes and get his

17   name, which I'm going to tell you now, I'm not going to

18   give it out, that's private.

19   Q.   Okay.  I'm just saying that you are not going to

20   be able to claim that you lost this painting contract

21   if you don't provide me with the information, that's

22   all.

23   A.   I am not going to be able to claim if I don't

24   provide you with the information?  If one minute I'm

25   sitting down with the contract in front of me and I'm

Page 58

1    told tomorrow we'll finalize the contract and I get

2    locked up, you're telling me, I don't get to tell that

3    part of the story.

4        Q.  Yes, you can tell that story, but you've got to

5        give me the guy's name.  You've got to give me the

6        contract so I can talk to him and see if, in fact, that

7        was the case.

8        A.  According to the constitution, I don't have to

9    do any of that.

10       Q.  Okay, let me ask you this:  Was there a sum he

11       was going to pay you, specific like that or what?

12       A.  $50,000 would have been a down payment to get

13   started, $50,000 just to start.

14       Q.  Just to start, to do what?

15       A.  To start, start work.

16       Q.  What was the project, do you remember?

17       A.  It was in the contract, a lot of reading, a lot

18   of contractual agreements.  I can't recall all the

19   details.

20       Q.  Was it in a particular place that you were going

21       to paint, do you recall that?

22       A.  UMass, the entire north campus of UMass.

23       Q.  Do you still have that contract?

24       A.  I told you, no.  Do not have the contract.

25       Q.  Did you call him the next morning and say I'm

Page 59

1    sorry, but can we reschedule the meeting for this

2    afternoon?

3    A.   Schedule.

4    Q.   Say that again.

5    A.   I did, yes, I did, I called to reschedule.

6    Q.   When did you call him?

7    A.   The next day, as soon as I got released.  I

8    went, cleaned up, showered, scheduled medical treatment

9    with my mother, and then called and handled all my

10   affairs.  Unfortunately, things of that scale don't

11   wait for little guys like me.

12   Q.   When was the meeting supposed to be?

13   A.   The meeting was 9 a.m. in the morning.

14   Q.   Where was the meeting going to be?

15   A.   At a Starbucks.  I'm assuming the Starbucks

16   that's in UMass that's over on the north campus there.

17   Q.   What time did you call the guy?

18   A.   At one, one, two o'clock.

19   Q.   Did you call him?

20   A.   I called him and left a message.

21   Q.   Did he get back to you?

22   A.   The following day, yup.

23   Q.   What did he say?

24   A.   Unfortunately, Mr. Campbell, things of this

25   scale need to be finalized at this time.  I'm sorry for

Page 60

1   your inconvenience, I hope things get better for you in

2   the future.  Maybe in the future, when there's space,

3   give me a call.

4       Q.  Did you ever talk to him again about doing work

5       for him in the future?

6       A.  Not since, no.

7       Q.  Why not?  It's been a year-and-a-half, did you

8       ever call him and say, do you have any more work for

9       me?

10      A.  I haven't thought to call him back.  I myself

11  have been busy with other engagements.

12      Q.  Do you have any employees?

13      A.  I do.

14      Q.  How many do you have?

15      A.  Three, so far.

16      Q.  Other than that matter, any other financial

17      losses that you can talk about as a result of this

18      incident?

19      A.  My wife is a great -- was the greatest financial

20  asset to me, she is half my life.

21      Q.  Your wife is a financial asset and as a result of

22      this incident with the police, has that changed?

23          Sir, sir, did you say that you're having marital

24      problems as a result of this incident, or was there

25      other things?

Page 61

1    A.  I'm saying wife is half my life.  She has a

2    business, I have a business.

3    Q.  What is her business?

4    A.  We're both intertwined in each other's business.

5    Q.  What is her business?

6    A.  I loss her, I loss half of my financial.

7    Q.  What is her business?

8    A.  She's a baker.

9    Q.  Nice.  Does she work in a bakery?

10   A.  No, she doesn't, she has her own bakery.

11   Q.  Where is that?

12   A.  In Lowell.

13   Q.  Does it have a name?

14   A.  Lulu Cakes.  Lulu Sweet Cakes is the name of it.

15   Q.  Why do you say you are going to lose it?

16   A.  I already lost it.

17   Q.  Why?

18   A.  Because my wife and I are going through a

19   divorce.

20   Q.  And has the divorce been filed?

21   A.  No.

22   Q.  And what is the reason for the divorce, if you

23   don't mind me asking?

24   A.  I've already told you.  Right after the Pender

25   Allen incident is when she said she's tired of the

Page 62

1   harassment.

2      Q.   Tired of what harassment?

3      A.   The constant police harassment, I guess, I don't

4   know.  You can ask her if you want to ask her, I don't

5   even understand it.

6      Q.   I don't know what that has to do with divorcing

7    you, you know what I mean?

8      A.   Oh, my God.  Yeah, I know what you mean.  I

9   don't know what it has to do with divorcing me either.

10     Q.   Is there anything else you want to say before we

11    finish up?

12     A.   When do I get to ask Mr. Pender Allen all of

13   these questions that you've asked me?

14     Q.   It's up to you.  I'm sorry?

15     A.   Is he available now?

16     Q.   No.  But get in touch with me and we can talk

17    about making arrangements for that.  So let me just see

18    if I have anything else I want to ask you.

19     A.   You asked me about it as if it's an excessive

20   amount.  That amount cannot scratch what I went

21   through.  That amount doesn't even put a ripple in the

22   pool.

23         This man literally took my life, turned it

24   upside-down and slammed it on the floor like that.  You

25   guys have to understand what -- actually, you guys

Page 63

1    don't have to understand anything.  I just have to do

2    what I have to do and keep the law on my side.

3       Q.  All right, I'm finished with my questions.  Thank

4    you very much, Leonitus, I appreciate it.  Worked out

5    good, you did a good job.

6                MR. LOUISON:  Do you have any spelling

7          issues or anything that you need?

8                Thank you very much, sir.

9       A.  When is our next date after this?

10      Q.  I don't know.

11      A.  Something we have to figure out.

12      Q.  I don't recall and I'm not looking at the file

13   right now.  I don't remember if the court scheduled

14   something.

15      A.  I think August or something.

16      Q.  All right, thank you very much.

17      A.  All right.

18      Q.  Good-bye, good seeing you.  Thank you very much.

19   Bye-bye.

20      A.  Stay well.

21      Q.  You too, buddy.

22      A.  All right.  Bye-bye.

23            (DEPOSITION ADJOURNED AT 12:01 p.m.)

24

25

Page 64

C E R T I F I C A T E

I, PATRICIA QUIRK, a Notary Public in and for the State

of Rhode Island and the Commonwealth of Massachusetts,

do hereby certify that I am expressly approved as a

person qualified and authorized to take depositions

pursuant to rules of Civil Procedure of this Court,

especially but without restriction thereto, under Rules

29 and 30(b)(4) of said Rules; that the witness was

first sworn by me; that the transcript contains a true

record of the proceedings.


Reading and signing of the transcript was not requested

by the deponent or any parties involved upon completion

of the deposition.


IN WITNESS WHEREOF, I have hereunto set my hand this

day of_____, 2020



PATRICIA QUIRK, CSR
NOTARY PUBLIC/CERTIFIED COURT REPORTER
MY COMMISSION EXPIRES 12/11/2021



**Page 1**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

------------------------------)
LEONITUS JABIR BEY                  )
    Plaintiff               )
                            )
    vs.                     )   C.A. NO. 19-10219-PBS
                            )
DAVID PENDER                        )
    Defendant               )
------------------------------)

DEPOSITION OF LEONITUS JABIR BEY, a
Plaintiff in the above-entitled cause, taken on
behalf of the Defendant, reported by Patricia
Quirk, CSR, a Notary Public in and for the State
of Rhode Island and The Commonwealth of
Massachusetts, appearing remotely via ZOOM from
Bristol, Rhode Island, on May 20, 2020, scheduled
at 10:00 a.m.


PRESENT:

FOR THE PLAINTIFF....PRO SE
    BY:   LEONITUS JABIR BEY
        P.O. BOX 1934
        LOWELL, MA  01854
FOR THE DEFENDANT....LOUISON, COSTELLO, CONDON & PFAFF, LLP
    BY:   BRADFORD N. LOUISON, ESQUIRE
        101 SUMMER STREET
        BOSTON, MA  02110
        (617) 439-0305

**Page 2**

I N D E X

WITNESS                         PAGE
LEONITUS JABIR BEY
EXAMINATION BY LOUISON          03


E X H I B I T S

NO.  DESCRIPTION               Page


REPORTER'S NOTE:
(NO EXHIBITS WERE MARKED DURING THIS DEPOSITION)

**Page 3**

1  (DEPOSITION COMMENCED AT 10:33 a.m.)
2  LEONITUS JABIR BEY
3  Being duly sworn, deposes and testifies as follows:
4  THE REPORTER:  Would you state your full
5  name for the record, please.
6  THE WITNESS:  Leonitus Jabir Bey.
7  EXAMINATION BY MR. LOUISON
8  (WITNESS ASKED FOR IDENTIFICATION, DID NOT PROVIDE.
   IDENTITY CONFIRMED BY MR. LOUISON)
9  MR. LOUISON:  It is my personal
10 knowledge that is him.
11 Q.  Did you want to go on the computer, or are you
12 going to use the phone?  What do you want to do?
13 A.  I actually had it sitting up from last night
14 because I was making sure it worked.
15 Q.  Mr. Bey, have you ever -- have you ever been in a
16 deposition before?
17 A.  I have not.
18 Q.  All right.  So basically, it's a procedure in a
19 civil suit in which the parties have the opportunity to
20 ask questions and get answers under oath.
21 A court reporter is taking everything down that I
22 ask you, and will take down your answers.  A transcript
23 will be made of today's deposition.  And I'll ask you
24 questions, you answer them.
25 If you don't understand a question, or if you

**Page 4**

1  have any other questions, just let me know.  If you
2  need to take a break -- it shouldn't take too long,
3  maybe about an hour or so, and we can get going.  Okay?
4  A.  Yes, sir.
5  Q.  You stated your name; do you go by any other
6  name?
7  A.  Nope.  No.  It depends.
8  Q.  Go ahead.
9  A.  Depends.  People like to force things on you.
10 There's people who do name calling, people call me
11 names, but I don't go by any other name, no.
12 Q.  I know the issue of the name, so I'm not going to
13 dwell on that.  But you've known by the name of Leon
14 Campbell before?
15 A.  No.  That name was forced on me by the
16 government, and then I was raised to believe that was
17 my name.  Then, once I started studying law, I found
18 out that is not my name, that is a government
19 contractual name, a third-party name, an international
20 commerce says we can trust access, birth certificate
21 name.  So, no.
22 Yes, I've been called that name before, but it
23 is not my common name.  Even growing up in the streets,
24 I denounced that name, so, no.
25 Q.  When did you stop using that name?

Page 5

1    A. When I was in -- when I was, like, nine years
2  old.
3    Q. Okay. What name did you take when you were nine
4  years old?
5    A. I've always been called Lion, like lion, I've
6  always been called Lion. Lion was always the name I
7  was called.
8    Q. When did you take the surname Bey, B-E-Y?
9    A. When I found out my ancestral heritage.
10    Q. What year was that, if you know?
11    A. I want to say that was 2016, the end of 2016.
12    Q. Okay. What's your date of birth, please?
13    A. 11/20/83.
14    Q. That makes you...
15    A. Thirty-six.
16    Q. Thirty-six, nice. What's your address?
17    A. Well, I domicile at an address, at my P.O.
18  Box 1934, that's the address, Lowell.
19    Q. You lived at 109 4th Avenue, Apartment One,
20  Lowell?
21    A. Well, I lived with my buddy, in a domicile.
22    Q. You domiciled --
23    A. At that address.
24    Q. Where were you born?
25    A. America.

Page 6

1    Q. Okay. Where did you grow up? What town did you
2  grow up in?
3    A. New York.
4    Q. Do you remember when you left New York?
5    A. I don't know, 2006 or '07, one of them.
6    Q. Sure. Where did you go when you left New York?
7    A. Massachusetts.
8    Q. Did you live in any other states in the United
9  States, other than New York and Massachusetts?
10    A. Is this relevant to --
11    Q. Yeah, I'm just trying to get some background
12  information.
13    A. Yeah, but is it relevant to the case?
14    Q. I just want to know if you've lived in any other
15  states.
16    A. Do I get all the same information on Mr. Pender
17  Allen (sic) that you're gathering on me?
18    Q. You could ask him questions in a deposition if
19  you want. So, anyway, what other states have you lived
20  in?
21    A. I can't recall.
22    Q. Who do you live with now?
23    A. My wife.
24    Q. What's her name?
25    A. Lauren McHugh.

Page 7

1    Q. Anybody else?
2    A. And Karen McHugh.
3    Q. Who is she?
4    A. Her mother, my mother-in-law, the woman that
5  came outside and had to tell Mr. Pender Allen to stop.
6    Q. Okay. Have you ever lived outside the United
7  States?
8    A. I can't recall.
9    Q. You can't recall if you ever lived outside the
10  United States?
11    A. No, I cannot.
12    Q. Wouldn't you remember that?
13    A. I should, but, the amount of police brutality I
14  go through constantly, being hit, dragged, and cuffed.
15  Taking a lot of drugs, having to get rid of the pain
16  that the police caused me every day of my life, since I
17  was 11 years old.
18      I'm going to tell you now, a lot of what I can
19  remember is only police violence towards me. I can't
20  really remember any of these extra questions you are
21  asking me, because I've been in surgery. I've taken
22  drugs to get my leg back and my mind back, and it's all
23  due to police brutality.
24      All I can remember is the ill treatment from
25  them, so you're really going to waste all of our times

Page 8

1  if you drag us into any of it, other than the facts of
2  where we need to go with this case.
3    Q. When you talk about police brutality, you are
4  talking about from whom?
5    A. From policy enforcers.
6    Q. So, you indicated that you had a leg problem as a
7  result of police brutality?
8    A. No. I'm saying the leg problem was part of
9  my -- the reason why I can't remember a lot of things.
10    Q. Okay.
11    A. But I can't recall a lot of these things that
12  you are asking me.
13    Q. But you kind of said that, was the leg problem as
14  a result of police brutality?
15    A. The leg problem has nothing to do with anything
16  of what you are trying to ask.
17    Q. Okay. What's -- let me ask you this: What's
18  your educational background?
19    A. I did a year of college, and I'm self-taught,
20  self-studied, self-educated.
21    Q. Did you graduate from high school?
22    A. I did.
23    Q. What high school?
24    A. Evander Charles High School.
25    Q. Where is that located?

## Page 13

1  in the face by Pender Allen for not driving -- for
2  pulling into my driveway, which incident?
3      Q.  No, I'm talking about the one with the state
4  police?
5      A.  Are you asking if I was traumatized in fear for
6  my life?
7      Q.  Yes.
8      A.  I was, very traumatized.
9      Q.  Did you seek any medical treatment or psychiatric
10  treatment as a result of that?
11      A.  My mother, who is a holistic nurse.  My
12  girlfriend at the time who was a shrink, my best
13  friends, all the people who counsel me, my pastor.  I
14  think I sought a lot of counseling, a lot of
15  counseling, both times, still in counseling.
16      Q.  Who are you in counseling with now?
17      A.  A holistic psychological nurse, she counsels me
18  and treats me and keeps me better.  She is the one I
19  get herbal medicines from when the doctors only try to
20  give me drugs.
21      Q.  Tell me her name again, it broke up when you said
22  it.
23      A.  I'm going to leave her name off the record.
24      Q.  Okay.  Did she treat you for any trauma or
25  emotional distress from the incident with Officer

## Page 14

1  Pender on January 22, 2019?
2      A.  Called my mother immediately and told her that
3  an officer punched me in the face several times, for
4  what reason, I do not know.  But when I go to court and
5  find out, I will tell you.
6      Q.  I'm sorry, I'm just confused because I'm having
7  trouble hearing it.
8          You are talking about your mother who you treated
9  with?
10      A.  My holistic interest, yes, my mother.
11      Q.  Okay.  And did she take any notes or keep any
12  records of any treatment?
13      A.  She does.
14      Q.  She does?
15      A.  Yes, she does.
16      Q.  Okay.  Are you still treating with her now?
17      A.  Every day.
18      Q.  Okay.  Are you going to introduce that treatment
19  at a -- in a trial in this case?
20      A.  No, I am not.  It's ancestral, and I can't do
21  that, I would need permission from the gods to do that
22  and I cannot.
23      Q.  You mentioned that you were beat you up by a
24  Canadian state trooper, what did you mean by that?
25      A.  I thought he was Canadian, he represented him

## Page 15

1  himself to be Canadian.
2      Q.  I thought you said he was a Massachusetts state
3  trooper?
4      A.  He was.  I could tell you he looked Canadian, he
5  had an accent.
6      Q.  Okay, all right.
7      A.  Yeah, I'm profiling like the officers do all the
8  time, so I was just profiling.
9      Q.  I didn't know if he was a police officer from
10  Canada the way you said that?
11      A.  I was just judging by the way he said nigger in
12  a Canadian accent.  The nigger, he was like nigger,
13  huh.  Like one of those.
14      Q.  That's it.  Have you ever served time in prison
15  or a jail?
16      A.  Yes, jail.
17      Q.  And when was that and how long was it?
18      A.  I'm thinking 90 days I didn't have a license.
19  The jail out of Massachusetts, that's the only place
20  I've ever done jail time was in Massachusetts.
21      Q.  Which jail was that, do you remember?
22      A.  No, I can't recall.
23      Q.  Was it at the house of correction in Billerica or
24  something like that?
25      A.  Something like that, wherever the Danvers,

## Page 16

1  wherever they beat the people and take them, however,
2  whatever their jurisdiction is.  I think that's how you
3  would find that out.
4      I can't recall, and being rehabilitated, so.
5      Q.  Have you ever had any involvement with the Lowell
6  Police Department prior to that incident on January 22,
7  2019?
8      A.  No.  Any involvement in what way?
9      Q.  Any way.  Either being stopped, going there
10  making a complaint, calling the police for something,
11  anything you can think of?
12      A.  I can't recall.
13      Q.  This David Pender, did you know him or have any
14  involvement with him prior to that date?
15      A.  I never met him a day before in my life.
16      Q.  Do you know a person named Dennis Paige?
17      A.  I can't recall.
18      Q.  I had a document, it was a registration for the
19  truck you were in.  I said it was owned by a Dennis
20  Paige of 17 Bridle Path Way in Tyngsboro.  Does that
21  refresh your recollection?
22      A.  I don't know, I don't want to disclose anyone's
23  information that I didn't get permission to disclose.
24  I would literally have to go ask if I could give out
25  his information.  If you have his information, I don't

Page 17

1   know how you got it, that's on you.  I personally do
2   not disclose other people's information without their
3   permission, so I couldn't tell you who that name is
4   that you mentioned.
5       Q.  When you were stopped that day, what kind of a
6   vehicle were you in?
7       A.  I was in a pickup truck, Ford pickup truck.
8       Q.  Whose pickup truck was it?
9       A.  My pickup truck.
10      Q.  How long had you had it prior to that date?
11      A.  I can't remember.
12      Q.  Do you remember who you bought it from?
13      A.  I do.
14      Q.  Who?
15      A.  I can't disclose that information, it's private.
16      Q.  Okay.  You can do whatever you want, I'm going to
17   say that you are not going to be able to disclose these
18   kinds of things at trial if you don't let us know ahead
19   of time.
20      A.  Why wouldn't I be able to disclose it at trial
21   if I don't tell it to you?  The constitution nor any of
22   the laws that I have read says that I don't have that
23   power, unless you are taking powers from me right now.
24      Q.  In a civil suit, you're obligated to present
25   evidence that you intend on presenting at trial.  So,

Page 18

1   you know, things that you are going to do at trial.
2       Let's say you are going to introduce records of
3   therapy treatment with your mother or that kind of
4   thing.  You've got to disclose it ahead of time.
5       A.  Well, I've seen a judge and been involved in the
6   case with Mr. Pender Allen, the judge allowed it.
7   Where they didn't introduce anything ahead of time.
8   They did it right in the middle of the case.
9       I'm a guy that lives and learns, so when I see
10  something that can be done by a judge or the DA or
11  anything -- I'm under the constitution -- I as a
12  people, people of the America, right, have all the same
13  equal rights and opportunity as that other person doing
14  X, Y, and Z in front of me.
15      So I'm going to do the same thing.  I'm not
16  going to throw myself out there, vulnerably.  I'm going
17  to do as I see the so-called leaders in front of me do.
18  So what the judge did, I'm going to do.
19      Q.  I'll ask you one more time, do you recall who you
20  bought the truck from?
21      A.  I do not.
22      Q.  Do you have it registered?
23      A.  I personally did not, that information is also
24  private.
25      Q.  Did you have the truck insured for auto

Page 19

1   insurance?
2       A.  I did not.  Me personally, I did not do any of
3   that.
4       Q.  Did it have a -- did it have a license plate on
5   it that night?
6       A.  Yes, it did.  It always had a license plate on
7   it.
8       Q.  What was the license plate, do you remember?
9       A.  I can't recall.  I can't recall.
10      Q.  Was it a Massachusetts license plate or was it
11  some other jurisdiction?
12      A.  Oh, no, it was definitely not Massachusetts
13  jurisdiction.  So they violated -- that's part of the
14  violation, it definitely wasn't their jurisdiction.
15      Q.  Did you have a driver's license from any
16  jurisdiction that day?
17      A.  From any jurisdiction?
18      Q.  Yes, a driver's license.
19      A.  The constitution is about jurisdiction, I did.
20  I had a right to drive.
21      Q.  I know, okay.  Where did you have a driver's
22  license issued from, that's what I want to know?
23      A.  From the constitution that says no states can
24  levy or take a right and put a tax on it, and if the
25  state chooses to take a right of the people and put a

Page 20

1   tax or levy or any things on it, the people are allowed
2   to take part in said right with impunity, according to
3   the constitution that everyone -- it protects my right
4   to travel unencumbered and unfettered along the
5   highways and byways of the land.
6       Q.  Do you still have that truck?
7       A.  I do.
8       Q.  Okay.  Do you have a driver's license currently?
9       A.  The same one as -- that one doesn't go anywhere,
10  it's like permanent.
11      Q.  All right, let me ask you a question.  Go ahead,
12  sorry.
13      A.  For the stenographer to get this.
14      I do not have an international commerce license,
15  no, I do not.  That license to do business with states
16  that recognize and the plastic that gave me permission
17  to move, that they may have tied up within their
18  jurisdiction, which it doesn't stop me from traveling
19  because the constitution protects my right to travel.
20      So that plastic international device, that you
21  are asking about, no, they have that tied up in their
22  stuff, and I believe that Mr. Pender Allen, along with
23  the judge and a few other people in the courtroom, they
24  are all friends with RMV, so they all got together and
25  worked together to tie up that piece of contractual

Page 21

```
 1   agreement.
 2         And they thought it would stop me, or they tied
 3   it up because they want all my federal reserve notes,
 4   but they've done it to other people and other people
 5   have folded and allowed them to do it, but I'm not one
 6   of those people who allow them to abuse me to a
 7   contractual agreement.
 8   Q.  Are you employed?
 9   A.  I'm self-employed.
10   Q.  What do you do?
11   A.  I'm a painter.
12   Q.  How long have you been doing that?
13   A.  Three years.
14   Q.  When you say "a painter," like a house painter?
15   A.  Yes, I paint houses; interior, exterior.  I do
16   minor carpentry, I also do lawn care, I do pretty much
17   about everything.
18   Q.  Very good.  On the date of the incident,
19   January 22nd, you were so employed the same way?
20   A.  Correct.
21   Q.  Do you have a business name, or how do you go
22   about business?
23   A.  LLC.
24   Q.  I couldn't hear you, say it again, please.
25   A.  The business name is I Paint.
```

Page 22

```
 1   Q.  I Paint, LLC, and it's at the address of 4th
 2   Avenue in Lowell?
 3   A.  Correct.
 4   Q.  Who is Jamarti Taleid Abdullah Bey?
 5   A.  My counselor.  I've got him here right now in
 6   this conference call.
 7   Q.  Let's talk about the date of the incident, the
 8   incident in the police report anyway, said it happened
 9   around 6 o'clock in the afternoon, or 6 o'clock in the
10   evening.  Where were you -- do you remember what you
11   did that day, prior to the involvement with Officer
12   Pender?
13   A.  I was just coming back to my car or seeing a
14   mechanic about the problem with my truck not staying
15   on.
16   Q.  And -- go ahead, what?
17   A.  What was that?
18   Q.  So what time had you gone to the mechanic?
19   A.  I can't recall the exact timing.  I do know it
20   was late afternoon.  Actually, like, it was around
21   evening, going into evening time.
22   Q.  Sure.  Do you have any recollection of what you
23   did before that during the day?
24   A.  I was at work, I think, yeah, I was at work.
25   Q.  And when you mean "at work," were you painting
```

Page 23

```
 1   somebody's house or at some place of employment?
 2   A.  No, actually I was back and forth to the junk
 3   yard because I needed to get a transmission because my
 4   truck needed a new transmission at the time.  It kept
 5   shutting off on me.
 6         So I was trying to do what I could do to get off
 7   the road so I could get it fixed.  I didn't want to
 8   have to spend tow truck money to tow the huge truck out
 9   of wherever it would break down on me.
10   Q.  Where were you coming from just before you were
11   involved with Pender?
12   A.  I can't really recall.
13   Q.  Were you coming from the body shop or the
14   mechanic?
15   A.  I think so, it might have been J & R Autos, or
16   somewhere.
17   Q.  And where is that, do you know?
18   A.  Somewhere in Lowell.  I was coming from
19   somewhere in Lowell, it wasn't far.  I wasn't any where
20   far because I was having problems with the truck and I
21   couldn't go anywhere.
22   Q.  Okay.  Do you think you were coming from that
23   mechanic before you were stopped, or did you stop
24   anywhere in between?
25   A.  I can't recall.
```

Page 24

```
 1   Q.  Okay.  And you said earlier you don't take any
 2   medication, did you have any medication or alcoholic
 3   beverages or anything like that prior to that day,
 4   before you were stopped by the police?
 5   A.  That day?
 6   Q.  Yeah.  That day, on January 22, 2019, prior to
 7   6:13 p.m., had you had any -- did you take any
 8   medication for anything?
 9   A.  No.
10   Q.  Did you take any alcoholic beverages?
11   A.  No.
12   Q.  Was anybody in the vehicle with you?
13   A.  Yes.
14   Q.  Who?
15   A.  Pathfinder Bey.
16   Q.  And who is Pathfinder Bey?
17   A.  He is my Co-Defendant, person in the car -- the
18   guest that was in the car with me, the guest who
19   recorded the entire incident.
20   Q.  Okay, what is his address?
21   A.  He is in Florida currently.
22   Q.  Do you know what his address is in Florida?
23   A.  I do not.
24   Q.  Do you know what town he lives in?
25   A.  I do not.
```

Page 25

1  Q. Anybody else in the car with you?
2  A. Nope.
3  Q. Where were you heading when you were stopped by
4  the police?
5  A. My domicile.
6  Q. Who is Ashiko, A-S-H-I-K-O, Smith, is that the
7  same person as Pathfinder Bey?
8  A. That is -- I'm pretty sure from what I recall,
9  that is the name that they kept calling        Mr.
10 Pathfinder this and kept trying to force him under so
11 they can assume jurisdiction over him.  A
12 jurisdictional name that they forced him to go by,
13 yeah, I remember them calling him that.
14 Q. Tell me what happened as you were going over the
15 O'Donnell Bridge?
16 A. Is that the bridge?
17 Q. Yeah, I think from the report it says O'Donnell
18 Bridge.  Why don't you just describe what happened.
19 A. As I was going over the bridge, my truck began
20 to flicker, the cabin lights began to flicker,
21 everything in the truck began to flicker.  So I assumed
22 the truck was going to shut off.
23      Immediately my brain thinks to get the truck out
24 of the way of pedestrians, the truck off the main road.
25 So I was in the left turning lane, and I wanted to go

Page 26

1  straight off the bridge, so I looked over to the car,
2  to the right of me, and I signaled to the car, hey, do
3  you mind if I go straight?  The guy was like sure, go
4  ahead, so when the lights changed instead of making a
5  left turn, I went straight.
6  Q. Okay, let me ask you this:  That left lane, are
7  there signs or anything that says left lane only or
8  anything like that?
9  A. No.  We were just spending a good amount of time
10 in the town after taking the turn more than once your
11 brain kind of makes it kind of a manual thing.
12 Q. My understanding is that there are multiple signs
13 that say left turn only for that lane you were in?
14 A. They probably just put those up now.
15 Q. And that it was also painted on the ground, an
16 arrow or something like that, that indicates left turn
17 only, do you recall that?
18 A. I'm not sure.  Because I did remember, I did ask
19 the person to the right of me if I could go straight.
20 Q. Okay, but you definitely knew that you were in a
21 left lane that was intended to only turn left, not go
22 straight, right?
23 A. No, because I see cars go straight in that lane
24 all the time so I thought I would do the same thing.
25 I've seen police do it.  Police go in that left turning

Page 27

1  lane and go straight.
2  Q. But you are not supposed to, right?
3  A. If the police can do it, we the people can do
4  it.  That's the law.  That's how it goes.  That's what
5  Abraham Lincoln said about everyone being equal.
6      So if the police can talk on their phones and
7  drive, so can we.  If the police go in the left turning
8  lane only and go straight so are the people.  The
9  people are going to see these things and we are going
10 to do it.  We're not killing or harming anyone.
11 Q. That's what you did, right?
12 A. No.
13 Q. You went straight?
14 A. I went straight, yes.
15 Q. Do you remember how many lanes are on that bridge
16 going that way?
17 A. Two lanes.
18 Q. So you indicated to the guy that -- as you said,
19 then what happened?
20 A. Then I went straight.
21 Q. Now, the --
22 A. Doing less than 20 miles an hour I went
23 straight.  I even -- I even had to stop to allow the
24 car going into McDonald's to turn in.  Stopped and
25 allowed the car to go into McDonald's.  That car went

Page 28

1  by, then I continued.
2      My truck is flickering on and off, so now the
3  truck wants to shut off.  I literally live -- 4th
4  Avenue from McDonald's, is less than 100 yards.  I said
5  why don't I try to get my truck out off the roadway and
6  into the safety of my driveway.  That way I don't got
7  to block up traffic with a tow truck, with all these
8  lights.  I don't want to disturb the people, let me
9  just get my truck out of the way.
10      So I slowly continued down 4th Avenue, saw one
11 of my brethren who was exiting, coming out of the
12 intersection of 4th Avenue.  I kindly waved to him,
13 gave him a wave, how are you doing, and made the right.
14 Q. Let me ask you this:  Were there any other cars
15 to your right when you crossed that bridge going
16 straight other than the guy you spoke to?
17 A. Nope.
18 Q. You don't recall anybody honking the horns at you
19 or anything like that?
20 A. Nope.  No, honking.
21 Q. You don't recall any difficulty where you may
22 have gotten too close to a car and they thought you
23 were going to cut them off?
24 A. No.
25 Q. When did you first realize there was a police car

## Page 29

behind you?

A.  When I was turning onto 4th Avenue.

Q.  How far is that from the bridge?

A.  Probably 100 yards, maybe.

Q.  How did you know that there was a police car behind you?

A.  The lights.

Q.  And those are the blue lights that were blinking?

A.  Yup.

Q.  And was there a siren or any horn?

A.  No siren, nothing.

Q.  All right.  And where was the police car with the blue lights from you?

A.  Well, I didn't know, when I was turning onto 4th, you can see behind you, like, you can see in all your rearview mirrors and stuff.  When those lights flash you can see the flickering in your mirror.

I saw the flickering, I'm not thinking anything of it.  When I looked, turned and looked, I just saw a cop car coming out of the McDonald's parking lot, and that's me turning onto 4th Avenue.  I can see that.  The cop was working his way out of the McDonald's parking lot.

I thought something must be going on, not thinking it's for me.  I go all the way to my house.

## Page 30

I'm literally into 4th Avenue like almost to Hope, on the Mount Hope side.  Then to my house there comes the flashing lights on my street now.

Q.  When you were heading that way, was the police car with the blue lights behind you?

A.  When I was heading in -- what was that?  When I was heading that way?

Q.  When you went over the bridge and were heading straight and then turned, was the police car behind you?

A.  At the time when -- the police car wasn't behind me until I was on 4th.

Q.  It broke up, could you say that again, please.

A.  He wasn't behind me until I made the turn onto 4th.

Q.  When you turned onto 4th, he was behind you?

A.  Yeah, he turned onto 4th and ended up behind me, yeah at some point.  I made it into the driveway.

Q.  Well, he was behind you on 4th, is it 4th Street or 4th Avenue?

A.  4th Avenue.

Q.  Did you pull over to the right when you saw a police car with its blue lights, or you kept on going?

A.  Well, the law says I can pull over where I feel safe.

## Page 31

Q.  Say that again, it broke up again.

A.  The law says that we have the right to pull over in a safe place, where we feel safe, not crowded, you know what I mean?

I saw the lights as soon as -- I assumed that they were for me.  I said oh, well, my driveway is less than 100 feet away from me, why not let me pull it into the driveway and talk to the officer.  I didn't want to pull over and talk to them and have to have the truck towed.

Q.  Sure.  What was it that gave you the understanding that the police car was for you?

A.  When he pulled into the driveway with me.

Q.  Yeah, you just said before, you said when I realized that the police car was for me, I wanted to pull over somewhere safe and pulled into your driveway?

A.  No, no, no, no.  In my mind, when I saw the lights, I'm like wait, I assumed after he got onto 4th, I'm like okay, maybe this must be for me, so I just turned into my driveway.  That's when I realized it was for me.

It wasn't at no point he was behind me, he was trying to pull me over, and I didn't pull over.  I went to my driveway, and he pulled into my driveway.

Q.  But I thought you said you had the right to pull

## Page 32

over somewhere safe?  So it seems to me you knew it was for you and you didn't want to pull over in the road, you wanted to pull over in your driveway?

A.  No.  I was already 100 feet away from my driveway with a place to pull over.

Q.  Is there a place to pull over on the right against the curb?

A.  No, the street is not big enough.  And it's pedestrian hours, and my driveway is less than 100 feet away from me, who wouldn't pull into their driveway?

Q.  Was it dark out yet or was it still light?

A.  Yeah, it was in the dark time.

Q.  You pulled into the driveway, what happened next?

A.  I waited for -- to see what the issue was and a taster came to the window, and then an officer behind the taser.

Q.  And did the officer come up to your window?

A.  No.  A taser and two arms came up to the window.

Q.  What happened, what did you do?

A.  I had to turn all the way around to see the officer behind his arms, and to see who was holding the taser.  I had to turn all the way around and I --

Well, so what I tried to do immediately was put the window down so I could talk to him.  But the truck is flickering, going off and on at the same time, so

Page 33

1  the alternator is dying on me. So the truck dies the
2  minute I pull into the driveway. I shut it off, but
3  it's supposed to still have electrical so you can put
4  the window down.
5      So at this point the window is not going down,
6  the radio is flickering on and off, lights are
7  flickering on and off. There's a cop screaming at my
8  window with a gun in his hand. Found out it was a
9  taser, I thought it was a gun.
10      Now it just went from zero to panic mode super
11 quick because I saw a weapon. I thought he was going
12 to come up to the window, maybe knock on the window.
13 Hey, what are you doing, maybe ask a question or two
14 first.
15      He banged on the window with the taser. Like
16 here's the window, that's how he knocked on the window.
17 And he went, "Put the window down."
18      And I said I can't put the window down, the
19 truck is not working, and I'm showing him the motion of
20 me pressing the window down. The window is not
21 working. I'm trying.
22      Then he goes, "Open the door. You want this?
23 You want this, open the door?" screaming while I'm
24 trying to comply.
25      You've got to understand that it's hard to

Page 34

1  comply or make it look like you're complying when
2  someone is frantically screaming and waving a weapon
3  around outside in your face.
4      I tried to open the door, I'm going to open the
5  door. Before I could open the door he rips the door
6  open.
7      Q. Then what happened?
8      A. So now I'm terrified. He rips the door open, I
9  am terrified. He goes, "Do you want this? Is this
10 what you want? Do you want this? Is this what you
11 want?" Screaming, right, waking up my mother-in-law,
12 she's been in there.
13      Lights are flashing all through the thing. I
14 clasped the steering wheel, because now I'm fearing for
15 my life because he's got a weapon in his hand, and he's
16 screaming if this is what I want.
17      I don't know if I hit someone on the way in, I
18 don't know if I killed a cat, I don't know what I did.
19 Last time I checked, driving without a license is not a
20 criminal offense, and it doesn't require a screaming,
21 so-called, officer at your window with a weapon in his
22 hand.
23      Q. Let me ask you: You pulled into the driveway, is
24 this a single-family house or multi-family house?
25      A. Multi-family house.

Page 35

1      Q. How many apartments are there?
2      A. Three.
3      Q. And the driveway, were there any other vehicles
4  in the driveway?
5      A. Several other vehicles were in the driveway.
6      Q. Where were they -- so you pull in, was there a
7  car in front of you, or to the left or the right?
8      A. There was a car in front of me, two beside me,
9  we share the driveway with the neighbors.
10      Q. Where was the police car?
11      A. Behind my car.
12      Q. And what -- when this was going on, as you
13 described, your passenger, where was he?
14      A. Sitting right there, my guest was right there.
15      Q. Did you eventually open the door, or did he open
16 the door, the police officer?
17      A. Mr. Allen ripped the door open.
18      Q. Then what happened?
19      A. Then he asked me if this is what I want. I
20 panicked and grabbed the steering wheel, I didn't know
21 what to do or say. I don't want to be shot. No one
22 wants to be shot. No one knows what to do when you
23 have a weapon in your face by a screaming man.
24      Q. Tell me what happened.
25      A. So all I did was grasp the steering wheel. My

Page 36

1  guest begins to ask what's the problem? Which someone
2  was trying to talk to him to try to get some sort of
3  vocal from him. It was all screaming.
4      After he asked me if this is what I want, he
5  punched me in the face several times, like three
6  strikes, he gave me three strikes; one, two, three.
7  Then my guest flares up, like he gets like scared and
8  pulls his phone out, and says, "Oh, my God, what are
9  you doing?"
10      Q. Where was he when that happened, was he still
11 sitting in the passenger seat?
12      A. In the passenger seat? He was also trying to
13 talk to Mr. Pender while Mr. Pender was screaming.
14      Q. Did he ever get out of the car?
15      A. I'm getting to that point.
16      Q. Did you hit the taser out of Officer Pender's
17 hand and knock it under the car?
18      A. Let me tell you something, my mother-in-law saw
19 everything.
20      Q. What's your mother-in-law's name?
21      A. Karen McHugh.
22      Q. And she lives with you, right?
23      A. Yes. But the courts wouldn't allow --
24      Q. So let me stop you there. So you left off, he
25 punched you, then what happened?

Page 37

1 A. My guest, Pathfinder, then panicked and pulled
2 his phone out and pushed record and began to record the
3 whole thing. Then he punched me again, when -- after
4 Pathfinder pulled out his phone to record, that seemed
5 to agitate Mr. Pender again.
6 Then after he pulled out the phone to record, he
7 struck me again. That's when my guest got out of the
8 car and went for a closer view, and asked Mr. Pender,
9 "What are you doing? Why are you hitting him? Why are
10 you hitting him? Why are you hitting him?"
11 Q. Where did he hit you?
12 A. In my face.
13 Q. How many times?
14 A. I want to say, I counted six blunt strikes to my
15 left eye. Six blunt strikes to the temple. He struck
16 three, then he came back with the taser. So the first
17 time he struck, he struck with the taser in his hand;
18 one, two, three, taser in hand.
19 The second time he came back, I didn't feel the
20 taser. That must have been what gave me the scar in my
21 inner eye. It must have been the taser he hit me with.
22 Then the second time he came back, I didn't feel the
23 taser when he was striking me.
24 Q. Hold on for a minute.
25 A. Hold on. My hands were clasped to the steering

Page 38

1 wheel. In order for me to hit anything out of someone
2 else's hand, I would need my hand to do so. But I was
3 clasped to a steering wheel in fear for my life.
4 Q. Stop right there for a minute. Are you saying
5 that he hit you in the face with his taser?
6 A. He had a taser in hand the first time he struck
7 me.
8 Let me ask you a question because I know you
9 guys want all these answers and stuff so you can make
10 everything nice and twisted up for you guys.
11 How does someone know where a taser is or
12 anything is in another man's hand when he is being
13 struck at the same time, in his face, in his mode of
14 visual, like in his mean of sight? I'm being struck in
15 my sight, how would I see that?
16 Q. I'm just asking you for your best observations.
17 I want to know whether or not he hit you with his fist,
18 whether he hit you with the taser, or did he hit you
19 with the other hand?
20 A. I'm being insulted. How would I observe
21 something if I'm being struck in the face? In my mode
22 of observation, my eyes are what I use to observe. I'm
23 being struck in my very eye at that moment. How would
24 I observe anything? Please tell me so because there
25 must be some skill that you know about that I don't

Page 39

1 know about.
2 Q. With your eyes, did you see what he hit you with?
3 A. I was busy being struck in my eye, how would I
4 see it? He was striking me in my face, in my visual.
5 Pender Allen was punching me in my eye. How would I
6 have seen it? I only have two eyes. One on the right
7 side. Pender Allen had my whole left side of my face
8 busy with his fist and the taser in his hand. How
9 would I -- I was fearing for my life.
10 Q. I'm just asking you, if you didn't see it?
11 A. All I did see was blue and the steering wheel
12 that I was trying to grab, and hoping that he didn't
13 discharge his weapon, that's all I saw. I saw big
14 black and blue and my steering wheel.
15 Q. What happened next?
16 A. My guest screamed, "Why are you hitting him?
17 Why are you hitting him? I'm recording. Why are you
18 hitting him? I'm recording." That's all I heard and
19 that's all I saw.
20 I saw black and blue, and I heard my guest
21 screaming, "Why are you hitting him? Why are you
22 hitting? I am recording."
23 Q. Then what happened?
24 A. Then I was dragged off the steering wheel onto
25 the floor, into the snow on my face, cuffed and put

Page 40

1 into the back of a van.
2 Q. Do you know who did that?
3 A. No, I do not. Once again, I was being struck
4 several times by an officer, struck in my head, the
5 place where I do my thought, the place where I do my
6 visual. I was being struck by an officer in the head
7 at that time.
8 Q. That's your answer. I just want to ask you, do
9 you know what police officer dragged you out of the car
10 into the snow?
11 A. The same police officer that was striking me in
12 the face, the same police officer that struck me.
13 Q. Who was that, that was Pender?
14 A. Pender Allen, yes.
15 Q. There were other police officers that arrived,
16 too, correct?
17 A. There was at least 14 cop cars out there, at
18 least 14, they filled the street.
19 Q. Did any other police officers touch you in any
20 way?
21 A. No, only Mr. Pender Allen.
22 Q. Pathfinder, what was he doing when you were
23 dragged out of the car, do you know?
24 A. After I got flown down to the floor, I saw
25 Pathfinder also get put to the floor. When I was

Page 41

1   thrown to the floor, I saw nothing but feet and car
2   tires, then another body hit the floor and that was
3   Pathfinder.
4       Q. You say the floor, that's the ground?
5       A. Yes.
6       Q. Then what happened?
7       A. Then we were put in the back of a van.
8       Q. Tell me what happened after that.
9       A. After I was struck, we were placed in the van.
10      Q. Yes, then what happened? Where did the van go?
11      A. We went to Lowell. While he was striking me, my
12   mother-in-law came outside, right, so she heard all the
13   noise, she came outside and asked "Why are you hitting
14   him?"
15          And then he couldn't answer her because he was
16   busy slamming me on the ground, and he told her "stay
17   there, this is none of your business." He was
18   screaming at her.
19          Then after being taken to the van, my friend, my
20   brethren, pulls up into the driveway.
21      Q. What's his name?
22      A. His name is Akif Wasif Bey (phonetic), he's also
23   one of the witnesses, his testimony is in there.
24      Q. Do you know how to spell that?
25      A. Akif Wasif Bey.

Page 42

1       Q. Spell it again?
2       A. Akif, A-K-I-F, Wasif, W-A-S-I-F, Bey.
3       Q. And what did he do?
4       A. He pulled into the driveway to find out what was
5   I being -- what was I being attacked for.
6       Q. Did he ask anybody that?
7       A. He did.
8       Q. Who did he ask?
9       A. Mr. Pender himself.
10      Q. Do you know what Pender said?
11      A. According to Akif's testimony, Mr. Pender said I
12   made him look small, that's why he did what he did. If
13   I would have stopped and -- he said if I would have
14   stopped, then he probably wouldn't have struck me or
15   been so aggressive with me.
16          But his words were, I made him look small, he
17   was made to feel small, he felt small, he was
18   embarrassed.
19          I did do a little research, and my
20   brother-in-law is a cop, and I thought you couldn't
21   operate emotionally.
22      Q. Who is your brother-in-law?
23      A. That's private information.
24      Q. Are you going to call him as a witness in a
25   trial?

Page 43

1       A. No, he's a cop in another town, Winchester
2   police, he is not police here.
3       Q. And has he talked to you about this case?
4       A. Oh, yes. Oh, trust me, yes, yes.
5       Q. Very nice. What's his name?
6       A. I would rather not say, it's not relevant to
7   this deposition. He doesn't need to be involved in
8   this case. He's just friendly outside advice of a
9   fellow officer who also shares all the capacities and
10   rules as Mr. Pender Allen Bey. I know how much of a
11   violation or how much I was violated.
12      Q. Let me ask you this: Did you have a machete in
13   your car?
14      A. Yeah, there was a machete in the car.
15      Q. Where was it?
16      A. Where it always is supposed to be, in the black
17   box, in the thing. The machete was in the -- according
18   to them they found it -- according to Mr. Pender Allen,
19   he wants to say he found it in the middle console. But
20   according to Akif Wasif Bey, Mr. Pender Allen didn't
21   find it.
22          The other slender, skinny officer found it and
23   called Mr. Pender Allen over and showed it to him. He
24   saw it in the back seat pocket behind the driver's seat
25   of the truck, where it always stays when I do yard

Page 44

1   work.
2       Q. Was it in a sheath of some sort or a container?
3       A. In it's holster, in its sheath, yes.
4       Q. When he came up to the car that you were fumbling
5   or looking for something between the seats, do you
6   recall that at all?
7       A. No, I did not. I did not take my eye off the
8   screaming cop at the window with the weapon in his
9   hand. I didn't take my eye off of him, I was fearing
10   for my life.
11          We already took that to trial, and he lost that
12   one when he tried to make the machete, that you can buy
13   from Wal-Mart, that any 16-year old can walk into
14   Wal-Mart and purchase, he tried to make it look like a
15   weapon.
16          So, a $14 machete in this federal case, why are
17   we bringing that up?
18      Q. So, let me ask you this: When he was yelling at
19   you, did Pender tell you or ask you or demand you to
20   get out of the car?
21      A. No, he kept asking, "Is this what you want?"
22      Q. Did he say open the door, open the window, what
23   did he say?
24      A. He said -- he said, "Open the door, is this what
25   you want?"

Page 45

1    Q. And you kept your hands on the steering wheel; is
2  that correct?
3    A. Like this,(witness indicating), up. I was
4  trying to show him the window didn't work, and I said
5  I'm going to open the door. Then even after complying,
6  and I saw that it wasn't de-escalating his demeanor,
7  his temper, his aggression, that's when I clasped the
8  steering wheel.
9    Once I saw him not coming down from his
10  outrageous, screaming anger, I said okay, this guy is
11  pretty upset. He probably has other things going on.
12  I clasped the wheel because I was thinking this cop
13  might take all his might out on me, so I just braced
14  myself for the worse.
15    Q. When you grasped the steering wheel, was the door
16  open or was it still closed?
17    A. It was open at that time.
18    Q. Who opened it? Did he open it?
19    A. Mr. Pender Allen opened it.
20    Q. Did he say get out of the car?
21    A. No, he said, is this what you want?
22    Q. That's when you grabbed ahold of the steering
23  wheel?
24    A. Yes.
25    Q. How did you eventually get out of the car? I

Page 46

1  know you said they pulled you out.
2    A. Mr. Pender Allen grabbed my arm like so, ripped
3  it off, and then struck me again, and pulled me out and
4  threw me on the floor.
5    Q. Moving forward, you were in the van, you went to
6  the Lowell Police Department station?
7    A. I think that's where they took me.
8    Q. And what happened there?
9    A. We were processed.
10    Q. And then what?
11    A. We waited for court.
12    Q. Did you have to stay the night, or were you
13  released?
14    A. I was released the following day.
15    Q. I'm sorry, I didn't mean to interrupt. So nobody
16  bailed you out that night. Did you have to stay there
17  until the morning, and they took you to court; is that
18  what happened?
19    A. I chose court in the morning. I didn't want to
20  give them their satisfaction of $40 bail, because they
21  are doing, like they have their own little -- not that
22  it's relevant, I stayed the night for court in the
23  morning.
24    Q. Did you have any injuries as a result of being
25  punched?

Page 47

1    A. Yeah. I have a scar in the middle of my left
2  eye. It's scarred now, it won't go away. The minute
3  you cut me or touch me, my body likes to leave marks
4  everywhere I'm touched. I have a scar and a line going
5  through my nostril up here. Over here you can see the
6  darkness in my temple where he had stricken me, and
7  under my eye here.
8    Q. Were you afforded any medical treatment while you
9  were at the police station?
10    A. Nope.
11    Q. Were you bleeding?
12    A. No, just scratched. Well, the blood from the
13  scratches, not like bleeding, like bloody blood.
14    Q. Did they give you anything to stop the bleeding;
15  a Band-Aid or anything like that?
16    A. No, they did not. They only forced names on us.
17    Q. After you went to court, what did you do?
18    A. I went to see my mother-in-law for treatment.
19    Q. I couldn't hear you, could you start that again?
20    A. I went to see my mother for treatment.
21    Q. What kind of treatment?
22    A. My wife treated me.
23    Q. What kind of treatment?
24    A. Well, I needed facial treatment, and I needed
25  medical treatment.

Page 48

1    Q. What kind of medical treatment or facial
2  treatment did you get?
3    A. I needed a detox treatment.
4    Q. You needed a what?
5    A. I needed a detoxification from the encounter.
6  Every time, in my culture, every time we come in
7  encounter with colonialism we detox. It's a spiritual,
8  cultural thing. We detox every time that we're touched
9  by the opposition.
10    Q. What does that involve, if you could describe it?
11    A. It involves several herbs, which I will not
12  mention the names of. It involves boiling water, it
13  involves oral intake. You can do anal intake, you can
14  do pee pee hole intake. There's a lot of ways to
15  administer this medicine.
16    Q. Did you do that?
17    A. Yeah, I detoxed. My mom flushed me out, and she
18  had to give me a talk to bring my mind back to
19  stabilization.
20    Q. Let me ask you this: Any treatment for your
21  face, your eye?
22    A. Ice pack, peroxide gel.
23    Q. Did you go to any other doctors or hospitals or
24  clinics for anything?
25    A. Unless you're considering them ultimate

Page 49

1　treatment, no, I went -- I got treated already, why
2　would I go to another treatment?  I didn't go to any
3　other doctors or any physicians or anything.
4　　　Q.  Okay.  You say in your lawsuit that you're
5　profiled as a black man, why do you say that?
6　　　A.  Who said that?  Profiled, no, no.  You guys just
7　listen to me for a minute.  I have proof of the
8　paperwork that they write, they -- and I asked the
9　court, and I am asking you, and I asked the federal
10　judge lady, and I'm going to ask again, what does that
11　letter mean when you guys put that on the paperwork for
12　us, what does it mean?
13　　　You've been "profiled," what does that mean?
14　Can you tell me what that means?  When they put the
15　letter B or H on these papers or stuff that you give
16　us, what do those letters mean?  Who is a B?
17　　　Q.  I don't know what you are talking about.
18　　　A.  That's profiling.  You said in the lawsuit, I
19　put profiling.  In the lawsuit, I put where you guys
20　write us and call us letters.
21　　　Q.  I don't call you anything, but what letter are
22　you talking about?
23　　　A.  On the ticket that Mr. Allen, along with his
24　partner, Kenny Griffin, that they like to write me
25　because.

Page 50

1　　　The following day, Kenny Griffin came and took
2　my truck, again.  After they took it and I got it back,
3　he came a couple of days later and took it again, while
4　it was parked not doing anything.
5　　　So he puts on the paper the letter B under race,
6　and then I see on another paper from Pender Allen the
7　letter H.  I don't know what these letters mean.  I
8　know I have a culture, I have a name, I have a history,
9　but I don't know what the letter B stands for, and I
10　don't know what the letter H stands for, and nobody has
11　yet to tell me.
12　　　Q.  What is H, do you have any idea what H means?
13　　　A.  You've got to understand.
14　　　Q.  I don't know what H means.
15　　　Let me ask you this, I forgot to ask you this:
16　What did happen to your truck, that night, if you know,
17　after you were taken away?
18　　　A.  (Inaudible).
19　　　Q.  Start that again, it all broke up, please.
20　　　A.  They broke the Fourth Amendment and went ahead
21　and illegally searched and seized my truck.
22　　　Q.  Did they remove it from the driveway?
23　　　A.  Yes, they did.
24　　　Q.  Where did they take it?
25　　　A.  To their own personal pal.  They are in cahoots

Page 51

1　with the tow truck people, they are friends.  They took
2　it to one of their tow truck gang guys.
3　　　Q.  Did you eventually get it back?
4　　　A.  Yes, I did.
5　　　Q.  When did you get it back, the next day or another
6　day?
7　　　A.  I think it was the day after, if not, the next
8　day.
9　　　Q.  Didn't you say earlier that it was taken again?
10　　　A.  Yes, Kenny Griffin shows up a few days later
11　when the truck is parked outside the house and just
12　takes it, again.
13　　　Q.  And it was parked on the street?
14　　　A.  She actually -- so she -- she called her -- we
15　called her, she called her brother, who is a Winchester
16　police officer, to find out if Ken Griffin can do that
17　according to another cop.  You can't do that, but he
18　can do it anyway.
19　　　Then after she called another officer to find
20　out, Mr. Griffin said she could keep the truck, and he
21　wasn't going to take the truck.  And decided like -- I
22　guess he was going to leave, and then I pulled up, and
23　asked one question and then he flipped out and took the
24　truck.
25　　　Q.  What was the question you asked him?

Page 52

1　　　A.  The question was, how come she can keep the
2　truck, but if I come over here you are going to take
3　the truck, and he got aggravated and he said I've had
4　enough of that, and took the truck.
5　　　Q.  Where was it parked, in the street or the
6　driveway?
7　　　A.  It was moved out of the driveway so she could
8　move her car, and it was in the street for less than
9　one second.  Actually, he stood down the block, drove
10　out and came to take my truck, a parked -- no one is
11　doing anything, truck's parked, he is out there parked,
12　waiting.
13　　　Q.  Did you get a citation the second time for
14　anything?
15　　　A.  Nope.  I got -- that's the citation when he put
16　it --
17　　　UNKNOWN FEMALE:  They took it anyways.
18　　　Q.  Listen, I'm happy that your wife is there, but
19　she can't participate.  Okay?  So, because, I don't
20　want her to be testifying.
21　　　What was the citation you got?
22　　　A.  A citation with the letter B on it.  I don't
23　know what that means, and he put that on my birth date
24　that I was born in 2020.  So, the citation, 2019, I'm
25　only a year old right now, according to Mr. Ken

Page 53

Griffin.
Q. Did you get a second citation, or was that the citation from the first night, or was that the second time when they came over?
A. The second night.
Q. Okay. And when?
A. When I came back, I think they came back because the first night when Mr. Pender Allen arrested me, they were all pretty sure that I was not going to come out of jail. They were pretty sure that I would be incarcerated fighting this behind bars.
Everyone was upset. All of the court officers were upset. Everyone turned red like a cherry, even the guy bringing me down to my property, you were so rude to the judge. I don't like how you were behaving to the judge.
I'm like, brother, if I was rude to the judge, why would she release me? They got upset about that, and then the next day, here they come again, and take the truck again, and then put another letter on the paper. Whatever they want to do, I don't know.
Q. Did they give you a citation? What did it say on the citation?
A. It said I won't be born until November 20th of 2019.

Page 54

Q. Yeah, I know that, but what did the citation say?
A. I would have to go and look at the citation. I think it was parking, something. I don't know.
Q. Okay, let me ask you this: What are you suing for, what do you want?
A. The amount or --
Q. Whatever it is that you are seeking, tell me now, if you want?
A. I am seeking my amount in full. I am seeking a public apology from Mr. Pender Allen. I'm seeking to better my community. I want to use to show my people that, hey, we can sit down and talk and get to the bottom of things without violence, but what the media shows us, without cops shooting us for no reason, without each other calling each other names, without all of this unnecessary hate towards each other.
I want all of the officers to know not everyone is a punk pushover, that they can come and flash their weapons, and we just bow our heads, and say, Oh please don't kill me.
Some of us of are going to take lawful steps to fight back, so all of the counsels need to know that they can't abuse all of the people out there.
Q. What is your amount in full?
A. My 9 million federal USD Federal Reserve Notes.

Page 55

Q. How did you come up with your 9 million American dollars for your demand?
A. My face can't be fixed. I can't even go outside and not see flashing lights and my heart beat skips a beat. Do you know what kind of stress I was going through? I am down 24/7 of my life. I used to want to be an officer, now I fear for my life.
Their badge makes me cower in the corner. I'm supposed to be a man for my two children, I have a son and a daughter. How do I tell my son that the very sirens outside that we're supposed to look at for service and protection terrifies his father. I get sweaty palms in the site of police. How are you guys going to fix me besides the physical damage, how would you guys fix me?
Q. Okay, well said. I just didn't know how you calculated $9 million is going to fix it?
A. I'm giving you the rundown, I'm also losing my wife of nine years.
Q. Why?
A. She is tired of this. I can't -- like -- it's personal things but I do think the trauma from police is affecting me in the bed. It's affecting me everywhere. It's causing a chain reaction. I'm losing everything. My company has been effected. Pender

Page 56

Allen cost me over a million dollar contract.
Q. How is that?
A. A guy from UMass that controls all the painting from UMass, I literally talks with that guy. The next day, instead of sitting down and talking to this guy, I'm in jail telling the judge that this cop beat me. That this is a miscommunication and we can fix this if you guys would just please try to hear me out. So I loss that contract.
Q. Wait a minute. You had a potential meeting with somebody from UMass?
A. I had a meeting the next day, not a potential meeting. I had a meeting with the guy who has the painting contract for UMass Lowell.
Q. You couldn't go because you were in court. So could you have rescheduled that meeting?
A. Yeah, I could have rescheduled, I called to reschedule. Now I'm placed on the back burner because the contracts get bidded on. So first come first served. So I have to wait then. I'm on the back burner, they are not waiting for a guy who plays cops and robbers with the police. No one is waiting for that, time is money.
Q. You are saying because you missed that meeting that morning on January 23rd, that you lost the

Page 57

1    contract?
2    A.  Yes.
3    Q.  What was the contract for?
4    A.  To have all the -- I was going to get whatever
5    buildings he had for UMass along with whatever of his
6    own private property he had that he needed to flip and
7    resell.  I was going to get pretty much like a ten-year
8    cover-all my workers' work contract.
9    Q.  Does this guy work for UMass Lowell?
10   A.  No, he doesn't.  He's like a company, a big
11   company in painting, like he works with the state.
12   Q.  So he's got a private business and he does work
13   for UMass?
14   A.  I don't know the full details.
15   Q.  What's his name?
16   A.  I would have to go through my notes and get his
17   name, which I'm going to tell you now, I'm not going to
18   give it out, that's private.
19   Q.  Okay.  I'm just saying that you are not going to
20   be able to claim that you lost this painting contract
21   if you don't provide me with the information, that's
22   all.
23   A.  I am not going to be able to claim if I don't
24   provide you with the information?  If one minute I'm
25   sitting down with the contract in front of me and I'm

Page 58

1    told tomorrow we'll finalize the contract and I get
2    locked up, you're telling me, I don't get to tell that
3    part of the story.
4    Q.  Yes, you can tell that story, but you've got to
5    give me the guy's name.  You've got to give me the
6    contract so I can talk to him and see if, in fact, that
7    was the case.
8    A.  According to the constitution, I don't have to
9    do any of that.
10   Q.  Okay, let me ask you this:  Was there a sum he
11   was going to pay you, specific like that or what?
12   A.  $50,000 would have been a down payment to get
13   started, $50,000 just to start.
14   Q.  Just to start, to do what?
15   A.  To start, start work.
16   Q.  What was the project, do you remember?
17   A.  It was in the contract, a lot of reading, a lot
18   of contractual agreements.  I can't recall all the
19   details.
20   Q.  Was it in a particular place that you were going
21   to paint, do you recall that?
22   A.  UMass, the entire north campus of UMass.
23   Q.  Do you still have that contract?
24   A.  I told you, no.  Do not have the contract.
25   Q.  Did you call him the next morning and say I'm

Page 59

1    sorry, but can we reschedule the meeting for this
2    afternoon?
3    A.  Schedule.
4    Q.  Say that again.
5    A.  I did, yes, I did, I called to reschedule.
6    Q.  When did you call him?
7    A.  The next day, as soon as I got released.  I
8    went, cleaned up, showered, scheduled medical treatment
9    with my mother, and then called and handled all my
10   affairs.  Unfortunately, things of that scale don't
11   wait for little guys like me.
12   Q.  When was the meeting supposed to be?
13   A.  The meeting was 9 a.m. in the morning.
14   Q.  Where was the meeting going to be?
15   A.  At a Starbucks.  I'm assuming the Starbucks
16   that's in UMass that's over on the north campus there.
17   Q.  What time did you call the guy?
18   A.  At one, one, two o'clock.
19   Q.  Did you call him?
20   A.  I called him and left a message.
21   Q.  Did he get back to you?
22   A.  The following day, yup.
23   Q.  What did he say?
24   A.  Unfortunately, Mr. Campbell, things of this
25   scale need to be finalized at this time.  I'm sorry for

Page 60

1    your inconvenience, I hope things get better for you in
2    the future.  Maybe in the future, when there's space,
3    give me a call.
4    Q.  Did you ever talk to him again about doing work
5    for him in the future?
6    A.  Not since, no.
7    Q.  Why not?  It's been a year-and-a-half, did you
8    ever call him and say, do you have any more work for
9    me?
10   A.  I haven't thought to call him back.  I myself
11   have been busy with other engagements.
12   Q.  Do you have any employees?
13   A.  I do.
14   Q.  How many do you have?
15   A.  Three, so far.
16   Q.  Other than that matter, any other financial
17   losses that you can talk about as a result of this
18   incident?
19   A.  My wife is a great -- was the greatest financial
20   asset to me, she is half my life.
21   Q.  Your wife is a financial asset and as a result of
22   this incident with the police, has that changed?
23   A.  Sir, sir, did you say that you're having marital
24   problems as a result of this incident, or was there
25   other things?

Page 61

1  A. I'm saying wife is half my life.  She has a
2 business, I have a business.
3  Q. What is her business?
4  A. We're both intertwined in each other's business.
5  Q. What is her business?
6  A. I loss her, I loss half of my financial.
7  Q. What is her business?
8  A. She's a baker.
9  Q. Nice.  Does she work in a bakery?
10  A. No, she doesn't, she has her own bakery.
11  Q. Where is that?
12  A. In Lowell.
13  Q. Does it have a name?
14  A. Lulu Cakes.  Lulu Sweet Cakes is the name of it.
15  Q. Why do you say you are going to lose it?
16  A. I already lost it.
17  Q. Why?
18  A. Because my wife and I are going through a
19 divorce.
20  Q. And has the divorce been filed?
21  A. No.
22  Q. And what is the reason for the divorce, if you
23 don't mind my asking?
24  A. I've already told you.  Right after the Pender
25 Allen incident is when she said she's tired of the

Page 62

1 harassment.
2  Q. Tired of what harassment?
3  A. The constant police harassment, I guess, I don't
4 know.  You can ask her if you want to ask her, I don't
5 even understand it.
6  Q. I don't know what that has to do with divorcing
7 you, you know what I mean?
8  A. Oh, my God.  Yeah, I know what you mean.  I
9 don't know what it has to do with divorcing me either.
10  Q. Is there anything else you want to say before we
11 finish up?
12  A. When do I get to ask Mr. Pender Allen all of
13 these questions that you've asked me?
14  Q. It's up to you.  I'm sorry?
15  A. Is he available now?
16  Q. No.  But get in touch with me and we can talk
17 about making arrangements for that.  So let me just see
18 if I have anything else I want to ask you.
19  A. You asked me about it as if it's an excessive
20 amount.  That amount cannot scratch what I went
21 through.  That amount doesn't even put a ripple in the
22 pool.
23  This man literally took my life, turned it
24 upside-down and slammed it on the floor like that.  You
25 guys have to understand what -- actually, you guys

Page 63

1 don't have to understand anything.  I just have to do
2 what I have to do and keep the law on my side.
3  Q. All right, I'm finished with my questions.  Thank
4 you very much, Leonitus, I appreciate it.  Worked out
5 good, you did a good job.
6  MR. LOUISON:  Do you have any spelling
7 issues or anything that you need?
8  Thank you very much, sir.
9  A. When is our next date after this?
10  Q. I don't know.
11  A. Something we have to figure out.
12  Q. I don't recall and I'm not looking at the file
13 right now.  I don't remember if the court scheduled
14 something.
15  A. I think August or something.
16  Q. All right, thank you very much.
17  A. All right.
18  Q. Good-bye, good seeing you.  Thank you very much.
19 Bye-bye.
20  A. Stay well.
21  Q. You too, buddy.
22  A. All right.  Bye-bye.
23  (DEPOSITION ADJOURNED AT 12:01 p.m.)
24
25

Page 64

1  C E R T I F I C A T E
2
3 I, PATRICIA QUIRK, a Notary Public in and for the State
4 of Rhode Island and the Commonwealth of Massachusetts,
5 do hereby certify that I am expressly approved as a
6 person qualified and authorized to take depositions
7 pursuant to rules of Civil Procedure of this Court,
8 especially but without restriction thereto, under Rules
9 29 and 30(b)(4) of said Rules; that the witness was
10 first sworn by me; that the transcript contains a true
11 record of the proceedings.
12
13 Reading and signing of the transcript was not requested
14 by the deponent or any parties involved upon completion
15 of the deposition.
16
17 IN WITNESS WHEREOF, I have hereunto set my hand this
18 day of_____, 2020
19
20
21 PATRICIA QUIRK, CSR
22 NOTARY PUBLIC/CERTIFIED COURT REPORTER
23 MY COMMISSION EXPIRES 12/11/2021
24
25